FILED

2024 Oct-10  PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# In The Matter Of:

# Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

---

## Catherine Calko

*May 31, 2024*

---

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ALABAMA
 2                     SOUTHERN DIVISION

 3
   CHRISTOPHER ROBINSON,       )
 4                             )
     PLAINTIFF,                )
 5                             )
                               )
 6 VS.                         )   CASE NO.
                               )   2:23-CV-01381-AMM
 7                             )
   SPRING OAKS CAPITAL,        )
 8 LLC, ET AL.,                )
                               )   VIDEO DEPOSITION OF:
 9 DEFENDANTS.                 )   CATHERINE CALKO

10

11

12          S T I P U L A T I O N S

13

14          IT IS STIPULATED AND AGREED, by and

15 between the parties through their respective

16 counsel, that the deposition of:

17               CATHERINE CALKO

18 may be taken before Dannah Moody, Commissioner and

19 Notary Public, State at Large, with all parties

20 appearing remotely via videoconference, on the 31st

21 day of May 2024, commencing at approximately 9:03

22 a.m.

23

24

25                                          Page 1
```

```
 1          IT IS FURTHER STIPULATED AND AGREED that

 2 the signature to and reading of the deposition by

 3 the witness is not waived, the deposition to have

 4 the same force and effect as if full compliance had

 5 been had with all laws and rules of Court relating

 6 to the taking of depositions.

 7

 8          IT IS FURTHER STIPULATED AND AGREED that

 9 it shall not be necessary for any objections to be

10 made by counsel to any questions, except as to form

11 or leading questions, and that counsel for the

12 parties may make objections and assign grounds at

13 the time of the trial, or at the time said

14 deposition is offered in evidence, or prior

15 thereto.

16

17

18

19

20

21

22

23

24

25                                          Page 2
```

```
 1                  APPEARANCES

 2

 3 FOR THE PLAINTIFF:

 4    Stan Herring
      Attorney at Law
 5    Watts & Herring, LLC
      301 19th Street North
 6    Birmingham, Alabama  35203
      stan@wattsherring.com
 7    205-879-2447

 8
      Patricia Lockhart
 9    Attorney at Law
      Watts & Herring, LLC
10    301 19th Street North
      Birmingham, Alabama  35203
11    patricia@wattsherring.com
      205-879-2447

12

13 FOR THE DEFENDANTS:

14    John Rossman
      Attorney at Law
15    Rossman Attorney Group, PLLC
      4628 Bruce Avenue
16    Edna, Minnesota  55424
      john.rossman@rossmanattorneygroup.com
17    952-201-1507

18
      Andrew Blady
19    General Counsel for Spring Oaks Capital
      1400 Crossways Boulevard, Suite 100B
20    Chesapeake, Virginia  23320
      866-281-3065

21

22 ALSO PRESENT:  Paige Byrd - Videographer

23

24

25                                          Page 3
```

```
 1                EXAMINATION INDEX

 2 Examination by Mr. Herring            6

 3
                  EXHIBIT INDEX
 4
   PX-1   30(b)(6) Depo Notice          33
 5 PX-2   9/27/22 Dispute Letter       110
   PX-3   10/31/22 Dispute Response    135
 6 PX-4   Spring Oaks Account Notes     98
   PX-5   Indigo Billing Statements    167
 7 PX-6   11/25/2022 TransUnion Credit Report  168
   PX-7   07/28/2023 TransUnion Credit Report  174
 8 PX-8   11/29/2023 TransUnion Credit Report  176
   PX-9   Spring Oaks Discovery Responses      176
 9 PX-10  Fair Debt Collection Practices Act   63
   PX-11  2022 Credit Reporting Resource Guide 67
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                          Page 4
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1 (1 - 4)

Defendant's Exhibit A - p.2 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1    I, Dannah Moody, a Court Reporter of
2  Birmingham, Alabama, and a Notary Public for the
3  State of Alabama at Large, acting as Commissioner,
4  certify that on this date, pursuant to Rule 30 of
5  the Alabama Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there came before
7  me on the 31st day of May 2024, with all parties
8  appearing remotely via videoconference, commencing
9  at 9:03 a.m., CATHERINE CALKO, witness in the above
10  cause, for oral examination, whereupon the
11  following proceedings were had:
12    THE VIDEOGRAPHER:  We now commence the
13  videotaped deposition in the United States District
14  Court for the Northern District of Alabama,
15  Southern Division in the matter of Christopher
16  Robinson versus Spring Oaks Capital, LLC, et al.
17  Civil action number 2:23-CV-01381-AMM.  Our witness
18  today is Ms. Catherine Calko.
19    Today's date is May 31st, 2024.  The time
20  is 9:03 a.m., central time.  Will all attorney's
21  present please state their names and whom they
22  represent.
23    MR. HERRING:  Stan Herring for the
24  plaintiff, Christopher Robinson.
25    MS. LOCKHART:  I'm Patricia Lockhart for
Page 5

1  corporate representative on behalf of Spring Oaks
2  Capital, LLC?
3  A.    Yes, I am.
4  Q.    And you've been authorized to speak on
5  their behalf; is that correct?
6  A.    Yes.
7  Q.    And you understand that as the corporate
8  representative your testimony will be binding on
9  Spring Oaks Capital, correct?
10  A.    Yes.
11  Q.    And who authorized you to speak on their
12  behalf?
13  A.    Our general counsel.
14  Q.    And is that Andrew Blady?
15  A.    Yes.
16  Q.    Okay.  And tell me what did you do to
17  prepare for your deposition today?
18  A.    Well, I read through the deposition
19  notices, reviewed the account history
20  documentation, our system of record, as well as the
21  correspondence from and to Mr. Robinson.
22  Q.    Anything else?
23  A.    To prepare for today?  I mean, I read
24  through our policies and procedures and
25  documentation that was noted in the deposition
Page 7

1  the plaintiff, Christopher Robinson.
2    MR. ROSSMAN:  I'm John Rossman, I'm an
3  attorney on behalf of Spring Oaks Capital, the
4  defendant in this matter.  And then I have
5  appearing with us today Catherine Calko, who is the
6  witness, and also Andrew Blady, who is general
7  counsel at Spring Oaks Capital.
8    MR. HERRING:  All right.  Okay.  I'm ready
9  to swear the witness in.
10    THE VIDEOGRAPHER:  Dannah, you can swear
11  the witness in.
12    CATHERINE CALKO,
13  having been duly sworn, was examined and
14  testified as follows:
15    EXAMINATION
16  BY MR. HERRING:
17  Q.    Will you please identify yourself for the
18  record?
19  A.    Catherine Calko.
20  Q.    And how do you spell that last name?
21  A.    C-A-L-K-O.
22  Q.    And Ms. Calko, where are you currently
23  employed?
24  A.    Spring Oaks Capital, LLC.
25  Q.    And are you here today to testify as the
Page 6

1  requests.
2  Q.    And what policies and procedures did you
3  read through?
4  A.    Our dispute and debt validation policy and
5  processing inbound correspondence procedure.
6  Q.    Is that the name of the policy and
7  procedure?
8  A.    I don't -- those are close names.  I don't
9  know if I have them exactly correct.  I don't have
10  them in front of me.
11  Q.    Okay.  Can you -- I'm sorry.  Can you
12  state that just one more time?  The name of it or
13  as close as you can get to it.
14  A.    Dispute and debt validation policy and
15  inbound correspondence processing procedure.
16  Q.    Did you review any other policies and
17  procedures?
18  A.    No.
19  Q.    Did you meet with your attorney?
20  A.    Yes.
21  Q.    By your attorney, I mean Mr. Rossman?
22  A.    Yes.
23  Q.    And how long did y'all meet?
24  A.    I mean, I don't really remember the exact
25  time.
Page 8

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2 (5 - 8)

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

| | |
|---|---|
| 1 Q.    More than an hour? | 1 A.    State. |
| 2 A.    **Probably, yes.** | 2 Q.    And the other case -- Ginocchio is that -- |
| 3 Q.    Okay.  Did -- more than two hours? | 3 did I say that right? |
| 4 A.    **I don't remember.** | 4 A.    **Right.** |
| 5 Q.    And how many depositions have you given in | 5 Q.    Was Spring Oaks being sued or were they |
| 6 your capacity in your employment at Spring Oaks? | 6 suing Ginocchio? |
| 7 A.    **Prior to today, two.** | 7 A.    **Spring Oaks was sued in that case.** |
| 8 Q.    How long have you been employed with | 8 Q.    Okay.  And do you recall where that was |
| 9 Spring Oaks? | 9 pending? |
| 10 A.    **Little over three and a half years.  Since** | 10 A.    **New York.** |
| 11 **October of 2020.** | 11 Q.    Federal Court? |
| 12 Q.    Okay.  And the two times that you gave | 12 A.    **No.** |
| 13 depositions, do you remember the names of those | 13 Q.    State Court? |
| 14 cases? | 14 A.    **Yes.** |
| 15 A.    **I don't remember the exact full name of** | 15 Q.    Okay.  And do you recall the claims in |
| 16 **the parties, but I could get close I think.** | 16 that case? |
| 17 Q.    Okay.  What do you recall? | 17 A.    **In that case it's basically a Hunstein** |
| 18 A.    **Andrew Nanon [sic] was one of the cases.** | 18 **allegation related to a letter render.** |
| 19 **Spring Oaks Capital versus Andrew Nanon.  And I** | 19 Q.    Have you ever testified at trial on behalf |
| 20 **believe the other one was Ginocchio [sic] is the** | 20 of Spring Oaks? |
| 21 **plaintiff's last name.** | 21 A.    **Yes, I have.** |
| 22 Q.    And so in the Andrew Nanon case, was | 22 A.    **How many times?** |
| 23 Spring Oaks the plaintiff or the defendant in that | 23 A.    **One trial.** |
| 24 case? | 24 Q.    And was Spring Oaks the plaintiff or |
| 25 A.    **Spring Oaks Capital, LLC -- well, actually** | 25 defendant? |
| Page 9 | Page 11 |

| | |
|---|---|
| 1 **Spring Oaks Capital, SPV, LLC filed a claim** | 1 A.    **Defendant.** |
| 2 **Mr. Nanon.  Mr. Nanon filed a counterclaim.** | 2 Q.    And where was that pending? |
| 3 Q.    And do you recall his counterclaim, the | 3 A.    **Pennsylvania.** |
| 4 allegations of that that you were testifying about? | 4 Q.    Did you go to the courthouse and testify |
| 5 A.    **No.** | 5 live? |
| 6 Q.    Do you recall the gist of what you | 6 A.    **No, I did not.** |
| 7 testified about in that case? | 7 Q.    You testified remotely? |
| 8        MR. ROSSMAN:  Objection.  Calls for | 8 A.    **Yes, I did.** |
| 9 speculation. | 9 Q.    Okay.  Do you recall what city the case |
| 10 Q.    You can answer. | 10 was pending in? |
| 11 A.    **I don't recall.** | 11 A.    **Philadelphia.** |
| 12 Q.    Okay.  And you don't recall what he was | 12 Q.    Do you recall the name of the plaintiff? |
| 13 alleging Spring Oaks did wrong? | 13 A.    **Marquita Culmer.** |
| 14 A.    **My memory is that it was not a specific** | 14 Q.    Comer? |
| 15 **allegation, but just general FDCPA -- alleging** | 15 A.    **Culmer, C-U-L-M-E-R.** |
| 16 **general FDCPA violations, but nothing specific.** | 16 Q.    And when was that? |
| 17 Q.    Do you recall where that case was pending? | 17 A.    **I believe it was March 15th of 2024.** |
| 18 A.    **Florida.** | 18 Q.    Okay.  So just a few months ago? |
| 19 Q.    Where did you -- where was the deposition? | 19 A.    **Correct.** |
| 20 A.    **The deposition was remote.** | 20 Q.    Do you know what the result was in that |
| 21 Q.    Okay.  Do you know where in Florida? | 21 case, what the outcome was? |
| 22 A.    **I don't know where the case is sitting** | 22 A.    **Yes.** |
| 23 **like what specific court.  I don't know.** | 23 Q.    What was that? |
| 24 Q.    Okay.  Do you recall if it was state or | 24 A.    **That was a jury trial and the jury found** |
| 25 federal? | 25 **in favor of the plaintiff and the case was** |
| Page 10 | Page 12 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3 (9 - 12)

Defendant's Exhibit A - p.4 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

---

**Page 13**

1 resolved.
2 Q.      Okay.  And do you know what the claims
3 were in that case?
4 A.      Yes.  The claim was related to whether or
5 not an account was marked as disputed.
6 Q.      Okay.  And do you recall the plaintiff's
7 lawyer in that case?
8 A.      I don't recall his full name.
9 Q.      Who was your lawyer in that case?
10 A.      John Rossman.
11 Q.      Okay.  And in terms of the claim about
12 whether or not the account was marked as disputed,
13 was it a similar situation to what we have here?
14 A.      No.
15 Q.      Or it was just not marked at all?
16 MR. ROSSMAN:  Objection.  Calls for
17 speculation.
18 Q.      You can answer.
19 A.      It was not similar to this case.
20 Q.      Okay.  How was it different?
21 A.      In that case there were two -- two
22 accounts that the consumer was disputing.  And one
23 of the accounts was correctly marked as disputed,
24 and the other account was missed in the review of
25 the correspondence and was not marked as disputed.

**Page 14**

1 Q.      And when you say it was marked as
2 disputed, do you recall exactly how that was
3 phrased?
4 MR. ROSSMAN:  Objection.  Vague as to how
5 that was phrased.
6 Q.      Do you understand my question?
7 A.      I actually don't understand your question.
8 Q.      Okay.  So let me just back up.  So the
9 consumer sent a dispute to Spring Oaks in that
10 case, correct?
11 A.      Correct.
12 Q.      And Spring Oaks as a part of its response
13 to that dispute told the credit bureaus or entered
14 a code to have the credit bureaus report on one of
15 the accounts that it was disputed; is that correct?
16 A.      That is correct.
17 Q.      And do you know if it was -- the reporting
18 code would've indicated that -- would've resulted
19 in the credit report saying account information
20 disputed by consumer or account previously in
21 dispute now resolved reported by credit grantor?
22 MR. ROSSMAN:  Objection.  Compound
23 question.
24 Q.      You can answer.
25 A.      What was reported was a code, not words.

**Page 15**

1 Q.      I understand.  But you understand as the
2 representative of Spring Oaks that when it sends a
3 code to the credit bureaus that that will result in
4 certain words being reported on a credit report,
5 right?
6 A.      Yes.
7 Q.      So what code did Spring Oaks send to the
8 credit bureaus for that -- as a result of that
9 dispute?
10 A.      Upon receiving --
11 MR. ROSSMAN:  Objection.  Vague as to
12 which dispute.
13 Q.      Do you know which dispute I'm talking
14 about?
15 A.      I think you're talking about the dispute
16 on the account that we marked as disputed.
17 Q.      Right.  The one we've been talking about
18 for the past five minutes.  So do you know what
19 code was sent to the credit bureaus as a result of
20 that account?
21 A.      Yes.
22 Q.      What was it?
23 A.      XB.
24 Q.      Did Spring Oaks ever send any other code
25 on that same account such as an XH code?

**Page 16**

1 A.      I don't -- I mean, I don't recall.  I
2 mean, I did not look at this, you know, this
3 documentation or this account prior to this
4 morning, so I don't want to answer incorrectly.  I
5 don't recall.
6 Q.      Okay.  Do you recall in that case if
7 Spring Oaks conducted an investigation into the
8 dispute?
9 A.      I don't recall.
10 Q.      Do you recall if after they received the
11 dispute if they determined that the dispute was
12 correct or if they determined that the consumer
13 actually owed the money in that case that was being
14 collected by Spring Oaks?
15 MR. ROSSMAN:  Objection.  Compound
16 question.
17 A.      Sorry.  I'm not following what you're --
18 what you're wanting me to answer.
19 Q.      I guess I'm trying to figure out if after
20 they got the dispute, did Spring Oaks -- did Spring
21 Oaks respond to the consumer telling them they
22 looked into it, and yes, it's your account and we
23 believe you owe it or something to that effect?
24 A.      I don't recall.
25 Q.      Okay.  Let me back up a little bit.  Where

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4 (13 - 16)

Defendant's Exhibit A - p.5 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  do you currently live?
2  A.       I live in Lebanon, Ohio.
3  Q.       Lebanon or Lebanon?  Say it again, please.
4  A.       Lebanon.
5  Q.       Okay.  And is that where you grew up?
6  A.       No.
7  Q.       Where'd you grow up?
8  A.       Northeast Ohio.
9  Q.       And I assume you graduated from high
10 school?
11 A.       Yes, I did.
12 Q.       And when was that?
13 A.       1994.
14 Q.       Okay.  What education did you get after
15 you graduated from high school?
16 A.       I got a bachelor's degree, and I have a
17 law degree.
18 Q.       Okay.  Your bachelor's degree, where was
19 that from?
20 A.       Bowling Green State University.
21 Q.       And what was that in?
22 A.       I'm a music major.
23 Q.       So then after music you decided to go to
24 law school?
25 A.       Well, eventually, yes.
                                          Page 17

1  Q.       Okay.
2  A.       So these were new accounts.
3  Q.       They were new accounts that were still
4  current at the time they were purchased at the
5  beginning of the batch or whatever; is that
6  correct?
7  A.       That's not correct.  These were accounts
8  that, you know, consumers applied for with the
9  company at MBNA.
10 Q.       Okay.  I see.
11 A.       These weren't acquired as portfolio
12 accounts.  This was acquisitions of new accounts,
13 new applications.
14 Q.       Like credit card applications?
15 A.       Yes, credit cards.
16 Q.       And how long were you with MBNA?
17 A.       I worked for MBNA from 2001 to 2000 -- to
18 20 -- I believe it was the summer of 2010.
19 Q.       And why'd you leave there?
20 A.       I left to take a job at the Ohio Attorney
21 General's Office.
22 Q.       Okay.  So I guess at some point in there
23 you went to law school?
24 A.       Correct.
25 Q.       And when was that?
                                          Page 19

1  Q.       Well, my son is a theater and math major,
2  so I'm hoping he doesn't go to law school.  So
3  after you got your music degree -- and when was
4  that?
5  A.       1999.
6  Q.       What did you do after that?
7  A.       I worked as a preschool teacher for about
8  a year and a half.  That was the original plan, to
9  be a music teacher.  And then after -- again, it
10 was probably about a year and half, I started
11 working for a company called MBNA.
12 Q.       So that would've been in about 2001?
13 A.       2001 is when I started MBNA.  It's hard to
14 forget.  It was a week before 9/11.
15 Q.       Wow.
16 A.       Yes.
17 Q.       And what did you do for MBNA?
18 A.       I was a collector.  I worked in customer
19 service.  I was a credit analyst, I was a team
20 manager, and I was a data analyst for the new --
21 department for acquiring new accounts.
22 Q.       Those new accounts, were those accounts
23 that were current or delinquent when you acquired
24 -- or when MBNA acquired them?
25 A.       MBNA was a lender.
                                          Page 18

1  A.       2006.
2  Q.       And when did you graduate?
3  A.       2010.
4  Q.       And where'd you attend law school?
5  A.       The University of Akron.
6  Q.       When you were at MBNA you mentioned that
7  you did some debt collection?
8  A.       Yes.
9  Q.       So that would've been first-party
10 collection; is that correct?
11 A.       Correct.
12 Q.       And during that time did you receive any
13 training on the Fair Debt Collection Practices Act,
14 if you recall?
15 A.       There was a training.  I mean, there was
16 weeks of training.  I don't recall everything that
17 was in that training.
18 Q.       Do you recall if as a collector for MBNA
19 you were required to comply with the Fair Debt
20 Collection Practices Act in how you collected debt?
21 A.       I don't recall.  I mean, again, that was
22 in 2001.
23 Q.       Okay.
24 A.       I think over 23 years ago.  I don't recall
25 the specifics of the training and what was
                                          Page 20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5 (17 - 20)

Defendant's Exhibit A - p.6 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  required.
2  Q.      So in 2010 you went to work at the AG's
3  Office, that's right?
4  A.      **Correct.**
5  Q.      And that's the State AG for Ohio?
6  A.      **Correct.**
7  Q.      And how long were you there?
8  A.      **About two years.**
9  Q.      Until about 2012?
10 A.      **Correct.**
11 Q.      And what kind of work did you do when you
12 were there?
13 A.      **I was an attorney, and I represented state**
14 **agencies.**
15 Q.      And what -- just generally what kind of
16 claims or issues if they weren't claims?
17 A.      **I had a variety of clients so anything**
18 **from the bureau of motor vehicles and licensing**
19 **issues through retirement systems and claims that**
20 **were brought against the retirement -- the state**
21 **retirement systems, individual retirees bringing**
22 **claims against the agency.**
23 Q.      Did you do anything involving debt
24 collection --
25 A.      **No.**
                                          Page 21

1  Q.      -- while you were with AG?  No?
2  A.      **No.**
3  Q.      And where did you go to work in 2012?
4  A.      **Bank of America.**
5  Q.      And how long were you there?
6  A.      **I believe it was until August of 2019.**
7  Q.      Tell me what did you do for Bank of
8  America.
9  A.      **I was part of the business controls team**
10 **responsible for vendor oversight.**
11 Q.      So were you employed in that capacity as
12 an attorney or just an employee of Bank of America
13 and not necessarily in the legal capacity?
14 A.      **I was not employed as an attorney by Bank**
15 **of America.**
16 Q.      Okay.  So tell me involved in the business
17 controls team, what -- just generally what did that
18 entail?
19 A.      **Essentially overseeing law firms that were**
20 **hired through a third party to collect on accounts.**
21 Q.      So were you with in-house counsel or
22 general counsel at Bank of America?
23 A.      **No.**
24 Q.      What was your job --
25 A.      **It was actually part of the operations**
                                          Page 22

1  team.
2  Q.      What was your job title?
3  A.      **I believe it was business controls**
4  **manager.**
5  Q.      Okay.  And so Bank of America -- the
6  lawsuits -- or the litigation I guess that you were
7  involved in, Bank of America was the plaintiff in
8  those cases trying to collect its own debt; is that
9  correct?
10 A.      **Correct.**
11 Q.      And did you testify for Bank of America in
12 your capacity?
13 A.      **No.**
14 Q.      You just oversaw the litigation?
15 A.      **I would not even characterize it as**
16 **overseeing the litigation.  I was part of the**
17 **business controls team.  We looked for certain**
18 **controls within the operational processing of the**
19 **law firms, not the litigation.**
20 Q.      So when you say you looked at certain
21 controls, are you just saying -- describe what that
22 means.
23 A.      **So, for example, if the requirement was**
24 **that the law firm needed to run a bankruptcy scrub**
25 **at the beginning of the month, did they run the**
                                          Page 23

1  bankruptcy scrub at the beginning of the month.
2  Q.      And when you left there in 2019, where did
3  you go?
4  A.      **Wells Fargo.**
5  Q.      And why did you leave Bank of America?
6  A.      **I left Bank of America because I was**
7  **concerned about their work from home strategy.  I**
8  **was working from home and it was my understanding**
9  **that they were going to begin eliminating work from**
10 **home positions.**
11 Q.      I guess that didn't last very long, did
12 it?
13 A.      **No.**
14 Q.      And how long were you with Wells Fargo?
15 A.      **It would be approximately a year and a**
16 **half or so, so August of 2019 through October of**
17 **2020.**
18 Q.      Did you go from Wells Fargo to Spring
19 Oaks?
20 A.      **Yes.**
21 Q.      What did you do for Wells Fargo?
22 A.      **Very similar position to what I had at**
23 **Bank of America.  I think the title was even the**
24 **same, business controls manager, if I'm remembering**
25 **correctly.  Business controls manager and slightly**
                                          Page 24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6 (21 - 24)

Defendant's Exhibit A - p.7 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

Page 25

1 different job functions.  Less time spent on the
2 oversight of external parties and more time spent
3 with the internal teams for internal operational
4 controls for collections and recovery.
5 Q.      And during your employment prior to Spring
6 Oaks, did you ever receive any training on how --
7 on the Fair Debt Collection Practices Act?
8 A.      Yes.
9 Q.      And where was that?
10 A.      With Bank of America and Wells Fargo.
11 Q.      Okay.  And did the training involve how to
12 comply with the Fair Debt Collection Practices Act
13 when collecting debt?
14 A.      Yes.
15 Q.      Okay.  Do you recall any training
16 regarding Section E8 of the Fair Debt Collection
17 Practices Act?
18 A.      I do not recall.
19 Q.      Do you know what Section E8 is?
20 A.      I think so, but I'm drawing a blank kind
21 of like on the spot.
22 Q.      Did you ever receive any training while --
23 prior to Spring Oaks in terms of the Fair Credit
24 Reporting Act?
25 A.      I don't recall.

Page 26

1 Q.      And when you started at Spring Oaks, do
2 you recall undergoing training regarding the Fair
3 Debt Collection Practices Act?
4 A.      Yes.
5 Q.      Okay.  And do you recall any training that
6 addressed credit reporting in terms of complying
7 with the Fair Debt Collection Practices Act?
8 A.      Can you repeat that?
9         MR. HERRING:  Could you read that back,
10 Ms. Court Reporter?
11         (Record read.)
12 A.      Yes.
13 Q.      And did that training discuss the
14 requirement of marking an account as disputed when
15 a consumer disputes the account?
16 A.      Yes.
17 Q.      And what did that training say?  Or what
18 did you learn from that training?
19         MR. ROSSMAN:  Objection.  Legal question.
20 Q.      What did you learn from that training?
21 A.      When a consumer disputes the account, we
22 need to mark the account as disputed with the
23 credit reporting agency if the account is credit
24 reporting.
25 Q.      And did you learn that that was mandatory

Page 27

1 under the FDCPA?
2 A.      Yes.
3 Q.      And to your knowledge do -- did the
4 employees at Spring Oaks who handled or
5 investigated or were involved with Christopher
6 Robinson's account and his dispute, did they
7 receive training on the FDCPA?
8 A.      Yes.
9 Q.      Tell me about what training employees
10 receive on the FDCPA.
11 A.      Annually we conduct a training module
12 through ACA materials.  It's a required training.
13 Q.      Is there a name for that?
14 A.      I think it's just FDCPA training.
15 Q.      Okay.  Is there a test or anything that's
16 given as a part of that training to the employees?
17 A.      Yes.
18 Q.      And do they have to score a certain score
19 on the test in order to be considered passing on
20 that material?
21 A.      Yes.
22 Q.      What happened -- and what is that score,
23 by the way?
24 A.      I don't recall.
25 Q.      And what happens if they don't score that

Page 28

1 -- get a passing grade on that?
2 A.      They would need to retake the training and
3 retake the test.
4 Q.      And did that training involve
5 investigating disputes?
6 A.      No.
7 Q.      Did it involve how to mark a -- how to
8 mark an account as disputed as part of an
9 investigation into a dispute?
10 A.      No.
11 Q.      Did it involve Section E8 of the FDCPA?
12         MR. ROSSMAN:  Objection.  Calls for
13 speculation.  Objection calls for legal conclusion.
14 Q.      You can answer.
15 A.      I don't recall.
16 Q.      Okay.  And are those -- are those training
17 courses or modules, those are done every year; is
18 that correct?
19         MR. ROSSMAN:  Objection.  Mischaracterizes
20 the previous testimony.
21 Q.      Well, I think you testified that they are
22 done annually?
23 A.      FDCPA training is conducted annually.
24 Q.      Okay.  And do y'all retain copies of those
25 training -- those training modules?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7 (25 - 28)

Defendant's Exhibit A - p.8 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  A.      Yes.
2  Q.      And do you retain copies of the tests that
3  employees take at the end of those training
4  modules?
5  A.      I believe it's just the score of the test.
6  Q.      Okay.  And is that score kept in their
7  personnel file?
8  A.      It's kept in the records with the testing.
9  I don't recall exactly how -- you know, is it in
10  the file -- personnel file or in a training file,
11  I'm not sure.
12  Q.      Do employees at Spring Oaks have personnel
13  files?
14          MR. ROSSMAN:  Objection.  Foundation.
15  Q.      Do you understand my question?
16  A.      I'm not exactly sure what you're -- like I
17  understand you're saying personnel files, but I'm
18  not sure what you mean by personnel file.  That
19  could mean different things.
20  Q.      What does it mean to you?
21  A.      A record of their employment history.
22  Q.      Okay.  And what about a record of
23  write-ups or reprimands?  Where would that be kept?
24  A.      That would be kept in the personnel file,
25  yes.

Page 29

1  Q.      Okay.  And in terms of the training that
2  employees received, would a copy of that or at
3  least a checklist of what training the employees
4  received would that be kept in the personnel file?
5  A.      I'm not sure.
6  Q.      Okay.  And I think the testing that is
7  done annually on the FDCPA as a part of that module
8  training, you said you weren't sure if the results
9  of that would be in the personnel file or training
10  file; is that correct?
11  A.      Correct.
12  Q.      Okay.  In terms of training on the FDCPA,
13  what training do employees get when they're newly
14  hired?
15  A.      It depends on what type of employee you're
16  talking about.
17  Q.      Sure.  And, again, we're talking about the
18  employees that are doing the debt collection or --
19  we'll start there.  Employees that are collecting
20  debt.
21  A.      Employees that are collecting debt
22  participate in a multi-week education in the
23  classroom and then some period of time with on the
24  job training.
25  Q.      And is there a training manual that Spring

Page 30

1  Oaks uses as a part of that training?
2  A.      There are training modules that are used
3  for that training.
4  Q.      Tell me what you mean by training module.
5  A.      It's not in just one document.  There may
6  be multiple documents to cover particular topics.
7  Q.      Are there videos as well?
8  A.      I don't know for the collector training if
9  there are videos.  There -- I don't know.
10  Q.      What about an employee who would've -- or
11  the employees who would've investigated
12  Mr. Robinson's dispute?
13  A.      Those employees have essentially one on
14  one training with the manager of the team of all of
15  the agents that do the investigations.  And then
16  basically side by side education with more tenured
17  agents.  They go through the policies, the
18  procedures, and the steps and do what we call like
19  job shadowing.  Watch somebody do the job, and then
20  they do the job, and somebody watches them do it.
21  Q.      So what are the names of the policies and
22  procedures that those agents were trained on?
23          MR. ROSSMAN:  Objection.  Repetitive.
24  Q.      I'll tell you what, I'll ask it this way.
25  Is there a policy and procedure that explains to

Page 31

1  those agents how they are supposed to conduct an investigation into a
2  dispute from a consumer?
3  A.      Yes.
4  Q.      And what is the name of that policy and
5  procedure?
6  A.      I believe the title is disputes job aid.
7  Q.      Disputes what?
8  A.      Job aid.
9  Q.      And that policy and procedure that they
10  would've been trained on, that's the same policy
11  and procedure that applies to them or applied to
12  them in 2022 when Mr. Robinson did -- sent his
13  dispute to Spring Oaks; is that correct?
14  A.      Yes.
15  Q.      And when was the last time that policy and
16  procedure was modified or updated or authored?
17  A.      I don't recall.
18  Q.      Do you have an idea?
19  A.      No.  That's a procedure that, you know, as
20  topics come up we may, you know, change, you know,
21  more frequently.  It just depends, and I don't
22  recall.
23  Q.      Is there a policy and procedure that tells
24  the agents how they are supposed to code the
25  account to the credit bureaus after they receive a

Page 32

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8 (29 - 32)

Defendant's Exhibit A - p.9 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  dispute from the consumer?
2        MR. ROSSMAN:  Objection.  Compound
3  question.
4  Q.      You can answer.
5  A.      I'm sorry.  Can you repeat.  I'm not sure
6  if you're talking who investigates the dispute or
7  who initially identifies the dispute.
8  Q.      I'll tell you what, I'm going to come back
9  to that.  But let me -- I'm going to share my
10 screen with you for a second.  So can you see the
11 document that I've marked Plaintiff's Exhibit 1?
12 A.      Yes.
13            (Plaintiff's Exhibit 1 was marked for
14             identification.)
15 Q.      And the title of the document says notice
16 of deposition pursuant to Federal Rules of
17 Procedure 30(b)(6) of Spring Oaks Capital.
18 A.      Yes.
19 Q.      Did I read that correctly?
20 A.      Yes.
21 Q.      And have you seen this document before
22 today?
23 A.      Yes.
24 Q.      And do you have a copy of that document in
25 front of you?
                                          Page 33

1  it's mail or e-mail, different teams of -- or some
2  other method, we have teams of associates who read
3  and review that correspondence to identify if
4  there's a dispute contained within the
5  correspondence from the consumer.  That associate
6  is then -- if they identify a dispute, they have
7  instructions on how to document the account to
8  notate the dispute.  When that account is notated
9  as disputed, that does transmit a code to the
10 credit reporting agencies.  It also moves the
11 account from a work flow standpoint out of active
12 collections into a hold queue essentially, if you
13 want to call it that, where then it sits on hold
14 until another team of employees can review and
15 investigate and respond to the consumer.
16 Q.      Okay.  Anything else you can think of
17 that's part of this process?
18 A.      That's the basic end to end process.  We
19 intake, inbound correspondence team reviews, makes
20 whatever notations, markings, codes are required
21 depending on the outcome there for disputes
22 specifically.  Again, it goes into a work flow for
23 a dispute agent to investigate and respond to the
24 dispute.
25 Q.      And is there a policy and procedure manual
                                          Page 35

1  A.      I don't have it in front of me, but I have
2  access to it.
3  Q.      Okay.  Do you -- by the way, are you --
4  where are you right now?
5  A.      I'm at home in my office.
6  Q.      Okay.  Is anybody there with you?
7  A.      No.
8  Q.      All right.  Nobody from Spring Oaks is
9  there?
10 A.      No.
11 Q.      Or Mr. Rossman's office?
12 A.      No.
13 Q.      Okay.  So are you prepared to testify
14 to -- let's see.  There are 26 topics identified.
15 Are you prepared to testify as to the information
16 identified in all 26 of those topics?
17 A.      Yes.
18 Q.      Okay.  I tell you what, let's go back to
19 where we were and we'll do it this way.  When a
20 dispute is sent from a consumer directly to Spring
21 Oaks, walk me through the process of how that
22 dispute is handled, you know, from intake all the
23 way to the end.
24 A.      When a dispute is received by Spring Oaks,
25 depending on the method it was received whether
                                          Page 34

1  or document that describes this whole process?
2        MR. ROSSMAN:  Objection.  Compound
3  question.
4        MR. HERRING:  How is that compound?
5        MR. ROSSMAN:  The policy and procedure.
6        MR. HERRING:  Okay.
7  Q.      Is there a policy that describes this
8  process and how that's supposed to work?
9  A.      The policy is actually more the
10 overarching requirements.  The procedure would be
11 more of the how to.
12 Q.      Okay.  So is there a policy that describes
13 the overarching requirements of this process?
14 A.      Yes.
15 Q.      And what's the name of that policy?
16 A.      As I mentioned earlier I may not have the
17 name exactly right, but it's dispute and debt
18 validation policy.
19 Q.      And so is there a process that describes
20 what you just described to me?
21 A.      Yes.
22 Q.      And what's that called?
23 A.      Processing inbound correspondence
24 procedure is for the intake part of the process.
25 And then the job aid -- the disputes job aid is for
                                          Page 36

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9 (33 - 36)

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

| | |
|---|---|
| 1  the investigation component. | 1      MR. ROSSMAN:  I was too slow on that one, |
| 2  Q.      So there's one for intake and one for | 2  Stan. |
| 3  investigation? | 3      MR. HERRING:  I mean, the others weren't, |
| 4  A.      Correct. | 4  but that one you missed.  It was awful.  All right. |
| 5  Q.      Is there a policy that discusses what code | 5  So we've been going about 45 minutes.  I need to |
| 6  to send to the credit bureaus in response to a | 6  take about a five, ten-minute break. |
| 7  dispute from a consumer? | 7      MR. ROSSMAN:  Yeah.  That sounds good.  So |
| 8      Let me ask it this way.  Is there a | 8  it's 9:53 right now.  9:53, central time. |
| 9  separate policy that would inform an employee of | 9  Reconvene at 10:05 central time? |
| 10  what code to send and how to make that | 10      MR. HERRING:  Yeah.  That's good.  And, |
| 11  determination to a credit bureau in response to a | 11  you know, I figured you've done this enough, |
| 12  consumer dispute directly to Spring Oaks? | 12  Ms. Calko, that you kind of know how this works. |
| 13  A.      I don't think that it's in -- I don't | 13  But I think you know, if you need to take a break, |
| 14  think the codes are in the policy. | 14  you know, that's fine.  This isn't an endurance |
| 15  Q.      Is there a procedure? | 15  test.  And if -- the only thing I would ask if |
| 16  A.      The job aid is what describes the | 16  there's a question pending, that we go ahead and |
| 17  investigation process that includes the codes. | 17  get that answer, and then we can take a break. |
| 18  Q.      And that's included within the process or | 18      THE WITNESS:  Yes, sir. |
| 19  procedure that you've already identified; is that | 19      MR. HERRING:  All right.  Thank you. |
| 20  correct? | 20      THE VIDEOGRAPHER:  The time is 9:54.  We |
| 21  A.      Correct. | 21  are off the record. |
| 22  Q.      When you say a job aid, what do you mean | 22      (A recess was taken.) |
| 23  by that? | 23      THE VIDEOGRAPHER:  The time is 10:06 a.m. |
| 24      MR. ROSSMAN:  Objection.  Repetitive. | 24  We are back the record. |
| 25      You can answer. | 25  Q.      Ms. Calko, I want to go back to one thing. |
| Page 37 | Page 39 |
| 1  A.      Essentially work instructions for the | 1  When we were talking about the training, you talked |
| 2  agent to follow based on what they are identifying | 2  about modules -- what you called modules.  And I |
| 3  within the correspondence and based on particular | 3  want to make sure I understand what all that |
| 4  account details.  So if you see this, then do this. | 4  includes.  So I think you said it includes |
| 5  Q.      And is that job aid or that procedure, is | 5  documents; is that right? |
| 6  that set up as a work flow within your software | 6  A.      The way I would describe the module it's, |
| 7  system or is that something that has to be done | 7  you know, for example, a PowerPoint document that |
| 8  manually by the agents? | 8  covers a certain topic. |
| 9      MR. ROSSMAN:  Objection.  Compound | 9  Q.      And within the PowerPoint presentation |
| 10  question.  Objection.  Confusing.  Objection. | 10  there are certain slides that go over whatever |
| 11  Calls for speculation. | 11  topic that PowerPoint is on; is that correct? |
| 12  Q.      You can answer if you understand my | 12  A.      Correct. |
| 13  question. | 13  Q.      And are there also written materials that |
| 14  A.      It is not part of the software.  The job | 14  are provided to employees as a part of that |
| 15  aid is not part of the software. | 15  training module? |
| 16  Q.      Okay.  Is that something that an agent has | 16  A.      The module is -- would be the written |
| 17  to consult or just know the next steps?  Or how do | 17  materials. |
| 18  they know what the next steps are? | 18  Q.      And is a copy of that provided to the |
| 19  A.      The job aid outlines the steps. | 19  employees? |
| 20  Q.      Okay.  And so that's a document that they | 20  A.      They have access to it, yes. |
| 21  review or they have that's available to them? | 21  Q.      So they can go online -- or in y'all's |
| 22  A.      Correct. | 22  system and look at it? |
| 23  Q.      All right. | 23  A.      Correct, yes. |
| 24      MR. HERRING:  John, you missed a compound | 24  Q.      Okay.  And that's not -- is that just |
| 25  objection a second ago. | 25  during the training or is that any time after that |
| Page 38 | Page 40 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10 (37 - 40)

Defendant's Exhibit A - p.11 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  that they want to go back and look at that?
2  A.        I believe it's always available.
3  Q.        And are there -- and I said written
4  materials.  Are there materials provided in
5  addition to the PowerPoint that would say
6  supplement the PowerPoint or explain in further
7  detail certain issues in the PowerPoint?
8  A.        We have the policies and the procedures
9  and the PowerPoints.  Those are the documents that
10  are part of the training.
11  Q.        And just so we're all clear.  When I say
12  documents, I mean in any format, you know, whether
13  that's electronic, you know, PDF, Word, hard copy,
14  anything.  So are there other materials in any
15  format aside from the PowerPoint that are provided
16  to the employees as a part of their training?  I
17  think you said policies and procedures, right?
18  A.        Right.  And those are electronic.  I mean,
19  those are electronic documents I guess to be more
20  precise.  Those are electronic documents that are
21  available to the employees.
22  Q.        So when we were talking about -- you
23  walked me through the -- I guess the investigative
24  process.  When a dispute is received from a
25  consumer, is there a policy -- is there an
                                        Page 41

1  additional or separate policy that informs the
2  employee on what code should be sent to the credit
3  bureaus in response to a dispute and how to know
4  what code should be sent?
5        MR. ROSSMAN:  Objection.  Repetitive.
6  Q.        You can answer.
7  A.        As I mentioned before it's not in the
8  policy.  The codes are in the dispute job aid.
9  Q.        And so do -- does the employee look at the
10  job aid?  Maybe I'm not understanding what the job
11  aid is.  Do they -- does that tell them which code
12  to send?
13  A.        The job aid tells what code to select in
14  the system.
15  Q.        And that's part of the procedure, not the
16  policy; is that right?
17  A.        It's the job aid.  It's part of the job
18  aid.
19  Q.        Okay.  Again, I'm -- my wife says I'm not
20  very smart, but I can lift heavy things.  So I'm
21  trying to understand what exactly the job aid is.
22  Like, what would -- is it something that's in the
23  screen that has a step -- I mean, it's in the
24  computer system and it has a step by step process?
25  A.        No.  As I mentioned before it is not part
                                        Page 42

1  of the software.  It is a document that gives
2  instruction to the agent based on what their
3  reading and observing from both the consumer
4  dispute and the account detail.
5  Q.        And then they follow the job aid and do
6  whatever it tells them to do, but they enter that
7  into your system, whatever they're doing; is that
8  right?
9  A.        Correct.
10  Q.        And any actions entered into the system
11  would show up in the account notes; is that
12  correct?
13  A.        Correct.
14  Q.        Okay.  Is a part of the -- is a part of
15  the, I guess, the steps I think you said if the
16  agent identifies the dispute, the account is marked
17  or notated as disputed; is that right?
18  A.        That is correct.  If the agent that is
19  processing the correspondence from the consumer
20  identifies as a dispute, they are instructed to
21  mark the account as disputed in the procedure.
22  Q.        And then I think you said the next thing
23  that happens is a code is sent to the CRAs telling
24  them that the account is disputed?
25        MR. ROSSMAN:  Objection.  Repetitive.
                                        Page 43

1  Q.        Is that right?
2  A.        The code that is placed on the account
3  does get sent to the credit reporting agency.
4  Q.        Okay.  So when the agent marks the account
5  as disputed, how is that done?  Is there like a box
6  they check or what happens?
7  A.        Within the system of record there is a
8  dispute form, so it's a separate section within the
9  system of record.  And the agent processing the
10  correspondence has a drop down selection to mark
11  the account as disputed.
12  Q.        Okay.  And you've reviewed the documents
13  that Spring Oaks has produced in this case so far,
14  correct?
15  A.        Yes.
16  Q.        Okay.  And do you know if y'all have
17  produced the dispute form that you just talked
18  about?
19  A.        The notation of the form would be in the
20  notes.
21  Q.        Okay.  And we'll look at that later.  Is
22  there a form though that is separate from the
23  notes?
24  A.        No.  What's exactly -- I mean, I guess
25  it's a section of the system of record that you --
                                        Page 44

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11 (41 - 44)

Defendant's Exhibit A - p.12 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1 basically gets transmitted into the notes.
2 Q.        Okay.  So they fill out a form in the
3 system and that information goes -- and is -- you
4 can read that in the notes, whatever they input
5 into that form; is that right?
6 A.        Correct.
7 Q.        And so does the system, once the account
8 as marked as disputed, does the employee have to
9 then decide what code to send to the credit bureaus
10 or does that happen has a part of the system
11 automatically?
12        MR. ROSSMAN: Objection.  Repetitive.
13 A.        The person processing the inbound
14 correspondence, you know, selects the drop down to
15 notate the dispute.
16 Q.        What do you mean by notate the dispute?
17 A.        To mark the account as disputed.
18 Q.        Within y'all's system?
19 A.        Correct.
20 Q.        Okay.  Then how does the code -- and just
21 for clarity sake, are we talking about an XB code
22 that goes to the credit bureaus at this point?
23        MR. ROSSMAN: Objection.
24 A.        Yes.
25 Q.        Do you know what an XB code is?
                                            Page 45

1 A.        Yes.
2 Q.        And what is that?
3 A.        An XB code is a code that signifies that
4 an account is disputed.
5 Q.        Okay.  And that XB code is the code that
6 Spring Oaks would use to tell the credit bureaus
7 that the account needs to be marked as disputed; is
8 that right?
9        MR. ROSSMAN: Objection.  Mischaracterizes
10 previous testimony.
11 Q.        You can answer.  If that's not right, you
12 can tell me.  Is that right?
13 A.        Can you repeat the question?
14 Q.        The XB code is the code that Spring Oaks
15 uses to tell the credit bureaus that the account
16 needs to be marked as disputed on -- in the
17 consumer's credit file?
18        MR. ROSSMAN: Same objection.
19 Q.        Is that right?
20 A.        The XB code is the code that we use to
21 notate the account as disputed.
22 Q.        Okay.  And what I guess I'm trying to
23 understand is, does an agent have to manually
24 select the XB code in order for that to happen?  Or
25 is once the account is marked as disputed, does
                                            Page 46

1 that XB code automatically go to the credit
2 bureaus?
3 A.        When the agent marks the account as
4 disputed, the code -- an internal code is on the
5 account to reflect that the account is disputed and
6 then Spring Oaks reports an XB code to the credit
7 reporting agencies -- agency, just TransUnion.
8 Q.        So tell me how that reporting happens.
9        MR. ROSSMAN: Objection.  Repetitive.
10 Q.        Well, let me ask you this:  Do you know
11 what a UDF is?
12 A.        I believe so, but I would prefer that -- I
13 mean, if you're going to ask me about it, I need to
14 know the acronym.
15 Q.        All right.
16        MR. ROSSMAN: Stan, you mean universal
17 data form?
18        MR. HERRING: Yeah, yeah.
19 Q.        I guess what I'm -- when you say report,
20 see that's vague to me.  I don't understand what
21 that means.  So the minute they mark it as
22 disputed, does the information -- not the minute,
23 but shortly thereafter -- does the information
24 automatically upload to the credit bureaus or does
25 that happen, you know, like once every few weeks or
                                            Page 47

1 how does that work?
2 A.        The reporting happens weekly.
3 Q.        And so it's just a mass exchange of
4 information from Spring Oaks to the credit bureaus
5 on the accounts and if there's new information that
6 gets uploaded.  If there's not, then nothing gets
7 uploaded for that account; is that right?
8        MR. ROSSMAN: Objection.  Compound
9 question.  Objection.  Confusing.
10 Q.        Is that correct?
11 A.        No.  The way the process works is that a
12 report is created for all accounts that are credit
13 reporting.  If there's new information, that
14 information will be contained within the report.
15 If there's no new information, the account data is
16 transmitted just, you know, as is from the previous
17 week if there's nothing new.
18 Q.        And I'm still not sure you've answered my
19 original question about how the XB code gets sent.
20 I mean, here's what I'm just trying to get at.
21        When the account is marked disputed, does
22 that trigger the XB code automatically or does the
23 agent then have to go in and maybe another drop
24 town menu chose the XB code?
25        MR. ROSSMAN: Objection.  Repetitive,
                                            Page 48

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12 (45 - 48)

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1 repetitive, repetitive.
2 Q.        You can answer.
3 A.        **The agent selects the drop down to notate**
4 **the account as disputed, the XB code is transmitted**
5 **to the credit reporting agencies in the weekly**
6 **reporting.**
7 Q.        So once the account is marked disputed,
8 the XB code is transmitted?  There's not a separate
9 step is what I'm trying to get at?
10 A.        **There is a separate step because, you**
11 **know, to the point earlier it doesn't happen**
12 **immediately.  The account gets marked as disputed**
13 **and then in the weekly report, the code is**
14 **transmitted.**
15 Q.        So even though the agent has marked the
16 account as disputed, are there other codes they
17 could select to send to the credit bureaus as a
18 part of that upload of information on the account?
19 A.        **I'm sorry.  Which employee are you talking**
20 **about?**
21 Q.        All right.  Well, maybe that's where the
22 confusion is.  So which employee marks the account
23 as disputed?
24        MR. ROSSMAN:  Objection.  Repetitive.
25 A.        **For correspondence from consumers, there's**

Page 49

1 a team of agents that read and review the inbound
2 response and take whatever action is needed.  If
3 the account is disputed, they would mark the
4 account -- notate the account as disputed.  If the
5 account has an attorney representation, they add
6 the attorney representation information so there's
7 a dedicated group of employees who are processing
8 inbound correspondence from consumers and
9 attorneys.
10 Q.        And so that team would be the one to mark
11 the account as disputed, correct?
12 A.        **Correct.**
13 Q.        And when they mark the account as
14 disputed, does it automatically choose -- does the
15 system automatically choose the XB code or could it
16 choose an XC or an XH code?
17 A.        **When a dispute is entered onto an account,**
18 **the agent does not select XB.  They select a**
19 **certain notation which corresponds to the XB code.**
20 Q.        Okay.  And so what notation would that be?
21 A.        **I believe it says -- I think the drop down**
22 **is written correspondence or something along those**
23 **lines.  Written or written correspondence.**
24 Q.        Okay.  And what notation would they use if
25 they wanted the code selected to be XC?

Page 50

1        MR. ROSSMAN:  Objection.  Calls for
2 speculation.  Objection.  Calls for legal
3 conclusion.
4 Q.        Is it a different notation?
5 A.        **I'm sorry.  I need to clarify which**
6 **employee we're talking about.  Because if we're**
7 **still talking about the employees that are**
8 **processing inbound correspondence, they are not**
9 **instructed to use any other notations.**
10 Q.        Other than XB or other than the notation
11 that would result in the XB code?
12 A.        **Correct.**
13 Q.        All right.  So -- and I think you said as
14 part of the process once a dispute has been
15 identified, the account moves to a hold queue; is
16 that right?
17 A.        **Yes.**
18 Q.        And then a different team takes over at
19 that point?
20 A.        **Correct.**
21 Q.        And what's the name of that team?
22 A.        **The disputes team.**
23 Q.        Okay.  Do they have additional or
24 different policies that they are trained on other
25 than what we've already talked about?

Page 51

1        MR. ROSSMAN:  Objection.  Repetitive.
2 A.        **Nothing in addition to what we've already**
3 **talked about.**
4 Q.        Okay.  Do they have additional procedures
5 or processes that they are trained on in how to
6 handle the dispute and do all the things they need
7 to do in addition to what we've already talked
8 about?
9        MR. ROSSMAN:  Objection.  Repetitive.
10 A.        **I mentioned previously the job aid.  They**
11 **follow -- the dispute agents follow the disputes**
12 **job aid.**
13 Q.        And is that a different job aid then the
14 one that the -- I guess the intake agents follow?
15 A.        **Yes.**
16 Q.        Does it have a different name?
17 A.        **Yes.**
18 Q.        What's it called?
19 A.        **Disputes job aid.**
20 Q.        Okay.  You may have said that just now and
21 I missed it.  And the jobs aid that we've talked
22 about earlier for the initial intake, was that the
23 intake jobs aid or what was that called?
24 A.        **Inbound correspondence procedure.**
25 Q.        Okay.  Is there any other policy,

Page 52

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13 (49 - 52)

Defendant's Exhibit A - p.14 of 180

Case 2:23-cv-01381-AMM   Document 44-1   Filed 10/10/24   Page 15 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

**Page 53**

1  procedure, or process that the dispute team is
2  required to use when investigating a dispute?
3  A.      No.
4  Q.      And is the dispute team -- are they also
5  responsible for responding to the dispute?
6  A.      Yes.
7  Q.      Are there any other policies, procedures,
8  or processes that would inform them how to respond
9  to the dispute other than what we've talked about?
10  A.      No.
11  Q.      Okay.  And walk me through the process or
12  the procedure for investigating the dispute by the
13  dispute team.
14  A.      **When an agent is working a dispute, they**
15  **pull up the account in the system -- system of**
16  **record.  They are to read the correspondence or**
17  **notes related to the dispute.  Depending on what**
18  **they read within that document they may take**
19  **certain steps.  Again, depending what they observe**
20  **from the consumer correspondence, they would then**
21  **investigate any claims, any specific disputes,**
22  **review the account documentation.  And then**
23  **depending on their findings, they would then notate**
24  **the account and then select the appropriate**
25  **correspondence to send to the consumer and make the**

**Page 54**

1  **proper notations within the system of record**
2  **related to their observations, their findings, and**
3  **the dispute.**
4  Q.      Is there a policy document or manual that
5  informs the initial intake agents on how to
6  document the account notes?
7          MR. ROSSMAN:  Objection.  Repetitive.
8  A.      **Yes.**
9  Q.      I didn't hear you.  What was your answer?
10  A.      **Yes.**
11  Q.      What's the name of that policy and
12  procedure -- or that policy?
13  A.      **It's the inbound -- processing inbound**
14  **correspondence procedure.**
15  Q.      Okay.  So it's a part of the other one
16  that we talked about?
17  A.      **Correct.**
18  Q.      And is there a separate policy that
19  informs the dispute team on how to document the
20  file or is that a part of that same policy that
21  we've already talked about?
22  A.      **It's a part of the disputes job aid.**
23  Q.      And the same questions for the procedures
24  and processes.  Are those a part of the jobs aid
25  we've already talked about or the job aids we've

**Page 55**

1  already talked about?
2  A.      **Can you explain what you mean by the**
3  **processes and procedures?**
4  Q.      Well, we've talked about policies that
5  talk about how to document the account notes.  Are
6  there processes and procedures that inform the
7  intake agents or the dispute team agents on how to
8  document the account notes separate from these --
9  the jobs -- I forget what they're called -- the job
10  aid that we've talked about?
11  A.      **No.**
12  Q.      Is there a policy that discusses how to
13  mark the account for credit reporting purposes
14  after an investigation has been completed and
15  response sent from the dispute team to the
16  consumer?
17  A.      **It's -- that information is within the job**
18  **aid.**
19  Q.      For the dispute team?
20  A.      **Correct.**
21  Q.      Okay.  And how would they -- well, let me
22  go back.  I'm sorry.  So initially the account is
23  marked XB.  And are you familiar with how that
24  translates on the credit report, what that says?
25          MR. ROSSMAN:  Objection.  Compound

**Page 56**

1  question.
2  Q.      You can answer.
3  A.      **Yes, I am familiar.**
4  Q.      And so what does an XB code translate to
5  on the credit report?
6          MR. ROSSMAN:  Objection.  Foundation.
7  Q.      You can answer.
8  A.      **I'm familiar, but I don't have the exact,**
9  **you know, phrasing, you know, off the top of my**
10  **head.**
11  Q.      Do you understand it to be account
12  information disputed by the consumer?
13          MR. ROSSMAN:  Objection.  Foundation.
14  Q.      I mean, if you're not, you're not.
15  A.      **I mean, I understand what the code does.**
16  **I cannot commit to exactly what it may say on a**
17  **credit report.**
18  Q.      So after the investigation and response,
19  does the job aid require the -- or what does the
20  job aid tell the agents doing that dispute
21  investigation in response on what they're supposed
22  to do with the credit reporting?
23          MR. ROSSMAN:  Objection.  Calls for
24  speculation.  Objection.  Vague.
25  Q.      You can answer.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14 (53 - 56)

Defendant's Exhibit A - p.15 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1  A.      The job aid does give instruction on the
2  steps to take to notate the account upon completion
3  of an investigation.
4  Q.      So what does it say?
5  A.      I don't have it in front of me.
6  Q.      Well, as Spring Oaks' corporate
7  representative here today to testify about that
8  issue, what do you recall about what it says?
9  A.      It depends.  There's certain steps and
10 observations that the agent need to review,
11 including if the consumer has disputed before or if
12 there's other information that they need to pay
13 attention to.  They need to -- as I mentioned
14 before, they need to document their findings.  They
15 need to select the letter to respond to the
16 consumer.  They need to select how we're going to
17 respond to the consumer, whether that's by mail or
18 e-mail.
19 Q.      And as a part of that process, do they
20 select whether or how the code for the credit
21 reporting will be changed?
22     MR. ROSSMAN:  Objection.  Mischaracterizes
23 previous testimony.
24 A.      The agent selects a code to reflect that
25 the investigation was completed.  They may also

Page 57

1  chose to select a code that the investigation was
2  completed and the consumer still disagrees.
3  Q.      And what is the name of that code?
4      MR. ROSSMAN:  Objection.  Foundation.
5  Q.      Let me make it a little clearer.  What is
6  the name of the code that updates I guess the
7  system that the investigation has been completed?
8  A.      As I mentioned it depends on other
9  factors.  There's two different codes to indicate
10 that the investigation has been completed.
11 Q.      Okay.  What are those codes?
12 A.      The codes are XH and XC.
13 Q.      Okay.  Is it possible -- is one option to
14 leave the account as an XB code -- with an XB code?
15 A.      Can you clarify what you mean by is it an
16 option?
17 Q.      Well, once the dispute agent completes the
18 investigation, you said they have two options.  Is
19 there a third option to leave the account as marked
20 as an XB account that is disputed by the consumer?
21 A.      There may be in certain circumstances,
22 yes.
23 Q.      And what circumstances would that be?
24 A.      It depends on the particular
25 correspondence and circumstances of the account.

Page 58

1  Such as, you know, what's the exact nature of
2  dispute, whether or not, you know, perhaps the
3  letter is coming from credit repair.  You know,
4  there's certain indicators that we would look at.
5  Q.      So we're talking about a situation where
6  at the end of the investigation rather than mark
7  the account as XH and XC, it would be marked as XB.
8  And you said there's certain things you would look
9  at the nature of the dispute, whether the letter is
10 from credit repair.  What else?
11 A.      Those are the two main components.
12 Q.      And so would the -- just procedurally
13 would the agent just leave it as XB, or would they
14 have to select a code to make it stay XB?
15     MR. ROSSMAN:  Objection.  Repetitive.
16 A.      Procedurally they leave the code as XB.
17 There's no change.
18 Q.      You said you have to look at the nature of
19 the disputes.  So tell me what you mean by that.
20 A.      Well, there's certain letters and certain
21 correspondences that Spring Oaks has identified
22 that, again, may indicate the account is credit
23 repair.  And based on the circumstances of the
24 letter and the correspondence, we may choose to
25 leave the XB code on the account after the

Page 59

1  investigation.
2  Q.      Why would whether the -- it's credit
3  repair matter in determining whether to leave the
4  code as XB on the account?
5  A.      There's -- I mean, frankly there's a
6  certain population of accounts that have presented,
7  you know, risk of litigation.  And those accounts
8  we've made a determination to handle separately in
9  a different process.
10 Q.      Okay.  So the -- so are there other
11 factors regarding credit -- or disputes that you
12 think are credit repair that would -- that would
13 influence Spring Oaks to leave an account marked as
14 XB?
15 A.      It's a case by case evaluation.
16 Q.      Well, you identified risk of litigation.
17 What other factors are there?  Does a credit repair
18 dispute make it in your eyes more or less
19 legitimate, the dispute?
20 A.      The risk factor I don't think has anything
21 to do with whether or not the dispute is
22 legitimate.
23 Q.      By risk factor you're talking about Spring
24 Oaks is worried about getting sued by these
25 consumers that are involved with credit repair

Page 60

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15 (57 - 60)

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

Page 61

```
 1  organizations; is that right?
 2  A.      Correct.
 3  Q.      Okay.  Aside from credit repair, what are
 4  some other examples of the nature of the dispute
 5  where after the investigation the account would be
 6  left or marked as XB?
 7  A.      Again, it's a case by case evaluation
 8  looking at the documentation.
 9  Q.      Sure.  I understand it's case by case.
10  And I'm asking you to give me some examples of the
11  case by case evaluation or what are the factors?
12          MR. ROSSMAN:  Objection.  Calls for
13  speculation.
14  Q.      You can answer.
15  A.      I'm sorry.  I wasn't sure if you were
16  going to rephrase.
17  Q.      No.  I'm kind of ignoring your lawyer.
18  A.      In thinking about the -- again, just
19  depends on what's actually in the letter or what
20  the correspondences, if you will, not always a
21  letter, from the consumer or their attorney that
22  may lead us to leave -- make the determination that
23  the XB code will stay on and we won't update
24  anything.
25  Q.      Have you ever seen a situation where the
```

Page 62

```
 1  account has stayed as XB?
 2          MR. ROSSMAN:  Objection.  Calls for
 3  speculation.
 4  A.      Yes, I have.
 5  Q.      Okay.  Is that pretty rare?
 6          MR. ROSSMAN:  Objection.  Vague as to
 7  rare.
 8  A.      I don't see it very often.
 9  Q.      Do Spring Oaks' policies and procedures
10  require the agents after investigation to either
11  change the code on the account to XC or XH?
12  A.      Yes.
13  Q.      Okay.  And why is that?
14  A.      That signifies that our investigation is
15  complete.
16  Q.      Is that something that as the
17  representative for Spring Oaks is mandated or
18  required by the Fair Debt Collection Practices Act
19  that the code be changed?
20          MR. ROSSMAN:  Objection.  Calls for a
21  legal conclusion.
22  Q.      You can answer.
23  A.      I'm sorry.  Can you repeat the question?
24          MS. HERRING:  Can you read it back?
25          (Record read.)
```

Page 63

```
 1          MR. ROSSMAN:  Same objection.
 2  A.      If I'm understanding the question
 3  correctly, I don't think the Fair Debt Collection
 4  Practices Act mandates any specific code.
 5  Q.      I'm going to share my screen with you.
 6  A.      And I guess to clarify, any specific
 7  dispute code.
 8  Q.      I'm showing you what I've marked as
 9  Exhibit 10 to your deposition.  Do you see that?
10  A.      Yes.
11          (Plaintiff's Exhibit 10 was marked for
12           identification.)
13  Q.      And for the record Exhibit 10 is a
14  document.  The cover page says Fair Debt Collection
15  Practices Act, 15 U.S.C. Section 1692-1692P.  Last
16  amended July 10.  Did I read that correctly?
17  A.      It appears that you did.
18  Q.      And is the Fair Debt Collection Practices
19  Act incorporated into the training provided by --
20  or provided to Spring Oaks' employees?
21  A.      Yes.
22  Q.      This thing won't let me do it right.
23  Okay.  So I've scrolled to page -- at the bottom,
24  it says page 8 on the bottom left.  Do you see
25  that?
```

Page 64

```
 1  A.      Yes.
 2  Q.      And so it's section 807, but also 1592
 3  U.S.C. Section E.  Are you with me?
 4  A.      Yes.
 5  Q.      And so under Section E it says, a debt
 6  collector may not use any false, deceptive or
 7  misleading representation or means in connection
 8  with the collection of any debt.  Without limiting
 9  the general application of the foregoing, the
10  following conduct is a violation of this section.
11  And I'm going to go on the right e(8).  Do you see
12  that?
13  A.      Yes.
14  Q.      And so one of the subsections under
15  Section e, e(8) says communicating or threatening
16  to communicate any -- to any person credit
17  information which is known or which should be known
18  to be false, including the failure to communicate
19  that a disputed debt is disputed.  Did I read that
20  correctly?
21  A.      Yes.
22  Q.      Are the employees that handle the dispute
23  investigation and decide what code to use to report
24  the results of the investigation, are they trained
25  on this section of the Fair Debt Collection
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16 (61 - 64)

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

---

**Page 65**

1　Practices Act?
2　A.　　Yes.
3　Q.　　Does this -- does the Fair Debt Collection
4　Practices Act to your knowledge and as the
5　representative of Spring Oaks say anything about
6　reporting that an investigation is complete?
7　　　　MR. ROSSMAN:  Objection.  Calls for a
8　legal conclusion.
9　　　　MR. HERRING:  I'm asking Spring Oaks'
10　position on that.
11　　　　MR. ROSSMAN:  Same objection.
12　A.　　Section 8 does not -- does not state
13　anything related to an investigation.
14　Q.　　Okay.  And so you have the -- this exhibit
15　with you, Exhibit 10.  Do you know if anywhere in
16　the Fair Debt Collection Practices Act it addresses
17　credit reporting or marking -- showing -- I'm
18　sorry.  Reporting that an account is disputed in
19　any kind of requirement to include that an
20　investigation is complete or has been done by the
21　debt collector?
22　　　　MR. ROSSMAN:  Objection.  Calls for a
23　legal conclusion.
24　A.　　The Fair Debt Collection Practices Act
25　doesn't provide guidance on how to -- you know, for

---

**Page 66**

1　example, what code to use for credit reporting.
2　Q.　　As the representative of Spring Oaks, do
3　you believe that whatever code Spring Oaks decides
4　to use to report that code must comply with the
5　Fair Debt Collection Practices Acts and
6　specifically Section 8, e(8)?
7　　　　MR. ROSSMAN:  Objection.  Compound
8　question.  Objection.  Calls for a legal
9　conclusion.
10　Q.　　You can answer.
11　A.　　The FDCPA requires that the account be,
12　you know, communicated -- that we communicate that
13　the debt is disputed.
14　Q.　　Okay.  And it says debt is disputed,
15　right?
16　A.　　Yes.
17　Q.　　It doesn't say was disputed, does it?
18　　　　MR. ROSSMAN:  Objection.  Argumentative.
19　A.　　The word is is.
20　Q.　　Okay.  And Spring Oaks understands that is
21　means present tense, correct?
22　　　　MR. ROSSMAN:  Objection.  Argumentative.
23　Q.　　You can answer.
24　A.　　Correct.  Is is present tense.
25　Q.　　Okay.  I'm showing you what I've marked as

---

**Page 67**

1　Exhibit 11 to your deposition.
2　　　　(Plaintiff's Exhibit 11 was marked for
3　　　　identification.)
4　Q.　　The 2022 Credit Reporting Resource Guide
5　put out by the credit reporting -- the Credit Data
6　Industry Association.  Is that the -- did I read
7　that correctly?
8　A.　　It appears that you did.
9　Q.　　Okay.  And is -- are you familiar with
10　this document?
11　A.　　I'm familiar with the resource guide.  I
12　don't recall the last version, you know, the
13　copyright 2022.  I don't recall the last version
14　that I have as my resource, but yes.
15　Q.　　Okay.  So this dispute in this case was in
16　2022, correct?
17　A.　　Correct.
18　Q.　　And does Spring Oaks incorporate the --
19　incorporate into its policies and procedures
20　information from this credit reporting resource
21　guide?
22　A.　　It is incorporated into the job aid.
23　Q.　　Let's see.  So going down to Exhibit 8 --
24　by the way, this isn't the whole -- the whole
25　thing.  It's -- because it's a couple of hundred

---

**Page 68**

1　pages long.  I've just taken out some relevant
2　portions.
3　　　　Exhibit 8, compliance condition codes.  Is
4　this section right here incorporated into the job
5　aid?
6　　　　MR. ROSSMAN:  Objection.  Vague as to this
7　section.
8　Q.　　Well, the information here on the
9　compliance code is in section -- Exhibit 8 or parts
10　of it?
11　A.　　Parts of it.
12　Q.　　Okay.  And so specifically if we look down
13　here -- well, let's go back up to the top I guess.
14　It says compliance condition codes are used to
15　reflect accounts closed at a consumer's request and
16　consumer disputes under the Fair Credit Billing
17　Act, Fair Debt Collection Practices Act, or direct
18　dispute provisions of the Fair Credit Reporting Act
19　in its implementing rules.  Did I read that
20　correctly?
21　A.　　Yes.
22　Q.　　And so what's the purpose from Spring
23　Oaks' perspective of this document that's
24　incorporated or parts of which are incorporated
25　into the job aid?

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17 (65 - 68)

Defendant's Exhibit A - p.18 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

---

Page 69

1  **A.     These are guidelines that instruct Spring**
2  **Oaks in what codes to report in certain instances**
3  **to the credit reporting agencies.**
4  Q.     Okay.  And so the first one I guess --
5  first one that's relevant to Spring Oaks'
6  investigation of Mr. Robinson's dispute is the XB
7  code that I've highlighted there; is that right?
8        MR. ROSSMAN:  Objection.  Vague as to
9  relevance.
10  Q.     Well, we can do this another way.  Did the
11  XA, was that applicable to Mr. Robinson's dispute?
12  Do I need to make it larger for you?
13  **A.     Well, I just need to read it to see if it**
14  **was applicable.  XA, account closed at consumer's**
15  **request.  I don't believe so.**
16  Q.     Okay.  So the next code is the XB code,
17  correct?
18  **A.     Yes.**
19  Q.     So it says, account -- I guess in the
20  description, account information has been disputed
21  by the consumer directly to the data furnisher
22  under the Fair Credit Reporting Act; the data
23  furnisher conducting its investigation.  Is that --
24  did I read that correctly?
25  **A.     Yes.**

---

Page 70

1  Q.     Okay.  So are -- does the job aid instruct
2  the dispute investigation team on how to determine
3  whether a dispute is done pursuant to the Fair
4  Credit Reporting Act or pursuant to the FDCPA?
5        MR. ROSSMAN:  Objection.  Compound
6  question.
7  Q.     Okay.  I'll withdraw that.  Does the job
8  aid instruct employees on the dispute investigation
9  team how to know if a dispute is done pursuant to
10  the Fair Credit Reporting Act?
11  **A.     Not specifically in those words.**
12  Q.     All right.  So what does it say generally?
13  **A.     Generally --**
14        MR. ROSSMAN:  Objection.  Foundation.
15  Q.     Well, let me ask you that.  Are you
16  familiar with how it instructs the employees --
17  **A.     Yes.**
18  Q.     -- as the corporate representative of
19  Spring Oaks --
20  **A.     Yes.**
21  Q.     -- are you familiar with how it instructs
22  the employees?
23  **A.     Yes.**
24  Q.     Okay.  You understand that you're here
25  today to testify about that, right?

---

Page 71

1  **A.     Correct.**
2  Q.     All right.  So what does it say?
3  **A.     It does not specifically call out FCRA,**
4  **but it does instruct the agents to review certain**
5  **account attributes to determine if we will look at**
6  **the dispute as being pursuant to FDCPA, FCRA, or**
7  **both.**
8  Q.     You said to look at certain account
9  attributes?
10  **A.     Correct.**
11  Q.     Not talking about the dispute attributes,
12  you're talking about account attributes; is that
13  right?
14  **A.     Correct.**
15  Q.     And what are those account attributes?
16  **A.     If the account is credit reporting.**
17  Q.     Anything else?
18  **A.     No.**
19  Q.     Does anything in the dispute -- is
20  anything in the dispute to be considered in
21  determining whether a dispute is an FCRA dispute?
22        MR. ROSSMAN:  Objection.  Repetitive.
23  Q.     You can answer.
24  **A.     Yeah.  The agents are not instructed to**
25  **look for -- the job aid doesn't tell them to look**

---

Page 72

1  **for anything within the dispute to determine if**
2  **it's an FCRA dispute.**
3  Q.     Is it fair to say that the sole factor is
4  -- in determining whether it's an FCRA dispute is
5  whether or not Spring Oaks is credit reporting that
6  account?
7        MR. ROSSMAN:  Objection.  Mischaracterizes
8  previous testimony.
9  **A.     That's the -- that is the key indicator**
10  **that directs the agent on how to handle the dispute**
11  **under, you know, considering whether it's FCRA and**
12  **FDCPA.  And, again, the job aid does not**
13  **specifically call out FCRA or FDCPA specific**
14  **disputes.**
15  Q.     It just tells the agent to go look and see
16  if Spring Oaks is credit reporting and if they are
17  it's considered an FCRA dispute.  Is that accurate?
18  **A.     We're looking at it as an FCRA dispute and**
19  **an FDCPA dispute.**
20  Q.     Okay.  And then looking back at Exhibit
21  10, in the description it says, code XB should be
22  reported for FCRA disputes.
23        MR. ROSSMAN:  You mean FDCPA.
24  **A.     FDCPA disputes.**
25  Q.     I'm sorry.  I was thinking of my next

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18 (69 - 72)

Defendant's Exhibit A - p.19 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

| | |
|---|---|
| 1 question while I was asking that one.  Code XB<br>2 should be reported for FDCPA disputes?<br>3 **A.     Yes, that's what it says.**<br>4 Q.     Okay.  And so are Spring Oaks' employees<br>5 trained or does the job aid instruct them that they<br>6 should report -- or use code XB to report FDCPA<br>7 disputes?<br>8 **A.     As I described earlier, the job aid does**<br>9 **not tell them to use a certain code.  They're**<br>10 **instructed to select a certain drop down section**<br>11 **within the system of record to notate the dispute.**<br>12 Q.     Hold on.  Say that one more time.  I'm<br>13 sorry.  I missed it.<br>14 **A.     The job aid doesn't tell the agent to**<br>15 **select an XB code.  The job aid instructs the**<br>16 **agents who are processing inbound correspondence to**<br>17 **select a certain drop down selection in the system**<br>18 **of record to notate the dispute.**<br>19 Q.     And one of those options is, what,<br>20 disputed?<br>21 **A.     I believe I testified earlier that it was**<br>22 **written dispute or written correspondence response.**<br>23 **I don't remember exactly the phrasing.**<br>24 Q.     I don't think I asked you.  What are the<br>25 other options?<br><div align="right">Page 73</div> | 1 given the codes.<br>2 Q.     Okay.<br>3 **A.     I should say the agents investigating the**<br>4 **dispute are given the codes.**<br>5 Q.     And those agents are trained to understand<br>6 when they select that code what that means, what<br>7 that translates to with the credit report, correct?<br>8 **A.     They're instructed on what the code means**<br>9 **-- again, for our internal processing.  I don't**<br>10 **know that we've said this exactly how it then**<br>11 **reports on the credit reporting -- credit report**<br>12 **for a consumer.  They're instructed on, here are**<br>13 **the codes, here's when you use them, here are the**<br>14 **scenarios.**<br>15 Q.     Okay.  And so going back to Exhibit 10, it<br>16 says, important note code XB should no longer be<br>17 reported after the investigation is completed.  The<br>18 XB should be removed by reporting the removal code<br>19 or changed to another code.  Do you see that?<br>20 **A.     This is Exhibit 11.  I think you said 10.**<br>21 Q.     I'm sorry.  Yeah.  Exhibit 11.<br>22 **A.     Yes.  You read that statement correctly.**<br>23 Q.     Okay.  So why -- why does -- scratch that.<br>24 So does Spring Oaks comply with that<br>25 important note, what it says should be done as part<br><div align="right">Page 75</div> |
| 1 **A.     What are the other options -- I will need**<br>2 **some clarification.  Other options for --**<br>3 Q.     The drop down menu.<br>4 **A.     -- agents processing inbound**<br>5 **correspondence?**<br>6 Q.     Yeah, sure.<br>7 **A.     That is -- that is the option they're**<br>8 **directed to.**<br>9 Q.     Okay.  That's their only option?<br>10 **A.     That's their instruction, yes.**<br>11 Q.     Okay.  But then the ones doing the dispute<br>12 investigation, they have other options, right?<br>13 **A.     They're instructed to look at other**<br>14 **options, yes.**<br>15 Q.     Okay.  And I just want to make sure we've<br>16 identified all the other options.  So can you list<br>17 those for me?<br>18 **A.     It is an XH, an XC, an XR.**<br>19 Q.     So are they given the actual code or are<br>20 they given a description like written dispute?<br>21     MR. ROSSMAN:  Objection.<br>22 Q.     That translates into that code?<br>23     MR. ROSSMAN:  Objection.  Repetitive.<br>24 Q.     You can answer.<br>25 **A.     The agents processing the disputes are**<br><div align="right">Page 74</div> | 1 of its policies and procedures when concluding an<br>2 investigation?<br>3 **A.     Generally speaking, yes.  I mentioned**<br>4 **earlier there's a -- may be scenarios where we**<br>5 **decide to leave the XB on.**<br>6 Q.     Well, if Spring Oaks does that, are they<br>7 violating this important note requirement in<br>8 Exhibit 11?<br>9     MR. ROSSMAN:  Objection.  Argumentative.<br>10 Q.     You can answer.<br>11 **A.     Sorry.  I'm thinking about the word**<br>12 **violating.**<br>13 Q.     Well, if you don't understand the<br>14 question, I can rephrase it.<br>15 **A.     Well, I'm just not sure -- I'm not**<br>16 **following the important note is a -- you used the**<br>17 **word violation, so --**<br>18 Q.     Well, let me ask you this:  Does Spring<br>19 Oaks believe that they're legally required to<br>20 change the XB code to another code after an<br>21 investigation is completed?<br>22     MR. ROSSMAN:  Objection.  Calls for a<br>23 legal conclusion.<br>24 **A.     I mean, Spring Oaks, you know, generally**<br>25 **believes that, you know, the guidelines should be**<br><div align="right">Page 76</div> |

1-888-326-0594  depos@bainandassociates.com<br>Bain & Associates Court Reporting Services, Inc.

Page: 19 (73 - 76)

Defendant's Exhibit A - p.20 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1  followed, and these are guidelines.
2  Q.        Okay.  So tell me what you mean by
3  guidelines.
4  A.        These are the guidelines or requirements
5  that we follow when credit reporting.
6  Q.        Okay.  And these are guidelines that are
7  provided by the consumer data industry association,
8  correct?
9  A.        Correct.
10 Q.        These aren't legal requirements, correct?
11        MR. ROSSMAN:  Objection.  Calls for a
12 legal conclusion.
13 Q.        Does Spring Oaks believe that these are
14 legal requirements?
15        MR. ROSSMAN:  Same objection.
16 Q.        You can answer.
17 A.        These requirements are not -- this is not
18 a law I guess is the best way to answer that.
19 Q.        Right.  So the FDCPA that's a law, right?
20 A.        Correct.
21 Q.        And that's passed by Congress, correct?
22 A.        Correct.
23 Q.        And Spring Oaks understands that if it
24 violates the law, the FDCPA, then it can be legally
25 liable for violating that law, right?
                                              Page 77

1  A.        Correct.
2  Q.        And if Spring Oaks were to not change the
3  XB code to another code, does Spring Oaks -- is it
4  Spring Oaks' position that they would have any
5  legal liability for that?
6  A.        Can you outline that scenario?  You're
7  saying if we -- if Spring Oaks does not change the
8  code from an XB?
9  Q.        This guidelines say that the code XB
10 should no longer be reported after the
11 investigation is completed.
12 A.        Yes.
13 Q.        Spring Oaks -- does Spring Oaks believe
14 that if they were to, after an investigation is
15 completed, not change the XB code, contrary to what
16 this guideline says, that they would face legal
17 liability from some entity or regulating authority
18 or anyone else?
19 A.        I'm sorry.  I'm still not -- you're asking
20 if we don't change the XB or if we don't follow the
21 guidance to no longer report the XB?
22 Q.        Right.  In other words, it's just a
23 guideline put out by the Consumer Data Industry
24 Association, right?
25 A.        Yes.  These are guidelines put out by the
                                              Page 78

1  Consumer Data Industry Association.
2  Q.        And Spring Oaks can chose whether it's
3  going to follow that guideline or not, correct?
4  A.        I mean, yes, yes.
5  Q.        And if Spring Oaks chose not to change an
6  XB code after an investigation, would the credit --
7  would the Consumer Data Industry Association have
8  some kind of legal recourse against Spring Oaks?
9        MR. ROSSMAN:  Objection.  Calls for
10 speculation.
11 Q.        If you know.
12 A.        I don't know.
13 Q.        What about any regulatory industry?
14        MR. ROSSMAN:  Objection.  Calls for
15 speculation.
16 A.        I don't know what would be the outcome
17 there.  I don't know.
18 Q.        Has Spring Oaks ever been sued for not
19 following this guideline in Exhibit 11?
20        MR. ROSSMAN:  Objection.  Vague.
21 Q.        But -- yeah.  That is a bad question.  So
22 has Spring Oaks ever been sued by the Consumer Data
23 Industry Association for not following this
24 guideline in Exhibit 11 regarding XB codes?
25 A.        Spring Oaks has not been sued by the
                                              Page 79

1  Consumer Data Industry Association relating to
2  following the codes, the compliance condition
3  codes.
4  Q.        Has Spring Oaks ever been sued by any
5  regulatory -- government regulatory body for not
6  following the guidelines regarding XB codes?
7  A.        No.
8  Q.        Has Spring Oaks ever had a complaint or
9  any kind of regulatory action filed against them
10 for not following the guideline in Exhibit 11?
11        MR. ROSSMAN:  Objection.  Repetitive.
12 A.        And you mentioned complaint and regulatory
13 actions.  I'm not sure what you mean by complaint.
14 Q.        Well, and by complaint -- I've already
15 asked you about lawsuit.  Has -- has Spring Oaks
16 ever had a regulatory action brought against them
17 by any agency for failure to follow this code?  I'm
18 sorry.  Not the code.  For failing to follow this
19 guidance regarding the XB code?
20 A.        No.
21 Q.        Is it Spring Oaks' position that they can
22 follow this guideline by changing an XB code after
23 the investigation is completed even if that
24 violates the FDCPA?
25        MR. ROSSMAN:  Objection.  Compound
                                              Page 80

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20 (77 - 80)

Defendant's Exhibit A - p.21 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1  question.  Calls for legal conclusion.
2  Q.    You can answer.
3  **A.    Spring Oaks does not believe it's**
4  **violating the FDCPA by using the codes within the**
5  **CDIA manual.**
6  Q.    I appreciate that, but that wasn't my
7  question.  Is it Spring Oaks' position that they
8  have to follow this code or this guidance in the
9  CDIA manual even if in doing so they would violate
10 the FDCPA?
11       MR. ROSSMAN:  Same objections.
12 **A.    I mean, Spring Oaks does not believe that**
13 **following the codes violates the FDCPA.**
14 Q.    Again, that's not my question.  I
15 understand that Spring Oaks believes it's not
16 violating the FDCPA.  I guess what I'm asking is
17 does Spring Oaks recognize that if in following
18 this guideline it would cause them to violate the
19 FDCPA that they should not follow the guideline and
20 should instead do what the FDCPA requires?
21       MR. ROSSMAN:  Objection.  Calls for
22 speculation.
23 Q.    You can answer.
24 **A.    You know, this is the third try here so I**
25 **may still not be understanding the question, but**

Page 81

1  **what you're asking me to answer, if I could just**
2  **clarify.  If the CDIA manual instructions results**
3  **in an FDCPA violation does Spring Oaks Capital**
4  **recognize that?**
5  Q.    Well, does Spring Oaks Capital recognize
6  that -- that it's more important for them to comply
7  with the FDCPA than to comply with this guidance
8  manual?
9        MR. ROSSMAN:  I'm going to object.  You've
10 asked this question four different ways and she's
11 answered it.  I'm going to object here.
12       MR. HERRING:  I haven't got --
13       MR. ROSSMAN:  This is repetitive.
14       MR. HERRING:  Well, you can keep
15 objecting, but I haven't got an answer to my
16 question.  I'm trying to get us on the same page.
17       MR. ROSSMAN:  I'm going to instruct her
18 not to answer here.
19       MR. HERRING:  No, no, no.
20       MR. ROSSMAN:  You're asking her the same
21 question here.
22       MR. HERRING:  You cannot instruct her not
23 to answer that question.  The only thing you can
24 instruct her not to answer is a question that would
25 breach attorney-client privilege.

Page 82

1        MR. ROSSMAN:  Well, I think -- I think
2  we're there because you're asking her about her --
3  she's an attorney and you're asking for -- about
4  her opinion about a legal decision that Spring Oaks
5  may or may not make.  So I mean, this is -- this is
6  -- you're asking her for a legal conclusion and --
7  you're asking her for a legal conclusion.  You
8  know, this is what you're asking for.  So we're
9  objecting.  She's answered.  We're not going to
10 answer this question further.
11       MR. HERRING:  All right.  Well, you're
12 going to need to move for a protective order on
13 that then because I'm going to leave the deposition
14 open to come back and get the answer to that
15 question.
16       MR. ROSSMAN:  Then that's certainly your
17 right, but here again, this is -- you're asking her
18 questions about, you know, Spring Oaks Capital and
19 internally what its legal decisions are.  That's
20 not what a deposition is for.  You're not here to
21 ask her questions about its legal decisions or
22 legal determinations.  You're here to ask about
23 facts.
24 Q.    All right.  Well, we'll ask it this way.
25 Does Spring Oaks provide any training to its

Page 83

1  employees that if there is a conflict between the
2  guidelines and the FDCPA and in following these
3  guidelines in Exhibit 11, that they would
4  ultimately potentially violate the FDCPA, does
5  Spring Oaks provide any training that tells them
6  how to handle that situation?
7        MR. ROSSMAN:  Objection.  Argumentative
8  and compound question.  And also calls for a legal
9  conclusion.
10       MR. HERRING:  No.  I asked what training
11 they provide to their employees and how to comply
12 with the FDCPA.
13       MR. ROSSMAN:  The other part of the
14 question was all legal conclusion about whether
15 they'd be violating the FDCPA.
16       MR. HERRING:  You can -- hey, just state
17 your objection and she can answer.  All right.
18       MR. ROSSMAN:  You were asking me about my
19 objection.
20       MR. HERRING:  No, no.
21 Q.    Go ahead and answer it.
22 **A.    Can the court reporter read that back,**
23 **please?**
24       (Record read.)
25       MR. ROSSMAN:  Same objections.

Page 84

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21 (81 - 84)

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1  Q.      You can answer.
2  A.      **The Spring Oaks Capital training trains**
3  **employees on our interpretation and steps that we**
4  **believe should be taken to adhere to the FDCPA.**
5  Q.      Well, that's one part, yes.  Do they do
6  that?
7  A.      I'm sorry.  Do they do what?
8  Q.      What you just said.
9  A.      Yes.  That's my answer.  That the training
10 does outline for agents how to comply with the
11 FDCPA.
12 Q.      All right.  And does the training address
13 any potential situation where adhering to the
14 guidelines might cause employees to violate the
15 FDCPA on how they should handle that?
16         MR. ROSSMAN:  Objection.  Repetitive
17 objection.  Attorney-client privilege.  Objection.
18 Confusing.
19         MR. HERRING:  It's not attorney-client
20 privilege.  I asked what they train their employees
21 on.
22 Q.      You can answer.
23         MR. ROSSMAN:  You're asking whether or not
24 there's a violation of the law.
25 Q.      You can answer.
                                            Page 85

1  A.      **The training does teach that if someone**
2  **has a question or they're confused about something**
3  **that they're to escalate it.**
4  Q.      Why does Spring Oaks credit report
5  accounts?
6  A.      **Spring Oaks Capital credit reports as part**
7  **of the collection and credit lifecycle process.**
8  Q.      Okay.  Turning back to Exhibit 11, the XH
9  code.  Do you see that?
10 A.      Yes.
11 Q.      I think this is one of the other codes
12 that you said that the Spring Oaks investigators
13 can chose from; is that right?
14 A.      Correct.
15 Q.      And I think -- was the one an XC code?
16 A.      That's one of them, yes.
17 Q.      Okay.  And those -- are those the only
18 three codes in terms of addressing -- once an
19 investigation of a dispute is completed?
20         MR. ROSSMAN:  Objection.  Mischaracterizes
21 previous testimony.
22 A.      The codes I mentioned before, XH, XC, and
23 XR.
24 Q.      XR?
25 A.      Yes.  XR.
                                            Page 86

1  Q.      Okay.  Let's see.  So this code XR, right
2  here (indicating)?
3  A.      Correct.
4  Q.      Says removes most recently reported
5  compliance condition code.  Do not use XR as a
6  default.  If no compliance condition applies in the
7  current reporting period, blank fill this field.
8  Did I read that accurately?
9  A.      Yes, you did read that accurately.
10 Q.      And so when would that apply?
11 A.      **If a consumer contacts us and says, you**
12 **know what, changed my mind, I'm not disputing.**
13 **Take the dispute off my account.  We may use it in**
14 **that instance or if we identify that perhaps**
15 **someone logged a disputed error on an account, we**
16 **would remove it using the XR code.**
17 Q.      Okay.  And then going back to the XH code.
18 Account previously in dispute the data furnisher
19 has completed its investigation.  To be used for
20 direct disputed under the FCRA, FDCPA, or FCBA.
21 Did I read that correctly?
22 A.      Or FCBA disputes, yes.
23 Q.      Yes.  Definition, reported when the
24 investigation of a dispute by the data furnisher
25 was completed.  Did I read that correctly?
                                            Page 87

1  A.      Yes, you read that correctly.
2  Q.      So how does this code take into account
3  whether the language of the FDCPA, looking back at
4  Exhibit 10, it's a violation for a failure to
5  communicate that a debt is disputed?
6         MR. ROSSMAN:  Objection.  Foundation.
7  Objection.  Confusing.
8  Q.      You can answer.  I'm sorry.  I switched
9  pages on you.  Which exhibit do you want to look
10 At?
11 A.      Can you repeat the question?
12 Q.      How does this XH code that says account
13 previously in dispute, the data furnisher has
14 completed its investigation.  How does that account
15 for the requirement in E8 of the FDCPA that talks
16 about it's failure to communicate -- I'm sorry.
17 Including the failure to communicate that a
18 disputed debt is disputed?
19         MR. ROSSMAN:  Counsel, you're engaging in
20 a legal argument with my client here.  She didn't
21 write the CDIA manual.  She didn't write the FDCPA.
22 So I don't -- what -- are you asking for her
23 opinion about --
24         MR. HERRING:  John, John, John, state your
25 objection and then I'll continue with your client.
                                            Page 88

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22 (85 - 88)

Defendant's Exhibit A - p.23 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1    MR. ROSSMAN:  Objection.  Foundation.
2  Thank you.
3    MR. HERRING:  If you want to testify, we
4  can swear you in and you can start testifying.
5    MR. ROSSMAN:  Go ahead, Stan.
6  Q.    All right.  Go ahead.  Do you understand
7  my question?
8  A.    Not after all that.  I'm sorry.  I need
9  you to go back.
10  Q.    John likes confusing us all.  Well, let me
11  ask you this:  How does the -- how do the dispute
12  agents know that the account is no longer in
13  dispute?
14    MR. ROSSMAN:  Objection.  Repetitive.
15  Q.    Do you understand that question?
16  A.    I'm thinking through it.  You asked me how
17  do the agents know the account is no longer in
18  dispute.  What the agents know is when they've
19  completed their investigation.
20  Q.    Right.  And so when they've completed
21  their investigation, they use the XH code to say
22  account previously in dispute, right?
23  A.    That's --
24    MR. ROSSMAN:  Objection.  Mischaracterizes
25  previous testimony.
                                          Page 89

1  Q.    When they complete their investigation,
2  they're instructed by the job aids to mark the
3  account as XH, correct?
4  A.    Correct.  When they complete their
5  investigation, yes.
6  Q.    And they understand that that means what
7  it says in this description, account previously in
8  dispute, the data furnisher has completed its
9  investigation, correct?
10  A.    They understand that it means that the --
11  that the -- that they've completed their part of
12  the process and the investigation.
13  Q.    So how does Spring Oaks know that the
14  consumer no longer disputes the account?
15    MR. ROSSMAN:  Objection.  Mischaracterizes
16  previous testimony.
17  Q.    Do you understand my question?
18  A.    Yes.  In some instances the consumer may
19  tell us that they are no longer disputing the
20  account.
21  Q.    Okay.  And if the consumer does not tell
22  you that, how would they know?
23  A.    If the consumer does not tell us that
24  they're no longer disputing the account?
25  Q.    Right.
                                          Page 90

1  A.    We would not know if they're no longer
2  disputing the account.
3  Q.    Then why does Spring Oaks use the XH code
4  that they know is going to reflect that the account
5  was previously in dispute?
6  A.    The XH code is a dispute code that
7  indicates that the data furnisher, Spring Oaks, has
8  completed its investigation.
9  Q.    And Spring Oaks knows that it also says
10  account previously in dispute, right?
11  A.    Knows that what, the CDIA manual says the
12  account previously in dispute, is that what you're
13  asking me?
14  Q.    No.  That when they use the XH code it's
15  going to go to -- the sole purpose of the XH code
16  is to tell the credit bureaus how to report the
17  account, right?
18  A.    Correct.
19  Q.    And they know that it's not just going to
20  say data furnisher has completed its investigation.
21  Spring Oaks knows that it's also going to say
22  account previous in dispute, past tense, right?
23  A.    Not necessarily.
24  Q.    Not with the XH code?
25  A.    They don't -- the agents are not trained,
                                          Page 91

1  you know, what's going to be reported to the
2  bureau.  They're trained on the XH code, means that
3  they've completed their investigation.
4  Q.    Okay.  I didn't ask you what the agents
5  know.  I asked you what Spring Oaks knows.  And
6  you're testifying here as Spring Oaks, right?
7    MR. ROSSMAN:  Objection.  Argumentative.
8  A.    I actually thought you did ask me about
9  the agents.  I'm sorry.
10  Q.    Well, if I did, I apologize.  I meant to
11  ask you what Spring Oaks knows.
12  A.    Spring Oaks reports a code, XH.
13  Q.    Right.  And Spring Oaks knows that that
14  code translates into account previously in dispute,
15  the data furnisher has completed its investigation,
16  correct?
17  A.    That's how it's defined in the compliance
18  condition code.
19  Q.    Correct.  And Spring Oaks knows that
20  that's how it's defined, right?
21  A.    Yes.
22  Q.    And Spring Oaks does this, uses this code,
23  whether it knows or not if the consumer still
24  disputes the account, right?
25  A.    Can you say that again?  I don't
                                          Page 92

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23 (89 - 92)

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1  understand.
2  Q.      Spring Oaks uses this code, account --
3  that results in reporting of account previously in
4  dispute.  It uses that code whether it knows or not
5  if the consumer is still disputing the account?
6  **A.      I don't think that's accurate.**
7  Q.      When Spring Oaks finishes its
8  investigation and sends the compliance code or uses
9  the compliance code, does it do that immediately at
10 the end of the investigation or does it wait a
11 period of time before doing that?
12       MR. ROSSMAN:  Objection.  Repetitive.
13 **A.      As I testified earlier, the code may go on**
14 **the account.  The reporting is done weekly.**
15 Q.      But I guess what I'm asking is, we didn't
16 talk about exactly when.  I mean, they finish the
17 investigation, and they do the coding.  I know it
18 may take a week to upload, but do they wait a month
19 before they do the coding or do they do it as part
20 of the end of the investigation right then?
21 **A.      They do it as part of their procedures to**
22 **conclude -- to basically conclude the**
23 **investigation.  If they've completed their**
24 **investigation, they mark the account as the XH.**
25 Q.      And they -- the employees in this case, in
Page 93

1  the Robinson case, used the XH code.  They didn't
2  do that by accident, did they?
3  **A.      No.**
4  Q.      They did that intentionally as a part of
5  their training, right?
6  **A.      The XH code is, I mean, that is a step**
7  **that's outlined in the job aid.**
8  Q.      So it wasn't a mistake or an error to do
9  that, right?
10 **A.      Correct.**
11       MR. ROSSMAN:  Stan, whenever you're ready,
12 I do want to take like a five-minute break.  But
13 you're in the middle of questions, so whenever
14 you're at a natural breaking point.
15       MR. HERRING:  I was actually getting ready
16 to transition.  And I guess -- you know, I can take
17 a break.  Ms. Calko, you know, I've got a bit more
18 to do.  I don't know what you want to do in terms
19 of eating or taking a lunch break or if you just
20 want to take a short break and keep going.  I'll
21 leave it completely up to you.
22       MR. ROSSMAN:  Stan, how many more hours do
23 you think you have?
24       MR. HERRING:  About five.  I'm kidding.  I
25 don't think I have five more, but at least -- at
Page 94

1  least two or more, maybe three.
2        MR. ROSSMAN:  Yeah.  So we probably should
3  take a lunch break just to -- we don't want to --
4  like you said, this isn't an endurance contest.
5  Should we break now until 12:30, for instance?
6  12:30 central time.  So it's nearly an hour break
7  or half hour.  What -- Catherine, I'll defer to you
8  since you're the witness here and you're doing most
9  of the work.  What would be a reasonable period of
10 time for you to take a break to eat lunch?
11       THE WITNESS:  I'm good with 45 minutes.
12 And I do want to mention that I have a hard stop at
13 4:00 o'clock for daycare pickup.
14       MR. HERRING:  Okay.  That's 4:00 o'clock
15 central time?
16       THE WITNESS:  4:00 eastern time.
17       MR. HERRING:  Okay.
18       MR. ROSSMAN:  Good.  So let's take a break
19 now until 12:30 central time, and we'll start at
20 12:30 central time to continue the deposition then.
21       MR. HERRING:  No, no, no, no.  Whoa, whoa.
22 I think we said 45 minutes.  Well, so it's 11:35
23 central.  What about coming back at -- since you
24 have to leave at 3:00, which would be 2:00 -- I'm
25 sorry.  You said 4:00, which would be 3:00 our
Page 95

1  time.  That should be enough time.  I think you had
2  said 12:15?  Catherine is that right?
3        THE WITNESS:  I did not say 12:15, but --
4        MR. HERRING:  Okay.  I'm sorry.
5        THE WITNESS:  I'm saying if we -- let's
6  see.  If it's -- we take 45 minutes roughly, it's
7  1:30 my time, 12:30 your guys time to come back.
8        MR. HERRING:  Okay.  Yeah.  That'll be
9  good.  That'll be good.
10       THE WITNESS:  Okay.
11       MR HERRING:  All right.  We'll see
12 everybody in about 45 minutes.
13       MR. ROSSMAN:  Thank you.
14       THE WITNESS:  Thank you.
15       MS. LOCKHART:  All right.  Thank you.
16            (A recess was taken.)
17       THE VIDEOGRAPHER:  The time is 12:32 p.m.
18 We are back on the record.
19 Q.      Okay.  Ms. Calko, during the lunch break
20 we just took, did you discuss this matter with
21 anybody?
22 **A.      No.**
23 Q.      Did you talk with Mr. Rossman during the
24 lunch break?
25 **A.      No.**
Page 96

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24 (93 - 96)

Defendant's Exhibit A - p.25 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1    Q.      Okay.  And you didn't talk with anybody at
2    Spring Oaks?
3    **A.      I talked to Mr. Blady just to say, how are**
4    **you doing?  All right.  Let's, you know, head back**
5    **out there.  Take a break.  I think he said, go get**
6    **some lunch and we jumped back -- we'll jump back at**
7    **about 1:30.**
8    Q.      Got you.  Did y'all discuss --
9    **A.      Well, and I talked to my husband about**
10   **picking the dog up from the vet.**
11   Q.      Did you and Mr. Blady discuss the case or
12   your testimony at all?
13   **A.      No.**
14   Q.      All right.
15   **A.      I do need just one moment.  I want to make**
16   **sure I have everything off of my screen, my**
17   **communicator.  I was checking in with my team.  I**
18   **just want to turn to make sure everything is completely**
19   **signed out.**
20   Q.      Let me know when you're ready.
21   **A.      I will.  Okay.  I think I got it.**
22   Q.      Okay.  I want to turn to --
23           MR. HERRING:  Well, before I do that, can
24   the court reporter read back the last question and
25   answer for me?
                                                    Page 97

1    that would include, say, like an opening page that
2    would have background information, you know, the
3    amount owed, and if there are any flags, that kind
4    of thing.  Is there a page that was not provided to
5    us that would have that kind of information?
6    **A.      There is a screenshot of the system that**
7    **has like name and address and balance, yes.**
8    Q.      And to your knowledge we haven't been
9    given that?
10   **A.      Correct.**
11   Q.      Okay.  Looking at the account notes and --
12   let's see.  So this is Bates SOC Robinson 0024, so
13   these were provided to us by Spring Oaks.  Is that
14   your understanding?
15   **A.      Yes.**
16   Q.      And so it looks like the account was
17   received by Spring Oaks on March 26th, 2022.  Am I
18   reading that right?
19   **A.      Yes.**
20   Q.      And so look up here.  This looks like the
21   address -- an address for Mr. Robinson for this
22   account.  Is that what that is?
23   **A.      Correct.**
24   Q.      And then above that on 3/27 where I've
25   highlighted it says, flag TransUnion lawsuit
                                                    Page 99

1           (Record read.)
2    Q.      So I want to share my screen.  I want to
3    look at the account notes that are marked as
4    Exhibit 4 to your deposition.
5           (Plaintiff's Exhibit 4 was marked for
6                  identification.)
7    Q.      Do you see that?
8    **A.      Yes.**
9    Q.      Okay.  Let's see.  Can you see these very
10   well or are they too small?
11   **A.      I think they're okay.**
12   Q.      Is that better?
13   **A.      That's fine, yes.**
14   Q.      Okay.  So I've called these account notes.
15   Will you describe for the record from Spring Oaks'
16   perspective exactly what Exhibit 4 is?
17   **A.      Exhibit 4, it is a printout of the account**
18   **notes from the Spring Oaks Capital system of**
19   **record.**
20   Q.      And does this represent all the actions
21   and documentation entered in the account notes for
22   this account?
23   **A.      Yes, it does.**
24   Q.      And so a lot of times when we get account
25   notes like this we'll get some separate documents
                                                    Page 98

1    history, send, removed.  And below that it has
2    added.  Can you explain to me what that is?
3    **A.      Yes.  Those are flags that are placed on**
4    **the account to send the account out to do a scrub**
5    **for lawsuit history.  And when the results are**
6    **returned the flag is removed.  So you see added and**
7    **removed.**
8    Q.      So what -- why does Spring Oaks do that?
9    I mean, why do they send out for lawsuit history
10   from TransUnion?
11   **A.      To identify if the consumer has a history**
12   **of lawsuits.**
13   Q.      Okay.  And why does that matter to Spring
14   Oaks?
15   **A.      That may indicate additional risks with**
16   **that particular account and may warrant different**
17   **treatment.**
18   Q.      Okay.  Let me go back up to the first page
19   just so I can make sure I understand what all these
20   columns are.  Okay.  So looking across the top, the
21   create date, that's seems pretty self explanatory.
22   Whatever action or input is noted here, that's the
23   date that that was done.  Is that accurate?
24   **A.      Correct.  Well, it's the date that the**
25   **note was loaded to the account.**
                                                    Page 100

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25 (97 - 100)

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

| | |
|---|---|
| 1  Q.    Okay.  And -- | 1  bottom on 3/31 it says initial -- or letter -- |
| 2  A.    And in many instances it will be the date | 2  initial letter scheduled to be sent 3/31/22.  Do |
| 3  stamp action when an action was taken. | 3  you see that? |
| 4  Q.    Got you.  And sometimes it may be a note | 4  A.    Yes. |
| 5  for something that's going to happen or something | 5  Q.    Okay.  And that's a -- was an initial |
| 6  like that.  Is that accurate? | 6  letter that y'all sent to the consumer in this |
| 7  A.    Something that's going to happen -- | 7  case; is that right? |
| 8  Q.    Like maybe something with today's date may | 8  A.    Correct. |
| 9  say send letter on tomorrow's date or something? | 9  Q.    Okay.  And do y'all still have a copy of |
| 10  A.    Yes. | 10  that? |
| 11  Q.    And then the time -- the column across the | 11  A.    Yes. |
| 12  top, that's 8:10.  So is that 8:10 a.m.? | 12     MR. HERRING:  Okay.  I don't recall seeing |
| 13  A.    Yes. | 13  that in -- produced in discovery.  John, is that |
| 14  Q.    And what -- is that eastern time or | 14  something y'all withheld? |
| 15  central? | 15     MR. ROSSMAN:  We produced that. |
| 16  A.    Eastern time zone. | 16     MR. HERRING:  Okay. |
| 17  Q.    Okay.  And then the note in the next | 17     MR. ROSSMAN:  We used it in -- your |
| 18  column, that's the actual note of what's being | 18  cocounsel can testify.  We used it during |
| 19  documented in the account notes, correct? | 19  Mr. Robinson's deposition as well so it's an |
| 20  A.    Correct.  Or the action taken so when you | 20  exhibit there as well. |
| 21  see ccalko viewed the account, I opened the account | 21     MR. HERRING:  Okay.  I may have missed |
| 22  in the system of record. | 22  that one. |
| 23  Q.    Okay.  And username that indicates who | 23  Q.    So then again on 4/3 y'all are doing a |
| 24  documented that note or took what action; is that | 24  lawsuit search with TransUnion; is that correct? |
| 25  right? | 25  A.    Correct. |
| Page 101 | Page 103 |
| 1  A.    Correct. | 1  Q.    And that's something that just |
| 2  Q.    Okay.  Where it says job, what does that | 2  automatically runs like once a week, once every few |
| 3  mean? | 3  weeks? |
| 4  A.    There may be systemic actions that are | 4  A.    It's periodic and I think maybe the |
| 5  programed that result in time, you know, a human didn't | 5  frequency has changed over time.  I'd have to |
| 6  initiate it.  For that instance, it was a process | 6  double check, but periodically that scrub is run. |
| 7  set up that's automatic and it's documenting in the | 7  Q.    Okay.  And then on 4/5 you see where it |
| 8  automatic processes. | 8  says -- let me get rid of that.  256-612-1392 |
| 9  Q.    Okay.  Then type, what is that? | 9  outbound unknown mobile.  Do you see that entry? |
| 10  A.    That's a general description of what type | 10  A.    Yes. |
| 11  of action was taken. | 11  Q.    Is that an autodial call or is that a |
| 12  Q.    And agency number? | 12  manual call? |
| 13  A.    I believe that's the -- our internal | 13     MR. ROSSMAN:  Objection.  Calls for a |
| 14  reference number. | 14  legal conclusion. |
| 15  Q.    So is that the reference number for the | 15  Q.    Did a human being make that phone call? |
| 16  account or for what? | 16  A.    A human being initiated the phone call, |
| 17  A.    Yes.  The account. | 17  yes. |
| 18  Q.    Okay.  And job ID? | 18  Q.    Yeah.  Okay.  But it was -- an auto dialer |
| 19  A.    If it's tied to one of the systemic | 19  was used? |
| 20  processes, those jobs or processes have IDs and | 20     MR. ROSSMAN:  Objection.  Calls for a |
| 21  maybe sub IDs of the job tasks and then there may | 21  legal conclusion. |
| 22  be additional systemic actions within the system | 22  Q.    If you know.  I understand you're trying |
| 23  that are also linked to that particular job, and | 23  to avoid TCPA liability, but -- |
| 24  that's where you see the action path ID. | 24  A.    I don't -- I mean, I don't know how -- I |
| 25  Q.    Okay.  Thank you.  So looking at the | 25  wouldn't classify if as an autodialer. |
| Page 102 | Page 104 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26 (101 - 104)

Defendant's Exhibit A - p.27 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

---

Page 105

1  Q.      Did a human being pick a phone up and push
2  in digits to make a call?
3  A.      **A human being pushed a digit to make the**
4  **call, not all of the digits in the phone number.**
5  **Yes.**
6  Q.      Like pushed a button on a screen and it
7  made a call?
8  A.      **Correct.**
9  Q.      All right.  Do you see the entry on
10 5/13/22 that reported to credit bureaus?
11 A.      **Yes.**
12 Q.      I believe that's the first time y'all
13 credit reported.  How would that credit reporting
14 have been done?  I mean, what's the process for
15 that?
16 A.      **A report is created within the system of**
17 **record and then that record is systemically sent to**
18 **TransUnion.**
19 Q.      Okay.  And I think that's -- you said
20 that's done -- once you start reporting, it's done
21 once a week?
22 A.      **Weekly, yes.**
23 Q.      Weekly.  Okay.  And how many accounts does
24 Spring Oaks credit report on in -- how many did
25 they in 2002?

---

Page 106

1         MR. ROSSMAN:  Objection.  Foundation.  Did
2  you say 2002?
3  Q.      I'm sorry.  2022.
4         MR. ROSSMAN:  Thank you.  Same objection.
5  A.      **I don't know.**
6  Q.      Is it more than a thousand?
7  A.      **Yes.**
8  A.      **More than 10,000?**
9  A.      **In 2022, yes.**
10 Q.      More than 20,000?
11 A.      **Yes.**
12 Q.      More than 50,000?
13 A.      **Yes.**
14 Q.      More than 100,000?
15 A.      **Yes.**
16 Q.      More than half a million?
17 A.      **Yes.**
18 Q.      More than a million?
19 A.      **I don't know.**
20 Q.      More than 750,000?
21 A.      **I don't know.**
22 Q.      Okay.  So at least 500,000, but more --
23 between there and a million somewhere.  Is that
24 accurate?
25 A.      **I just don't know beyond, you know,**

---

Page 107

1  approximately 500,000.
2  Q.      Okay.  And that's week in and week out
3  during that time frame?
4  A.      **What do you mean by week in and week out?**
5  Q.      I mean, they just -- they consistently
6  reported on at least half a million people during
7  the course of that year?
8  A.      **The number fluctuates I think, so I don't**
9  **know for certain the number.  But we report weekly,**
10 **and it was approximately 500,000 or some number**
11 **over that.**
12 Q.      Okay.  Does Spring Oaks have the ability
13 to go back to May 13th, 2022, and identify or
14 access the information it credit reported on this
15 account to the credit bureaus?
16 A.      **I believe so.**
17 Q.      Okay.  Is that -- is that a difficult
18 process or is it extremely involved or do you know?
19 A.      **I don't know.**
20 Q.      Do you know who would know that?
21 A.      **Yes.**
22 Q.      Who is that?
23 A.      **Someone in our business ops team can look**
24 **at the reporting.**
25 Q.      And so if they can do that in May, then

---

Page 108

1  there's another one there on June 3rd, they could
2  access each one of those and see what, if anything,
3  was updated to the credit bureaus for this account.
4  Is that accurate?
5  A.      **Correct.**
6  Q.      So a lot of entities like y'all update
7  monthly.  Is there a reason that y'all update
8  weekly?
9  A.      **Just an internal decision to reflect the**
10 **activity on the account on a more frequent basis.**
11 Q.      Can you tell from these -- well, let me
12 back up a little bit.  On 8/19/2022, it looks like
13 there was a message left?
14 A.      **That is a text message.**
15 Q.      Okay.  I see to the right it says text
16 message.  Got you.  Do you know if y'all ever
17 actually spoke to Mr. Robinson?
18 A.      **From my review of the documentation, I do**
19 **not believe that we did.**
20 Q.      Okay.  Turning to the page Bates SOC 019.
21 At the top, on 10/3, do you see that part I've
22 highlighted?
23 A.      **Yes, I do.**
24 Q.      And so on 10/3/2022 at 12:49, will you
25 read that file entry for me?

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27 (105 - 108)

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1  A.      Dispute, written dispute, written, filed
2  on $675.09 with reason, written dispute, customer
3  does not recognize account, written dispute, loaded
4  document to file.
5  Q.      Okay.  So why does it say written dispute
6  so many times?
7  A.      It's actually showing the entries of the
8  notes and then where it says dispute, that is as we
9  were discussing earlier, the notation from the
10 dispute form.  So we put it in the notes and then
11 we also put it in the dispute form which translates
12 -- creates an entry in the notes.
13 Q.      Okay.  So the entry at the -- the second
14 entry from the top where it says dot, dot, dot,
15 written dispute, loaded document to file.  Is that
16 a handwritten -- or a typewritten note?
17 A.      Correct, yes.
18 Q.      And ndavis.  Do you know who ndavis is?
19 A.      Yes, I do.
20 Q.      Why does it say deleted next to her name?
21 A.      She's no --
22 Q.      Or him.
23 A.      Pardon?
24 Q.      I didn't know if it was a him or her.  I'm
25 sorry.
                                          Page 109

1  A.      This is a letter that was received by
2  Spring Oaks Capital dated stamped October 3rd,
3  2022, dated September 27th, 2022 noting that it was
4  sent by certified mail outlining basically that the
5  person who signed the document is disputing --
6  disputing this debt and it has Christopher
7  Robinson's name at the bottom.
8  Q.      Are the employees that do this intake,
9  they're trained on how to document the file I guess
10 to correctly and accurately describe the dispute.
11 Is that fair?
12 A.      Yes.
13 Q.      And they're trained that it's important to
14 correctly and accurately describe the dispute; is
15 that right?
16 A.      Yes.
17 Q.      And why is that important?
18 A.      It's important to maintain our records.
19 I'll leave it at all.
20 Q.      Is it important for other employees who
21 are looking at the file to be able to understand
22 the nature of the dispute?
23 A.      Yes.
24 Q.      Okay.  At the top it looks like there was
25 a stamp applied and it has certain categories and
                                          Page 111

1  A.      She's no longer employed --
2  Q.      Okay.
3  A.      -- at Spring Oaks.
4  Q.      Okay.  And then is the part in all caps,
5  is that the part that the system puts in?
6  A.      That's the system drop down that I was
7  referencing earlier, written dispute.
8  Q.      And then it says filed on $675.09
9  with reason, dot, dot, dot.  Was there more typed
10 in there and the dot, dot, dot just shortens it for
11 space or --
12 A.      No.  That is the actual notation that the
13 inbound correspondence team uses to call attention
14 to this type of entry.  It's really just calling
15 attention to the entry with the dots.  There's
16 nothing that's excluded.
17 Q.      Okay.  Then it says customer does not
18 recognize account.  Do you see that?
19 A.      Yes, I do.
20 Q.      So looking at Exhibit 2 to your
21 deposition, do you recognize this document?
22         (Plaintiff's Exhibit 2 was marked for
23          identification.)
24 A.      Yes, I do.
25 Q.      And what is it?
                                          Page 110

1  then it has some handwritten notes.  Do you see
2  that?
3  A.      Yes.
4  Q.      Okay.  The first one says CND.  What does
5  that stand for?
6  A.      Cease and desist.
7  Q.      Okay.  And then what's the note that's
8  written on there?
9  A.      It's the first initial and last name of
10 the person that logged the correspondence.  It says
11 text and e-mail.
12 Q.      Okay.  And I guess that is because down
13 here Mr. Robinson said if you want to communicate
14 with me, there are two convenient ways, text and
15 e-mail, right?
16 A.      Correct.
17 Q.      Is there a place -- in the next paragraph
18 he goes on to say, the only convenient times to
19 communicate with me by text or e-mail are Monday to
20 Friday 1:00 to 4:00 p.m.  How would that be
21 documented in the notes?
22 A.      It would have to be typed into the notes.
23 Q.      Okay.  There's no place on this form to
24 document that; is that correct?
25 A.      That's correct.
                                          Page 112

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28 (109 - 112)

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  Q.       Does Spring Oaks train its employees that
2  it's important to document the dates and times or
3  the days and times when they can communicate with
4  the consumer?
5  A.       Yes.
6  Q.       Do you know if that was documented in
7  Spring Oaks' notes?
8  A.       I believe in this instance it was -- the
9  account was documented to not have any more phone
10 calls or mail and to document that he wanted --
11 Mr. Robinson was requesting text and e-mails only.
12 Q.       And did the notes, based on your review,
13 document the days and time when Mr. Robinson said
14 that he could be texted or e-mailed?
15 A.       I do not believe so.
16 Q.       And does Spring Oaks believe it's
17 important to honor a consumer's request to only be
18 contacted during certain days and at certain times?
19 A.       Yes.
20 Q.       Does Spring Oaks train its employees that
21 if they contact the consumers at other days and
22 times that aren't convenient that that could be a
23 violation of the FDCPA?
24 A.       Yes.
25 Q.       Okay.  So do you have a copy of the
                                        Page 113

1  communicated with, would that be in these notes?
2  A.       Yes.
3  Q.       And would they also -- if that was
4  entered, would there also be like a kind of an
5  account home page or whatever where a collector or
6  an employee could look and see what flags were on
7  the case or would they just have to go to the notes
8  and look?
9  A.       No.  There's a section to show the flags.
10 Q.       Okay.  What's that called?
11 A.       I don't recall the section of the system,
12 the name of it.
13 Q.       Okay.  And you didn't see that in the
14 production, did you?
15 A.       No.
16 Q.       And the section that shows the flags, does
17 it keep a history of what flags are in place and
18 when or is it just whatever is going on at that
19 moment is what it shows?
20 A.       It's whatever is going on the moment in
21 time, current status.
22 Q.       Okay.  Looking on 10/3, this line right
23 here (indicating).  It says, form inbound written
24 correspondence added.  What does that mean?
25 A.       Yes.  That means that there's an -- if you
                                        Page 115

1  Exhibit 4 pulled up in front of you?
2  A.       No.  Let me see.  Okay.  I have it.
3  Q.       Will you find in there where it was
4  documented to only communicate with Mr. Robinson by
5  text or e-mail?
6  A.       Yes.  If you go to --
7          MR. ROSSMAN:  Stan, could you put that
8  Exhibit on the screen, please, Exhibit 4?
9  A.       This is Exhibit 4.  We just need to go up
10 in the page right around October 3rd, 2022.
11         MR. ROSSMAN:  I see, I see.  Okay.  Yes.
12 Thank you.  Sorry.
13 A.       And then scroll down a little bit.  Back
14 up.
15 Q.       It flips me over to the next page.
16 A.       Yeah.  It's at the very bottom.
17 Q.       All right.
18 A.       Do not mail.  Change from false to true.
19 Do not call.  Change from false to true.
20 Q.       Does it say in text or e-mail?
21 A.       The flag -- the flags on those categories
22 were not changed.  So it doesn't have an entry
23 there related to text or e-mail.
24 Q.       And if there was going to be an entry as
25 to days and times that the consumer can be
                                        Page 114

1  scroll back down to the other page that you had
2  highlighted before.  Actually sorry.  Go back up.
3  It's basically a section within the system to log
4  that we logged, you know, some type of inbound
5  correspondence from the consumer.
6  Q.       So how is that -- what does that entry do
7  different than the entry on the previous page where
8  they documented written correspondence or written
9  dispute?
10 A.       The dispute is specifically for logging
11 disputes and identifying accounts as being
12 disputed.  The inbound correspondence tab is filled
13 out, you know, essentially for all types of
14 correspondence.  Whether that's attorney
15 representation, notice of bankruptcy, a request, I
16 want to settle my account, that form is just used
17 to log and track inbound correspondence.
18 Q.       Okay.  And then so the line says above,
19 disputed changed from false to true.  Tell me what
20 that means.
21 A.       It means that the agent filled out the
22 dispute form and the account was now identified and
23 coded as disputed.
24 Q.       And would that result in the XB code being
25 sent to the credit bureau the next time the credit
                                        Page 116

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29 (113 - 116)

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1 report was updated?
2 A.      Yes.
3 Q.      Okay.  So all this happens on 10/3.  It
4 looks like on 10/7, is that the next -- that
5 appears to be next time the credit report was
6 updated?
7 A.      Yes.
8 Q.      And so if we were able to pull the credit
9 report on 10/8, it should show that the account is
10 disputed; is that right?
11          MR. ROSSMAN: Objection.  Foundation.
12 A.      The report was sent and created.  I don't
13 know how quickly TransUnion would update the code.
14 Q.      Okay.  Well, so it was updated again on
15 10/14, 10/21, 10/25, and 10/28.  So you would
16 figure at least by then it would be updated or do
17 you just not know?
18 A.      All I'm saying is that if we reported the
19 code to TransUnion on 10/7, I don't know what exact
20 date TransUnion put the code on Mr. Robinson's
21 credit file.
22 Q.      Okay.  So going back to the previous page,
23 you see where it says consumer does not recognize
24 account?
25 A.      Yes.
                                              Page 117

1 Q.      Okay.  Looking back at Exhibit 2, can you
2 show me what was stated in here that would result
3 in that note being put in the account notes?
4 A.      I don't see those words, I do not
5 recognize this account.  That was the agent's
6 interpretation is, you know, what I can say about
7 that.  It looks like that was her interpretation of
8 what she read.
9 Q.      Are the agents trained or does the job aid
10 information provide them with certain ways they're
11 supposed to document a dispute like certain words
12 to use?
13 A.      Yes.
14 Q.      And is one of those does not recognize the
15 account?
16 A.      I believe so.  But there's probably
17 multiple other phrases that are, you know, offered
18 as suggestion based on what the agent has read.
19 Q.      Okay.  And Exhibit 2 goes on after it says
20 I'm disputing this debt and all others you claim I
21 have.  Please note I do not want you to send me any
22 information.  I simply want you to know that I
23 dispute any debts.  This is not a request for
24 validation or verification.  I am not interested in
25 you sending me any documentation.  So looking at
                                              Page 118

1 the account notes was that, what I just read,
2 documented in the account notes anywhere?
3 A.      Those specific words were not documented,
4 but the document itself was loaded to the account.
5 Q.      Do you know why that was not documented?
6          MR. ROSSMAN: Objection.  Mischaracterizes
7 previous testimony.
8 Q.      Do you know why?
9 A.      The documentation is -- to log a dispute
10 is to be shorthand.  It's not to copy and paste
11 essentially the entire dispute from the
12 correspondence.  This document labeled as Exhibit 2
13 is loaded to the account in a section called
14 documents where it is stored and the work
15 instructions for both the inbound correspondence
16 agents and the dispute agents, you know, to read
17 the document in its entirety.  So those shorthand
18 notes are not meant to be an entire copy and paste,
19 if you will, of the full letter or full
20 correspondence.
21 Q.      Is it important as a part of the policy
22 and procedures for Spring Oaks employees when they
23 document in shorthand in the account notes to
24 document whether the request is a validation or
25 verification or whether the dispute is just a
                                              Page 119

1 dispute or is a request of validation and
2 verification?
3 A.      The agent who logs the inbound
4 correspondence does not have to get into that
5 detail.  The team that investigates disputes will
6 need to read the entire document to understand what
7 the consumer is requesting, disputing, you know,
8 whatever the case may be in a particular piece of
9 correspondence.
10 Q.      As Spring Oaks corporate representative
11 looking at this letter, is it ambiguous to you at
12 all that as to -- whether or not Mr. Robinson was
13 requesting any documents or a validation or
14 verification in his letter?
15 A.      The words on the page say this is not a
16 request for a validation or verification.
17 Q.      Or information or documentation, correct?
18 A.      It says above, please note do not want you
19 to send me any information.  And then at the bottom
20 it does say, I am not interested in you sending me
21 any documentation.
22 Q.      So Spring Oaks would train its employees
23 who would reading this letter and doing the dispute
24 investigation, would train them to recognize that
25 when they see this kind of language from a consumer
                                              Page 120

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30 (117 - 120)

Defendant's Exhibit A - p.31 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1 that this is not a request for validation or
2 verification; is that correct?
3 **A.      They are trained to read the document,**
4 **yes.**
5 Q.      Are they trained to ignore what the
6 consumer said regarding whether it's a request for
7 validation or verification?
8 **A.      No.**
9 Q.      And they're trained, aren't they, that
10 when a consumer says I don't want documentation, I
11 dont' want information, this is not a request for
12 validation or verification, they're trained to
13 honor that request, aren't they?
14      MR. ROSSMAN:  Objection.  Argumentative
15 and repetitive.
16 **A.      In this instance and as we discussed**
17 **earlier is that we're looking at this as both an**
18 **FCRA and FDCPA dispute both.  So yes, he's saying**
19 **that it's not a request for validation, but our**
20 **processes are to respond looking at this from an**
21 **FCRA perspective.**
22 Q.      Is there anything in this letter that says
23 it's a dispute pursuant to the FCRA?
24 **A.      No.**
25 Q.      Is there anything in this letter that is

Page 121

1 asking you to correct or alter any credit
2 reporting?
3 **A.      It doesn't specifically reference credit**
4 **reporting.**
5 Q.      But you understand -- Spring Oaks
6 understands that when he says that he disputes the
7 debt that in order to comply with the Fair Debt
8 Collection Practices Act, it has to report the debt
9 as disputed in the credit bureaus, right?
10 **A.      Yes.  But this also doesn't say under the**
11 **-- he's disputing under the FDCPA.  He doesn't say**
12 **that he's disputing under the FDCPA or FCRA.**
13 Q.      If it said that they was disputing under
14 the FDCPA, would Spring Oaks still treat this as an
15 FCRA letter?
16      MR. ROSSMAN:  Objection.  Speculation.
17 Q.      You can answer.
18 **A.      If it's credit reporting as we've**
19 **discussed before, we look at it as both.**
20 Q.      So from Spring Oaks' perspective it
21 doesn't matter whether it says FDCPA or FCRA, does
22 it, in terms of whether you treat it as an FCRA
23 letter?
24 **A.      It doesn't -- if the customer -- it**
25 **doesn't matter if the customer specifically calls**

Page 122

1 out for one regulation or another.
2 Q.      If -- so why does Spring Oaks if they view
3 this as an FCRA letter, does Spring Oaks believe it
4 still has to comply with the FDCPA even though this
5 is an FCRA letter?
6      MR. ROSSMAN:  Objection.  Calls for a
7 legal conclusion.
8 Q.      Well, you're a lawyer, aren't you?
9 **A.      Yes, yes, I am.**
10 Q.      Okay.  Do you understand my question?
11 **A.      I would like you to repeat it.**
12      MR. HERRING:  Will you read it back,
13 please?
14      (Record read.)
15      MR. ROSSMAN:  Same objection.
16 **A.      I'm sorry.  I didn't quite catch all of**
17 **that.**
18 Q.      So if Spring Oaks views this as an FCRA
19 letter, does Spring Oaks believe that it still has
20 to comply with FDCPA specifically Section E8 in
21 records to credit reporting?
22 **A.      Yes.  We're looking at both.**
23 Q.      All right.  Going back to Exhibit 4.  So
24 the letter was received October 3rd and it looks
25 like a response was sent or the investigation was

Page 123

1 completed on October 31st.  Is that accurate?
2 **A.      Correct.**
3 Q.      Then so looking at the note that I
4 highlighted it says, do not mail.  Change from true
5 to false.  What does that mean?
6 **A.      There's a check box on the account that we**
7 **looked at earlier, you know, as an example.  That**
8 **was marked true to do not mail Mr. Robinson.**
9 **Within the system in order to actually print a**
10 **letter, and in this letter, the letter FCRA invalid**
11 **dispute info accurate with validation, in order to**
12 **be able to print that letter the agent had to**
13 **change the status from true to false.  And if you**
14 **see up above she changed it back from false to**
15 **true.**
16 Q.      Okay.  That's what -- yeah.  That was just
17 for the purpose of printing?
18 **A.      Correct.**
19 Q.      Okay.  So why did that letter have to be
20 printed?
21 **A.      In order to respond to Mr. Robinson.**
22 Q.      Okay.  Could it not have just been -- was
23 that letter ultimately mailed to Mr. Robinson?
24 **A.      The letter e-mail to Mr. Robinson.**
25 Q.      Okay.  So it had to be printed and then

Page 124

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31 (121 - 124)

Defendant's Exhibit A - p.32 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1 scanned in?
2 A.      I guess --
3         MR. ROSSMAN:  Objection.
4 A.      We're using the word print in different
5 ways.
6 Q.      Well, can you explain to me what you mean
7 by print?
8 A.      Yes.  I don't mean an actual like physical
9 printer with a physical piece of paper.  Within the
10 system, you can print to PDF, and so then it
11 creates a PDF of the correspondence.
12 Q.      Okay.  And is that what was done here?
13 A.      Yes.
14 Q.      Okay.  Then so underneath that on 10/29 it
15 says jortiz viewed this account.  Who is that?
16 A.      That is Johanna Ortiz.  She's a member of
17 our quality assurance team.
18 Q.      And then above that says kmoore viewed
19 this account.  Who is that?
20 A.      Kara Moore was the dispute agent that
21 investigated and responded to this dispute.
22 Q.      Okay.  Going back down a little bit more.
23 You see where it says status changed on 10/3 from
24 ACT to written?
25 A.      Yes.

Page 125

1 Q.      What does that mean?
2 A.      That's representing that the status was
3 changed from active to written dispute.
4 Q.      Okay.  What's the difference between an
5 active and a written dispute?
6 A.      An active account is an account that's --
7 Q.      Okay.  I'm sorry.
8 A.      -- being worked by collectors.  The
9 written -- when it switches to the written
10 category, as I mentioned before, that's where it
11 goes into a protective queue we're not calling,
12 we're not trying to communicate with the customer
13 while it's being investigated or researched.
14 Q.      And then two -- line above it says
15 document written dispute, Robinson PDF uploaded.
16 Is that Exhibit 2 that we've been looking at, the
17 letter?
18 A.      That is Mr. Robinson's -- the letter that
19 was sent in Mr. Robinson's name on it.
20 Q.      Okay.
21         MR. ROSSMAN:  Go you go back to Exhibit 2
22 and show it to her, please?
23 A.      Yes.
24 Q.      That's what is documented -- sorry.  Right
25 here (indicating); is that right?

Page 126

1 A.      Correct.
2 Q.      And by right here we're talking about
3 10/3/2022 at 12:50.  And then above that on 10/4 it
4 says, document, STM 20211120 PDF uploaded.  What is
5 that?
6 A.      That is -- you can see it also says job so
7 that was -- it was a job that was run to upload
8 statements to the account.
9 Q.      And then lhurlocker viewed this account.
10 Who is that?
11 A.      That Lauren Hurlocker.  She was a quality
12 review agent within the back office team.
13 Q.      Is all this a part of the dispute
14 investigation that's going on?
15 A.      No.  This is -- on 10/3/2022 and
16 10/4/2022, this is the first part of the process,
17 receiving and processing the inbound
18 correspondence.
19 Q.      Okay.  And so what would lhurlocker have
20 been looking at?
21 A.      The work that ndavis completed.
22 Q.      Okay.  And then the four documents that
23 are uploaded on 10/4 right above that, what are
24 those documents?
25 A.      Those are statements to the account that

Page 127

1 were loaded to the document section within the
2 account system of record.
3 Q.      Then on 10/4 and 10/5 are those statements
4 as well?
5 A.      Yes.
6 Q.      And where -- would those statement have
7 been in Spring Oaks' system or would they have to
8 go get those somewhere?
9 A.      The statements come from the seller.  And
10 on this date, in order to upload them into the
11 system of record, we had to have them within the
12 Spring Oaks system overall and then load them into
13 the system of record that houses the account.  So
14 they were most likely from an SFTP site that we
15 obtained the statements from the seller and then
16 they get loaded to the account.
17 Q.      What's SFTP site?
18 A.      Secure file transfer protocol.
19 Q.      Is it protocol or portal?
20 A.      I thought it was protocol.  I could be
21 wrong.
22 Q.      I think Midland calls theirs a portal.
23 Okay.  So they're housed in that system and then if
24 Spring Oaks needs them, they go and download them
25 or upload them into Spring Oaks' system; is that

Page 128

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32 (125 - 128)

Defendant's Exhibit A - p.33 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  right?
2  A.        No.  We obtain them from the seller using
3  the SFTP protocol.  We ingest them into our system
4  and then load them to the account.  You don't leave
5  anything on the SFTP site.
6  Q.        So looking at this page, can you tell when
7  the dispute investigation team started doing its
8  work?
9  A.        Yes.  That would've been 10/31/2022 at
10  approximately 9:05, 9:05 a.m.
11  Q.        Okay.  So other than credit reporting, did
12  anything else happen on the account between I
13  guess, what, when those documents were uploaded and
14  when kmoore viewed the account on 10/31?
15  A.        I mean, there was a flag placed on the
16  account and removed so it looks like we were
17  looking at the account to see if it would perhaps
18  go to a collection agency for work, but it looks
19  like the flag was removed.  There was an indicator
20  within the system that checked off that the media
21  had been loaded to the account.
22  Q.        Okay.  Hold on.  So the flag about it
23  being -- going to a third party collector, is that
24  at 10/6 at 8:43?
25  A.        The first one is at 10/4 and then it is

Page 129

1  removed on 10/6.
2  Q.        Okay.  And then the flag on 10/28, what is
3  that?
4  A.        It looks like it's looking for the check
5  boxes for the do not -- actually I would need to
6  double check on that particular job, that flag.
7  Q.        Is -- so is it your belief that DNC is do
8  not contact?
9  A.        I'm not sure.
10  Q.        Okay.  What is debt flag?  You see over in
11  the --
12  A.        Yes.  Debt flag just indicates that some
13  type of flag was added to the account.  So, again,
14  you can see on 10/4 flag track prime, flag vendor,
15  it's basically putting an indicator on the account
16  to be able to pull reporting later.  I don't recall
17  -- the flag DNC check, I don't recall specifically
18  what that process is related to.
19  Q.        Okay.  And so I think you had said earlier
20  there's a page like a screenshot that would show
21  what flags are on the account?
22  A.        Current flags.
23  Q.        Current flags.  So if one of these were
24  added and removed it wouldn't show it as ever
25  having been there?

Page 130

1  A.        It would be in the notes.
2  Q.        It would be in the notes, but not on that
3  page?
4  A.        Not on the page that shows the current
5  flags.
6  Q.        Okay.  So 10/31 kmoore viewed this
7  account?
8  A.        Yes.
9  Q.        Can you tell what part of the account or
10  what kmoore would've looked at or been looking at?
11  A.        Not by the documentation.
12  Q.        Is there some other part of the system
13  that would document what kmoore was looking at?
14  A.        No.
15  Q.        And is there a page or a screen or some
16  part of the system that documents the steps taken
17  as part of the investigation and dispute
18  investigation?
19  A.        Yes.  If you scroll up, the documentation
20  is in the notes.
21  Q.        Okay.  I guess that wasn't a very good
22  question.  Other than these notes, is there some
23  separate page that would talk about, you know,
24  looked at this document, contacted this person,
25  reviewed this, that kind of thing?

Page 131

1  A.        No.  As we talked before, there's what I
2  referred to as the dispute form where they input
3  the notes related to the investigation.  Those
4  notes are transferred to the actual what we call
5  the notes part of the system.  So it's logging what
6  actions and comments were made within the dispute
7  form.
8  Q.        Then those notes end up in what we're
9  looking at?
10  A.        I'm sorry.  Say that again.
11  Q.        And those notes would end up in what we're
12  looking at?
13  A.        Correct.
14  Q.        Okay.  Is there a separate place to go
15  look that just has the notes that are entered and
16  not all these actions?
17  A.        I mean, the notes are the notes.  There's
18  the form, but it has exactly when's in -- for
19  example, if you go to line 9/11, like that's
20  exactly what's in the dispute form.
21  Q.        Okay.  All right.  So on 10/31 at 9:08 it
22  says -- do you read these starting at the bottom or
23  do you go up to the top of that section?
24  A.        You need to start at the far left and read
25  each entry -- it looks like they're center

Page 132

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33 (129 - 132)

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1 justified so for example, if you're looking at --
2 the section that's not highlighted under 9:08 where
3 it says 10/31, that's all one -- no.  Go down a
4 little bit.  Go down.  Yeah.  Where it says letter
5 FCRA.  No.
6 Q.      I see what you're saying.
7 A.      Yeah.  So that's one comment and, again,
8 it's a wrap.  The text appears to be wrapped and
9 center justified or centered.
10 Q.      So is there a place in y'all's system to
11 go view the filled out dispute forms?
12 A.      Yes.
13 Q.      Where is that?
14 A.      It's in the system of record.  It's like a
15 button that you click to open up what I've been
16 referring to as the form.
17 Q.      What else is housed there?
18 A.      It's the notes that you see here and it is
19 where the drop down section is to make the
20 selection upon completing an investigation or if
21 you need to delete a dispute that's where you would
22 select the HR.
23 Q.      Okay.  So will you read into the record
24 this note I guess from 10/31 reflecting I guess
25 what the investigation or what was done?

Page 133

1 Consumer indicating they're disputing
2 account.  After further investigation into
3 documents on file, compiled a DINV packet with all
4 required docs and sending it to consumer via
5 e-mail.
6 Q.      Okay.  So you're starting up at the very
7 top, right?
8 A.      I'm sorry.  I thought you asked me to --
9 Q.      No, no.  That's fine.
10 A.      -- read the notes where her notes on her
11 investigation.
12 Q.      All right.  So what's a DINV packet?
13 A.      It is a response letter and the packet
14 includes account documentation typically statements
15 or, you know, depending on the type of account
16 there may be other types of documentation that we
17 provide to the consumer.
18 Q.      Okay.  And looking at the next page at the
19 bottom on 10/31/2022, 9:11 it says, e-mail debt
20 validation.  You see that?
21 A.      Yes.
22 Q.      So is that the -- is that explaining what
23 was referenced on the previous page was e-mailed?
24 A.      Correct.
25 Q.      Okay.  And so would kmoore have been the

Page 134

1 one who decided -- who would've looked at this and
2 investigated and decided what to do in response to
3 the dispute?
4 A.      Yes.
5 Q.      And so exhibit -- I'm showing you
6 Exhibit 3 to your deposition.  Letter from Spring
7 Oaks dated October 31, 2022, marked as Exhibit 3,
8 Robinson 001 through 12.
9        (Plaintiff's Exhibit 3 was marked for
10        identification.)
11 Q.      Does that appear to you to be what was
12 sent to Christopher Robinson?
13 A.      No.  Those look a little bit out of order
14 and it looks like the initial letter is mixed in
15 there as well.  I don't believe we would've sent
16 the initial letter to him as part of the dispute
17 response packet.
18 Q.      Okay.
19 A.      Unless I misheard your numbers.
20 Q.      It's 001.
21 A.      Okay.
22 Q.      Well, maybe it'd be easier if you pulled
23 this up on your screen and looked at it to see if
24 I'm looking at the wrong thing.
25 A.      I have it up.  001 looks correct.  002

Page 135

1 looks correct.  003 looks correct.  004 looks
2 correct.  005 looks correct.  006 looks correct.
3 007 looks correct.  008 looks correct.  And then 9
4 is where it begins the initial letter.
5 MR. ROSSMAN:  There's the initial letter
6 you were asking me about.
7 MR. HERRING:  Okay.  Yeah.  I see it was
8 buried in here.
9 Q.      Okay.  So this is the letter dated April
10 5, 2022.  I got you.  Okay.  All right.  We'll just
11 keep it.  So the letter that was sent goes through
12 008.  Is that accurate?
13 A.      Yes.
14 Q.      Okay.  And it's your testimony that this
15 was sent by e-mail and not by US mail?
16 A.      Correct.
17 Q.      Even though it has an address on here and
18 it has no e-mail address on the letter?
19 A.      Correct.
20 Q.      Okay.  And looking at this letter it says,
21 our service is in receipt of your dispute and/or
22 request for validation of the debt.  So kmoore is
23 the one who would've reviewed Mr. Robinson's
24 letter, Exhibit 2, and from that decided that he
25 had requested a validation of debt; is that

Page 136

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34 (133 - 136)

Defendant's Exhibit A - p.35 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1  correct?
2  A.     No.
3  Q.     What's incorrect about that?
4  A.     Kmoore was the agent that reviewed
5  Mr. Robinson's letter.  The letter she selected is
6  the letter that the team is instructed to send in
7  instances where the account is credit reporting and
8  we receive a written dispute.
9  Q.     Okay.  So who chose to send that letter,
10 Exhibit 3?
11 A.     This letter is what the team is instructed
12 to send upon receipt of an investigation of the
13 type of dispute that we have in Exhibit 2.
14 Q.     And how many letter options are there for
15 the team to send in response to a dispute?
16 A.     I don't have it in front of me, but I
17 believe it may be five.
18 Q.     Okay.  Is there -- would those letters be
19 identified in the job aid?
20 A.     Yes.
21 Q.     Okay.  And it identifies those letters in
22 that job aid.  And does it inform the employee on
23 which one to use?
24 A.     The job aid instructs the agent on what
25 letter to select based on the circumstances of the
Page 137

1  letter, right?
2  A.     Yes.
3  Q.     Is there a letter that you send out if --
4  well, is one of the options a letter if you deem it
5  to be I guess a frivolous dispute?
6  A.     I don't think it's labeled as that, but if
7  we continue to get disputes that don't have new
8  information, we have that letter that goes out.
9  Q.     What about if you receive a letter -- if
10 they receive a letter that they believe is from a
11 credit repair organization?
12 A.     In most instances we would respond to the
13 consumer with our normal letter process.
14 Q.     Okay.  And if you receive a letter from
15 the credit repair organization or you believe it
16 is, is that noted or notated in the account notes?
17 A.     No, not generally.
18 Q.     Okay.  Well, you testified earlier that --
19 I was asking you about if after an investigation
20 there were ever times when the account just -- you
21 decided to keep it as XB?
22 A.     Yes.
23 Q.     And you said that y'all would do that when
24 you believed the dispute was from a credit repair
25 organization.  So how would you know to mark it or
Page 139

1  account and the dispute.
2  Q.     And are those -- the letters themselves --
3  they're all form letters, right?
4  A.     Correct.
5  Q.     And does the agent have the ability to
6  freehand or change any of the letter?
7  A.     No.
8  Q.     Do they have the discretion to do that?
9  A.     No.
10 Q.     And what are the five different options?
11 A.     We have a letter to respond to scenarios
12 that are -- what we deem a debt validation where
13 the account is not credit reporting.  A letter
14 letting the customer know that we've received, you
15 know, one or more disputes that provide the same
16 information so no new information has been
17 provided.  There's nothing else that we can
18 investigate.  We have a letter that advices the
19 customer that we found their dispute to be valid,
20 and we may be removing their trade line from the
21 credit file.  And we have a letter or scenarios
22 when consumers are claiming fraud for them to
23 provide additional information.  And, again, that's
24 off of memory.
25 Q.     Sure.  And, of course, you have this
Page 138

1  to leave it as XB if you don't mark in the account
2  or in notes that the letter is from a credit repair
3  organization?
4  A.     It's a very small population of accounts
5  that have -- it's not all credit repair that we
6  decide to mark the XB.  It's a very small
7  population of accounts where again, we're
8  determined that there's additional risk of
9  litigation.  Generally speaking, we're responding
10 to credit repair letters and not marking it, you
11 know, specifically as credit repair.  Again, it's a
12 small population of accounts that would only be
13 left on as the XB.
14 Q.     I understand that.  But how would the
15 employee who's making that decision whether to
16 leave it as XB or not know that the letter -- or it
17 was from a credit repair organization and that it
18 needed to be maintained as XB and not changed to
19 XH, XR, or XC?
20 A.     Those accounts are escalated to the
21 manager and the manager and myself actually review
22 those letters before making that decision, so it's
23 not at the agent level.
24 Q.     Okay.  Do you treat accounts differently
25 that you deem are from a credit repair
Page 140

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35 (137 - 140)

Defendant's Exhibit A - p.36 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1  organization?
2      MR. ROSSMAN: Objection. Repetitive.
3  Q.     I mean, other than what you've testified
4  to before.
5  A.     I don't think there's anything additional
6  to add. Generally speaking we respond at our
7  normal process. There is a small population of
8  particular letters that are associated with a
9  associated with a higher risk of litigation. When
10 those are identified and escalated to the manager,
11 and, again, we would discuss those and determine if
12 they're going to be left with an XB code.
13 Q.     And was there anything about this letter
14 or dispute that looking at the account notes, was
15 there anything that was documented about a
16 suspicion of this being from a credit repair
17 organization, this dispute?
18     MR. ROSSMAN: Objection. Vague as the
19 word suspicion.
20 Q.     Do you understand what I mean?
21 A.     I think so.
22 Q.     Well, if you don't, I can try to clarify.
23 A.     Yeah. I guess that would help.
24 Q.     Okay. So when this letter was received,
25 did -- can you tell if it was treated or handled in

Page 141

1  many similar examples, you know, particularly where
2  the customer is saying only contact me between
3  Monday to Friday, 1:00 to 4:00, text and e-mail.
4  That similar pattern is, you know, frankly unusual
5  for so many people to only need to be contacted
6  between Monday to Friday, 1:00 to 4:00 p.m. And,
7  again, coming from certified mail from a location
8  other than where the consumer lives and frankly the
9  lawsuits that have come out of this -- receiving
10 this letter or the similar letter.
11 Q.     So why does it matter to Spring Oaks if
12 the letter is from or they believe the letter is
13 from a credit repair organization?
14 A.     As I said earlier generally speaking it
15 does not. We will still respond, you know, to the
16 consumer. If the consumer has a dispute, we want
17 to help provide documentation to, you know, clear
18 up, show our investigation. What I'm saying is
19 that this letter particular over time seeing a
20 number of these with red flags and understanding
21 that these letters have a heightened, you know,
22 risk of litigation, which would've seen, this
23 letter particular is the one that I'm referring.
24 General speaking we're trying to respond to
25 consumers and their disputes and provide them

Page 143

1  any manner that appears that whoever was
2  investigating it believed or thought or had a
3  suspicion that it was from a credit repair
4  organization? And by this letter I'm talking about
5  Exhibit 2.
6  A.     At the time this dispute was processed it
7  was not identified as coming from credit repair.
8  Q.     And was it sent at any point to you or the
9  other person you mentioned to decide whether it
10 should be left as XB or changed to XH or XR or
11 whatever else?
12     MR. ROSSMAN: Objection.
13 A.     No.
14 Q.     You can answer.
15 A.     No.
16 Q.     Okay. Looking at the letter now, do you
17 have a reason to believe that this is from a credit
18 repair organization?
19 A.     Yes.
20 Q.     And what is that?
21 A.     Well, first of all, it's being sent by
22 certified mail, and I've seen a number of these
23 letters sent by certified mail where they are not
24 coming from the location where the consumer is
25 located. And I've seen I don't know how many, but

Page 142

1  documentation to illustrate, you know, the account
2  that they had at one point.
3  Q.     So you said you've seen a number of these?
4  A.     Yes.
5  Q.     Has Spring Oaks changed the way that it
6  responds to these letters?
7  A.     Yes.
8  Q.     Do they still send a response saying,
9  here's your debt validation and documents even
10 though the consumer has said -- or may have said
11 that they don't want that validation or
12 verification or documents?
13 A.     No.
14 Q.     And why is that?
15 A.     The risk and threat of litigation coming
16 out of responding to these letters.
17 Q.     Spring Oaks decided that -- does Spring
18 Oaks believe that sending -- responding to these
19 types of letters and saying our office is in
20 receipt of your dispute and/or request for
21 validation and then including the documents, has
22 Spring Oaks determined that that action violates
23 the FDCPA?
24     MR. ROSSMAN: Objection. Calls for a
25 legal conclusion.

Page 144

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36 (141 - 144)

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

| | |
|---|---|
| 1 Q. You can answer. | 1 not requesting documents or validation or |
| 2 A. I just want to clarify. Are you asking me | 2 verification? |
| 3 if Spring Oaks has determined if sending this | 3 MR. ROSSMAN: Objection. Repetitive. |
| 4 letter violates the FDCPA? | 4 Q. You can answer. |
| 5 Q. Yes. | 5 A. The agents have been trained to |
| 6 A. No. | 6 investigate the dispute and then escalate those |
| 7 Q. Has Spring Oaks trained its employees | 7 particular letters to their manager. |
| 8 doing these investigations that they have concerns | 8 Q. Okay. Does Spring Oaks believe that this |
| 9 about whether this -- sending this type of letter | 9 statement, our office is in receipt of your dispute |
| 10 and the documentation and response to a dispute | 10 or request for validation of debt -- hold on. I |
| 11 like Mr. Robinson's violates the FDCPA? | 11 lost my place. Does Spring Oaks believe responding |
| 12 MR. ROSSMAN: Objection. Compound | 12 that the consumer potentially -- consumer requested |
| 13 question and confusing. | 13 a validation of debt is an accurate response? |
| 14 Q. You can answer. | 14 MR. ROSSMAN: I'm going to object to the |
| 15 A. I'm actually not sure what you're asking. | 15 extent this calls for a legal conclusion. |
| 16 Q. I'm just saying have they trained their | 16 MR. HERRING: Yeah. Okay. John. |
| 17 employees who handle these investigations or | 17 Q. To a letter that specifically says it's |
| 18 responsible for responding, have they trained those | 18 not a request for validation or verification or |
| 19 employees that they have concerns about whether | 19 documentation? |
| 20 responding in this manner like in Exhibit 3 | 20 A. I'm sorry. That was a bit of a -- can you |
| 21 potentially violates the FDCPA? | 21 please re-ask the question? |
| 22 A. No. | 22 Q. Yeah. It got a little jumbled up. So |
| 23 Q. But they've told them to stop doing that? | 23 looking back at Mr. Robinson's letter it says, |
| 24 Stop responding that way, correct? | 24 please note I do not want you to send me any |
| 25 MR. ROSSMAN: Objection. Mischaracterizes | 25 information. This is not a request for validation |
| Page 145 | Page 147 |
| 1 previous testimony. | 1 or verification. I'm not interested in you sending |
| 2 Q. Is that correct? | 2 me any documentation. Then the response appears to |
| 3 A. They have been educated to escalate | 3 say that they're responding to his request for |
| 4 examples where they see that letter specifically | 4 validation of the debt. |
| 5 with the certified mail don't contact me except | 5 Do you believe that's an accurate |
| 6 between the hours of 1:00 and 4:00 for further | 6 representation of Mr. Robinson's letter to Spring |
| 7 review. And that would then go to the manager and | 7 Oaks? |
| 8 they are to complete their investigation and | 8 A. It says dispute and/or request for |
| 9 escalate it to their manager. | 9 validation. |
| 10 Q. Have they been trained to honor -- now | 10 Q. And so is that why Spring Oaks says at |
| 11 honor the consumer's request and not send | 11 next paragraph enclosed, you'll find the documents |
| 12 validation and verification? | 12 with your account provided and response to your |
| 13 MR. ROSSMAN: Objection. Mischaracterizes | 13 dispute and/or request for validation? Why did |
| 14 previous testimony. | 14 Spring Oaks send him documents when he specifically |
| 15 Q. You can answer. | 15 told them not to? |
| 16 A. I'll just repeat. I mean, I think I just | 16 MR. ROSSMAN: Objection. Repetitive. |
| 17 need to repeat what I just said. They've been | 17 A. Yeah. As I mentioned earlier we're |
| 18 trained to investigate the account and then | 18 looking at this both FCRA and FDCPA dispute and |
| 19 escalate to their manager. | 19 responding to the dispute under FCRA. |
| 20 Q. Well, before you were talking about the | 20 MR. ROSSMAN: We're coming up on 90 |
| 21 times about when communications could occur. I'm | 21 minutes since the last break. I just want -- |
| 22 talking about this specific response that includes | 22 MR. HERRING: Yeah. All right. |
| 23 saying here's your validation of debt even though | 23 MR. ROSSMAN: Maybe ten minutes. I know |
| 24 that was not requested. Have they been trained to | 24 you're in the middle of questioning. I don't want |
| 25 honor that statement by the consumer that they're | 25 to interrupt. |
| Page 146 | Page 148 |

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37 (145 - 148)

Defendant's Exhibit A - p.38 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1    MR. HERRING:  No, no.  That's fine, John.
2  Why are you worried about interrupting me now?
3  You've been interrupting me all day.  Yeah.  Let's
4  take a ten minute break.  I'm sorry.  I didn't
5  realize we'd been going that long.
6    MR. ROSSMAN:  No problem.  Catherine, just
7  to confirm, when is your hard stop at?
8    THE WITNESS:  4:00 p.m. eastern time.  So
9  you guys are, what, 1:00?  No.  2:00.
10    MR. ROSSMAN:  So we've got about another
11  hour.
12    MR. HERRING:  We've got about an hour
13  left.
14    MR. ROSSMAN:  Perfect.  Good.  Perfect.
15  Good.  Five minute break and we'll come right back.
16    MR. HERRING:  All right.  Let's take ten
17  minutes.
18    MR. ROSSMAN:  Ten minutes.  Thank you.
19    THE VIDEOGRAPHER:  The time is 1:56.  We
20  are off the record.
21    (A recess was taken.)
22    THE VIDEOGRAPHER:  The time the 2:06 p.m.
23  We are back on the record.
24  Q.    Okay.  So let me share my screen again.
25  My computer is even getting tired.  It's getting

Page 149

1  slow.  Okay.  Looking back at -- excuse me --
2  Exhibit 4.  The time that's highlighted right here
3  where I'm pointing 10/31/2022, 9:08 (indicating).
4  It says, letter FCRA invalid dispute-info accurate
5  with validation sent.  What does that mean?
6  A.    That is the notation that indicates that
7  the agent selected that letter to print to PDF as
8  we talked before.  The printing to PDF, that's
9  showing what letter she chose in the system.
10  Q.    Okay.  And so the letter that we were
11  looking at is Exhibit 3, if it'll pull it up.
12    MR. ROSSMAN:  Could you please?
13  Q.    So that is what y'all called the invalid
14  dispute letter?
15  A.    That's not the full name.  You have to go
16  back to the notes.  The note is DINV.
17  Q.    Sorry.  My computer is just taking it's
18  time.  All right.
19  A.    Yeah.  The FCRA invalid dispute-info
20  accurate with validation.  The shorthand code for
21  that is, you know, DINV.
22  Q.    Okay.  That's referenced up here at the
23  top, right?
24  A.    Correct.
25  Q.    So that's not saying that y'all found the

Page 150

1  dispute to be invalid, is it?
2  A.    It's noting that there was -- there were
3  no errors found on the account.
4  Q.    Okay.  Is it saying that y'all think it's
5  a frivolous dispute?
6  A.    No.
7    MR. HERRING:  Come on, John.  You
8  should've objected to that.
9    MR. ROSSMAN:  I wanted the answer to that
10  one.
11  Q.    All right.  Having a computer issue here.
12  Let me stop the share for a second.  I'm having --
13  I'm getting out of a couple of programs because for
14  some reason my laptop is slowing down.  All right.
15  Let's try this again.  Okay.  Y'all seeing the
16  screen with Exhibit 4?
17  A.    Yes.
18  Q.    Looking at this e-mail at the bottom it
19  says 10/31/2022, 9:11, e-mailed debt validation.
20  Is that the actual time that the e-mail would've
21  gone out?
22  A.    That time stamp notates the time that she
23  loaded or that she made the notation about the
24  e-mail.
25  Q.    Okay.  So when would the e-mail have

Page 151

1  been -- well, let me ask you this:  How does that
2  process work?
3  A.    The agent prints the letter to PDF and
4  then prepares an e-mail.  We have a designated
5  Outlook e-mail box for responding to consumers with
6  a template greeting and attach the PDF to the
7  e-mail and then sent the e-mail to the consumer.
8  And then the agent is to load -- document what
9  actions were taken and then load a copy of the
10  e-mail that would include the attached PDF to the
11  system of record.
12  Q.    So can we -- so are the e-mails sent out
13  individual on a case by case basis or are they sent
14  out like in mass?
15  A.    Individually.
16  Q.    Can we tell from the notes when exactly
17  this e-mail would've gone out?
18  A.    Not from the notes.
19  Q.    Okay.  How would we figure that out?
20  A.    We have a copy of the e-mail and I think
21  if you scroll back down you can see where the --
22  no.  I'm sorry.  Go up.
23  Q.    There's 10/31 at 9:09.  It says --
24  A.    Yeah.  That's the e-mail, but I believe
25  that's just the PDF so if you scroll back up one

Page 152

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38 (149 - 152)

Defendant's Exhibit A - p.39 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

```
 1   page --
 2        MR. ROSSMAN:  I think we just lost Stan.
 3        MS. LOCKHART:  Yeah, it would appear so.
 4   Where'd he go?  I'll let him know.
 5        MR. ROSSMAN:  Yeah.  Patricia, if you want
 6   to check in with him.  Thanks.
 7        MS. LOCKHART:  I'll call him.  For some
 8   reason his computer just completely shut down.  He
 9   said, can we take a five minute break and let him
10   either get on a different one or get that one back
11   working?
12        MR. ROSSMAN:  Fair enough.  We'll log back
13   in at 2:20.
14        MS. LOCKHART:  All right.  Thanks.
15        MR. ROSSMAN:  Thank you.
16            (A recess was taken.)
17        THE VIDEOGRAPHER:  The time is 2:24.
18        MR. HERRING:  Okay.  Will you read back
19   the last question?
20            (Record read.)
21   Q.    Okay.  Let me pull that document back up.
22   So we're talking about Exhibit 4, correct?  Did you
23   find where the e-mail went out?
24   A.    Yes, I did.  If you can scroll down to the
25   next page, it's not exactly where the e-mail went
```
Page 153

```
 1   out, but where she -- the agent actually uploaded
 2   the message that was sent so that's the PDF and if
 3   you go up one, two, three, four, five, six, it
 4   says, document requested documentation.MSG.  That's
 5   the actual e-mail message.
 6   Q.    That right there (indicating)?
 7   A.    Yes.
 8   Q.    Okay.  So that's -- that tells us when it
 9   was sent out?
10   A.    That tells us when it was loaded to the
11   account, the actual copy of the e-mail that was
12   sent.
13   Q.    Okay.  So the e-mail -- once it's -- in
14   order for it to be loaded to the account, it has to
15   have already been sent; is that right?
16   A.    Correct.
17   Q.    Okay.  And is it fair to say since she
18   started working on this at 9:05 that she would've
19   sent the e-mail between 9:05 and 9:11?
20   A.    Yes.
21   Q.    On October 31, right?
22   A.    Yes.
23   Q.    And is it fair to say that the e-mail was
24   sent -- I'm sorry.  It was uploaded at 9:10 and
25   then she started at 9:07.  Is it fair to say that
```
Page 154

```
 1   -- and what's her name, kmoore?
 2   A.        Kara.  And she started at -- the first
 3   entry is at 9:05.
 4   Q.    I'm sorry.  9:05.  So that she conducted
 5   her investigation, chose the e-mail, or decided to
 6   -- conducted her investigation, decided what to do,
 7   and sent the e-mail out between 9:05 and 9:10?
 8   A.    Yes.
 9   Q.    Okay.  Do Spring Oaks employees have any
10   kind of incentives or goals in terms of their pay
11   or bonuses or promotion or whatever based on how
12   quickly or the number of disputes that they handle
13   in a given period of time?
14   A.        Spring Oaks employees that handle dispute
15   investigations do not have incentives or bonuses
16   related to actually anything.  They don't have
17   incentives or bonuses.
18   Q.    They're just paid straight up salary?
19   A.    They're paid hourly.
20   Q.    Hourly.  And how much are they paid
21   hourly?
22        MR. ROSSMAN:  Objection.  Foundation.
23   Q.    You can answer.
24   A.    I mean, it depends on their tenure and how
25   long they've been with the company.
```
Page 155

```
 1   Q.    So can you -- what's the starting pay?
 2   A.    $20 an hour.
 3   Q.    Okay.  And if they'd been there five
 4   years, how much would it go up?
 5        MR. ROSSMAN:  Objection.  Foundation.
 6   Q.    Does it go up like cost of living or
 7   3 percent or what?
 8        MR. ROSSMAN:  Same objection.
 9   A.    There's annual increases.
10   Q.    Okay.  Do you know how long Ms. Moore had
11   been working for Spring Oaks?
12   A.    At this time I don't recall exactly.
13   Q.    And do they work 40 hours a week?
14   A.    Yes.
15   Q.    And do they -- I know they don't
16   individually have bonuses or goals, but do they
17   share in departmental bonuses or goals?
18   A.    The dispute agents do not.
19   Q.    Okay.  Do you recall Ms. Moore's education
20   level?
21        MR. ROSSMAN:  Objection.  Foundation.
22   Q.    You can answer.
23   A.    Do you mean like as far as high school or
24   college?
25   Q.    Yes.
```
Page 156

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39 (153 - 156)

Defendant's Exhibit A - p.40 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

| | |
|---|---|
| 1  A.      I don't recall. | 1  Q.      Spring Oaks -- those are guidelines. |
| 2  **Personnel Data** | 2  Spring Oaks has a choice as to whether they use the |
| 3 | 3  XB code or the XH code, correct? |
| 4 | 4  **A.      Yes.  We have a choice of, you know, which** |
| 5 | 5  **codes that we do use, correct.** |
| 6 | 6  Q.      Right.  So why chose the XH code? |
| 7 | 7         MR. ROSSMAN:  Objection.  Repetitive. |
| 8 | 8  **A.      To reflect that the investigation was** |
| 9 | 9  **completed.** |
| 10 | 10  Q.      We talked about this a little bit earlier. |
| 11 | 11  One reason Spring Oaks credit reports debt is that |
| 12 | 12  it assists Spring Oaks in getting consumers to pay, |
| 13 | 13  correct? |
| 14 | 14         MR. ROSSMAN:  Objection.  Mischaracterizes |
| 15 | 15  previous testimony. |
| 16  Q.      Okay.  Looking at the account notes can | 16  **A.      That's not how I phrased it.  I don't** |
| 17  you tell -- well, I'm sorry. | 17  **remember exactly what I said, but it was something** |
| 18         Looking at 10/31/2022 at 9:09, do you see | 18  **along the lines of as part of the credit reporting** |
| 19  the note I just highlighted? | 19  **lifecycle and managing the accounts we credit** |
| 20  A.      Yes. | 20  **report.** |
| 21  Q.      Okay.  So what is -- can you read that | 21  Q.      Spring Oaks is not required to credit |
| 22  into the record? | 22  report accounts, is it? |
| 23  **A.      Yes.  That note says, dispute resolved,** | 23  A.      That's correct. |
| 24  **XH, previously in dispute now resolved, reported by** | 24  Q.      I mean, there are lots of debt collectors |
| 25  **CR.** | 25  that don't credit report debts they collect, |
| Page 157 | Page 159 |

| | |
|---|---|
| 1  Q.      Okay.  What is CR? | 1  correct? |
| 2  A.      Credit report. | 2         MR. ROSSMAN:  Objection.  Foundation. |
| 3  Q.      What does that mean, reported by CR?  Does | 3  Q.      Correct? |
| 4  that just mean the account is being reported? | 4  **A.      I'm not sure.** |
| 5  **A.      Yes.  It's just a notation that the** | 5  Q.      Well, I mean, you've been to ACA |
| 6  **account is reported.  And the XH is, you know,** | 6  conferences and you've talked to other people.  You |
| 7  **what's going to be reported.** | 7  know there are plenty of debt collectors out there |
| 8  Q.      So is this a reason why Ms. Moore would've | 8  that don't credit report because they just don't |
| 9  been trained to code the account to report as | 9  want the headache or potentially liability, right? |
| 10  account previously in dispute now resolved versus | 10  **A.      There are some that do not credit report,** |
| 11  account disputed by consumer? | 11  **correct.** |
| 12  **A.      She was trained to report the account as** | 12  Q.      And one of the reasons that Spring Oaks |
| 13  **XH after she had completed her investigation.** | 13  credit reports is because that gives it an extra |
| 14  Q.      And why does Spring Oaks train its | 14  tool to collect debt from consumers who want to get |
| 15  employees to report it that way? | 15  their credit cleaned up; is that right? |
| 16         MR. ROSSMAN:  Objection.  Repetitive. | 16         MR. ROSSMAN:  Objection.  Mischaracterizes |
| 17  Q.      You can answer. | 17  previous testimony. |
| 18  **A.      It's in following the CDIA Guidelines.** | 18  A.      I didn't say you testified to that.  I'm |
| 19  Q.      But those aren't mandatory.  We discussed | 19  asking if I'm correct on that. |
| 20  that earlier, right? | 20  **A.      I don't know that I could speak for why** |
| 21  **A.      We discussed that those are guidelines.** | 21  **customers do what they do.** |
| 22  Q.      Right.  They're not mandatory on Spring | 22  Q.      Well, Spring Oaks knows that credit |
| 23  Oaks, correct?  Is that correct? | 23  reporting a debt on a consumer has an adverse or |
| 24  **A.      I'm thinking about what you mean by** | 24  negative effect on their credit score, don't they? |
| 25  **mandatory.  Can you expand on that?** | 25         MR. ROSSMAN:  Objection.  Foundation. |
| Page 158 | Page 160 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40 (157 - 160)

Defendant's Exhibit A - p.41 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  Q.      Does Spring Oaks know that?
2  A.      **Spring Oaks knows that if an account is**
3  **being reported, it may impact the credit score.  I**
4  **can't speak to how it impacts the credit score.**
5  Q.      Does Spring Oaks believe that debt
6  collection account could positively impact the
7  consumer's credit report?
8          MR. ROSSMAN:  Objection.  Argumentative.
9  A.      **There are a lot of components that go into**
10 **the algorithms and so I really don't think that I**
11 **can answer that.**
12 Q.      Well, you don't --
13 A.      **It's based on algorithms and lots of**
14 **detail that goes into what makes up the score.  I**
15 **don't think that I'm qualified to speak to what**
16 **makes up a score.**
17 Q.      And I'm asking you in your role as Spring
18 Oaks corporate representative, is Spring Oaks
19 aware -- no.  Scratch that.
20          Does Spring Oaks believe that credit
21 reporting a debt collection account would
22 positively impact a consumer's credit report or
23 credit rating?
24          MR. ROSSMAN:  Objection.  Argumentative.
25 Q.      I mean, is that what you're telling me?
Page 161

1  Q.      I mean, we all know that just based on
2  common sense that that would help them, right?
3          MR. ROSSMAN:  Objection.  Calls for
4  speculation.  Objection.  Repetitive.
5  Q.      Do you know that?
6  A.      **I don't know it.  I believe that it would**
7  **improve the score, but I don't know for sure.**
8  Q.      Okay.  So why does Spring Oaks credit
9  report debt collection accounts?
10          MR. ROSSMAN:  Objection.  Repetitive.
11 A.      **Because I mentioned before, now I may be**
12 **not remembering exactly how I phrased it, but again**
13 **as part of the collection activity and credit**
14 **reporting lifecycle, Spring Oaks Capital does**
15 **report collection accounts.**
16 Q.      Well, you just told me that they do.  I'm
17 asking you as the representative of Spring Oaks,
18 why does Spring Oaks credit report collection
19 accounts?
20          MR. ROSSMAN:  Objection.  Repetitive.
21 Q.      I mean, telling me it's a part of the
22 collection account cycle, that doesn't -- that
23 doesn't explain why Spring Oaks does it.  So why
24 does Spring Oaks do it?
25          MR. ROSSMAN:  Objection.  Same objection.
Page 163

1          MR. ROSSMAN:  Objection.  Argumentative.
2  A.      **There may be an impact, but if they -- I**
3  **mean, there's -- on the other hand, if they pay it**
4  **off, there's a different kind of impact.  So,**
5  **again, there's lots of components that go into the**
6  **algorithms of a score.**
7  Q.      Right.  I'm not asking a specific score.
8  But you just said you know enough to know if they
9  pay it off, there's a different impact.  And I
10 think we all know by that you don't mean that if
11 they pay off a debt collection account it's a
12 negative impact.  I think you're saying that
13 there's a positive impact, right?
14 A.      **There could be.**
15 Q.      Do you think if you paid off a debt
16 collection account there could be a negative
17 impact?
18          MR. ROSSMAN:  Objection.  Calls for
19 speculation.  And objection.  Foundation.
20 Q.      You can answer.
21 A.      **If a consumer pays off a debt collection**
22 **account, could there be a negative impact?**
23 Q.      I mean, is that what Spring Oaks believes?
24 A.      **I don't think so, but I don't know for**
25 **sure.**
Page 162

1  Repetitive.
2  Q.      You can answer.
3  A.      **I mean --**
4          MR. ROSSMAN:  You've already asked this
5  question.
6  Q.      You can answer.
7  A.      **It does reflect why.  Again, it's part of**
8  **the collection -- I said it's part of the**
9  **collection activity and credit lifecycle.**
10 Q.      What part?  What part of it?
11 A.      **If a consumer is aware that Spring Oaks**
12 **Capital now owns the account and is collecting on**
13 **the account, you know, they know where to turn to**
14 **to go ahead and make arrangements or they can**
15 **dispute the account and handle the account as they**
16 **determine.**
17 Q.      And so is that --
18 A.      **That may include paying it, it may include**
19 **disputing.**
20 Q.      And so is it your testimony today that the
21 only reason Spring Oaks reports credit -- I'm sorry
22 -- debt collection accounts is to assist a consumer
23 in identifying Spring Oaks as the owner of the
24 account or the collector of the account?
25 A.      **No.  That is not the only reason.**
Page 164

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41 (161 - 164)

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  Q.       What else?
2  A.       It is also part of the collection
3  activities.  And, again, now the consumer is aware
4  of, you know, who owns the account, who's reporting
5  on the account, who's collecting on the account.
6  Q.       How is it a part of the collection
7  activities?
8  A.       If a consumer identifies the account on
9  their credit report, then they know where to --
10 where to make payment.
11 Q.       Does Spring Oaks -- when we were talking
12 earlier about risk analyst and that kind of thing,
13 does Spring Oaks potentially subject itself to
14 risks of civil liability by credit reporting?
15       MR. ROSSMAN:  Objection.  Calls for a
16 legal conclusion.
17 Q.       You can testify to that.
18 A.       Spring Oaks Capital is aware that by
19 credit reporting consumer accounts to the credit
20 reporting agencies that may result in civil suits
21 being filed.
22 Q.       Right.  So that would be a down side to
23 credit reporting, right?
24 A.       Yes.
25 Q.       So given that Spring Oaks is not required

Page 165

1  to credit report and they can choose to, what would
2  the upside to credit reporting be?
3       MR. ROSSMAN:  Objection.  Confusing.
4  Q.       What would the benefit to Spring Oaks be
5  to credit report?
6       MR. ROSSMAN:  Same objection.  Also
7  repetitive.
8  Q.       If they're facing political legal exposure
9  by falsely credit reporting?  You can answer.
10      MR. ROSSMAN:  Mischaracterizes previous
11 testimony.
12 A.       I'm sorry.  I missed the question because
13 I think it's getting a little bit tangled up now.
14 I actually thought I heard political thrown in
15 there somewhere.  Can you repeat the question?
16 Q.       Well, we talked about the potential down
17 side to credit reporting and that it could lead to
18 legal exposure, right?  And so what would the up
19 side or benefit be to Spring Oaks to credit report
20 if they're not legally required to do so and don't
21 have to do so?
22 A.       The collections activity.  And, again, if
23 the customer knows who's -- you know, who owns the
24 account and is being reported on their credit
25 report.

Page 166

1  Q.       That's all you're willing to say; is that
2  right?
3       MR. ROSSMAN:  Objection.
4  A.       I think that's the answer.
5  Q.       But you're not willing to admit that by
6  credit reporting it gives Spring Oaks leverage and
7  assists them in putting pressure on consumers to
8  pay debts that they might owe to Spring Oaks or
9  that Spring --
10 A.       I wouldn't characterize it that way.
11 Q.       Okay.  This is Exhibit 5 to your
12 deposition that's on the screen.  Bates SOC
13 Robinson 25 through 43.
14      (Plaintiff's Exhibit 5 was marked for
15      identification.)
16 Q.       And these just appear to be, you know,
17 various billing statements for the Indigo account.
18 And y'all produced these.  Were these documents
19 ever provided to Mr. Robinson, if you know?
20 A.       The documents that were attached to the
21 dispute response, those statements were e-mailed to
22 Mr. Robinson.
23 Q.       And let me go back.  One thing about the
24 e-mail.  So as a part of sending an e-mail, do
25 y'all track whether or not the e-mail is received

Page 167

1  or bounces back?
2  A.       We do get notification if an e-mail is
3  bounced back.
4  Q.       Okay.  And did you get any kind of
5  notification in this case?
6  A.       No.
7  Q.       All right.  And you looked for that?
8  A.       Correct.
9  Q.       Okay.  Do y'all receive a notification if
10 the e-mail is opened?
11 A.       Not e-mails that come out of the e-mail
12 box that we send to consumers to respond to
13 disputes.
14 Q.       Okay.  Do you receive some kind of
15 notification if the e-mail ends up in a consumer
16 spam folder?
17 A.       No.
18 Q.       Okay.  I'm showing you Exhibit 6 to your
19 deposition, which is a part of the TransUnion
20 credit report for Mr. Robinson created on November
21 25th, 2022.
22      (Plaintiff's Exhibit 6 was marked for
23      identification.)
24 Q.       Do you see that?
25 A.       Correct, yes, I do.

Page 168

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42 (165 - 168)

Defendant's Exhibit A - p.43 of 180

Christopher Robinson vs. Spring Oaks Capital, LLC, et al.

Catherine Calko
5/31/2024

1    Q.       And going to the -- and it's Bates
2    stamped, by the way, this is Robinson production
3    150 and 202.  So going to the Spring Oaks account,
4    is this account information that Spring Oaks
5    reported to the credit bureaus on Mr. Robinson?
6    A.       It appears to be except for the remarks.
7    Q.       Okay.  And it says, account -- the remarks
8    says, account previously in dispute, now resolved.
9    Reported by credit grantor.  Placed for collection.
10   Did I read that -- is that what you're talking
11   about?
12   A.       That's what I read on the page, yes.
13   Q.       Okay.  So who reported that?
14   A.       What Spring Oaks Capital reported was an
15   XH code.
16   Q.       Okay.  And you're saying that's not an XH
17   code?
18   A.       That doesn't say XH code.  That has
19   remarks.
20   Q.       Okay.  I understand.  But it's not going
21   to say XH.  XH is the code that Spring Oaks uses
22   that tells the credit bureaus to report the account
23   as account previously in dispute, now resolved,
24   correct?
25   A.       Spring Oaks doesn't tell the -- Spring

Page 169

1    Oaks just reports the code, the XH.  It does not
2    report any language or tell TransUnion or
3    annualcreditreport.com what language to use.
4    Q.       So does Spring Oaks -- is it Spring Oaks'
5    testimony that when they plug in the XH code, they
6    have no idea what's going to be reported on the
7    TransUnion credit report?
8    A.       No.  I'm not saying has no idea.  I'm
9    saying that Spring Oaks does not dictate that
10   specific verbiage.
11   Q.       But Spring Oaks knows that that's the
12   verbiage that's going to end up on the credit
13   report when it does an XH code, right?
14           MR. ROSSMAN:  Objection.  Mischaracterizes
15   previous testimony.
16   A.       And I can't agree to that.
17   Q.       All right.  So what does Spring Oaks think
18   is going to happen when it uses an XH code?
19   A.       It identifies the account that has had an
20   investigation completed by the credit grantor,
21   which at this stage is Spring Oaks Capital.
22   Q.       All right.  So looking back at Exhibit 11.
23   The Consumer Data Industry Association Resource
24   Guide 2022, Exhibit 8, compliance condition codes.
25   And that's what we're talking about, correct,

Page 170

1    compliance condition codes?
2    A.       Correct.
3    Q.       And Spring Oaks uses these codes -- Spring
4    Oaks got the compliance condition codes that it
5    uses I guess, what, from this manual?
6    A.       Correct.
7    Q.       And it says code XH, account previously in
8    dispute.  The data furnisher has completed its
9    investigation.  To be used for direct disputes
10   under FCRA, FDCPA, and FCBA.  Right?  Did I read
11   that right?
12   A.       You read that correctly, yes.
13   Q.       So are you telling me that when Spring
14   Oaks puts in the HX code, it does not know or does
15   not understand that what's going to come out on the
16   other end at the credit bureaus is that language
17   right there, account previously in dispute?
18   A.       That's a description of the code.  The
19   definition is reported when the investigation of a
20   dispute by the data furnisher was completed.
21   Q.       Okay.  Can you state that one more time?
22   A.       I will.  It is on the document marked
23   Exhibit 11 under XH.  Definition:  Reported when
24   the investigation of a dispute by the data
25   furnisher was completed.

Page 171

1    Q.       Okay.  So what does that -- when you're
2    supposed to use that code?
3    A.       That's how that code is defined.
4    Q.       Okay.  So what is -- I guess I'm just
5    confused.  I don't understand what Spring Oaks
6    thinks is going to happen when it uses that code.
7            MR. ROSSMAN:  Objection.  Repetitive.
8    A.       The code is to signify than an
9    investigation has been completed.  That's how the
10   code is defined.
11   Q.       Does Spring Oaks not understand though
12   that that's -- for Spring Oaks that's what it
13   signifies, but does it not understand that account
14   previously in dispute, that that language is going
15   to be the result of that code in the credit report?
16   A.       Spring Oaks doesn't dictate the language
17   that's in the credit report.
18   Q.       So the language that's in the credit
19   report was given to Spring Oaks by somebody else,
20   right?
21           MR. ROSSMAN:  Objection.  Mischaracterizes
22   previous testimony.
23   Q.       Well, let me ask it this way.  The
24   language that results from that code XH, I think
25   you're saying was not determined by Spring Oaks,

Page 172

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43 (169 - 172)

Defendant's Exhibit A - p.44 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1 right?
2 **A.       Correct.  Spring Oaks reports a code.**
3 Q.       Okay.  And one second.  Let's see.
4 Exhibit 6 last updated 11/18/22.  So there's
5 11/18/22 date reported to credit bureaus.  Do you
6 see that?
7 **A.       Yes.**
8 Q.       All right.  And I understand that y'all
9 didn't create that language, but does Spring Oaks
10 -- is Spring Oaks aware of the fact that when it
11 pushes that code that under remarks on the credit
12 report this language is what's going to appear?
13       MR. ROSSMAN:  Objection.  Repetitive.
14 **A.       And I previously stated, that I can't say**
15 **that that exact language is going to appear when**
16 **that XH code is used.**
17 Q.       Okay.  So Spring Oaks has -- when they do
18 XH, they have no idea what's going to happen on the
19 credit reporting end; is that right?
20       MR. ROSSMAN:  Objection.  Repetitive.
21 **A.       No.  That's not what I'm saying.  What I'm**
22 **saying --**
23 Q.       What does Spring Oaks think is going to
24 happen --
25       MR. ROSSMAN:  Let her answer the question.

Page 173

1 still says account previously in dispute, now
2 resolved reported by credit grantor.  And you don't
3 know how that got that, right?
4       MR. ROSSMAN:  Objection.  Repetitive.
5 Q.       Is that correct?
6 **A.       I'm saying I don't know -- you're saying**
7 **that I don't know that's how that got there.  What**
8 **I'm saying is that Spring Oaks Capital did not**
9 **dictate that language.  We used an XH code to**
10 **indicate that the investigation was complete.**
11 Q.       Okay.  Well, if you just wanted to say
12 investigation was complete, would you mind reaching
13 out to the credit bureaus and asking them if they
14 can take that part out, account previously in
15 dispute?  Has Spring Oaks ever thought about doing
16 that?
17       MR. ROSSMAN:  Objection.  Calls for
18 speculation.
19 Q.       Have they?  You can answer.
20 **A.       We haven't reached out to ask them to**
21 **change that language.**
22 Q.       Okay.  Well, and if Spring Oaks does the
23 code just because they complete the investigation
24 and this is the remarks that ends up, do you
25 believe that accurately represents what Spring Oaks

Page 175

1 Let her answer, please.  You asked her a question,
2 let her answer.
3 Q.       All right.  Go ahead.
4 **A.       What I'm saying is that Spring Oaks**
5 **reports the code.  We understand the definition of**
6 **the code, but I -- Spring Oaks does not know**
7 **exactly what the report reporting agency may use in**
8 **the remarks and does not dictate that.**
9 Q.       Okay.  So Exhibit 7 to your deposition is
10 a credit report dated 7/28/23.
11       (Plaintiff's Exhibit 7 was marked for
12       identification.)
13 Q.       So here we have the Resurgent receivables.
14 They did an investigation -- well, I won't say what
15 they did.  But it says here, account information
16 disputed by consumer, FCRA.  That's the other code,
17 right, the XB code?
18       MR. ROSSMAN:  Objection.  Foundation.
19 **A.       I don't know.**
20 Q.       You don't know?
21 **A.       I don't know.**
22 Q.       Spring Oaks does not know that?
23 **A.       I don't know what triggered that remark on**
24 **a trade line that doesn't belong to Spring Oaks.**
25 Q.       Okay.  Now, here's Spring Oaks and it

Page 174

1 intends to report about the status of the debt?
2 **A.       I mean, this does not say that the**
3 **investigation was complete.**
4 Q.       Okay.
5 **A.       It says now resolved.  The definition is**
6 **investigation complete.**
7 Q.       All right.  And do you know how long this
8 XH code has been in place?
9 **A.       What do you mean this XH code has been in**
10 **place?**
11 Q.       Well, the XH code.  Do you know how long
12 it's been used by the industry?
13 **A.       No, I do not.**
14 Q.       Okay.  Exhibit -- let's see.  Exhibit 8.
15       (Plaintiff's Exhibit 8 was marked for
16       identification.)
17 Q.       I think I might have skipped one.  Exhibit
18 7 -- well, I'm going to offer 7 and 8.  And 8 is
19 basically the same thing.  Exhibit 9, responses to
20 discovery.
21       (Plaintiff's Exhibit 9 was marked for
22       identification.)
23 Q.       Did you assist in preparing these
24 responses?
25 **A.       Yes.**

Page 176

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44 (173 - 176)

Defendant's Exhibit A - p.45 of 180

**Christopher Robinson vs. Spring Oaks Capital, LLC, et al.**

**Catherine Calko**
**5/31/2024**

1  Q.      In regards to the investigation that was
2  conducted into the dispute, have you told me about
3  all the steps that were taken to investigate the
4  dispute?
5  **A.      Have I told you all of the steps?**
6  Q.      Yes, ma'am.  We went through what happened
7  as a part of the investigation and dispute.
8  **A.      We walked through the documentation**
9  **reflecting the dispute investigation.**
10  Q.      Okay.  Were there other steps taken as a
11  part of the investigation that were not in the
12  documentation?
13  **A.      Not that I'm aware of.**
14  Q.      Okay.  Then looking on -- at exhibit -- at
15  this Exhibit 9.  This is the last thing.  Number 5.
16  **A.      Yes.**
17  Q.      Where we asked to identify the person or
18  persons responsible for deciding on language used
19  to mark Christopher Robinson's credit report.
20  **A.      Yes.**
21  Q.      Okay.  So y'all refer to the Credit
22  Reporting Resource Guide produced.  Okay.  I don't
23  think that was actually produced.  But is that the
24  same document that I -- that we've looked at that
25  I've discussed parts of as Exhibit --

Page 177

1  **A.      I believe so.**
2  Q.      -- Exhibit 11.
3       MR. HERRING:  Okay.  That's all I have.
4       MR. ROSSMAN:  All right.  We -- I don't
5  have any questions.  We do intend to read and sign
6  off on the transcript.
7       MR. HERRING:  Okay.  All right.
8       THE WITNESS:  Thank you.
9       MR. HERRING:  Thank y'all.
10       MR. ROSSMAN:  Thank you.
11       THE VIDEOGRAPHER:  The time is 3:01.  We
12  are off the record.
13            (The video deposition of CATHERINE CALKO
14            was concluded at 3:01 p.m.)
15            --oOo--
16
17
18
19
20
21
22
23
24
25

Page 178

SIGNATURE OF WITNESS

       I, _____
hereby certify that on this _____ day of
_____ 2024, I have read the foregoing
transcript and to the best of my knowledge it
constitutes a true and accurate transcript of my
testimony taken by oral deposition on May 31, 2024.


_____
WITNESS


Subscribed and sworn to
before me this _____
day of _____
2024.

_____
NOTARY PUBLIC

Page 179

C E R T I F I C A T E

STATE OF ALABAMA   )
                   )
ETOWAH COUNTY      )

       I hereby certify that the above and
foregoing proceedings were taken down by me in
stenotype, and the questions and answers thereto
were reduced to computer print under my
supervision, and that the foregoing represents a
true and correct transcript of the proceedings
given by said witness upon said hearing.
       I further certify that I am neither of
counsel nor of kin to the parties to the action,
nor am I in anywise interested in the result of
said cause.
       Signed the 14th day of June 2024.



_____
Dannah Moody
ACCR #688 - Expires September 30th, 2024
CCR, Commissioner State of Alabama
My Commission Expires April 7th, 2026

Page 180

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45 (177 - 180)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER ROBINSON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **SPRING OAKS CAPITAL, LLC,** | ) | |
| **et. al.** | ) | |
| | ) | **2:23-cv-01381-AMM** |
| **Defendant.** | ) | |

PLAINTIFF'S
EXHIBIT

**1**

---

**NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6) OF SPRING
OAKS CAPITAL, LLC**

---

TO: Counsel for Spring Oaks Capital

YOU ARE HEREBY NOTIFIED that, pursuant to Fed. R. Civ. P. 30(b)(6), the deposition of

Spring Oaks Capital ("Spring Oaks") will be taken at the offices of Watts & Herring, LLC, 301

19th Street North, Birmingham, AL 35203 and/or by video conference or Zoom, on May 31,

2024, at 9:00 am, CST.

Spring Oaks is requested to designate one or more officers, directors, or managing agents, or

other persons who consent to testify on its behalf, and who can testify as to the following

matters:

1. The Receipt and Processing of Dispute Letters at the time you received and processed

   Christopher Robinson, including:

a. Policies and procedures relating to the receipt and processing of consumer dispute letters;

b. Specific processes employed upon receiving a dispute letter from Christopher Robinson on or about October 3, 2022; and

c. Training provided to employees related to receipt and processing consumer dispute letters from 2021 to present.

2.     Investigation of Disputes in place at the time you received and processed Christopher Robinson, including:

a. Policies, methodologies and procedures for investigating consumer disputes;

b. Specific steps and procedures followed in investigating the dispute from Christopher Robinson; and

c. Criteria or guidelines for determining the outcome of a dispute investigation.

3.     Decision Making on Credit Report Markings in place at the time you received and processed Christopher Robinson, including:

a. The general decision-making process for choosing specific language or markings on a consumer's credit report post-dispute;

b. Rationale or considerations behind the decision to use the language "Account previously in dispute-now resolved" in Christopher Robinson's case;

c. Comparisons or discussions surrounding the industry standard language "Account information disputed by consumer" versus SPRING OAKS' chosen language for Christopher Robinson.

d. Any policies, procedures, memoranda or training materials governing, detailing or prescribing the decision, rational or considerations to use the language

"Account previously in dispute-now resolved" in response to a consumer dispute at or near the time of Christopher Robinson's dispute to SPRING OAKS;

e. Any policies, procedures, memoranda or training materials governing, detailing or prescribing the decision, rational or considerations to not use the language "Account information disputed by consumer" in response to a consumer dispute at or near the time of Christopher Robinson's dispute to SPRING OAKS;

4.      Communication with Credit Reporting Agencies at the time you received and processed Christopher Robinson, including:

a. Spring Oaks general communication practices and protocols with credit reporting agencies such as Equifax, Experian and TransUnion;

b. Specific communications relating to Christopher Robinson's dispute and subsequent report markings.

5.      Involvement of Third-Party Vendors or Contractors at the time you received and processed Christopher Robinson, including:

a. Policies or procedures involving third-party vendors or contractors in the dispute process; and

b. Specific involvement, if any, of third-party vendors or contractors in Christopher Robinson's dispute handling.

6.      Performance Metrics and Goals in place at the time you received and processed Christopher Robinson, including:

a. Any performance metrics, incentives, or goals related to the handling and resolution of consumer disputes within SPRING OAKS;

b. How these metrics, incentives, or goals have changed over the last 3 years.

c. Metrics, incentives or goals for the individual(s) that handled, processed, investigated Mr. Robinson's dispute and/or credit reported Mr. Robison's account after his dispute;

d. Status of the Metrics, incentives or goals for the individual(s) that handled, processed, investigated Mr. Robinson's dispute and/or credit reported Mr. Robison's account after his dispute;

7.     The identities, job titles, training and responsibilities for any employee, agent, individual or third party vendor who received, processed, investigated, responded to, credit reported or was involved in any manner with Christopher Robinson's letter dated September 27, 2022 and received on or about October 3, 2022.

8.     The steps and actions taken by SPRING OAKS or anyone acting on its behalf to investigate Christoher Robinson's dispute the subject of this action.

9.     The steps and actions taken by SPRING OAKS or anyone acting on its behalf to update Christoher Robinson's account information to the credit bureaus, including but not limited to Equifax, Experian, Trans Union and Innovis after you received Christopher Robinson's dispute the subject of this action.

10.     The rationale or reasoning behind choosing the language "Account previously in dispute-now resolved"   for marking Christoher Robinson's credit report.

11.     Why SPRING OAKS did not use the language "Account information disputed by consumer" in marking Christoher Robinson's credit report.

12.     Any communications, instructions, or guidelines given to or received from Equifax, Experian and TransUnion or any other entity concerning the marking of Christopher Robinson's account.

13.     Any and all changes or updates made to Christoher Robinson's credit report from the date of receipt of the dispute letter to the present.

14.     The identities of any third-party vendors or contractors involved in any part of the process from receiving Christoher Robinson's dispute letter the subject of this action to marking Christoher Robinson's credit report.

15.     Software tools or platforms used in the dispute investigation process, including but not limited to those used for credit reporting.

16.      The qualifications, training, and experience of the person or persons responsible for marking, changing, or updating Christoher Robinson's credit report.

17.     Any communications (e.g., email, call, text, letter) and their respective dates, initiated by SPRING OAKS towards Christopher Robinson since the receipt of the dispute letter.

18.     Any internal policies, procedures, guidelines, or training materials related to the changing, altering, or updating a consumer's credit information to the credit bureaus for the time period 12 months prior to receiving Christoher Robinson's dispute letter up to the present date.

19.     Any internal policies, procedures, guidelines, or training materials related to the changing, altering or updating a consumer's credit information to the credit bureaus when you receive a letter from the consumer disputing the alleged debt you are collecting or in response to a letter from the consumer disputing the alleged debt you are collecting for the time period 12 months prior to receiving Christoher Robinson's dispute letter up to the present date.

20.     Any and all policies, procedures, guidelines, training materials and documents evidencing the decision-making process on how to mark Christoher Robinson's credit report post the receipt of the dispute letter from 2018 to present.

21.     All communications, including emails, memos, letters, and other documents, between SPRING OAKS and credit reporting agencies like Equifax, Experian and TransUnion regarding Christoher Robinson's account from 12 months prior to receiving the dispute letter up to the present date.

22.     Any internal documents, studies, or research discussing the implications of different credit report markings on consumers' credit scores or creditworthiness.

23.     The full credit reporting history of Christopher Robinson as held or accessed by SPRING OAKS.

24.     All data, information, documents, communications, or records to or from any third-party vendors or contractors involved in any part of the process from receiving, processing, and investigating Christoher Robinson's dispute letter related to or describing the processes, procedures or practices for handling or investigating and disputes and also for to marking, changing, altering or updating Christoher Robinson's credit information with the credit bureaus.

25.     All records of internal discussions or meetings related to Christoher Robinson's dispute, its investigation, and subsequent credit report marking, changes or updates with the credit bureaus.

26.     Your account notes, by whatever name called, for Christopher Robinson's alleged debt on which you were collecting or attempting to collect that is the subject of this action documenting all actions taken on the alleged account, communications (internally or otherwise), investigations of any disputes by Christoher Robinson, correspondence received and sent, and/or any credit reporting.

DOCUMENT REQUEST: Please produce any and all documents, including but not limited to internal policies, procedures, guidelines, training materials, communications, reports, studies, and memos related to the above-listed topics for the time frame of 12 months prior to September 27, 2022, to the present (unless otherwise specified).

Respectfully Submitted,

/s/ Patricia S. Lockhart
**Patricia S. Lockhart (LOC023)**
Watts & Herring, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(256) 276-2527
patricia@wattsherring.com
**Attorneys for Plaintiff**

/s/ M. Stan Herring
**John G. Watts (WAT056)**
**M. Stan Herring (HER037)**
Watts & Herring, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattsherring.com
stan@wattsherring.com
**Attorneys for Plaintiff**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **01/10/24** a copy of the foregoing has been served on the following counsel for by using the CM/ECF system, U.S. Mail, postage prepaid and properly addressed and/or email to the email addresses below:

**John K Rossman**
ROSSMAN ATTORNEY GROUP PLLC
4628 Bruce Avenue
Edna, MN 55424
952-201-1507
Email: john.rossman@rossmanattorneygroup.com

**Neal D Moore , III**
CHRISTIAN AND SMALL LLP
505 20th Street North
Suite 1800
Birmingham, AL 35203
205-795-6588
Fax: 205-328-7234
Email: ndmoore@csattorneys.com

**L Jackson Young , Jr**
CHRISTIAN AND SMALL, LLP
505 North 20TH Street, Ste. 1800
Birmingham, AL 35242
205-795-6588
Fax: 205-328-7234
Email: LJYoung@csattorneys.com

***Counsel for the defendant***
***Spring Oaks Capital, LLC***

  */s/ Patricia S. Lockhart*
OF COUNSEL

*news text + email*

50

OCT 03 2022

COMPLAINT _____
DISPUTE *news*
ATTY REP _____
BK _____
DECEASED _____
SETTLEMENT _____
DSA _____
POA _____
LAWSUIT _____
CERTIFIED *news*
GENERAL _____

September 27, 2022

**By Certified Mail**
SPRING OAKS CAPITAL LLC
PO BOX 1216
CHESAPEAKE, VA 23327

Dear Sir or Madam:

I understand you are claiming that I owe you and/or your client money.

I'm disputing this debt (and all other debts you claim that I have). You can find all the debts you claim to have on me – I dispute them all. Please note I do NOT want you to send me any information – I simply want you to know that I dispute any debts you claim to have on me. This is not a request for validation or verification. I am not interested in you sending me any documentation.

If you want to communicate with me, there are only two convenient ways I want you to communicate with me – text and email. All other ways are inconvenient, and I do not want you to communicate with me in any way other than email or text. You can email me at redbones1094@gmail.com and you can text me at (256) 612-1392.

The only convenient times to communicate with me (only by text and email) are Monday to Friday from 1 pm to 4 pm. All other times are inconvenient for me so only communicate with me from 1 pm to 4 pm.

Thank you.

CHRISTOPHER ROBINSON
Date of Birth: Rule 5-2 1982
Last 4 Social: XXX-XX-1094
20 BURNEY MOUNTAIN RD
FALKVILLE, AL 35622

PLAINTIFF'S
EXHIBIT

**2**

*Certified Mail #9414811898765814632205 Date: 09/27/2022*

SOC_ROBINSON 000044

Date: October 31, 2022



Christopher B Robinson

20 BURNEY MOUNTAIN RD

FALKVILLE, AL 35622

**Post Office Box 1216**

**Chesapeake, VA 23327-1216**

**Toll Free Number: 866-281-3065**

**Office Hours:**

**M-Thurs. 8am-9pm EST**

**F 8am-6pm EST**

**ACCOUNT INFORMATION**
Original Creditor: Celtic Bank
Original Account No.: Rule 5-2 3527
Current Creditor: Spring Oaks Capital SPV, LLC
Reference No.: Rule 5-2 1371
Balance: $675.09

Dear Christopher B Robinson,

Our office is in receipt of your dispute and/or request for validation of the debt.  Please be advised that we have reviewed your account and have confirmed the name and amount owed on the account.  Based on our investigation of your dispute, we have determined that you are the correct consumer listed for this account.

Enclosed you will find documents associated with your account provided in response to your dispute and/or request for validation.  Should you have any questions regarding this account, please feel free to contact us.

Thank you,

Spring Oaks Capital, LLC

We are a debt collector, but this is not an attempt to collect a debt.



**SEE FOLLOWING PAGES FOR IMPORTANT INFORMATION**

SOC_ROBINSON 000001

**For Connecticut Residents**

This collection agency is licensed in Connecticut, License number CCA-1916692. NMLS #1916692.

**For Colorado Residents:**

The address and telephone number of our local office is as follows: Colorado Manager, Inc., 8690 Wolff Court, Suite 110, Westminster, CO 80031 (Phone 303-920-4763).

**For Massachusetts Residents:**

NOTICE OF IMPORTANT RIGHTS

You have the right to make a written or oral request that telephone calls regarding your debt not be made to you at your place of employment. Any such oral request will be valid for only ten days unless you provide written confirmation of the request postmarked or delivered within seven days of such request. You may terminate this request by writing to the debt collector.

**For Minnesota Residents:**

This collection agency is licensed by the Minnesota Department of Commerce.

**For North Carolina Residents:**

Spring Oaks Capital, LLC's North Carolina company number is as follows: 119507661.

**For New York Residents:**

If a creditor or debt collector receives a money judgment against you in court, state and federal laws may prevent the following types of income from being taken to pay the debt: 1. Supplemental security income, (SSI); 2. Social security; 3. Public assistance (welfare); 4. Spousal support, maintenance (alimony) or child support; 5. Unemployment benefits;  6. Disability benefits; 7. Workers' compensation benefits; 8. Public or private pensions; 9. Veterans' benefits; 10. Federal student loans, federal student grants, and federal work study funds; and 11. Ninety percent of your wages or salary earned in the last sixty days.

**For New York City Residents:**

You may also reach us by calling Tim Rees at 866-539-7554.  New York City Department of Consumer Affairs License Number(s): 2097110-DCA.

**For Tennessee Residents:**

Spring Oaks Capital, LLC is licensed by the Collection Service Board of the Department of Commerce and Insurance.

SOC_ROBINSON 000002

## Rule 5-2

3527

GENESIS FS CARD SERVICES
PO BOX 4477
BEAVERTON OR 97076-4477

| Account Number | 3527 |
|---|---|
| New Balance | $304.00 |
| Minimum Payment Due | $44.00 |
| Payment Due Date | 07/18/21 |
| AMOUNT ENCLOSED | $ |

GENESIS FS CARD SERVICES
PO BOX 23039
COLUMBUS GA 31902-3039

Make check/money order payable to

Please write your account number on your check/money order and do not send cash.

CHRISTOPHER B ROBINSON        **0000000
20 BURNEY MOUNTAIN RD
FALKVILLE AL  35622-5700

Address/Phone Number Change

☐ Please check here and complete Address/Phone Number Change Form on reverse side.

**Make your payment online at www.myindigocard.com**

---

Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

## indigo®

**MASTERCARD ACCOUNT STATEMENT**
3527
May 23, 2021 - June 21, 2021



### Account Summary

| | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $0.00 |
| Overlimit Amount | $4.00 |
| Statement Closing Date | June 21, 2021 |
| # of Days in Billing Cycle | 30 |

### Purchase/Cash Advance Balance Summary

| | |
|---|---|
| Previous Balance | $0.00 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $224.54 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| Fees Charged | $79.46 |
| Interest Charged | $0.00 |
| New Purchase/Cash Advance Balance | $304.00 |

### Payment Information

| | |
|---|---|
| Total New Balance | $304.00 |
| Minimum Payment Due | $44.00 |
| Payment Due Date | July 18, 2021 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 9 month(s) | $341 |

If you would like information about credit counseling services, call 1-866-946-9545 .

Mail payment to:
Genesis FS Card Services
PO BOX 23039
COLUMBUS GA 31902-3039

Please mail billing inquiries to:
Genesis FS Card Services
P.O. Box 4499
Beaverton, OR 97076-4499

QUESTIONS?
Call 1-866-946-9545
www.myindigocard.com

YOUR ACCOUNT IS CURRENTLY $4.00 OVER YOUR $300.00 CREDIT LINE.
PLEASE REMIT THIS TO US IMMEDIATELY.

### Transactions

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| 252478011570008221070 68 | 06/06 | 06/07 | HARDEES 1501387 HARTSELLE AL | $6.00 |
| 527082411588388000426022 | 06/06 | 06/07 | HARTSELLE FOODMART HARTSELLE AL | $10.00 |
| 5554807115740000000114 | 06/06 | 06/07 | JACK'S # 241    Q22 HARTSELLE AL | $10.53 |
| 527082411588388000426006 | 06/06 | 06/07 | HARTSELLE FOODMART HARTSELLE AL | $15.19 |
| 527048711578388000793529 | 06/05 | 06/07 | TACO BELL #037141 HARTSELLE AL | $16.93 |
| 553095911578388001136872 | 06/05 | 06/07 | O'REILLY AUTO PARTS 10 HARTSELLE AL | $162.39 |
| 252478011590010810986 40 | 06/08 | 06/09 | BUFFALO ROCK VENDING H HUNTSVILLE AL | $1.75 |
| 252478011600011153148 79 | 06/09 | 06/10 | BUFFALO ROCK VENDING H HUNTSVILLE AL | $1.75 |

### Fees

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| 7501301149174000000000 00 | 05/29 | 05/31 | ANNUAL FEE | $75.00 |
| | 06/21 | 06/21 | CREDIT PROTECTION FEES | $4.46 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$79.46** |

### 2021 Totals Year-to-Date

| | |
|---|---|
| Total fees charged in 2021 | $79.46 |
| Total interest charged in 2021 | $0.00 |

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

SOC_ROBINSON 000003

Defendant's Exhibit 'A' - p.58 of 180

3527

**indigo**

**MASTERCARD ACCOUNT STATEMENT**
███████████527
May 23, 2021 - June 21, 2021



| Interest Charge Calculation | | | |
|---|---|---|---|

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.90% | $0.00 | $0.00 |
| Cash Advances | 29.90% | $0.00 | $0.00 |

(v) = Variable Rate

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

SOC_ROBINSON 000004

Defendant's Exhibit A - p.59 of 180

5TDD-0445-5008-3527

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

ADDRESS _____

CITY _____ STATE _____ ZIP CODE _____

( ) _____        _____
HOME PHONE                     BUSINESS PHONE

EMAIL ADDRESS _____

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

---

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

### What To Do If You Think You Find A Mistake On Your Statement

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

### Your Rights If You Are Dissatisfied With Your Credit Card Purchases

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

### PAYMENTS

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 P.M. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 P.M. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

### ANNUAL FEE (if applicable)

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

### CREDIT BUREAU REPORTING

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

### HOW INTEREST CHARGES ARE DETERMINED

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be a component in the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR) to:
   a. your *Average Daily Balance* of Cash Advances (including new Cash Advances); and
   b. your Average Daily Balance of Purchases (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date in your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

### Calculating the Purchase and Cash Advance Balance Subject to Interest Charges

**Average Daily Balance of Purchases (including new Purchases):** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

### Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

### OTHER DISCLOSURES

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000005

Defendant's Exhibit A - p.60 of 180

R5975-C597-1219

3527

GENESIS FS CARD SERVICES
PO BOX 4477
BEAVERTON OR 97076-4477

| | |
|---|---|
| Account Number | 3527 |
| New Balance | $675.09 |
| Minimum Payment Due | $419.09 |
| Payment Due Date | 02/18/22 |
| AMOUNT ENCLOSED | $ |

GENESIS FS CARD SERVICES   ◄ Make check/money
PO BOX 23039                        order payable to
COLUMBUS GA 31902-3039

Please write your account number on your check/money order
and do not send cash.

CHRISTOPHER B ROBINSON          **0000000
20 BURNEY MOUNTAIN RD
FALKVILLE AL  35622-5700

  Address/Phone Number Change
☐ Please check here and complete Address/Phone
    Number Change Form on reverse side.

**Make your payment online at www.myindigocard.com**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

## indigo®

**MASTERCARD ACCOUNT STATEMENT**
527
December 21, 2021 - January 19, 2022



| Account Summary | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $281.00 |
| Overlimit Amount | $375.09 |
| Statement Closing Date | January 19, 2022 |
| # of Days in Billing Cycle | 30 |

| Purchase/Cash Advance Balance Summary | |
|---|---|
| Previous Balance | $619.66 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$40.00** |
| **Interest Charged** | **$15.43** |
| New Purchase/Cash Advance Balance | $675.09 |

| Payment Information | |
|---|---|
| Total New Balance | $675.09 |
| Minimum Payment Due | $419.09 |
| Payment Due Date | February 18, 2022 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 12 month(s) | $746 |

If you would like information about credit counseling services, call 1-866-946-9545 .

| | | |
|---|---|---|
| **Mail payment to:** | **Please mail billing inquiries to:** | **QUESTIONS?** |
| Genesis FS Card Services | Genesis FS Card Services | Call 1-866-946-9545 |
| PO BOX 23039 | P.O. Box 4499 | www.myindigocard.com |
| COLUMBUS GA 31902-3039 | Beaverton, OR 97076-4499 | |

YOUR MINIMUM PAYMENT INCLUDES ANY OVERLIMIT AND PAST DUE AMOUNTS.
PLEASE REMIT IMMEDIATELY.

Your statement will soon be updated. We have made changes to make it easier to read and
understand. In addition, we will be upgrading our website which may temporarily limit access
to some parts of the site.
**Important:**
Your due date will change to the 22nd of the month starting in March 2022.

| Fees | | | | |
|---|---|---|---|---|
| **Reference Number** | **Tran Date** | **Post Date** | **Description of Transaction or Credit** | **Amount** |
| | 01/19 | 01/19 | LATE PAYMENT CHARGE | $40.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$40.00** |

| Interest Charged | | | | |
|---|---|---|---|---|
| **Reference Number** | **Tran Date** | **Post Date** | **Description of Transaction or Credit** | **Amount** |
| | 01/19 | 01/19 | INTEREST CHARGE PURCHASE | $15.43 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$15.43** |

| 2022 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2022 | $40.00 |
| Total interest charged in 2022 | $15.43 |

SOC_ROBINSON 000006

Defendant's Exhibit A - p.61 of 180

3527

# indigo®

**MASTERCARD ACCOUNT STATEMENT**
████████████3527
December 21, 2021 - January 19, 2022



| Interest Charge Calculation | | | |
|---|---|---|---|

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.90% | $619.66 | $15.43 |
| Cash Advances | 29.90% | $0.00 | $0.00 |

(v) = Variable Rate

SOC_ROBINSON 000007

Defendant's Exhibit A - p.62 of 180

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

_____

ADDRESS
_____

CITY _____ STATE _____ ZIP CODE _____

(    ) _____

HOME PHONE                    BUSINESS PHONE
_____

EMAIL ADDRESS

---

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

**What To Do If You Think You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**PAYMENTS**

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 P.M. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 P.M. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

**ANNUAL FEE (if applicable)**

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

**CREDIT BUREAU REPORTING**

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**HOW INTEREST CHARGES ARE DETERMINED**

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be added to the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under **Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)** to:
   a. your *Average Daily Balance of Cash Advances* (including new Cash Advances); and
   b. your *Average Daily Balance of Purchases* (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date in your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases).** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

**OTHER DISCLOSURES**

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000008

RS975-C597-1219

AUG. 2022

**SPRING OAKS CAPITAL**

1400 Crossways Blvd, STE 100 B
Chesapeake, VA 23320
Toll Free Number: 866-281-3065
Office Hours:
M–Thurs, 8am–9pm EST, F 8am–6pm EST

To: Christopher B Robinson
20 Burney Mountain Rd
Falkville, AL 35622-5700

Reference: ███1371

**Spring Oaks Capital, LLC is a debt collector.** We are trying to collect a debt that is now owned by Spring Oaks Capital SPV, LLC. We will use any information you give us to help collect the debt.

### Our information shows:

You had an Indigo Mastercard account originated with Celtic Bank with account number ████████3527. The creditor on 01/20/2022 was Celtic Bank. Your Celtic Bank account is now owned by Spring Oaks Capital SPV, LLC.

| | | |
|---|---|---|
| As of 01/20/2022 you owed: | | $675.09 |
| Between 01/20/2022 and today: | | |
| You were charged this amount in interest: | + | $0.00 |
| You were charged this amount in fees: | + | $0.00 |
| You paid or were credited this amount toward the debt: | - | $0.00 |
| **Total amount of the debt now:** | | $675.09 |

### How can you dispute the debt?

- **Call or write to us by May 15, 2022, to dispute all or part of the debt.** If you do not, we will assume that our information is correct.

- **If you write to us by May 15, 2022,** we must stop collection on any amount you dispute until we send you information that shows you owe the debt. You may use the form below or write to us without the form. You may also include supporting documents.

### What else can you do?

- **Write to ask for the name and address of the original creditor, if different from the current creditor.** If you write by May 15, 2022, we must stop collection until we send you that information. You may use the form below or write to us without the form.

- **Go to www.cfpb.gov/debt-collection to learn more about your rights under federal law.** For instance, you have the right to stop or limit how we contact you.

- **Contact us about your payment options by visiting www.springoakscapital.com or calling 866-281-3065.**

SEE REVERSE SIDE FOR OTHER IMPORTANT INFORMATION

DEPT 914    4379812922040
PO BOX 4115
CONCORD CA  94524

ADDRESS SERVICE REQUESTED

CHRISTOPHER B ROBINSON
20 BURNEY MOUNTAIN RD
FALKVILLE AL 35622-5700

### How do you want to respond?

*Check all that apply:*
- ☐ **I want to dispute the debt because I think:**
  - ☐ This is not my debt.
  - ☐ The amount is wrong.
  - ☐ Other (please describe on reverse or attach additional information).
- ☐ **I want you to send me the name and address of the original creditor.**
- ☐ **I enclosed this amount:** $ _____

Make your check payable to Spring Oaks Capital, LLC. Include the reference number ███371.

**Mail this form to:**

SPRING OAKS CAPITAL, LLC
ATTN: CORRESPONDENCE DEPT
PO BOX 1216
CHESAPEAKE VA  23327-1216

SOC_ROBINSON 000009

As required by law, you are hereby notified that a negative credit agency report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. This does not affect your right to dispute the debt as set forth in this letter.

SOC_ROBINSON 000010
SPOIE-0401•1714663713•01534•1534

| **FACTS** | **What does Spring Oaks Capital, LLC, and its affiliates, including Spring Oaks Capital SPV, LLC (collectively "Spring Oaks", "us", or "we") do with your personal information?** |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>• Social Security Number   and   Date of Birth<br>• Address                          and   Telephone Number<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| **How?** | All financial companies need to share customer's personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customer's personal information; the reasons Spring Oaks chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Spring Oaks share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes -** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus. | Yes | No |
| **For our marketing purposes -** to offer our products and services to you | No | No |
| **For joint marketing with other financial companies** | No | No |
| **For our affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes -** information about your creditworthiness | Yes | No |
| **For nonaffiliates to market to you** | No | No |

| **Questions?** | Call 866-281-3065 or go to www.springoakscapital.com |
|---|---|

SOC_ROBINSON 000011<br>SPOIL-0401-1714663713-01534-1534

| Who we are | |
|---|---|
| **Who is providing this notice?** | Spring Oaks Capital LLC, and its affiliates, including Spring Oaks Capital SPV, LLC |

| What we do | |
|---|---|
| **How does Spring Oaks protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law.  These measures include computer safeguards and secured files and buildings. |
| **How does Spring Oaks collect my personal information?** | We collect your personal information, for example, when you<br><br>▪ call us        or      email us<br>▪ use our online portal    or      write us |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br><br>▪ sharing for affiliates' everyday business purposes - information about your creditworthiness<br>▪ affiliates from using your information to market to you<br>▪ sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control.  They can be financial and nonfinancial companies. |
| **Nonaffiliates** | Companies not related by common ownership or control.  They can be financial and nonfinancial companies. |
| **Joint Marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you. |

| Other important information |
|---|
| Please refer to the following reference number if you need to contact us with any questions: ████1371. |

SOC_ROBINSON 000012
SPOIL-0401•1714663713•01534•1534

| Create Date | Note | Username | Type | Agency # | Job ID | Job Task ID | Action Path ID |
|---|---|---|---|---|---|---|---|
| 10/2/2023 8:10 | ccalko viewed this account | ccalko | VIEW | 1371 | | | |
| 10/2/2023 8:07 | ccalko viewed this account | ccalko | VIEW | 1371 | | | |
| 9/29/2023 15:18 | tmckoy viewed this account | tmckoy | VIEW | 1371 | | | |
| 9/29/2023 7:24 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 9/26/2023 16:37 | ccalko viewed this account | ccalko | VIEW | 1371 | | | |
| 9/26/2023 10:32 | ccalko viewed this account | ccalko | VIEW | 1371 | | | |
| 9/26/2023 10:16 | ccalko viewed this account | ccalko | VIEW | 1371 | | | |
| 9/26/2023 8:28 | ccalko viewed this account | ccalko | VIEW | 1371 | | | |
| 9/26/2023 8:04 | ccalko viewed this account | ccalko | VIEW | 1371 | | | |
| 9/26/2023 8:02 | ccalko viewed this account | ccalko | VIEW | 1371 | | | |
| 9/26/2023 7:49 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/26/2023 7:45 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/22/2023 6:55 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 9/21/2023 8:54 | yklinger viewed this account | yklinger | VIEW | 1371 | | | |
| 9/21/2023 8:47 | yklinger viewed this account | yklinger | VIEW | 1371 | | | |
| 9/21/2023 8:36 | yklinger viewed this account | yklinger | VIEW | 1371 | | | |
| 9/21/2023 8:32 | yklinger viewed this account | yklinger | VIEW | 1371 | | | |
| 9/20/2023 21:00 | Attorney Representation changed from [] to [true] | job | DEBT | 1371 | 16551 | 27595 | |
| 9/20/2023 20:26 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/20/2023 20:21 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/20/2023 20:20 | Form COMPLAINT_TRACKING added | ablady | DEBT | 1371 | | | |
| 9/20/2023 20:20 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/20/2023 20:18 | Form COMPLAINT_TRACKING added | ablady | DEBT | 1371 | | | |
| 9/20/2023 20:18 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/20/2023 20:15 | Form ATTORNEY_REPRESENTATION added | ablady | DEBT | 1371 | | | |
| 9/20/2023 20:15 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/20/2023 20:13 | Lawsuit received | ablady | USER | 1371 | | | |
| 9/20/2023 20:13 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/20/2023 20:12 | Do Not Txt changed from [false] to [true] | ablady | DEBT | 1371 | | | 12870 |
| 9/20/2023 20:12 | Do Not Email changed from [false] to [true] | ablady | DEBT | 1371 | | | 12870 |
| 9/20/2023 20:12 | Status changed from [ACT] to [ATTY] | ablady | DEBT | 1371 | | | |
| 9/20/2023 20:12 | Document Complaint-served 9-20-2023.pdf uploaded | ablady | DOCUMENT | 1371 | | | |
| 9/20/2023 20:11 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/20/2023 20:11 | Worklist changed from [Active Inventory] to [Complaints (Formal)] | ablady | WORKLIST | 1371 | | | |
| 9/20/2023 20:08 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/20/2023 20:05 | ablady viewed this account | ablady | VIEW | 1371 | | | |
| 9/15/2023 4:50 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 9/11/2023 22:07 | Primary Phone (662) 280-9171 status changed from NEW to INACTIVE | job | DEMOGRAPHIC | 1371 | 17015 | 28456 | |
| 9/11/2023 14:37 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 9/10/2023 12:29 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 9/8/2023 4:58 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 9/7/2023 6:09 | Settlement Offer Date changed from [08/02/2023] to [09/06/2023] | job | DEBT | 1371 | 13737 | 24378 | |
| 9/7/2023 6:09 | Settlement Offer Amount changed from [$385.00] to [$375.00] | job | DEBT | 1371 | 13737 | 24378 | |
| 9/4/2023 15:05 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 9/1/2023 4:40 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 8/26/2023 0:51 | Primary demographic, Cell Phone changed from ▮▮ to ▮▮ | job | DEMOGRAPHIC | 1371 | 16948 | 29143 | |
| 8/26/2023 0:51 | Primary demographic, Phone Main changed from ▮▮ to ▮▮ | job | DEMOGRAPHIC | 1371 | 16948 | 29143 | |
| 8/26/2023 0:51 | Primary Phone ▮▮-1392 status changed from INACTIVE to ACTIVE | job | DEMOGRAPHIC | 1371 | 16948 | 29143 | |
| 8/25/2023 4:51 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 8/20/2023 14:38 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 8/18/2023 7:20 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 8/15/2023 1:33 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 8/15/2023 1:26 | Flag PBI_DEMO_SEND removed | job | DEBT_FLAG | 1371 | 17848 | 30022 | 17358 |
| 8/15/2023 1:26 | Flag PBI_DEMO_SEND_N2_DELETE added | job | DEBT_FLAG | 1371 | 17848 | 30022 | 17355 |
| 8/15/2023 0:48 | Flag PBI_DEMO_SEND added | job | DEBT_FLAG | 1371 | 17848 | 30020 | 17353 |

**PLAINTIFF'S EXHIBIT**

**4**

SOC_ROBINSON 000013

| Date/Time | Description | Type | Category | | | | |
|---|---|---|---|---|---|---|---|
| 8/13/2023 14:44 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 8/11/2023 4:51 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 8/8/2023 0:48 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 8/6/2023 14:27 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 8/5/2023 13:55 | Flag PBI_DEMO_SEND removed | job | DEBT_FLAG | 371 | 17848 | 30022 | 17358 |
| 8/5/2023 13:55 | Flag PBI_DEMO_SEND_DELETE added | job | DEBT_FLAG | 371 | 17848 | 30022 | 17355 |
| 8/5/2023 13:46 | Flag PBI_DEMO_SEND added | job | DEBT_FLAG | 371 | 17848 | 30020 | 17353 |
| 8/4/2023 4:45 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 8/2/2023 16:53 | Settlement Offer Date changed from [06/01/2023] to [08/02/2023] | job | DEBT | 371 | 13739 | 24380 | |
| 8/2/2023 16:53 | Settlement Offer Amount changed from [$410.00] to [$385.00] | job | DEBT | 371 | 13739 | 24380 | |
| 7/31/2023 14:14 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 7/30/2023 12:22 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 7/28/2023 4:38 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 7/25/2023 1:17 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 7/23/2023 14:52 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 7/21/2023 6:04 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 7/17/2023 23:25 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 7/16/2023 14:07 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 7/14/2023 7:32 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 7/10/2023 10:11 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 7/9/2023 11:34 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 7/7/2023 7:19 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 7/3/2023 21:55 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 7/2/2023 13:35 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 6/30/2023 7:26 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 6/23/2023 4:35 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 6/19/2023 12:22 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 6/18/2023 11:39 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 6/16/2023 15:15 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | |
| 6/16/2023 7:21 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 6/12/2023 20:27 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 6/11/2023 13:42 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 6/9/2023 7:29 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 6/5/2023 9:24 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 6/4/2023 11:16 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 6/2/2023 10:03 | Settlement Offer Date changed from [05/02/2023] to [06/01/2023] | job | DEBT | 371 | 13738 | 24379 | |
| 6/2/2023 10:03 | Settlement Offer Amount changed from [$440.00] to [$410.00] | job | DEBT | 371 | 13738 | 24379 | |
| 6/2/2023 4:38 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 5/29/2023 21:30 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 5/28/2023 13:34 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 5/26/2023 4:39 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 5/22/2023 6:22 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 5/19/2023 4:34 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 5/14/2023 11:15 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 5/12/2023 5:02 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 5/8/2023 11:38 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 5/7/2023 11:18 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 5/5/2023 7:09 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 5/3/2023 8:36 | Settlement Offer Date changed from [03/07/2023] to [05/02/2023] | job | DEBT | 371 | 13738 | 24379 | |
| 5/3/2023 8:36 | Settlement Offer Amount changed from [$320.00] to [$440.00] | job | DEBT | 371 | 13738 | 24379 | |
| 5/1/2023 9:45 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 4/30/2023 9:22 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 4/28/2023 4:40 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 4/27/2023 1:08 | Primary Phone ███-2772 created | job | DEMOGRAPHIC | 371 | 7269 | 15609 | |
| 4/21/2023 4:47 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 4/17/2023 11:17 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 4/16/2023 11:22 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |

SOC_ROBINSON 000014

| Date | Description | Type | Category | | | |
|---|---|---|---|---|---|---|
| 4/14/2023 8:08 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 4/10/2023 21:29 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 4/9/2023 13:19 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 4/7/2023 4:27 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 4/3/2023 7:59 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 4/2/2023 10:47 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 3/31/2023 4:28 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 3/30/2023 6:20 | Letter S123 not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 16075 | 26950 | |
| 3/30/2023 1:09 | Flag SO_SinglePay removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15710 |
| 3/30/2023 1:09 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15554 |
| 3/29/2023 23:50 | Letter Settlement Offer-single payment scheduled to be sent on 03/29/2023 | job | LETTER | 1371 | 16074 | 26946 | 15709 |
| 3/29/2023 22:15 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY added | job | DEBT_FLAG | 1371 | 16074 | 26945 | 15557 |
| 3/29/2023 11:40 | Flag SO_SinglePay_GMAIL added | job | DEBT_FLAG | 1371 | 14958 | 25634 | |
| 3/27/2023 17:48 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 3/26/2023 12:43 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 3/25/2023 4:55 | Letter S123 not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 16075 | 26950 | |
| 3/25/2023 2:02 | Flag SO_SinglePay_GMAIL removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15710 |
| 3/25/2023 2:02 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15554 |
| 3/25/2023 0:00 | Letter Settlement Offer-single payment scheduled to be sent on 03/25/2023 | job | LETTER | 1371 | 16074 | 26946 | 15709 |
| 3/24/2023 22:07 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY added | job | DEBT_FLAG | 1371 | 16074 | 26945 | 15557 |
| 3/24/2023 4:54 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 3/21/2023 15:40 | Flag SO_SinglePay_GMAIL added | job | DEBT_FLAG | 1371 | 14958 | 25634 | |
| 3/20/2023 7:05 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 3/19/2023 9:48 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 3/17/2023 4:52 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 3/13/2023 15:53 | Letter S123 not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 16075 | 26950 | |
| 3/13/2023 11:35 | Flag SO_SinglePay_GMAIL removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15710 |
| 3/13/2023 11:35 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15554 |
| 3/13/2023 9:49 | Letter Settlement Offer-single payment scheduled to be sent on 03/13/2023 | job | LETTER | 1371 | 16074 | 26946 | 15709 |
| 3/13/2023 9:41 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY added | job | DEBT_FLAG | 1371 | 16074 | 26945 | 15557 |
| 3/13/2023 9:14 | Flag SO_SinglePay_GMAIL added | job | DEBT_FLAG | 1371 | 14958 | 25634 | |
| 3/10/2023 5:53 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 3/8/2023 7:18 | Settlement Offer Date changed from [01/19/2023] to [03/07/2023] | job | DEBT | 1371 | 13744 | 24385 | |
| 3/8/2023 7:18 | Settlement Offer Amount changed from [$325.00] to [$320.00] | job | DEBT | 1371 | 13744 | 24385 | |
| 3/6/2023 12:34 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 3/5/2023 12:15 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 3/3/2023 6:07 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 3/3/2023 3:21 | Letter S123 not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 16075 | 26950 | |
| 3/2/2023 22:41 | Flag SO_SinglePay_GMAIL removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15710 |
| 3/2/2023 22:41 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15554 |
| 3/2/2023 21:24 | Letter Settlement Offer-single payment scheduled to be sent on 03/02/2023 | job | LETTER | 1371 | 16074 | 26946 | 15709 |
| 3/2/2023 20:19 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY added | job | DEBT_FLAG | 1371 | 16074 | 26945 | 15557 |
| 3/1/2023 13:38 | Flag SO_SinglePay_GMAIL added | job | DEBT_FLAG | 1371 | 14958 | 25634 | |
| 2/27/2023 11:59 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | |
| 2/26/2023 12:00 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 2/24/2023 6:42 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 2/24/2023 2:09 | Letter S123 not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 16075 | 26950 | |
| 2/23/2023 21:10 | Flag SO_SinglePay_GMAIL removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15710 |
| 2/23/2023 21:10 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15554 |
| 2/23/2023 17:49 | Letter Settlement Offer-single payment scheduled to be sent on 02/23/2023 | job | LETTER | 1371 | 16074 | 26946 | 15709 |
| 2/23/2023 16:37 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY added | job | DEBT_FLAG | 1371 | 16074 | 26945 | 15557 |
| 2/23/2023 13:08 | Flag SO_SinglePay_GMAIL added | job | DEBT_FLAG | 1371 | 14958 | 25634 | |
| 2/22/2023 15:14 | Reference # changed from [] to ███████ 1943] | job | DEBT | 1371 | 14032 | 24725 | 15793 |
| 2/20/2023 9:19 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | |
| 2/19/2023 11:46 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 2/17/2023 8:10 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 2/14/2023 23:00 | Letter S123 not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 16075 | 26950 | |

SOC_ROBINSON 000015

| Date/Time | Description | Type | Category | | | | |
|---|---|---|---|---|---|---|---|
| 2/14/2023 17:51 | Flag SO_SinglePay_GMAIL removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15710 |
| 2/14/2023 17:51 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 16074 | 26948 | 15554 |
| 2/14/2023 16:06 | Letter Settlement Offer-single payment scheduled to send on 02/14/2023 | job | LETTER | 1371 | 16074 | 26946 | 15709 |
| 2/14/2023 16:04 | Flag SO_SinglePay_SNAIL_SCHEDULETODAY added | job | DEBT_FLAG | 1371 | 16074 | 26945 | 15557 |
| 2/14/2023 15:29 | Flag SO_SinglePay_GMAIL added | job | DEBT_FLAG | 1371 | 14958 | 25634 | |
| 2/13/2023 7:21 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 2/12/2023 10:58 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 2/10/2023 4:41 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 2/6/2023 7:15 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 2/5/2023 10:52 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 2/3/2023 7:46 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 1/30/2023 4:18 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | |
| 1/27/2023 4:26 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 1/26/2023 23:03 | ███-7472 Message: This message is from Spring Oaks Capital, LLC.  This message is regarding your Indigo Mastercard account originated by Celtic Bank, which is now owned by Spring Oaks Capital SPV, LLC. We are willing to accept $325.00 to resolve your account for less than the full balance.  Review this offer by going to springoaks.co/s/uGDXEqr4g. If you have any questions, reply to this text or contact one of our representatives at 833-418-3083. We have agents ready to respond during normal business hours.  We request that you review and take advantage of this offer by 2023-03-04. Your account is in your hands. We are not obligated to renew this offer. Please contact us if you need more time to reply to this offer.  We are a debt collector. Click here for important disclosures https://portal.springoaks.com/disclosures/111641371. Reply STOP to opt out. - Delivered 01/26/2023 03:31 PM | job | TEXT_MESSAGE | 1371 | 14918 | 25623 | |
| 1/22/2023 10:40 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 1/20/2023 4:36 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 1/19/2023 17:03 | Settlement Offer Date changed from [12/05/2022] to [01/19/2023] | job | DEBT | 1371 | 13741 | 24382 | |
| 1/19/2023 17:03 | Settlement Offer Amount changed from [$355.00] to [$325.00] | job | DEBT | 1371 | 13741 | 24382 | |
| 1/19/2023 8:28 | Letter PO not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 14851 | 25583 | |
| 1/19/2023 5:18 | Flag GMAILEMAILS removed | job | DEBT_FLAG | 1371 | 15615 | 26364 | 15372 |
| 1/19/2023 5:18 | Flag GMAILSCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 15615 | 26364 | 15371 |
| 1/19/2023 4:32 | Letter Flexible Payment Options scheduled to be sent on 01/19/2023 | job | LETTER | 1371 | 15615 | 26362 | 15298 |
| 1/19/2023 3:17 | Flag GMAILSCHEDULETODAY added | job | DEBT_FLAG | 1371 | 15615 | 26361 | 15369 |
| 1/18/2023 9:38 | Flag State_Lic_Report removed | job | DEBT_FLAG | 1371 | 13684 | 24118 | 14359 |
| 1/18/2023 9:34 | Flag State_Lic_Report added | job | DEBT_FLAG | 1371 | 13684 | 24116 | 14357 |
| 1/17/2023 17:30 | Original Primary Phone Main changed from [] to [(256) 274-3416] | job | DEBT | 1371 | 15750 | 26570 | |
| 1/17/2023 17:30 | Primary demographic, Dob Age In Years changed from [0] to [40] | job | DEMOGRAPHIC | 1371 | 15750 | 26570 | |
| 1/17/2023 17:30 | Primary demographic, Cell Phone changed from ███ to ███ | job | DEMOGRAPHIC | 1371 | 15750 | 26570 | |
| 1/17/2023 17:30 | Primary Phone ███ status changed from NEW to INACTIVE | job | DEMOGRAPHIC | 1371 | 15750 | 26570 | |
| 1/17/2023 17:30 | Primary demographic, Dob Age In Years changed from [0] to [40] | job | DEMOGRAPHIC | 1371 | 15750 | 26570 | |
| 1/17/2023 17:30 | Primary demographic, Cell Phone changed from ███ to ███ | job | DEMOGRAPHIC | 1371 | 15750 | 26570 | |
| 1/17/2023 17:30 | Primary demographic, Phone Main changed from ███ to ███ | job | DEMOGRAPHIC | 1371 | 15750 | 26570 | |
| 1/17/2023 17:30 | Primary Phone (256) 274-3416 status changed from NEW to INACTIVE | job | DEMOGRAPHIC | 1371 | 15750 | 26570 | |
| 1/17/2023 15:01 | Flag GMAILEMAILS added | job | DEBT_FLAG | 1371 | 10740 | 20313 | |
| 1/15/2023 17:27 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 1/13/2023 4:53 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 1/13/2023 1:32 | Original Primary Phone Home changed from [] to ███ | job | DEBT | 1371 | 7269 | 15609 | |
| 1/13/2023 1:32 | Primary  Phone (662) 280-9171 created | job | DEMOGRAPHIC | 1371 | 7269 | 15609 | |
| 1/12/2023 8:17 | Letter PO not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 14851 | 25583 | |
| 1/12/2023 4:55 | Flag GMAILEMAILS removed | job | DEBT_FLAG | 1371 | 15615 | 26364 | 15372 |
| 1/12/2023 4:55 | Flag GMAILSCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 15615 | 26364 | 15371 |
| 1/12/2023 3:27 | Letter Flexible Payment Options scheduled to be sent on 01/12/2023 | job | LETTER | 1371 | 15615 | 26362 | 15298 |
| 1/12/2023 3:01 | Flag GMAILSCHEDULETODAY added | job | DEBT_FLAG | 1371 | 15615 | 26361 | 15369 |
| 1/11/2023 14:04 | Creditor Card Number Agreement Code changed from [] to ███ 205] | job | DEBT | 1371 | 14958 | 25634 | |
| 1/9/2023 16:06 | Flag GMAILEMAILS added | job | DEBT_FLAG | 1371 | 10740 | 20313 | |

SOC_ROBINSON 000016

| Date/Time | Description | User | Type | | | | |
|---|---|---|---|---|---|---|---|
| 1/8/2023 13:55 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 1/6/2023 6:24 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 1/4/2023 6:17 | Letter PO not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 14851 | 25583 | |
| 1/4/2023 5:05 | Flag GMAILEMAILS removed | job | DEBT_FLAG | 1371 | 15615 | 26364 | 15372 |
| 1/4/2023 5:05 | Flag GMAILSCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 15615 | 26364 | 15371 |
| 1/4/2023 4:28 | Letter Flexible Payment Options scheduled to be sent on 01/04/2023 | job | LETTER | 1371 | 15615 | 26362 | 15298 |
| 1/4/2023 3:06 | Flag GMAILSCHEDULETODAY added | job | DEBT_FLAG | 1371 | 15615 | 26361 | 15369 |
| 1/3/2023 15:17 | Flag GMAILEMAILS added | job | DEBT_FLAG | 1371 | 10740 | 20313 | |
| 1/2/2023 12:22 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 1/1/2023 14:38 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 12/30/2022 5:28 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 12/29/2022 8:04 | Monthly SMS Count changed from [] to [0] | job | DEBT | 1371 | | 23798 | |
| 12/29/2022 8:04 | Settlement Offer Account Frequency changed from [1] to [9] | job | DEBT | 1371 | | 23798 | |
| 12/26/2022 9:31 | Letter PO not sent due to restriction reason: Account Do Not Mail Flag Set | job | LETTER | 1371 | 14851 | 25583 | |
| 12/26/2022 7:45 | Flag GMAILEMAILS removed | job | DEBT_FLAG | 1371 | 15615 | 26364 | 15372 |
| 12/26/2022 7:45 | Flag GMAILSCHEDULETODAY removed | job | DEBT_FLAG | 1371 | 15615 | 26364 | 15371 |
| 12/26/2022 6:28 | Letter Flexible Payment Options scheduled to be sent on 12/26/2022 | job | LETTER | 1371 | 15615 | 26362 | 15298 |
| 12/26/2022 3:44 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 12/26/2022 3:07 | Flag GMAILSCHEDULETODAY added | job | DEBT_FLAG | 1371 | 15615 | 26361 | 15369 |
| 12/25/2022 11:14 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 12/23/2022 5:18 | Flag GMAILEMAILS added | cwilson | DEBT_FLAG | 1371 | | | |
| 12/23/2022 5:18 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 12/18/2022 21:36 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 12/18/2022 11:02 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 12/16/2022 9:55 | CJackson viewed this account | CJackson (DELETED) | VIEW | 1371 | | | |
| 12/16/2022 4:37 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 12/11/2022 20:29 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 12/11/2022 10:33 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 12/9/2022 4:43 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 12/7/2022 1:29 | Primary  Phone (256) 476-7472 created | job | DEMOGRAPHIC | 1371 | 7269 | 15609 | |
| 12/4/2022 20:42 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 12/4/2022 10:47 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 12/3/2022 4:35 | Settlement Offer Frequency Current Month changed from [1] to [] | job | DEBT | 1371 | 15271 | 25962 | |
| 12/2/2022 14:28 | Settlement Offer Date changed from [11/02/2022] to [12/05/2022] | job | DEBT | 1371 | 13739 | 24380 | |
| 12/2/2022 14:28 | Settlement Offer Amount changed from [$365.00] to [$355.00] | job | DEBT | 1371 | 13739 | 24380 | |
| 12/2/2022 7:18 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 11/27/2022 20:51 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | | 8443 | |
| 11/27/2022 7:06 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 11/25/2022 7:36 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 11/20/2022 12:53 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 11/20/2022 7:07 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 11/18/2022 7:27 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 11/17/2022 4:58 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 11/13/2022 12:19 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 11/13/2022 7:06 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 11/11/2022 4:51 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 11/6/2022 12:07 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 11/6/2022 7:06 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 11/4/2022 6:36 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 11/2/2022 19:18 | Settlement Offer Date changed from [09/02/2022] to [11/02/2022] | job | DEBT | 1371 | 13739 | 24380 | |
| 11/2/2022 19:18 | Settlement Percent changed from [] to [54.07%] | job | DEBT | 1371 | 13739 | 24380 | |
| 11/2/2022 19:18 | Settlement Offer Amount changed from [$395.00] to [$365.00] | job | DEBT | 1371 | 13739 | 24380 | |
| 10/31/2022 9:11 | Important Note changed from [] to [****EMailed Debt Validation****] | kmoore | DEBT | 1371 | | | |
| 10/31/2022 9:11 | Next Work Date changed from [10/11/2022] to [11/07/2022] | kmoore | DEBT | 1371 | | | |
| 10/31/2022 9:11 | ****EMailed Debt Validation**** | kmoore | IMPORTANT | 1371 | | | |

SOC_ROBINSON 000017

| Date/Time | Description | User | Type | | | | |
|---|---|---|---|---|---|---|---|
| 10/31/2022 9:11 | Customer indicated they're disputing account; After further investigation into documents on file. Compiled a DINV packet with all required docs and sending it to consumer via Email. | kmoore | USER | 1371 | | | |
| 10/31/2022 9:11 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:11 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:11 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:10 | Document Requested Documentation .msg uploaded | kmoore | DOCUMENT | 1371 | | | |
| 10/31/2022 9:10 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:09 | Status changed from [WRITTEN] to [ACT] | kmoore | DEBT | 1371 | | | 14497 |
| 10/31/2022 9:09 | Disputed changed from [true] to [false] | kmoore | DEBT | 1371 | | | |
| 10/31/2022 9:09 | Dispute Resolved XH - Previously in dispute, now resolved, reported by CR | kmoore | DISPUTE | 1371 | | | |
| 10/31/2022 9:09 | Document DINV_email_10.31.22-.pdf uploaded | kmoore | DOCUMENT | 1371 | | | |
| 10/31/2022 9:09 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:09 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:09 | Added to worklist Active Inventory | kmoore | WORKLIST | 1371 | | | 14497 |
| 10/31/2022 9:08 | Do Not Mail changed from [false] to [true] | kmoore | DEBT | 1371 | | | |
| 10/31/2022 9:08 | Last Work Date changed from [10/05/2022 12:49:10 AM EDT] to [10/31/2022 09:08:25 AM EDT] | kmoore | DEBT | 1371 | | | |
| 10/31/2022 9:08 | Do Not Mail changed from [true] to [false] | kmoore | DEBT | 1371 | | | |
| 10/31/2022 9:08 | Letter FCRA Invalid Dispute-Info Accurate with Validation sent | kmoore | LETTER | 1371 | | | |
| 10/31/2022 9:08 | Letter FCRA Invalid Dispute-Info Accurate with Validation scheduled to be sent on 10/31/2022 | kmoore | LETTER | 1371 | | | |
| 10/31/2022 9:08 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:08 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:08 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:08 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:07 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/31/2022 9:05 | kmoore viewed this account | kmoore | VIEW | 1371 | | | |
| 10/29/2022 12:27 | jortiz viewed this account | jortiz | VIEW | 1371 | | | |
| 10/28/2022 16:07 | Flag dnccheck102822 added | job | DEBT_FLAG | 1371 | 9651 | 18646 | |
| 10/28/2022 4:18 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 10/25/2022 4:54 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 10/21/2022 7:52 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 10/14/2022 4:20 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 10/8/2022 0:25 | Last Activity Date changed from [2022-10-05] to [2022-10-08] | job | DEBT | 1371 | 14442 | 25143 | |
| 10/7/2022 6:53 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 10/6/2022 8:43 | Flag TRAKPRIMEOCT22 removed | job | DEBT_FLAG | 1371 | | | |
| 10/5/2022 6:23 | Has Media changed from [] to [true] | job | DEBT | 1371 | | 20518 | |
| 10/5/2022 0:56 | Document STM_20210820.pdf uploaded | job | DOCUMENT | 1371 | | | |
| 10/5/2022 0:49 | Next Work Date changed from [03/28/2022] to [10/11/2022] | job | DEBT | 1371 | | | |
| 10/5/2022 0:05 | Document STM_20220120.pdf uploaded | job | DOCUMENT | 1371 | | | |
| 10/4/2022 22:12 | Document STM_20211020.pdf uploaded | job | DOCUMENT | 1371 | | | |
| 10/4/2022 20:48 | Flag VENDOCT22PLACEMENTS added | job | DEBT_FLAG | 1371 | 9651 | 18646 | |
| 10/4/2022 20:48 | Flag TRAKPRIMEOCT22 added | job | DEBT_FLAG | 1371 | 9651 | 18646 | |
| 10/4/2022 20:04 | Document STM_20210921.pdf uploaded | job | DOCUMENT | 1371 | | | |
| 10/4/2022 18:00 | Document STM_20210720.pdf uploaded | job | DOCUMENT | 1371 | | | |
| 10/4/2022 17:23 | Document STM_20210622.pdf uploaded | job | DOCUMENT | 1371 | | | |
| 10/4/2022 13:43 | Document STM_20211221.pdf uploaded | job | DOCUMENT | 1371 | | | |
| 10/4/2022 13:00 | lhurlocker viewed this account | lhurlocker (DELETED) | VIEW | 1371 | | | |
| 10/4/2022 11:04 | Document STM_20211120.pdf uploaded | job | DOCUMENT | 1371 | | | |
| 10/3/2022 12:50 | Document writtendispute_robinson.pdf uploaded | ndavis (DELETED) | DOCUMENT | 1371 | | | |
| 10/3/2022 12:49 | Status changed from [ACT] to [WRITTEN] | ndavis (DELETED) | DEBT | 1371 | | | 12364 |
| 10/3/2022 12:49 | Disputed changed from [false] to [true] | ndavis (DELETED) | DEBT | 1371 | | | |
| 10/3/2022 12:49 | Form INBOUND_WRITTEN_CORRESPONDENCE_ added | ndavis (DELETED) | DEBT | 1371 | | | |
| 10/3/2022 12:49 | Do Not Mail changed from [false] to [true] | ndavis (DELETED) | DEBT | 1371 | | | |
| 10/3/2022 12:49 | Do Not Call changed from [false] to [true] | ndavis (DELETED) | DEBT | 1371 | | | |

SOC_ROBINSON 000018

| Date | Description | User | Type | | | | |
|---|---|---|---|---|---|---|---|
| 10/3/2022 12:49 | Dispute WRITTEN DISPUTE (WRITTEN) filed on $675.09 with reason *** written dispute , customer does not recognize acct *** | ndavis (DELETED) | DISPUTE | 371 | | | |
| 10/3/2022 12:49 | *** written dispute , loaded document to file *** | ndavis (DELETED) | USER | 371 | | | |
| 10/3/2022 12:49 | ndavis viewed this account | ndavis (DELETED) | VIEW | 371 | | | |
| 10/3/2022 12:49 | ndavis viewed this account | ndavis (DELETED) | VIEW | 371 | | | |
| 10/3/2022 12:49 | ndavis viewed this account | ndavis (DELETED) | VIEW | 371 | | | |
| 10/3/2022 12:49 | Added to worklist Dispute | ndavis (DELETED) | WORKLIST | 371 | | | 12364 |
| 10/3/2022 12:48 | ndavis viewed this account | ndavis (DELETED) | VIEW | 371 | | | |
| 10/2/2022 11:51 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 10/2/2022 7:05 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 9/30/2022 12:24 | Flag AGFLAG922 added | job | DEBT_FLAG | 371 | 9067 | 17924 | |
| 9/30/2022 4:39 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 9/25/2022 12:54 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 9/25/2022 7:05 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 9/24/2022 0:23 | Message: This message is from Spring Oaks Capital, LLC regarding your Indigo Mastercard account that is now owned by Spring Oaks Capital SPV LLC. We have an offer for you to resolve your account for less than the full balance. Visit springoaks.co/s/Na1roTKF0 to jump straight to your available offer. If needed you can reach us by phone at 833-418-3083. We are a debt collector. Click here for important disclosures https://portal.springoaks.com/disclosures. Reply STOP to opt out. - SMS MT Failed 09/23/2022 11:17 AM | job | TEXT_MESSAGE | 371 | | 21183 | |
| 9/23/2022 6:57 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 9/18/2022 16:00 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 9/18/2022 7:07 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 9/16/2022 8:07 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 9/14/2022 15:35 | Last Work Date changed from [09/14/2022 01:18:48 PM EDT] to [09/14/2022 03:03:39 PM EDT] | job | DEBT | 371 | | 8772 | |
| 9/14/2022 15:35 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 09/14/2022 03:03 PM | job | PHONE | 371 | | 8772 | |
| 9/14/2022 13:50 | Last Activity Date changed from [2022-09-12] to [2022-09-14] | job | DEBT | 371 | | 8772 | |
| 9/14/2022 13:50 | Last Work Date changed from [09/12/2022 01:20:08 PM EDT] to [09/14/2022 01:18:48 PM EDT] | job | DEBT | 371 | | 8772 | |
| 9/14/2022 13:50 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 09/14/2022 01:18 PM | job | PHONE | 371 | | 8772 | |
| 9/14/2022 0:24 | Message: This message is from Spring Oaks Capital, LLC regarding your Indigo Mastercard account that is now owned by Spring Oaks Capital SPV LLC. We have an offer for you to resolve your account for less than the full balance. Visit springoaks.co/s/7ICPJqVZL to jump straight to your available offer. If needed you can reach us by phone at 833-418-3083. We are a debt collector. Click here for important disclosures https://portal.springoaks.com/disclosures. Reply STOP to opt out. - SMS MT Failed 09/13/2022 10:31 AM | job | TEXT_MESSAGE | 371 | | 21183 | |
| 9/12/2022 13:50 | Last Work Date changed from [09/12/2022 11:16:37 AM EDT] to [09/12/2022 01:20:08 PM EDT] | job | DEBT | 371 | | 8772 | |
| 9/12/2022 13:50 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 09/12/2022 01:20 PM | job | PHONE | 371 | | 8772 | |
| 9/12/2022 11:48 | Last Activity Date changed from [2022-08-05] to [2022-09-12] | job | DEBT | 371 | | 8772 | |
| 9/12/2022 11:48 | Last Work Date changed from [08/05/2022 01:18:27 PM EDT] to [09/12/2022 11:16:37 AM EDT] | job | DEBT | 371 | | 8772 | |
| 9/12/2022 11:48 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 09/12/2022 11:16 AM | job | PHONE | 371 | | 8772 | |
| 9/12/2022 5:04 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 9/11/2022 13:40 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 9/9/2022 5:58 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 9/5/2022 5:47 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 9/4/2022 13:32 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |

SOC_ROBINSON 000019

| Date | Description | | | | | | |
|---|---|---|---|---|---|---|---|
| 9/3/2022 4:51 | Settlement Offer Date changed from [08/01/2022] to [09/02/2022] | job | DEBT | 371 | 13737 | 24378 | |
| 9/3/2022 4:51 | Settlement Offer Amount changed from [$410.00] to [$395.00] | job | DEBT | 371 | 13737 | 24378 | |
| 9/2/2022 6:24 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 8/29/2022 4:05 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 8/28/2022 13:16 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 8/27/2022 0:11 | Message: This message is from Spring Oaks Capital, LLC regarding your Indigo Mastercard account that is now owned by Spring Oaks Capital SPV LLC. We have an offer for you to resolve your account for less than the full balance. Visit springoaks.co/s/da1qkhLY- to jump straight to your available offer. If needed you can reach us by phone at 833-418-3083. We are a debt collector. Click here for important disclosures https://portal.springoaks.com/disclosures. Reply STOP to opt out. - SMS MT Failed 08/25/2022 08:36 PM | job | TEXT_MESSAGE | 371 | | 21183 | |
| 8/26/2022 5:43 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 8/21/2022 21:17 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 8/19/2022 8:25 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 8/19/2022 0:37 | Message: This message is from Spring Oaks Capital, LLC regarding your Indigo Mastercard account that is now owned by Spring Oaks Capital SPV LLC. We have an offer for you to resolve your account for less than the full balance. Visit springoaks.co/s/n4vd-sbVO to jump straight to your available offer. If needed you can reach us by phone at 833-418-3083. We are a debt collector. Click here for important disclosures https://portal.springoaks.com/disclosures. Reply STOP to opt out. - SMS MT Failed 08/18/2022 04:09 PM | job | TEXT_MESSAGE | 371 | | 21183 | |
| 8/14/2022 13:24 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 8/12/2022 7:50 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 8/7/2022 18:16 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 8/7/2022 11:14 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 8/5/2022 13:48 | Last Work Date changed from [08/05/2022 01:13:37 PM EDT] to [08/05/2022 01:18:27 PM EDT] | job | DEBT | 371 | | 8772 | |
| 8/5/2022 13:48 | OUTBOUND ANSWERING_MACHINE MOBILE NO_ANSWER 08/05/2022 01:18 PM | job | PHONE | 371 | | 8772 | |
| 8/5/2022 13:32 | Last Activity Date changed from [2022-08-02] to [2022-08-05] | job | DEBT | 371 | | 8772 | |
| 8/5/2022 13:32 | Last Work Date changed from [08/02/2022 12:08:09 PM EDT] to [08/05/2022 01:13:37 PM EDT] | job | DEBT | 371 | | 8772 | |
| 8/5/2022 13:32 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 08/05/2022 01:13 PM | job | PHONE | 371 | | 8772 | |
| 8/5/2022 7:55 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 8/2/2022 12:33 | Last Activity Date changed from [2022-07-05] to [2022-08-02] | job | DEBT | 371 | | 8772 | |
| 8/2/2022 12:33 | Last Work Date changed from [07/05/2022 06:39:01 PM EDT] to [08/02/2022 12:08:09 PM EDT] | job | DEBT | 371 | | 8772 | |
| 8/2/2022 12:33 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 08/02/2022 12:08 PM | job | PHONE | 371 | | 8772 | |
| 8/1/2022 8:29 | Flag State_Lic_Report removed | job | DEBT_FLAG | 371 | 13684 | 24118 | 14359 |
| 8/1/2022 8:17 | Flag State_Lic_Report added | job | DEBT_FLAG | 371 | 13684 | 24116 | 14357 |
| 8/1/2022 7:15 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 7/31/2022 15:31 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 7/29/2022 6:02 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 7/28/2022 14:38 | Settlement Offer Date changed from [07/01/2022] to [08/01/2022] | job | DEBT | 371 | 13737 | 24378 | |
| 7/28/2022 14:38 | Settlement Offer Amount changed from [$420.00] to [$410.00] | job | DEBT | 371 | 13737 | 24378 | |
| 7/27/2022 20:47 | Flag State_Lic_Report removed | job | DEBT_FLAG | 371 | 13684 | 24118 | 14359 |
| 7/27/2022 20:38 | Flag State_Lic_Report added | job | DEBT_FLAG | 371 | 13684 | 24116 | 14357 |
| 7/26/2022 16:17 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 371 | 5944 | 13629 | 6557 |
| 7/26/2022 14:34 | Flag State_Lic_Report removed | job | DEBT_FLAG | 371 | 13684 | 24118 | 14359 |
| 7/26/2022 14:24 | Flag State_Lic_Report added | job | DEBT_FLAG | 371 | 13684 | 24116 | 14357 |
| 7/25/2022 1:17 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 7/24/2022 12:46 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |

SOC_ROBINSON 000020

| Date/Time | Description | | Type | | | | |
|---|---|---|---|---|---|---|---|
| 7/22/2022 6:13 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 7/17/2022 18:30 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 7/17/2022 10:51 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 7/15/2022 5:48 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 7/11/2022 0:53 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 7/10/2022 12:51 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 7/9/2022 11:39 | Settlement Offer Frequency Current Month changed from [] to [1] | job | DEBT | 1371 | | 23798 | |
| 7/9/2022 11:39 | Settlement Offer Account Frequency changed from [] to [1] | job | DEBT | 1371 | | 23798 | |
| 7/8/2022 7:34 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 7/5/2022 19:05 | Last Work Date changed from [07/05/2022 02:33:19 PM EDT] to [07/05/2022 06:39:01 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 7/5/2022 19:05 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 07/05/2022 06:39 PM | job | PHONE | 1371 | | 8772 | |
| 7/5/2022 15:05 | Last Activity Date changed from [2022-06-24] to [2022-07-05] | job | DEBT | 1371 | | 8772 | |
| 7/5/2022 15:05 | Last Work Date changed from [06/24/2022 04:14:41 PM EDT] to [07/05/2022 02:33:19 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 7/5/2022 15:05 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 07/05/2022 02:33 PM | job | PHONE | 1371 | | 8772 | |
| 7/3/2022 20:51 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 7/3/2022 11:17 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 7/2/2022 6:58 | Settlement Offer Date changed from [06/10/2022] to [07/01/2022] | job | DEBT | 1371 | 11830 | 21710 | |
| 7/2/2022 6:58 | Settlement Offer Amount changed from [$440.00] to [$420.00] | job | DEBT | 1371 | 11830 | 21710 | |
| 7/1/2022 7:01 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 6/27/2022 0:48 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 6/26/2022 12:44 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 6/25/2022 4:14 | Flag CREDIT_VISION removed | job | DEBT_FLAG | 1371 | 3764 | 12867 | 9792 |
| 6/25/2022 2:14 | Flag CREDIT_VISION added | job | DEBT_FLAG | 1371 | 3764 | 13272 | 9790 |
| 6/24/2022 16:36 | Last Activity Date changed from [2022-06-22] to [2022-06-24] | job | DEBT | 1371 | | 8772 | |
| 6/24/2022 16:36 | Last Work Date changed from [06/22/2022 06:03:09 PM EDT] to [06/24/2022 04:14:41 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/24/2022 16:36 | OUTBOUND ANSWERING_MACHINE MOBILE NO_ANSWER 06/24/2022 04:14 PM | job | PHONE | 1371 | | 8772 | |
| 6/24/2022 8:19 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 6/22/2022 18:33 | Last Activity Date changed from [2022-06-17] to [2022-06-22] | job | DEBT | 1371 | | 8772 | |
| 6/22/2022 18:33 | Last Work Date changed from [06/17/2022 10:55:45 AM EDT] to [06/22/2022 06:03:09 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/22/2022 18:33 | OUTBOUND ANSWERING_MACHINE MOBILE NO_ANSWER 06/22/2022 06:03 PM | job | PHONE | 1371 | | 8772 | |
| 6/19/2022 16:52 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 6/19/2022 11:07 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 6/17/2022 11:16 | Last Activity Date changed from [06/13/2022] to [06/17/2022] | job | DEBT | 1371 | | 8772 | |
| 6/17/2022 11:16 | Last Work Date changed from [06/13/2022 07:55:08 AM EDT] to [06/17/2022 10:55:45 AM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/17/2022 11:16 | OUTBOUND ANSWERING_MACHINE MOBILE NO_ANSWER 06/17/2022 10:55 AM | job | PHONE | 1371 | | 8772 | |
| 6/17/2022 7:08 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 6/13/2022 20:21 | Last Work Date changed from [06/13/2022 02:37:29 PM EDT] to [06/13/2022 07:55:08 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/13/2022 20:21 | OUTBOUND ANSWERING_MACHINE MOBILE NO_ANSWER 06/13/2022 07:55 PM | job | PHONE | 1371 | | 8772 | |
| 6/13/2022 15:14 | Last Activity Date changed from [06/10/2022] to [06/13/2022] | job | DEBT | 1371 | | 8772 | |
| 6/13/2022 15:14 | Last Work Date changed from [06/10/2022 02:36:26 PM EDT] to [06/13/2022 02:37:29 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/13/2022 15:14 | OUTBOUND ANSWERING_MACHINE MOBILE NO_ANSWER 06/13/2022 02:37 PM | job | PHONE | 1371 | | 8772 | |
| 6/12/2022 22:31 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 6/12/2022 12:29 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |

SOC_ROBINSON 000021

| Date/Time | Description | | Category | | | | |
|---|---|---|---|---|---|---|---|
| 6/10/2022 15:04 | Last Work Date changed from [06/10/2022 11:11:15 AM EDT] to [06/10/2022 02:36:26 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/10/2022 15:04 | (256) 642-4063 OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 06/10/2022 02:36 PM | job | PHONE | 1371 | | 8772 | |
| 6/10/2022 14:04 | Settlement Offer Amount changed from [] to [$440.00] | job | DEBT | 1371 | 9651 | 18646 | |
| 6/10/2022 12:34 | Last Activity Date changed from [06/08/2022] to [06/10/2022] | job | DEBT | 1371 | | 8772 | |
| 6/10/2022 12:34 | Last Work Date changed from [06/01/2022 02:39:14 PM EDT] to [06/10/2022 11:11:15 AM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/10/2022 12:34 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 06/10/2022 11:11 AM | job | PHONE | 1371 | | 8772 | |
| 6/10/2022 6:25 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 6/8/2022 5:43 | Last Activity Date changed from [06/01/2022] to [06/08/2022] | job | DEBT | 1371 | 7269 | 15609 | |
| 6/8/2022 5:43 | Primary Phone created | job | DEMOGRAPHIC | 1371 | 7269 | 15609 | |
| 6/8/2022 5:43 | Primary Phone created | job | DEMOGRAPHIC | 1371 | 7269 | 15609 | |
| 6/8/2022 0:08 | Message: This message is from Spring Oaks Capital - SMS MT Failed | job | TEXT_MESSAGE | 1371 | | 21183 | |
| 6/5/2022 22:01 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 6/5/2022 12:41 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 6/3/2022 9:21 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 6/1/2022 15:01 | Last Work Date changed from [06/01/2022 12:39:06 PM EDT] to [06/10/2022 02:39:14 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/1/2022 15:01 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 06/01/2022 02:39 PM | job | PHONE | 1371 | | 8772 | |
| 6/1/2022 13:04 | Last Activity Date changed from [05/02/2022] to [06/01/2022] | job | DEBT | 1371 | | 8772 | |
| 6/1/2022 13:04 | Last Work Date changed from [05/02/2022 08:52:36 PM EDT] to [06/01/2022 12:39:06 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 6/1/2022 13:04 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 06/01/2022 12:39 PM | job | PHONE | 1371 | | 8772 | |
| 5/29/2022 17:05 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 5/29/2022 11:06 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 5/27/2022 6:40 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 5/22/2022 22:54 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 5/22/2022 13:20 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 5/20/2022 7:24 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 5/16/2022 2:53 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | | 8443 | |
| 5/15/2022 15:19 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 5/13/2022 11:36 | Debt reported to Credit Bureaus | job | CREDIT_REPORT | 1371 | 5944 | 13629 | 6557 |
| 5/13/2022 1:17 | Flag METRO2 added | job | DEBT_FLAG | 1371 | 5944 | 13628 | 6557 |
| 5/9/2022 7:05 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 5/8/2022 15:28 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 5/2/2022 21:50 | Last Work Date changed from [05/02/2022 05:15:37 PM EDT] to [05/02/2022 08:52:36 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 5/2/2022 21:50 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 05/02/2022 08:52 PM | job | PHONE | 1371 | | 8772 | |
| 5/2/2022 18:42 | Last Activity Date changed from [04/22/2022] to [05/02/2022] | job | DEBT | 1371 | | 8772 | |
| 5/2/2022 18:42 | Last Work Date changed from [04/22/2022 11:49:34 AM EDT] to [05/02/2022 05:15:37 PM EDT] | job | DEBT | 1371 | | 8772 | |
| 5/2/2022 18:42 | OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 05/02/2022 05:15 PM | job | PHONE | 1371 | | 8772 | |
| 5/1/2022 18:57 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 5/1/2022 11:23 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 4/22/2022 14:03 | Last Activity Date changed from [04/20/2022] to [04/22/2022] | job | DEBT | 1371 | | 8772 | |
| 4/22/2022 14:03 | Last Work Date changed from [04/20/2022 02:04:03 PM EDT] to [04/22/2022 11:49:34 AM EDT] | job | DEBT | 1371 | | 8772 | |
| 4/22/2022 14:03 | Primary Phone status changed from NEW to INACTIVE | job | DEMOGRAPHIC | 1371 | | 8772 | |
| 4/22/2022 14:03 | Phone Status Rule ID 1 applied to Primary Phone | job | DEMOGRAPHIC | 1371 | | 8772 | |

SOC_ROBINSON 000022

Defendant's Exhibit A - p.77 of 180

| Date/Time | Description | | Category | | | | |
|---|---|---|---|---|---|---|---|
| 4/22/2022 14:03 | ██████ OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 04/22/2022 11:49 AM | job | PHONE | 371 | | 8772 | |
| 4/20/2022 14:38 | Last Activity Date changed from [04/19/2022] to [04/20/2022] | job | DEBT | 371 | | 8772 | |
| 4/20/2022 14:38 | Last Work Date changed from [04/19/2022 04:49:14 PM EDT] to [04/20/2022 02:04:03 PM EDT] | job | DEBT | 371 | | 8772 | |
| 4/20/2022 14:38 | ██████ OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 04/20/2022 02:04 PM | job | PHONE | 371 | | 8772 | |
| 4/19/2022 17:16 | Last Activity Date changed from [04/15/2022] to [04/19/2022] | job | DEBT | 371 | | 8772 | |
| 4/19/2022 17:16 | Last Work Date changed from [04/15/2022 10:55:56 AM EDT] to [04/19/2022 04:49:14 PM EDT] | job | DEBT | 371 | | 8772 | |
| 4/19/2022 17:16 | ██████ OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 04/19/2022 04:49 PM | job | PHONE | 371 | | 8772 | |
| 4/17/2022 16:51 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 4/17/2022 10:53 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 4/15/2022 13:11 | Last Activity Date changed from [04/12/2022] to [04/15/2022] | job | DEBT | 371 | | 8772 | |
| 4/15/2022 13:11 | Last Work Date changed from [04/12/2022 03:52:53 PM EDT] to [04/15/2022 10:55:56 AM EDT] | job | DEBT | 371 | | 8772 | |
| 4/15/2022 13:11 | ██████ OUTBOUND UNKNOWN MOBILE NO_ANSWER 04/15/2022 10:55 AM | job | PHONE | 371 | | 8772 | |
| 4/12/2022 21:22 | Last Activity Date changed from [04/08/2022] to [04/12/2022] | job | DEBT | 371 | | 8772 | |
| 4/12/2022 21:22 | Last Work Date changed from [04/08/2022 05:36:32 PM EDT] to [04/12/2022 03:52:53 PM EDT] | job | DEBT | 371 | | 8772 | |
| 4/12/2022 21:22 | ██████ OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 04/12/2022 03:52 PM | job | PHONE | 371 | | 8772 | |
| 4/10/2022 23:39 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 4/10/2022 12:41 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 4/8/2022 18:59 | Last Work Date changed from [04/08/2022 03:17:44 PM EDT] to [04/08/2022 05:36:32 PM EDT] | job | DEBT | 371 | | 8772 | |
| 4/8/2022 18:59 | ██████ OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 04/08/2022 05:36 PM | job | PHONE | 371 | | 8772 | |
| 4/8/2022 15:53 | Last Activity Date changed from [04/05/2022] to [04/08/2022] | job | DEBT | 371 | | 8772 | |
| 4/8/2022 15:53 | Last Work Date changed from [04/05/2022 04:30:32 PM EDT] to [04/08/2022 03:17:44 PM EDT] | job | DEBT | 371 | | 8772 | |
| 4/8/2022 15:53 | ██████ OUTBOUND UNKNOWN MOBILE NO_ANSWER 04/08/2022 03:17 PM | job | PHONE | 371 | | 8772 | |
| 4/5/2022 20:37 | Last Work Date changed from [04/05/2022 09:24:59 AM EDT] to [04/05/2022 04:30:32 PM EDT] | job | DEBT | 371 | | 8772 | |
| 4/5/2022 20:37 | ██████ OUTBOUND UNKNOWN MOBILE NO_ANSWER 04/05/2022 04:30 PM | job | PHONE | 371 | | 8772 | |
| 4/5/2022 9:55 | Last Activity Date changed from [03/31/2022] to [04/05/2022] | job | DEBT | 371 | | 8772 | |
| 4/5/2022 9:55 | Last Work Date changed from [03/31/2022 03:45:24 PM EDT] to [04/05/2022 09:24:59 AM EDT] | job | DEBT | 371 | | 8772 | |
| 4/5/2022 9:55 | ██████ OUTBOUND UNKNOWN MOBILE NO_ANSWER 04/05/2022 09:24 AM | job | PHONE | 371 | | 8772 | |
| 4/3/2022 21:58 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 371 | 2114 | 8443 | 6748 |
| 4/3/2022 12:41 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 371 | 2114 | 8442 | 6748 |
| 3/31/2022 20:20 | Last Activity Date changed from [03/29/2022] to [03/31/2022] | job | DEBT | 371 | | 8772 | |
| 3/31/2022 20:20 | Last Work Date changed from [03/28/2022 02:46:06 PM EDT] to [03/31/2022 03:45:24 PM EDT] | job | DEBT | 371 | | 8772 | |
| 3/31/2022 20:20 | ██████ OUTBOUND UNKNOWN MOBILE OUT_OF_SERVICE 03/31/2022 03:45 PM | job | PHONE | 371 | | 8772 | |
| 3/31/2022 18:42 | Scheduled letter Initial Letter sent | job | LETTER | 371 | 7974 | 16504 | |
| 3/31/2022 9:36 | Letter Initial Letter scheduled to be sent on 03/31/2022 | job | LETTER | 371 | 7677 | 16168 | 7079 |
| 3/31/2022 6:44 | Flag GENMAR2022LETTER added | cwilson | DEBT_FLAG | 371 | | | |
| 3/29/2022 22:06 | SMS Flag changed from [] to [true] | job | DEBT | 371 | 11038 | 20755 | |
| 3/29/2022 22:06 | Flag SMS_FLAG_SET removed | job | DEBT_FLAG | 371 | 11038 | 20755 | 13113 |
| 3/29/2022 22:00 | Flag SMS_FLAG_SET added | job | DEBT_FLAG | 371 | | 20754 | |

SOC_ROBINSON 000023

| Date/Time | Description | | Category | | | | |
|---|---|---|---|---|---|---|---|
| 3/29/2022 2:52 | Last Activity Date changed from [03/28/2022] to [03/29/2022] | job | DEBT | 1371 | 7269 | 15599 | |
| 3/29/2022 2:52 | Flag TRANS_UNION_PHONES added | job | DEBT_FLAG | 1371 | 7269 | 15599 | |
| 3/29/2022 2:52 | Primary  Phone [ ] created | job | DEMOGRAPHIC | 1371 | 7269 | 15599 | |
| 3/29/2022 2:52 | Primary  Phone [ ] created | job | DEMOGRAPHIC | 1371 | 7269 | 15599 | |
| 3/28/2022 15:22 | Charge off Date changed from [] to [01/20/2022] | job | DEBT | 1371 | 9651 | 18646 | |
| 3/28/2022 14:46 | Next Work Date changed from [03/26/2022] to [03/28/2022] | job | DEBT | 1371 | | | |
| 3/28/2022 14:46 | Last Activity Date changed from [03/26/2022] to [03/28/2022] | job | DEBT | 1371 | | | |
| 3/28/2022 14:46 | Last Work Date changed from [03/26/2022 11:29:49 AM EDT] to [03/28/2022 02:46:06 PM EDT] | job | DEBT | 1371 | | | |
| 3/28/2022 14:46 | Status Code changed from [NEW] to [ACT] | job | DEBT | 1371 | | | |
| 3/28/2022 14:46 | Worklist changed from [New] to [Active Inventory] | job | WORKLIST | 1371 | | | |
| 3/28/2022 14:46 | Removed from worklist New | job | WORKLIST | 1371 | | | |
| 3/28/2022 14:46 | Added to worklist Active Inventory | job | WORKLIST | 1371 | | | |
| 3/28/2022 13:59 | Flag TRANS_UNION_START removed | job | DEBT_FLAG | 1371 | 4061 | 11125 | 7077 |
| 3/28/2022 13:14 | Flag TRANS_UNION_MONITORING added | job | DEBT_FLAG | 1371 | 4061 | 11115 | 7012 |
| 3/27/2022 22:08 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND removed | job | DEBT_FLAG | 1371 | 2114 | 8443 | 6748 |
| 3/27/2022 12:33 | Flag TRANS_UNION_LAWSUIT_HISTORY_SEND added | job | DEBT_FLAG | 1371 | 2114 | 8442 | 6748 |
| 3/26/2022 11:29 | Lawsuit History Radius changed from [] to [100] | job | DEBT | 1371 | 6772 | 21941 | |
| 3/26/2022 11:29 | Next Work Date changed from [] to [03/26/2022] | job | DEBT | 1371 | 6772 | 21941 | 7245 |
| 3/26/2022 11:29 | Last Work Date changed from [] to [03/26/2022 11:29:49 AM EDT] | job | DEBT | 1371 | 6772 | 21941 | 7245 |
| 3/26/2022 11:29 | Status Code changed from [ACT] to [NEW] | job | DEBT | 1371 | 6772 | 21941 | 7245 |
| 3/26/2022 11:29 | SOL Date changed from [] to [08/18/2024] | job | DEBT | 1371 | 6772 | 21941 | |
| 3/26/2022 11:29 | Flag TRANS_UNION_START added | job | DEBT_FLAG | 1371 | 6772 | 21941 | 6729 |
| 3/26/2022 11:29 | ELS Opt In Confirmed REDBONES1094@GMAIL.COM | job | DEMOGRAPHIC | 1371 | 6772 | 21941 | 8133 |
| 3/26/2022 11:29 | ELS Opt In Confirmed REDBONES1094@GMAIL.COM | job | DEMOGRAPHIC | 1371 | 6772 | 21941 | 8333 |
| 3/26/2022 11:29 | Primary  Address 20 BURNEY MOUNTAIN RD, FALKVILLE, AL 35622 created | job | DEMOGRAPHIC | 1371 | 6772 | 21941 | |
| 3/26/2022 11:29 | Primary demographic, date of birth changed from [] to [07/19/1982] | job | DEMOGRAPHIC | 1371 | 6772 | 21941 | |
| 3/26/2022 11:29 | Primary demographic, email address changed from [] to [ ]@GMAIL.COM] | job | DEMOGRAPHIC | 1371 | 6772 | 21941 | |
| 3/26/2022 11:29 | Primary demographic, last name changed from [] to [Robinson] | job | DEMOGRAPHIC | 1371 | 6772 | 21941 | |
| 3/26/2022 11:29 | Primary demographic, first name changed from [] to [Christopher B] | job | DEMOGRAPHIC | 1371 | 6772 | 21941 | |
| 3/26/2022 11:29 | Primary demographic, national ID changed from [] to [XXXXX1094] | job | DEMOGRAPHIC | 1371 | 6772 | 21941 | |
| 3/26/2022 11:29 | Worklist changed from [] to [New] | job | WORKLIST | 1371 | 6772 | 21941 | 6514 |
| 3/26/2022 11:29 | Added to worklist New | job | WORKLIST | 1371 | 6772 | 21941 | 6514 |

SOC_ROBINSON 000024

Defendant's Exhibit A - p.79 of 180

GENESIS FS CARD SERVICES
PO BOX 4477
BEAVERTON OR 97076-4477

| Account Number | 3527 |
| New Balance | $304.00 |
| Minimum Payment Due | $44.00 |
| Payment Due Date | 07/18/21 |
| AMOUNT ENCLOSED | $ |

GENESIS FS CARD SERVICES
PO BOX 23039
COLUMBUS GA 31902-3039

Make check/money order payable to

Please write your account number on your check/money order and do not send cash.

CHRISTOPHER B ROBINSON          **0000000
20 BURNEY MOUNTAIN RD
FALKVILLE AL  35622-5700

Address/Phone Number Change

☐ Please check here and complete Address/Phone Number Change Form on reverse side.

**Make your payment online at www.myindigocard.com**

---

Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

## indigo

**MASTERCARD ACCOUNT STATEMENT**
3527
May 23, 2021 - June 21, 2021



### Account Summary

| | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $0.00 |
| Overlimit Amount | $4.00 |
| Statement Closing Date | June 21, 2021 |
| # of Days in Billing Cycle | 30 |

### Purchase/Cash Advance Balance Summary

| | |
|---|---|
| Previous Balance | $0.00 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $224.54 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$79.46** |
| **Interest Charged** | **$0.00** |
| New Purchase/Cash Advance Balance | $304.00 |

### Payment Information

| | |
|---|---|
| **Total New Balance** | **$304.00** |
| **Minimum Payment Due** | **$44.00** |
| **Payment Due Date** | **July 18, 2021** |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 9 month(s) | $341 |

If you would like information about credit counseling services, call 1-866-946-9545.

Mail payment to:
Genesis FS Card Services
PO BOX 23039
COLUMBUS GA 31902-3039

Please mail billing inquiries to:
Genesis FS Card Services
P.O. Box 4499
Beaverton, OR 97076-4499

QUESTIONS?
Call 1-866-946-9545
www.myindigocard.com

**YOUR ACCOUNT IS CURRENTLY $4.00 OVER YOUR $300.00 CREDIT LINE. PLEASE REMIT THIS TO US IMMEDIATELY.**

### Transactions

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| 252478011570000822107068 | 06/06 | 06/07 | HARDEES 1501387 HARTSELLE AL | $6.00 |
| 527082411588380000426022 | 06/06 | 06/07 | HARTSELLE FOODMART HARTSELLE AL | $10.00 |
| 555480711574000000000114 | 06/06 | 06/07 | JACK'S # 241    Q22 HARTSELLE AL | $10.53 |
| 527082411588380000426006 | 06/06 | 06/07 | HARTSELLE FOODMART HARTSELLE AL | $15.19 |
| 527048711578380000793529 | 06/05 | 06/07 | TACO BELL #037141 HARTSELLE AL | $16.93 |
| 553095911578380001136872 | 06/05 | 06/07 | O'REILLY AUTO PARTS 10 HARTSELLE AL | $162.39 |
| 252478011590010081098640 | 06/08 | 06/09 | BUFFALO ROCK VENDING H HUNTSVILLE AL | $1.75 |
| 252478011600011115314879 | 06/09 | 06/10 | BUFFALO ROCK VENDING H HUNTSVILLE AL | $1.75 |

### Fees

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| 750130114917400000000000 | 05/29 | 05/31 | ANNUAL FEE | $75.00 |
| | 06/21 | 06/21 | CREDIT PROTECTION FEES | $4.46 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$79.46** |

### 2021 Totals Year-to-Date

| | |
|---|---|
| Total fees charged in 2021 | $79.46 |
| Total interest charged in 2021 | $0.00 |

PLAINTIFF'S EXHIBIT

5

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

SOC_ROBINSON 000025

**indigo**

**MASTERCARD ACCOUNT STATEMENT**
527
May 23, 2021 - June 21, 2021



| Interest Charge Calculation | | | |
|---|---|---|---|
| Your **Annual Percentage Rate (APR)** is the annual interest rate on your account. | | | |
| **Type of Balance** | **Annual Percentage Rate (APR)** | **Balance Subject to Interest Rate** | **Interest Charge** |
| Purchases | 29.90% | $0.00 | $0.00 |
| Cash Advances | 29.90% | $0.00 | $0.00 |
| | (v) = Variable Rate | | |

Defendant's Exhibit A - p.81 of 180

SOC_ROBINSON 000026

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

ADDRESS

CITY                              STATE              ZIP CODE

(     )
HOME PHONE                           BUSINESS PHONE

EMAIL ADDRESS

3527

---

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

**What To Do If You Think You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**PAYMENTS**

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 P.M. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 P.M. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

**ANNUAL FEE (if applicable)**

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

**CREDIT BUREAU REPORTING**

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**HOW INTEREST CHARGES ARE DETERMINED**

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be included in the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR) to:
   a. your *Average Daily Balance* of Cash Advances (including new Cash Advances); and
   b. your Average Daily Balance of Purchases (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date in your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases).** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for this Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

**OTHER DISCLOSURES**

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000027

R5975-C597-1219

3527

GENESIS FS CARD SERVICES
PO BOX 4477
BEAVERTON OR 97076-4477

| | |
|---|---|
| Account Number | 3527 |
| New Balance | $345.10 |
| Minimum Payment Due | $85.10 |
| Payment Due Date | 08/18/21 |
| AMOUNT ENCLOSED | $ |

GENESIS FS CARD SERVICES
PO BOX 23039
COLUMBUS GA 31902-3039

◄ Make check/money order payable to

Please write your account number on your check/money order and do not use cash.

CHRISTOPHER B ROBINSON
20 BURNEY MOUNTAIN RD
FALKVILLE AL  35622-5700

**0000000

☐ Please check here and complete Address/Phone Number Change Form on reverse side.

Address/Phone Number Change

**Make your payment online at www.myindigocard.com**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

## indigo®

**MASTERCARD ACCOUNT STATEMENT**
3527
June 22, 2021 - July 19, 2021



### Account Summary

| | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $40.00 |
| Overlimit Amount | $45.10 |
| Statement Closing Date | July 19, 2021 |
| # of Days in Billing Cycle | 28 |

### Purchase/Cash Advance Balance Summary

| | |
|---|---|
| Previous Balance | $304.00 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$33.53** |
| **Interest Charged** | **$7.57** |
| New Purchase/Cash Advance Balance | $345.10 |

### Payment Information

| | |
|---|---|
| Total New Balance | **$345.10** |
| Minimum Payment Due | **$85.10** |
| Payment Due Date | **August 18, 2021** |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 9 month(s) | $383 |

If you would like information about credit counseling services, call 1-866-946-9545 .

**Mail payment to:**
Genesis FS Card Services
PO BOX 23039
COLUMBUS GA 31902-3039

**Please mail billing inquiries to:**
Genesis FS Card Services
P.O. Box 4499
Beaverton, OR 97076-4499

**QUESTIONS?**
Call 1-866-946-9545
www.myindigocard.com

YOUR MINIMUM PAYMENT INCLUDES ANY OVERLIMIT AND PAST DUE AMOUNTS.
PLEASE REMIT IMMEDIATELY.

### Fees

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 07/19 | 07/19 | CREDIT PROTECTION FEES | $4.53 |
| | 07/19 | 07/19 | LATE PAYMENT CHARGE | $29.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$33.53** |

### Interest Charged

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 07/19 | 07/19 | INTEREST CHARGE PURCHASE | $7.57 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$7.57** |

### 2021 Totals Year-to-Date

| | |
|---|---|
| Total fees charged in 2021 | $112.99 |
| Total interest charged in 2021 | $7.57 |

### Interest Charge Calculation

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.90% | $304.16 | $7.57 |
| Cash Advances | 29.90% | $0.00 | $0.00 |

(v) = Variable Rate

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

Page 1 of 2

SOC_ROBINSON 000028

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

3527

ADDRESS
_____

CITY _____  STATE _____  ZIP CODE _____

( )
HOME PHONE _____  BUSINESS PHONE _____

EMAIL ADDRESS
_____

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

### What To Do If You Think You Find A Mistake On Your Statement

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

### Your Rights If You Are Dissatisfied With Your Credit Card Purchases

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

### PAYMENTS

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 PM. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 PM. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

### ANNUAL FEE (if applicable)

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

### CREDIT BUREAU REPORTING

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

### HOW INTEREST CHARGES ARE DETERMINED

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be added to the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under **Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)** to:
   a. your *Average Daily Balance of Cash Advances* (including new Cash Advances); and
   b. your *Average Daily Balance of Purchases* (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date in your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases):** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for this Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

### OTHER DISCLOSURES

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000029

R5975-C597-1219

3527

GENESIS FS CARD SERVICES
PO BOX 4477
BEAVERTON OR 97076-4477

| | |
|---|---|
| Account Number | 3527 |
| New Balance | $398.83 |
| Minimum Payment Due | $138.83 |
| Payment Due Date | 09/18/21 |
| AMOUNT ENCLOSED | $ |

GENESIS FS CARD SERVICES
PO BOX 23039
COLUMBUS GA 31902-3039

Make check/money order payable to

Please write your account number on your check/money order and do not send cash.

CHRISTOPHER B ROBINSON          **0000000
20 BURNEY MOUNTAIN RD
FALKVILLE AL  35622-5700

Address/Phone Number Change

☐ Please check here and complete Address/Phone Number Change Form on reverse side.

**Make your payment online at www.myindigocard.com**

---

Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

## indigo®

**MASTERCARD ACCOUNT STATEMENT**
3527
July 20, 2021 - August 19, 2021



### Account Summary

| | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $80.00 |
| Overlimit Amount | $98.83 |
| Statement Closing Date | August 19, 2021 |
| # of Days in Billing Cycle | 31 |

### Purchase/Cash Advance Balance Summary

| | |
|---|---|
| Previous Balance | $345.10 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$45.14** |
| **Interest Charged** | **$8.59** |
| New Purchase/Cash Advance Balance | $398.83 |

### Payment Information

| | |
|---|---|
| **Total New Balance** | **$398.83** |
| **Minimum Payment Due** | **$138.83** |
| **Payment Due Date** | **September 18, 2021** |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 10 month(s) | $442 |

If you would like information about credit counseling services, call 1-866-946-9545 .

| Mail payment to: | Please mail billing inquiries to: | QUESTIONS? |
|---|---|---|
| Genesis FS Card Services | Genesis FS Card Services | Call 1-866-946-9545 |
| PO BOX 23039 | P.O. Box 4499 | www.myindigocard.com |
| COLUMBUS GA 31902-3039 | Beaverton, OR 97076-4499 | |

YOUR MINIMUM PAYMENT INCLUDES ANY OVERLIMIT AND PAST DUE AMOUNTS.
PLEASE REMIT IMMEDIATELY.

### Fees

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 08/19 | 08/19 | CREDIT PROTECTION FEES | $5.14 |
| | 08/19 | 08/19 | LATE PAYMENT CHARGE | $40.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$45.14** |

### Interest Charged

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 08/19 | 08/19 | INTEREST CHARGE PURCHASE | $8.59 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$8.59** |

### 2021 Totals Year-to-Date

| | |
|---|---|
| Total fees charged in 2021 | $158.13 |
| Total interest charged in 2021 | $16.16 |

### Interest Charge Calculation

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.90% | $345.26 | $8.59 |
| Cash Advances | 29.90% | $0.00 | $0.00 |

(v) = Variable Rate

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

Page 1 of 2

SOC_ROBINSON 000030

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

ADDRESS

CITY                    STATE            ZIP CODE

(   )
HOME PHONE                    BUSINESS PHONE

EMAIL ADDRESS

3527

---

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

### What To Do If You Think You Find A Mistake On Your Statement

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

### Your Rights If You Are Dissatisfied With Your Credit Card Purchases

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

### PAYMENTS

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 PM. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 PM. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

### ANNUAL FEE (if applicable)

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

### CREDIT BUREAU REPORTING

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

### HOW INTEREST CHARGES ARE DETERMINED

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, as further explained equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be added to the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under **Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)** to:
   a. your *Average Daily Balance of Cash Advances* (including new Cash Advances); and
   b. your *Average Daily Balance of Purchases* (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date in your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases):** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, add the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

### OTHER DISCLOSURES

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000031

R5975-C597-1219

3527

**GENESIS FS CARD SERVICES**
PO BOX 4477
BEAVERTON OR  97076-4477

| Account Number | 3527 |
| New Balance | $454.70 |
| Minimum Payment Due | $194.70 |
| Payment Due Date | 10/18/21 |
| **AMOUNT ENCLOSED** | $ |

Make check/money order payable to

Please write your account number on your check/money order and do not send cash.

 Address/Phone Number Change

☐ Please check here and complete Address/Phone Number Change Form on reverse side.

**Make your payment online at www.myindigocard.com**

Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

# indigo

**MASTERCARD ACCOUNT STATEMENT**
3527
August 20, 2021 - September 20, 2021



| Account Summary | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $120.00 |
| Overlimit Amount | $154.70 |
| Statement Closing Date | September 20, 2021 |
| # of Days in Billing Cycle | 32 |

| Purchase/Cash Advance Balance Summary | |
|---|---|
| Previous Balance | $398.83 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$45.94** |
| **Interest Charged** | **$9.93** |
| New Purchase/Cash Advance Balance | $454.70 |

| Payment Information | |
|---|---|
| **Total New Balance** | **$454.70** |
| **Minimum Payment Due** | **$194.70** |
| **Payment Due Date** | **October 18, 2021** |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 10 month(s) | $503 |

If you would like information about credit counseling services, call 1-866-946-9545 .

**Mail payment to:**
Genesis FS Card Services
PO BOX 23039
COLUMBUS GA 31902-3039

**Please mail billing inquiries to:**
Genesis FS Card Services
P.O. Box 4499
Beaverton, OR 97076-4499

**QUESTIONS?**
Call 1-866-946-9545
www.myindigocard.com

YOUR MINIMUM PAYMENT INCLUDES ANY OVERLIMIT AND PAST DUE AMOUNTS.
PLEASE REMIT IMMEDIATELY.

| Fees | | | | |
|---|---|---|---|---|
| **Reference Number** | **Tran Date** | **Post Date** | **Description of Transaction or Credit** | **Amount** |
| | 09/20 | 09/20 | CREDIT PROTECTION FEES | $5.94 |
| | 09/20 | 09/20 | LATE PAYMENT CHARGE | $40.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$45.94** |

| Interest Charged | | | | |
|---|---|---|---|---|
| **Reference Number** | **Tran Date** | **Post Date** | **Description of Transaction or Credit** | **Amount** |
| | 09/20 | 09/20 | INTEREST CHARGE PURCHASE | $9.93 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$9.93** |

| 2021 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2021 | $204.07 |
| Total interest charged in 2021 | $26.09 |

| Interest Charge Calculation | | | |
|---|---|---|---|
| Your **Annual Percentage Rate (APR)** is the annual interest rate on your account. | | | |
| **Type of Balance** | **Annual Percentage Rate (APR)** | **Balance Subject to Interest Rate** | **Interest Charge** |
| Purchases | 29.90% | $399.01 | $9.93 |
| Cash Advances | 29.90% | $0.00 | $0.00 |
| (v) = Variable Rate | | | |

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

Defendant's Exhibit A  p.87 of 180

SOC_ROBINSON 000032

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

_____

ADDRESS

_____

CITY                                STATE            ZIP CODE

( )_____

HOME PHONE                          BUSINESS PHONE

_____

EMAIL ADDRESS

3527

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

**What To Do If You Think You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing*. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**PAYMENTS**

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 PM. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 PM. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

**ANNUAL FEE (if applicable)**

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

**CREDIT BUREAU REPORTING**

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**HOW INTEREST CHARGES ARE DETERMINED**

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be assessed in the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under **Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)** to:
   a. your *Average Daily Balance of Cash Advances* (including new Cash Advances); and
   b. your Average Daily Balance of Purchases (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date in your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases):** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for this Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

**OTHER DISCLOSURES**

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000033

R5975-C597-1219

GENESIS FS CARD SERVICES
PO BOX 4477
BEAVERTON OR 97076-4477

| | |
|---|---|
| Account Number | 3527 |
| New Balance | $512.81 |
| Minimum Payment Due | $252.81 |
| Payment Due Date | 11/18/21 |
| AMOUNT ENCLOSED | $ |

GENESIS FS CARD SERVICES
PO BOX 23039
COLUMBUS GA 31902-3039

Make check/money order payable to

Please write your account number on your check/money order and do not send cash.

CHRISTOPHER B ROBINSON          **0000000
20 BURNEY MOUNTAIN RD
FALKVILLE AL  35622-5700

Address/Phone Number Change

☐ Please check here and complete Address/Phone Number Change Form on reverse side.

**Make your payment online at www.myindigocard.com**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

## indigo®

**MASTERCARD ACCOUNT STATEMENT**
3527
September 21, 2021 - October 19, 2021

 mastercard

### Account Summary

| | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $160.00 |
| Overlimit Amount | $212.81 |
| Statement Closing Date | October 19, 2021 |
| # of Days in Billing Cycle | 29 |

### Purchase/Cash Advance Balance Summary

| | |
|---|---|
| Previous Balance | $454.70 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$46.78** |
| **Interest Charged** | **$11.33** |
| New Purchase/Cash Advance Balance | $512.81 |

### Payment Information

| | |
|---|---|
| Total New Balance | $512.81 |
| Minimum Payment Due | $252.81 |
| Payment Due Date | November 18, 2021 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 11 month(s) | $568 |

If you would like information about credit counseling services, call 1-866-946-9545 .

| Mail payment to: | Please mail billing inquiries to: | QUESTIONS? |
|---|---|---|
| Genesis FS Card Services | Genesis FS Card Services | Call 1-866-946-9545 |
| PO BOX 23039 | P.O. Box 4499 | www.myindigocard.com |
| COLUMBUS GA 31902-3039 | Beaverton, OR 97076-4499 | |

YOUR MINIMUM PAYMENT INCLUDES ANY OVERLIMIT AND PAST DUE AMOUNTS.
PLEASE REMIT IMMEDIATELY.

### Fees

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 10/19 | 10/19 | CREDIT PROTECTION FEES | $6.78 |
| | 10/19 | 10/19 | LATE PAYMENT CHARGE | $40.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$46.78** |

### Interest Charged

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 10/19 | 10/19 | INTEREST CHARGE PURCHASE | $11.33 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$11.33** |

### 2021 Totals Year-to-Date

| | |
|---|---|
| Total fees charged in 2021 | $250.85 |
| Total interest charged in 2021 | $37.42 |

### Interest Charge Calculation

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.90% | $454.93 | $11.33 |
| Cash Advances | 29.90% | $0.00 | $0.00 |

(v) = Variable Rate

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

SOC_ROBINSON 000034

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

3527

ADDRESS

_____

CITY _____ STATE _____ ZIP CODE _____

( )

HOME PHONE _____ BUSINESS PHONE _____

EMAIL ADDRESS _____

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

**What To Do If You Think You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**PAYMENTS**

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 P.M. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 P.M. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

**ANNUAL FEE (if applicable)**

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

**CREDIT BUREAU REPORTING**

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**HOW INTEREST CHARGES ARE DETERMINED**

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be included in the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR) to:
   a. your *Average Daily Balance of Cash Advances* (including new Cash Advances); and
   b. your *Average Daily Balance of Purchases* (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date during your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases):** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for this Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

**OTHER DISCLOSURES**

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000035

Defendant's Exhibit A - p.90 of 180

R5975-C597-1219

3527

GENESIS FS CARD SERVICES
PO BOX 4477
BEAVERTON OR 97076-4477

| | |
|---|---|
| **Account Number** | 3527 |
| **New Balance** | **$565.58** |
| **Minimum Payment Due** | **$305.58** |
| **Payment Due Date** | **12/18/21** |
| **AMOUNT ENCLOSED** | $ |

GENESIS FS CARD SERVICES
PO BOX 23039
COLUMBUS GA 31902-3039

Make check/money
order payable to

Please write your account number on your check/money order
and do not send cash.

CHRISTOPHER B ROBINSON        **0000000
20 BURNEY MOUNTAIN RD
FALKVILLE AL  35622-5700

Address/Phone Number Change

☐ Please check here and complete Address/Phone
Number Change Form on reverse side.

**Make your payment online at www.myindigocard.com**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

# indigo®

**MASTERCARD ACCOUNT STATEMENT**
3527
October 20, 2021 - November 19, 2021



### Account Summary

| | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $200.00 |
| Overlimit Amount | $265.58 |
| Statement Closing Date | November 19, 2021 |
| # of Days in Billing Cycle | 31 |

### Purchase/Cash Advance Balance Summary

| | |
|---|---|
| Previous Balance | $512.81 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$40.00** |
| **Interest Charged** | **$12.77** |
| New Purchase/Cash Advance Balance | $565.58 |

### Payment Information

| | |
|---|---|
| **Total New Balance** | **$565.58** |
| **Minimum Payment Due** | **$305.58** |
| **Payment Due Date** | **December 18, 2021** |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 11 month(s) | $625 |

If you would like information about credit counseling services, call 1-866-946-9545 .

| | |
|---|---|
| **Mail payment to:** | **Please mail billing inquiries to:** |
| Genesis FS Card Services | Genesis FS Card Services |
| PO BOX 23039 | P.O. Box 4499 |
| COLUMBUS GA 31902-3039 | Beaverton, OR 97076-4499 |

**QUESTIONS?**
Call 1-866-946-9545
www.myindigocard.com

**YOUR MINIMUM PAYMENT INCLUDES ANY OVERLIMIT AND PAST DUE AMOUNTS.
PLEASE REMIT IMMEDIATELY.**

### Fees

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 11/19 | 11/19 | LATE PAYMENT CHARGE | $40.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$40.00** |

### Interest Charged

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 11/19 | 11/19 | INTEREST CHARGE PURCHASE | $12.77 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$12.77** |

### 2021 Totals Year-to-Date

| | |
|---|---|
| Total fees charged in 2021 | $290.85 |
| Total interest charged in 2021 | $50.19 |

### Interest Charge Calculation

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.90% | $512.81 | $12.77 |
| Cash Advances | 29.90% | $0.00 | $0.00 |

(v) = Variable Rate

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

SOC_ROBINSON 000036

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

ADDRESS _____

CITY _____ STATE _____ ZIP CODE _____

( )
HOME PHONE _____ BUSINESS PHONE _____

EMAIL ADDRESS _____

3527

---

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

**What To Do If You Think You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**PAYMENTS**

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 P.M. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 P.M. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

**ANNUAL FEE (if applicable)**

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

**CREDIT BUREAU REPORTING**

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**HOW INTEREST CHARGES ARE DETERMINED**

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be a component in the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under **Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)** to:
   a. your *Average Daily Balance of Cash Advances* (including new Cash Advances); and
   b. your *Average Daily Balance of Purchases* (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date during your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases):** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for this Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

**OTHER DISCLOSURES**

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000037

Defendant's Exhibit A - p.92 of 180

R5975-C587-1219

**GENESIS FS CARD SERVICES**
PO BOX 4477
BEAVERTON OR 97076-4477

| | |
|---|---|
| Account Number | 3527 |
| New Balance | $619.66 |
| Minimum Payment Due | $360.66 |
| Payment Due Date | 01/18/22 |
| AMOUNT ENCLOSED | $ |

GENESIS FS CARD SERVICES
PO BOX 23039
COLUMBUS GA 31902-3039

Make check/money order payable to

Please write your account number on your check/money order and do not send cash.

CHRISTOPHER B ROBINSON          **0000000
20 BURNEY MOUNTAIN RD
FALKVILLE AL  35622-5700

Address/Phone Number Change

☐ Please check here and complete Address/Phone Number Change Form on reverse side.

**Make your payment online at www.myindigocard.com**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

# indigo®

**MASTERCARD ACCOUNT STATEMENT**
3527
November 20, 2021 - December 20, 2021



### Account Summary

| | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $240.00 |
| Overlimit Amount | $319.66 |
| Statement Closing Date | December 20, 2021 |
| # of Days in Billing Cycle | 31 |

### Purchase/Cash Advance Balance Summary

| | |
|---|---|
| Previous Balance | $565.58 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$40.00** |
| **Interest Charged** | **$14.08** |
| New Purchase/Cash Advance Balance | $619.66 |

### Payment Information

| | |
|---|---|
| Total New Balance | $619.66 |
| Minimum Payment Due | $360.66 |
| Payment Due Date | January 18, 2022 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 12 month(s) | $685 |

If you would like information about credit counseling services, call 1-866-946-9545 .

| Mail payment to: | Please mail billing inquiries to: | QUESTIONS? |
|---|---|---|
| Genesis FS Card Services | Genesis FS Card Services | Call 1-866-946-9545 |
| PO BOX 23039 | P.O. Box 4499 | www.myindigocard.com |
| COLUMBUS GA 31902-3039 | Beaverton, OR 97076-4499 | |

YOUR MINIMUM PAYMENT INCLUDES ANY OVERLIMIT AND PAST DUE AMOUNTS.
PLEASE REMIT IMMEDIATELY.

Your statement will soon be updated. We have made changes to make it easier to read and understand. In addition, we will be upgrading our website which may temporarily limit access to some parts of the site.
**Important:**
Your due date will change to the 22nd of the month starting in March 2022.

### Fees

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 12/20 | 12/20 | LATE PAYMENT CHARGE | $40.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$40.00** |

### Interest Charged

| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| | 12/20 | 12/20 | INTEREST CHARGE PURCHASE | $14.08 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$14.08** |

### 2021 Totals Year-to-Date

| | |
|---|---|
| Total fees charged in 2021 | $330.85 |
| Total interest charged in 2021 | $64.27 |

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

SOC_ROBINSON 000038

-3527

**indigo**

**MASTERCARD ACCOUNT STATEMENT**
3527
November 20, 2021 - December 20, 2021



| Interest Charge Calculation | | | |
|---|---|---|---|

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.90% | $565.58 | $14.08 |
| Cash Advances | 29.90% | $0.00 | $0.00 |

(v) = Variable Rate

SOC_ROBINSON 000039

Defendant's Exhibit A - p.94 of 180

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

3527

_____
ADDRESS

_____
CITY                              STATE              ZIP CODE

( )
_____
HOME PHONE                        BUSINESS PHONE

_____
EMAIL ADDRESS

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

**What To Do If You Think You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**PAYMENTS**

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 P.M. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 P.M. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

**ANNUAL FEE (if applicable)**

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at: Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

**CREDIT BUREAU REPORTING**

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**HOW INTEREST CHARGES ARE DETERMINED**

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be added to the

calculation of your Average Daily Balance of Cash Advances. We will not charge any Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under **Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)** to:
   a. your *Average Daily Balance of Cash Advances* (including new Cash Advances); and
   b. your *Average Daily Balance of Purchases* (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date in your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases):** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advances as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for this Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

**OTHER DISCLOSURES**

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000040

Defendant's Exhibit A - p.95 of 180

R5975-C597-1219

3527

GENESIS FS CARD SERVICES
PO BOX 4477
BEAVERTON OR 97076-4477

**Account Number** ▓▓▓▓3527
**New Balance** $675.09
**Minimum Payment Due** $419.09
**Payment Due Date** 02/18/22
**AMOUNT ENCLOSED** $ _____

GENESIS FS CARD SERVICES   ◄ Make check/money
PO BOX 23039                  order payable to
COLUMBUS GA 31902-3039

Please write your account number on your check/money order
and do not send cash.

___Address/Phone Number Change___
☐ Please check here and complete Address/Phone
Number Change Form on reverse side.

CHRISTOPHER B ROBINSON     **0000000
20 BURNEY MOUNTAIN RD
FALKLVILLE AL 35622-5700

**Make your payment online at www.myindigocard.com**

---------------------------------------------------------------

Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

## indigo®

**MASTERCARD ACCOUNT STATEMENT**
▓▓▓▓527
December 21, 2021 - January 19, 2022


mastercard

| Account Summary | |
|---|---|
| Credit Line | $300.00 |
| Available Credit | $0.00 |
| Past Due Amount | $281.00 |
| Overlimit Amount | $375.09 |
| Statement Closing Date | January 19, 2022 |
| # of Days in Billing Cycle | 30 |

| Purchase/Cash Advance Balance Summary | |
|---|---|
| Previous Balance | $619.66 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Cash Advances | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$40.00** |
| **Interest Charged** | **$15.43** |
| New Purchase/Cash Advance Balance | $675.09 |

| Payment Information | |
|---|---|
| **Total New Balance** | **$675.09** |
| **Minimum Payment Due** | **$419.09** |
| **Payment Due Date** | **February 18, 2022** |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $40.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 12 month(s) | $746 |

If you would like information about credit counseling services, call 1-866-946-9545 .

**Mail payment to:**
Genesis FS Card Services
PO BOX 23039
COLUMBUS GA 31902-3039

**Please mail billing inquiries to:**
Genesis FS Card Services
P.O. Box 4499
Beaverton, OR 97076-4499

**QUESTIONS?**
Call 1-866-946-9545
www.myindigocard.com

YOUR MINIMUM PAYMENT INCLUDES ANY OVERLIMIT AND PAST DUE AMOUNTS.
PLEASE REMIT IMMEDIATELY.

Your statement will soon be updated. We have made changes to make it easier to read and
understand. In addition, we will be upgrading our website which may temporarily limit access
to some parts of the site.
**Important:**
Your due date will change to the 22nd of the month starting in March 2022.

| Fees | | | | |
|---|---|---|---|---|
| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
| | 01/19 | 01/19 | LATE PAYMENT CHARGE | $40.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$40.00** |

| Interest Charged | | | | |
|---|---|---|---|---|
| Reference Number | Tran Date | Post Date | Description of Transaction or Credit | Amount |
| | 01/19 | 01/19 | INTEREST CHARGE PURCHASE | $15.43 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$15.43** |

| 2022 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2022 | $40.00 |
| Total interest charged in 2022 | $15.43 |

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

Defendant's Exhibit A - p.96 of 180

SOC_ROBINSON 000041

# indigo®

**MASTERCARD ACCOUNT STATEMENT**
████████████3527
December 21, 2021 - January 19, 2022



| Interest Charge Calculation | | | |
|---|---|---|---|

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 29.90% | $619.66 | $15.43 |
| Cash Advances | 29.90% | $0.00 | $0.00 |

(v) = Variable Rate

SOC_ROBINSON 000042

Defendant's Exhibit A - p.97 of 180

## ADDRESS / PHONE NUMBER CHANGE FORM

If you provide us with a cellular phone number, you are expressly consenting that (i) we and our agents may contact you at that number and (ii) we may use automated telephone dialing systems to initiate such contacts and/or leave recorded messages.

3527

ADDRESS

CITY                                    STATE              ZIP CODE

(     )
HOME PHONE                              BUSINESS PHONE

EMAIL ADDRESS

Detach here ▼ and return above portion with your remittance. After detaching, retain lower portion for your future reference.

**This Account is issued by Celtic Bank and serviced by Genesis FS Card Services, Inc.**

**What To Do If You Think You Find A Mistake On Your Statement**

If you think there is an error on your statement, write to us at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

In your letter, give us the following information:
- *Account Information:* Your name and Account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of Problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing.* You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at: Genesis FS Card Services, P.O. Box 4499, Beaverton, Oregon 97076.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**PAYMENTS**

Payments should be mailed with the payment coupon and in the envelope provided to the Genesis FS Card Services payment address indicated on the payment coupon. Any payment received in that form and at that address on or before 5:00 PM. Eastern Time on a normal banking day will be credited to your Account that day. If your payment is received in that form and at that address after 5:00 PM. Eastern Time on a normal banking day, or anytime on a nonbanking day, we will credit it to your Account the next banking day. Payments can also be made online by visiting www.myindigocard.com. When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Payments received at other than the remittance address on the face of this statement may be subject to a delay in crediting of up to 5 days after the date of receipt.

**ANNUAL FEE (if applicable)**

If you wish to terminate your ability to use your Card to obtain further Purchases and Cash Advances in order to avoid paying the renewal Annual Fee, you must deliver written notice of termination to us within thirty (30) days from the mailing date of the statement containing the renewal Annual Fee notice. Your notice must be sent to us at Genesis FS Card Services, P.O. Box 4477, Beaverton, OR 97076. Upon receipt, we will close your Account and the renewal Annual Fee will not be charged to your Account. Terminating credit availability will not cancel your obligations to pay amounts outstanding on your Account, and you will be required to pay your outstanding balance with interest in accordance with the terms of your Cardholder Agreement. These rights do not apply to an Annual Fee charged in connection with the opening of your Account.

**CREDIT BUREAU REPORTING**

We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**HOW INTEREST CHARGES ARE DETERMINED**

Your interest charge for any Billing Cycle will include the following components, the total of which constitutes your total interest charge for the Billing Cycle:
1. A Cash Advance Transaction Fee interest charge imposed on each Cash Advance transaction posted during a Billing Cycle, in an amount equal to the greater of $5 or 5% of the amount of each Cash Advance. Any unpaid Cash Advance Transaction Fee interest charges will be a part of the

calculation of your Average Daily Balance of Cash Advances. We will not charge a Cash Advance Transaction Fees, however, during the one-year period beginning on the date you open your Account.
2. Periodic interest charge computed by applying the applicable Monthly Periodic Rate or Rates, determined as provided below under **Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)** to:
   a. your *Average Daily Balance of Cash Advances* (including new Cash Advances); and
   b. your Average Daily Balance of Purchases (including new Purchases).
   However, if the total of the amounts so computed is an amount less than $.50, then a minimum interest charge of $.50 will be imposed instead of such smaller amounts and will be treated as an interest charge on Purchases.
3. A Foreign Currency Conversion Fee interest charge in an amount equal to 1% of the converted U.S. dollar amount of each transaction, including Cash Advances and Purchases, that is effected in any currency other than U.S. dollars.

**When Interest Charges Begin to Accrue.** Interest charges on Purchases will be imposed at the applicable Monthly Periodic Rate from the date each Purchase is made, and will continue to accrue on unpaid balances as long as they remain unpaid. However, we do not assess interest charges in the following circumstances:
1. If you paid the New Balance at the beginning of your previous Billing Cycle by the Payment Due Date during the previous Billing Cycle, or if that New Balance was $0 or a credit balance, then:
   a. if you pay the New Balance on your current Statement in full by the Payment Due Date in your current Billing Cycle, we will not assess interest charges on Purchases during your current Billing Cycle; and
   b. if you make a payment that is less than the New Balance by the Payment Due Date in your current Billing Cycle, we will credit that payment as of the first day in your current Billing Cycle.
2. If you had a New Balance at the beginning of your previous Billing Cycle and you did not pay that New Balance by the Payment Due Date during that previous Billing Cycle, then we will not assess interest charges on any Purchases during the current Billing Cycle if you pay the New Balance at the beginning of your current Billing Cycle by the Payment Due Date in your current Billing Cycle.

Periodic interest charges on Cash Advances will be imposed at the applicable Monthly Periodic Rate from the date each Cash Advance is made and will continue to accrue on unpaid balances as long as they remain unpaid. There is no grace period on Cash Advances and there is no period within which to pay to avoid interest charges on Cash Advances.

**Calculating the Purchase and Cash Advance Balance Subject to Interest Charges**

**Average Daily Balance of Purchases (including new Purchases).** To get the Average Daily Balance of Purchases, we take the beginning Purchase balance of your Account each day, including unpaid interest charges on Purchases and Foreign Currency Conversion Fee interest charges on Purchases, add any new Purchases as of the date of transaction, and subtract the applicable portion of any payments and credits as of the transaction date. On the first day of a Billing Cycle, we also add any unpaid fees. This gives us the daily balance for Purchases. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Purchases.

**Average Daily Balance of Cash Advances (including new Cash Advances):** To get the Average Daily Balance of Cash Advances, we take the beginning Cash Advance balance of your Account each day, including unpaid interest charges on Cash Advances and Foreign Currency Conversion Fee interest charges on Cash Advances, add any new Cash Advances as of the date of transaction, and the Cash Advance Transaction Fee interest charge on any Cash Advance as of the transaction date of each Cash Advance, and subtract the applicable portion of any payments and credits as of the transaction date. This gives us the daily balance for Cash Advances. Then we add all these daily balances for the Billing Cycle together and divide the total by the number of days in the Billing Cycle. This gives us the Average Daily Balance of Cash Advances.

**Computing the Purchase and Cash Advance Balance Monthly Periodic Rates and Corresponding Annual Percentage Rates (APR)**

**Monthly Periodic Rates:** The Monthly Periodic Rate is calculated by dividing the APR by 12. The Purchase APR is 29.9% and the Monthly Periodic Rate for Purchases is 2.4916%.

The Cash Advance APR is 29.9% and the Monthly Periodic Rate for Cash Advances is 2.4916%.

**OTHER DISCLOSURES**

For AR, HI, IA, ME Residents: This communication is from a debt collector. This is an attempt to collect debt and any information obtained will be used for the purpose.

SOC_ROBINSON 000043

R5975-C597-1219

Personal Credit Report for:

**CHRISTOPHER ROBINSON**

File Number:

7524

Date Created:

**11/25/2022**

Visit **transunion.com/dispute** to start a dispute online.

## 👤 Personal Information

You have been on our files since 03/01/2001. Your SSN has been masked for your protection.

**Credit Report Date**

11/25/2022

**Social Security Number**

XXX-XX-1094

**Date of Birth**

████1982

**Name**

CHRISTOPHER B. ROBINSON

## Also Known As

**AKA**

CHRISTOPHER BRAN ROBINSON

**AKA**

CHRISTOPHER BRANDON ROBINSON

**AKA**

CHRIS B. ROBINSON



## Addresses

**Current Address**

Robinson v Spring Oaks 000150

SPRING OAKS CAPITAL LLC ████****

## Account Information

| | |
|---|---|
| **Address** | PO BOX 1216 CHESAPEAKE, VA 23327 |
| **Phone** | ████ |
| **Date Opened** | 03/26/2022 |
| **Responsibility** | Individual Account |
| **Account Type** | Open Account |
| **Loan Type** | FACTORING COMPANY ACCOUNT |
| **Balance** | $675 |
| **Date Updated** | 11/18/2022 |
| **High Balance** | $675 |
| **Original Creditor** | CELTIC BANK |
| **Past Due** | $675 |
| **Pay Status** | >Collection< |
| **Estimated month and year this item will be removed** | 07/2028 |
| **Remarks** | Account previously in dispute-now resolved. reported by credit grant; >PLACED FOR COLLECTION< |

# Satisfactory Accounts

The following accounts are reported with no adverse information. For your protection, your account numbers have been partially masked, and in some cases scrambled. Please note: Accounts are reported as "Current; Paid or paying as agreed" if paid within 30 days of the due date. Accounts reported as Current may still incur late fees or interest charges if not paid on or before the due date.

**Account Name**

MRV BANKS/REVVI4████████****

## Account Information

Personal Credit Report for:

**CHRISTOPHER ROBINSON**

File Number:

█████7524

Date Created:

**07/28/2023**

Visit **transunion.com/dispute** to start a dispute online.

## 8 Personal Information

You have been on our files since 03/01/2001. Your SSN has been masked for your protection.

**Credit Report Date**

07/28/2023

**Social Security Number**

XXX-XX-1094

**Date of Birth**

████1982

**Name**

CHRISTOPHER B. ROBINSON

## Also Known As

**AKA**

CHRISTOPHER BRAN ROBINSON

**AKA**

CHRISTOPHER BRANDON ROBINSON

**AKA**

CHRIS B. ROBINSON



## Addresses

Robinson v Spring Oaks 000004

Defendant's Exhibit A - p.101 of 180

| | |
|---|---|
| **Address** | P O BOX 60550 ,H AT HUTCHINSON, KS 67504-0550 |
| **Phone** | ███████████ |
| **Date Opened** | 10/21/2022 |
| **Responsibility** | Individual Account |
| **Account Type** | Open Account |
| **Loan Type** | FACTORING COMPANY ACCOUNT |
| **Balance** | $992 |
| **Date Updated** | 07/15/2023 |
| **High Balance** | $992 |
| **Original Creditor** | COVINGTON CREDIT |
| **Past Due** | $992 |
| **Pay Status** | >Collection< |
| **Estimated month and year this item will be removed** | 05/2028 |
| **Remarks** | >PLACED FOR COLLECTION< |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RESURGENT RECEIVABLES ████████████

## Account Information

| | |
|---|---|
| **Address** | 355 S MAIN STREET,STE 300 J GREENVILLE, SC 29601 |
| **Phone** | (888) 453-0011 |
| **Date Opened** | 07/22/2020 |
| **Responsibility** | Individual Account |
| **Account Type** | Open Account |
| **Loan Type** | FACTORING COMPANY ACCOUNT |

| | |
|---|---|
| **Balance** | $1,099 |
| **Date Updated** | 07/05/2023 |
| **High Balance** | $862 |
| **Original Creditor** | CREDIT ONE BANK N A |
| **Past Due** | $1,099 |
| **Pay Status** | >Collection< |
| **Estimated month and year this item will be removed** | 11/2026 |
| **Remarks** | Account information disputed by consumer (FCRA); >PLACED FOR COLLECTION< |

SPRING OAKS CAPITAL LLC ████ ****

## Account Information

| | |
|---|---|
| **Address** | PO BOX 1216 CHESAPEAKE, VA 23327 |
| **Phone** | (866) 281-3065 |
| **Date Opened** | 03/26/2022 |
| **Responsibility** | Individual Account |
| **Account Type** | Open Account |
| **Loan Type** | FACTORING COMPANY ACCOUNT |
| **Balance** | $675 |
| **Date Updated** | 07/21/2023 |
| **High Balance** | $675 |
| **Original Creditor** | CELTIC BANK |
| **Past Due** | $675 |
| **Pay Status** | >Collection< |

| Estimated month and year this item will be removed | 07/2028 |
|---|---|
| **Remarks** | Account previously in dispute-now resolved. reported by credit grant; >PLACED FOR COLLECTION< |

## Satisfactory Accounts

The following accounts are reported with no adverse information. For your protection, your account numbers have been partially masked, and in some cases scrambled. Please note: Accounts are reported as "Current; Paid or paying as agreed" if paid within 30 days of the due date. Accounts reported as Current may still incur late fees or interest charges if not paid on or before the due date.

| Account Name |
|---|
| BRIGIT / COASTAL COMMUNITY BANK ████* |

### Account Information

| | |
|---|---|
| **Address** | 5415 EVERGREEN WAY EVERETT, WA 98203 |
| **Phone** | (425) 257-9000 |
| **Monthly Payment** | $0 |
| **Date Opened** | 05/04/2023 |
| **Responsibility** | Individual Account |
| **Account Type** | Installment Account |
| **Loan Type** | NOTE LOAN |
| **Balance** | $0 |
| **Date Updated** | 06/05/2023 |
| **Payment Received** | $575 |
| **Last Payment Made** | 05/12/2023 |
| **High Balance** | $600 |
| **Pay Status** | Paid, Closed; was Paid as agreed |
| **Terms** | $0 per month, paid Monthly for 24 months |
| **Date Closed** | 06/05/2023 |

Robinson v Spring Oaks 000061

Personal Credit Report for:

**CHRISTOPHER ROBINSON**

File Number:
█████7524

Date Created:
**11/29/2023**

Visit **transunion.com/dispute** to start a dispute online.

## 🔓 Personal Information

You have been on our files since 03/01/2001. Your SSN has been masked for your protection.

**Credit Report Date**

11/29/2023

**Social Security Number**

XXX-XX-1094

**Date of Birth**

████1982

**Name**

CHRISTOPHER B. ROBINSON

## Also Known As

**AKA**

CHRISTOPHER BRAN ROBINSON

**AKA**

CHRISTOPHER BRANDON ROBINSON

**AKA**

CHRIS B. ROBINSON

PLAINTIFF'S
EXHIBIT

**8**

## Addresses

| | |
|---|---|
| **Account Type** | Open Account |
| **Loan Type** | FACTORING COMPANY ACCOUNT |
| **Balance** | $442 |
| **Date Updated** | 11/06/2023 |
| **High Balance** | $442 |
| **Original Creditor** | REVVI CARD MRV BANKS |
| **Past Due** | $442 |
| **Pay Status** | >Collection< |
| **Estimated month and year this item will be removed** | 10/2029 |
| **Remarks** | Account information disputed by consumer (FCRA); >PLACED FOR COLLECTION< |

---

RESURGENT RECEIVABLES ███████████

## Account Information

| | |
|---|---|
| **Address** | PO Box 1269 GREENVILLE, SC 29602 |
| **Phone** | (866) 464-1183 |
| **Date Opened** | 07/22/2020 |
| **Responsibility** | Individual Account |
| **Account Type** | Open Account |
| **Loan Type** | FACTORING COMPANY ACCOUNT |
| **Balance** | $1,121 |
| **Date Updated** | 11/06/2023 |
| **High Balance** | $862 |
| **Original Creditor** | CREDIT ONE BANK N A |

Robinson v Spring Oaks 000119

Defendant's Exhibit A - p.106 of 180

| | |
|---|---|
| **Past Due** | $1,121 |
| **Pay Status** | >Collection< |
| **Estimated month and year this item will be removed** | 11/2026 |
| **Remarks** | Account information disputed by consumer (FCRA); >PLACED FOR COLLECTION< |

---

SPRING OAKS CAPITAL LLC███████**

## Account Information

| | |
|---|---|
| **Address** | PO BOX 1216 CHESAPEAKE, VA 23327 |
| **Phone** | (866) 281-3065 |
| **Date Opened** | 03/26/2022 |
| **Responsibility** | Individual Account |
| **Account Type** | Open Account |
| **Loan Type** | FACTORING COMPANY ACCOUNT |
| **Balance** | $675 |
| **Date Updated** | 11/24/2023 |
| **High Balance** | $675 |
| **Original Creditor** | CELTIC BANK |
| **Past Due** | $675 |
| **Pay Status** | >Collection< |
| **Estimated month and year this item will be removed** | 07/2028 |
| **Remarks** | Account previously in dispute-now resolved. reported by credit grant; >PLACED FOR COLLECTION< |

---

SPRING OAKS CAPITAL LLC███████****

## Account Information

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CHRISTOPHER ROBINSON** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.:** |
| ) | |
| **SPRING OAKS CAPITAL, LLC,** ) | |
| **et. al.** ) | **2:23-cv-01381-AMM** |
| ) | |
| **Defendant.** ) | |

---

**ANSWERS AND RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY**
**REQUESTS BY SPRING OAKS CAPITAL, LLC**

---

Defendant Spring Oaks Capital, LLC ("Spring Oaks" and "Defendant") submits the herein answers, objections and responses to Plaintiff's First Set of Interrogatories, Document Requests, and Requests for Admission as follows:

**PRELIMINARY STATEMENT**

1.     These answers are based upon information presently known by Spring Oaks.   It is anticipated that further discovery, investigation, legal research and analysis will supply additional factual conclusions and legal contentions.   Spring Oaks reserves the right to rely on such additional discovery, investigation, legal research and analysis, and to make such additions, changes, and variations to these answers as warranted thereby.   These answers are made in a good faith effort to supply as much information and specification as presently known.

2.     Each answer herein is subject to all objections on any grounds that would require exclusion of all or part of any statement herein as if such request was asked of, or statements

1

PLAINTIFF'S
EXHIBIT

**9**
_____

contained herein were made by, a witness testifying at trial, all such objections being expressly reserved.

3.      The absence of an objection that a request is irrelevant is not intended to be a waiver of that objection and Spring Oaks reserves the right to object on relevancy grounds at any stage of these proceedings.

4.      To the extent any request or any part thereof is intended to elicit information protected from discovery by the attorney-client privilege or the attorney work product doctrine, Spring Oaks objects thereto and asserts the protection and privileges provided thereby to the fullest extent.

Referencing and expressly incorporating each of these general objections, Spring Oaks hereby responds and objects as follows:

## ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify the person or persons responsible for receiving, processing, investigating and/or responding to Christopher Robinson's letter delivered to you on or about October 3, 2022.

**Answer:** Spring Oaks objects to this interrogatory as overly broad and vague and ambiguous as to "responsible for receiving, processing, investigating and/or responding," and to the extent it seeks information that is not relevant or likely to lead to the discovery of admissible evidence.   Subject to and without waiving said objections, Spring Oaks identifies the following individuals: Ny'Asia Davis, Lauren Hurlocker and Keara Moore and refers Plaintiff to the documents produced in response to Plaintiff's Request for Production of Documents.

### INTERROGATORY NO. 2:

2

Identify and describe the exact procedure or protocol followed upon receipt of Christopher Robinson's letter disputing a debt being collected by you.

**Answer:** Spring Oaks objects to this interrogatory as overly broad and unduly burdensome. Spring Oaks further objects because this request is vague and ambiguous as to "procedure or protocol." Subject to and without waiving the objections, Spring Oaks noted the account as "disputed" upon receipt of Plaintiff's letter disputing the debt. Spring Oaks then conducted a reasonable investigation of Plaintiff's claim disputing the debt, confirmed Plaintiff is the correct consumer on the account and confirmed that the information on the account is accurate. On October 31, 2022, Spring Oaks emailed correspondence to Plaintiff informing Plaintiff of the results of its investigation of Plaintiff's dispute. Spring Oaks did not receive a response of any kind from Plaintiff until Plaintiff filed this lawsuit, more than 11 months after Spring Oaks informed Plaintiff of its investigation results and findings.

## INTERROGATORY NO. 3:

Specify the training given to the person or persons identified in Interrogatory #1 concerning the receiving, processing, investigating and/or responding to Christopher Robinson's letter delivered to you on or about October 3, 2022.

**Answer:** Spring Oaks objects to the interrogatory as overly broad and unduly burdensome to the extent it seeks information not relevant to Plaintiff's claims. Spring Oaks further objects to the interrogatory because it is vague and ambiguous as to "training given" in specific relation to Plaintiff's disputed account. Spring Oaks further objects to the extent that this request seeks information that is proprietary and confidential. Spring Oaks will produce relevant employee

3

training documents responsive to this request upon execution of mutually agreeable protective order.

**INTERROGATORY NO. 4:**

Describe any and all steps taken by SPRING OAKS to investigate Christopher Robinson's dispute the subject of this action.

**Answer:** Spring Oaks objects to this interrogatory as vague and ambiguous as to "investigate." Subject to and without waiving this objection, Spring Oaks noted the account as "disputed" upon receipt of Plaintiff's letter disputing the debt.   Spring Oaks then conducted a reasonable investigation of Plaintiff's claim disputing the debt, confirmed Plaintiff is the correct consumer on the account and confirmed that the information on the account is accurate.   On October 31, 2022, Spring Oaks emailed correspondence to Plaintiff informing Plaintiff of the results of its investigation of Plaintiff's dispute.   Spring Oaks did not receive a response of any kind from Plaintiff until Plaintiff filed this lawsuit, over 11 months after Spring Oaks informed Plaintiff of its investigation results and findings.

**INTERROGATORY NO. 5:**

Identify the person or persons responsible for deciding on the language used to mark Christopher Robinson's credit report in response to the dispute.

**Answer:** Spring Oaks objects to this interrogatory as vague and ambiguous as to the phase "deciding on the language used to mark. . ."   Further, Spring Oaks did not "decide" on "language used to mark" Plaintiff's "credit report" and instead Spring Oaks reported to TransUnion certain codes contained within the "Credit Reporting Resource Guide" published by the Consumer Data Industry Association.   Subject to and without waiving the objections, see TransUnion and the

4

authors of the Credit Reporting Resource Guide produced in response to Plaintiff's Request for Production of Documents.

**INTERROGATORY NO. 6:**

Specify the rationale or reasoning behind choosing the language "Account previously in dispute-now resolved" for marking Christopher Robinson's credit report.

 **Answer:** Spring Oaks objects to this interrogatory as overly broad and unduly burdensome. Spring Oaks objects to this interrogatory as vague and ambiguous as to the "rationale or reasoning."  Subject to and without waiving the objections, Spring Oaks did not "choose" any "language" in reporting Plaintiff's account to TransUnion and instead relied upon the Consumer Data Industry Association compliance condition codes contained within the "Credit Reporting Resource Guide" to report on the account.

**INTERROGATORY NO. 7:**

Explain in detail why SPRING OAKS did not use the language "Account information disputed by consumer" in marking Christopher Robinson's credit report.

 **Answer:** Spring Oaks objects that this interrogatory seeks information that is not relevant or likely to lead to the discovery of admissible evidence and is argumentative, specifically, by requesting a response to a vague hypothetical.  Subject to and without waiving the objections, Spring Oaks did not "use" any "language" in reporting Plaintiff's account to TransUnion and instead relied upon the Consumer Data Industry Association compliance condition codes contained within the "Credit Reporting Resource Guide" to report on the account.

**INTERROGATORY NO. 8:**

Defendant's Exhibit A - p.112 of 180

List all credit reporting agencies SPRING OAKS communicated with concerning Christopher Robinson's account from September 2021 to the present.

**Answer:** TransUnion.

## INTERROGATORY NO. 9:

Detail any communications, instructions, or guidelines given to or received from Equifax, Experian and TransUnion concerning the marking of Christopher Robinson's account.

**Answer:** Spring Oaks objects that this interrogatory is vague and ambiguous as to "concerning the marking of Christopher Robinson' account."   Subject to and without waiving the objection, none.

## INTERROGATORY NO. 10:

Describe any and all changes or updates made to Christopher Robinson's credit report from the date of receipt of the dispute letter to the present.

**Answer:** Spring Oaks objects that this interrogatory is overbroad and unduly burdensome to the extent it seeks information better known to Plaintiff or other non-parties to this lawsuit, and because it is vague and ambiguous as to "changes or updates made" without specifying by whom.

## INTERROGATORY NO. 11:

Identify any third-party vendors or contractors involved in any part of the process from receiving Christopher Robinson's dispute letter the subject of this action to marking Christopher Robinson's credit report.

**Answer:** None.

## INTERROGATORY NO. 12:

6

Describe any performance metrics, incentives, or goals, by whatever name called, related to the receiving, processing, investigating and/or responding to consumer disputes within SPRING OAKS in place at the time you received, processed, investigated and responded to Christopher Robinson's dispute letter.

**Answer:** Spring Oaks objects that the interrogatory is overly broad and unduly burdensome, seeks information that is not relevant or likely to lead to the discovery of admissible evidence. Spring Oaks further objects that the interrogatory is vague and ambiguous to "performance metrics, incentives, or goals." Subject to and without waiving the objections, none.

## INTERROGATORY NO. 13:

Identify and describe any research, studies, or internal documents that discuss the implications of different credit report markings on a consumer's credit score or creditworthiness for the last ten (10) years.

**Answer:** Spring Oaks objects that the interrogatory is overly broad and unduly burdensome, seeks information that is not relevant or likely to lead to the discovery of admissible evidence. Spring Oaks further objects that the interrogatory is vague and ambiguous to "research, studies, or internal documents." Subject to and without waiving the objections, none.

## INTERROGATORY NO. 14:

Specify any and all software tools or platforms used in the dispute investigation process, including but not limited to those used for credit reporting.

**Answer:** Spring Oaks objects that the interrogatory is overly broad and unduly burdensome, seeks information that is not relevant or likely to lead to the discovery of admissible evidence. Subject to and without waiving the objections, InterProse.

7

**INTERROGATORY NO. 15:**

Detail the qualifications, training, and experience of the person or persons responsible for marking, changing or updating Christopher Robinson's credit report.

**Answer:** Spring Oaks objects that the interrogatory is overly broad and unduly burdensome, seeks information that is not relevant or likely to lead to the discovery of admissible evidence. Spring Oaks further objects to the extent that this request seeks information that is proprietary and confidential. Subject to and without waiving the objections, Spring Oaks develops and implements internal, standardized policies for account handling and all employees are knowledgeable and aware of such policies. Spring Oaks will produce relevant employee training documents responsive to this request upon execution of mutually agreeable protective order.

**INTERROGATORY NO. 16:**

Detail all forms of communication (e.g., email, call, text, letter) and their respective dates, initiated by SPRING OAKS towards Christopher Robinson since the receipt of the dispute letter.

**Answer:** See the documents produced in response to Plaintiff's Requests for Production of Documents which include the initial notice that Spring Oaks sent to Plaintiff on April 5, 2022, and the dispute response email Spring Oaks sent to Plaintiff on October 31, 2022.

**RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

1.      Produce all internal policies, procedures, guidelines, or training materials related to the receiving, processing, investigating and/or responding to of consumer dispute letters for the time period 12 months prior to receiving Christopher Robinson's dispute letter up to the present date.

8

**Response:** Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.  Spring Oaks further objects to the extent that this request seeks documents that are proprietary and confidential and not relevant or likely to lead to the discovery of admissible information.  Subject to and without waiving the objections, Spring Oaks will produce to Plaintiff the policies and procedures in effect from October 1, 2022 through October 31, 2022 pertaining to the handling, processing, and reporting of written consumer disputes upon the entry of a suitable, mutually agreed-upon Protective Order.

2.     Produce all internal policies, procedures, guidelines, or training materials related to the changing, altering or updating a consumer's credit information to the credit bureaus for the time period 12 months prior to receiving Christopher Robinson's dispute letter up to the present date.

**Response:** Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.  Spring Oaks further objects to the extent that this request seeks documents that are proprietary and confidential and not relevant or likely to lead to the discovery of admissible information.  Subject to and without waiving the objections, Spring Oaks will produce to Plaintiff the policies and procedures in effect from October 1, 2022 through October 31, 2022 pertaining to the handling, processing, and reporting of written consumer disputes upon the entry of a suitable, mutually agreed-upon Protective Order.

3.     Produce all internal policies, procedures, guidelines, or training materials related to the changing, altering or updating a consumer's credit information to the credit bureaus when you receive a letter from the consumer disputing the alleged debt you are collecting or in response to a

9

letter from the consumer disputing the alleged debt you are collecting for the time period 12 months prior to receiving Christopher Robinson's dispute letter up to the present date.

**Response:** Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.   Spring Oaks further objects to the extent that this request seeks documents that are proprietary and confidential and not relevant or likely to lead to the discovery of admissible information.   Subject to and without waiving the objections, Spring Oaks will produce to Plaintiff the policies and procedures in effect from October 1, 2022 through October 31, 2022 pertaining to the handling, processing, and reporting of written consumer disputes upon the entry of a suitable, mutually agreed-upon Protective Order.

4.      Produce any and all policies, procedures, guidelines, training materials and documents evidencing the decision-making process on how to mark Christopher Robinson's credit report post the receipt of the dispute letter.

**Response:** Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.   Spring Oaks further objects to the extent that this request seeks documents that are proprietary and confidential and not relevant or likely to lead to the discovery of admissible information.   Subject to and without waiving the objections, Spring Oaks will produce to Plaintiff the policies and procedures in effect from October 1, 2022 through October 31, 2022 pertaining to the handling, processing, and reporting of written consumer disputes upon the entry of a suitable, mutually agreed-upon Protective Order.

10

5.     Produce all communications, including emails, memos, letters, and other documents, between SPRING OAKS and credit reporting agencies including but not limited to Equifax, Experian and TransUnion regarding Christopher Robinson's account from 12 months prior to receiving the dispute letter up to the present date.

**Response:** Responsive documents in Spring Oaks' possession regarding the reporting of Plaintiff's account to TransUnion are produced herein.

6.     Produce any internal documents, studies, or research discussing the implications of different credit report markings on consumers' credit scores or creditworthiness.

**Response:** Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.   Subject to and without waiving the foregoing objections, none.

7.     Produce any and all information, documents or communications discussing or instructing the use of the language "Account previously in dispute-now resolved reported by credit grantor" in relation to marking credit reports from 2021 to present.

**Response:** Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.   Spring Oaks further objects to this request to the extent it seeks documents protected from discovery by the attorney-client privilege and/or attorney work product doctrine.   Subject to and without waiving the objections, Spring Oaks produces the "Credit Reporting Resource Guide" published by the Consumer Data Industry Association herein.

8.     Produce the full credit reporting history of Christopher Robinson as held, reported or accessed by SPRING OAKS.

11

**Response:** Spring Oaks objects to this request on the grounds that it seeks information in the possession and control of Plaintiff, and that it is vague and ambiguous as to "full credit reporting history."   Subject to and without waiving the objections, responsive documents are produced herein.

9.      Produce all data, information, documents, communications, or records related to any third-party vendors or contractors involved in any part of the process from receiving, processing and investigating Christopher Robinson's dispute letter to marking, changing, altering or updating Christopher Robinson's credit information with the credit bureaus.

**Response:** None.

10.     Produce any software manuals, user guidelines, or training materials related to platforms or tools used in the dispute investigation and credit reporting process from 12 months prior to receiving the dispute letter up to the present date.

**Response:** Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.   Spring Oaks further objects to the extent that this request seeks documents that are proprietary and confidential and not relevant or likely to lead to the discovery of admissible information.   Subject to and without waiving the objections, Spring Oaks will produce to Plaintiff the policies and procedures in effect from October 1, 2022 through October 31, 2022 pertaining to the handling, processing, and reporting of written consumer disputes upon the entry of a suitable, mutually agreed-upon Protective Order.

12

11.     Produce all records of internal communications, discussions or meetings related to Christopher Robinson's dispute, its investigation, and subsequent credit report marking, changes or updates with the credit bureaus.

**Response:** Spring Oaks objects to this request to the extent it seeks documents protected from discovery by the attorney-client privilege and/or attorney work product doctrine.   Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.   Spring Oaks further objects to the extent that this request seeks documents that are proprietary and confidential and not relevant or likely to lead to the discovery of admissible information.   Subject to and without waiving the objections, responsive documents are produced herein.

12.     Produce any and all documents, communications, or training materials related to performance metrics, incentives, or goals associated with the handling of consumer disputes within SPRING OAKS.

**Response:** Spring Oaks objects to this request on the grounds that it is vague, overly broad, unduly burdensome, and not proportionate to the needs of the case, insofar as it is not limited to matters at issue in this lawsuit.   Spring Oaks further objects to the extent that this request seeks documents that are proprietary and confidential and not relevant or likely to lead to the discovery of admissible information.   Subject to and without waiving the objections, none.

13.     Produce your account notes, by whatever name called, for Christopher Robinson's alleged debt on which you were collecting or attempting to collect that is the subject of this action documenting any and all actions taken on the alleged account, communications (internally or

13

otherwise), investigations of any disputes by Christopher Robinson, correspondence received and sent, and/or any credit reporting.

**Response:** Spring Oaks objects to this request to the extent it seeks documents protected from discovery by the attorney-client privilege and/or attorney work product doctrine.   Subject to and without waiving these objections, responsive documents are enclosed.

## RESPONSES TO REQUESTS FOR ADMISSIONS

1.  Admit that Spring Oaks received a letter from Christopher Robinson on October 3, 2022.

    **Response:** Admit.

2.  Admit that the letter from Christopher Robinson made clear he disputed the alleged debt that SPRING OAKS claims Christopher Robinson owed.

    **Response:** Spring Oaks objects to this request on the basis that the letter is a written document.   Subject to and without waiving the objections, Spring Oaks admits only that it understood from Plaintiff's letter that Plaintiff disputed the debt held by Spring Oaks. Spring Oaks denies any characterization regarding Plaintiff's specific intent or clarity of the letter.

3.  Admit that Christopher Robinson explicitly mentioned in the letter that he did NOT want SPRING OAKS to send any documentation.

    **Response:** Spring Oaks objects to this request on the basis that the letter is a written document.   Subject to and without waiving the objections, to the extent an answer is required, Spring Oaks denies this request because the letter states that Plaintiff did not want Spring Oaks to send any "information," and he was not "interested in" receiving documentation.

14

4.   Admit that Christopher Robinson explicitly mentioned in the letter that he did NOT want SPRING OAKS to send any validation.

**Response:** Spring Oaks objects on the basis that the letter is a written document.   Subject to and without waiving the objections, to the extent an answer is required, Spring Oaks denies this request because while the letter states that it was not "a request for validation," there is no "explicit" statement not to send any validation.

5.   Admit that the dispute letter from Christopher Robinson was not a request for validation of the alleged debt.

**Response:** Spring Oaks objects on the basis that the letter is a written document.   Spring Oaks further objects to the extent that this request seeks a legal opinion or legal conclusion about what constitutes a "request for validation.   Subject to and without waiving these objections, to the extent an answer is required, Spring Oaks can neither truthfully admit or deny because Spring Oaks does not know Plaintiff's intent in sending the letter.

6.   Admit that the dispute letter from Christopher Robinson was not a request for verification of the alleged debt.

**Response:** Spring Oaks objects on the basis that the letter is a written document.   Spring Oaks further objects to the extent that this request seeks a legal opinion or legal conclusion about what constitutes a "request for verification."   Subject to and without waiving these objections, to the extent an answer is required, Spring Oaks can neither truthfully admit or deny because Spring Oaks does not know Plaintiff's intent in sending the letter.

7.   Admit that SPRING OAKS is familiar with the industry standard language used by other collectors when updating consumer account information to the credit bureaus.

**Response:** Spring Oaks objects that this request is overly broad, vague, and ambiguous as to "industry standard language used by other collectors."   Spring Oaks further objects that the request seeks information that is not relevant or likely to lead to the discovery of admissible evidence.   Subject to and without waiving the objections, Spring Oaks admits only that some credit reporting terms are "standardized," such as the compliance condition codes contained within the Credit Reporting Resource Guide published by the Consumer Data Industry Association, but denies any familiarity with unspecified terms used by unspecified debt collectors.

8.  Admit that SPRING OAKS is familiar with the industry standard language used by other collectors when updating consumer account information to the credit bureaus when a consumer disputes an account, namely: "Account information disputed by consumer."

**Response:** Spring Oaks objects that this request is overly broad, vague, and ambiguous as to "industry standard language used by other collectors."   Spring Oaks further objects that the request seeks information that is not relevant or likely to lead to the discovery of admissible evidence.   Subject to and without waiving the objections, Spring Oaks admits only that some credit reporting terms are "standardized," such as the compliance condition codes contained within the Credit Reporting Resource Guide published by the Consumer Data Industry Association, but denies any familiarity with unspecified terms used by unspecified debt collectors.

9.  Admit that SPRING OAKS chose to mark Christopher Robinson's credit report with the language "Account previously in dispute – now resolved" rather than "Account information disputed by consumer."

16

**Response:** Denied.   Spring Oaks did not "choose" any "language" in reporting Plaintiff's account to TransUnion and instead relied upon the Consumer Data Industry Association compliance condition codes contained within the "Credit Reporting Resource Guide" to note the account.

10. Admit that SPRING OAKS' decision to use the aforementioned language was not an accident or oversight.

**Response:** Denied. Spring Oaks did not "decide" to "use" any "aforementioned language" in reporting Plaintiff's account to TransUnion and instead relied upon the Consumer Data Industry Association compliance condition codes contained within the "Credit Reporting Resource Guide" to note the account.

11. Admit that the decision to use the aforementioned language was a conscious corporate policy or decision.

**Response:** Denied. Spring Oaks did not "decide" to "use" any "aforementioned language" in reporting Plaintiff's account to TransUnion and instead relied upon the Consumer Data Industry Association compliance condition codes contained within the "Credit Reporting Resource Guide" to note the account.

12. Admit that SPRING OAKS is aware of how to mark a credit report to reflect that a debt is disputed by the consumer.

**Response:** Admit.

17

**ROSSMAN ATTORNEY GROUP, PLLC**

Date: March 1, 2024          */s/ John K. Rossman*
                             John K. Rossman
                             Attorney for Spring Oaks Capital, LLC
                             P.O. Box 24140
                             Edina, MN 55424
                             612-439-5551
                             John.Rossman@rossmanattorneygroup.com

### VERIFICATION FOR INTERROGATORY RESPONSES

I, Catherine Calko, have read the foregoing Answers to Interrogatories and declare under penalty of perjury that the information set forth therein is true and correct to the best of my knowledge.

EXECUTED on this 1st day of March, 2024.

_____
Catherine Calko

18



# Fair Debt Collection Practices Act

**15 U.S.C. §§ 1692-1692p**

PLAINTIFF'S
EXHIBIT

**10**

**Last amended July 2010**

Defendant's Exhibit A - p.127 of 180

# THE FAIR DEBT COLLECTION PRACTICES ACT

As amended by Pub. L. 111-203, title X, 124 Stat. 2092 (2010)

As a public service, the staff of the Federal Trade Commission (FTC) has prepared the following complete text of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p.

Please note that the format of the text differs in minor ways from the U.S. Code and West's U.S. Code Annotated. For example, this version uses FDCPA section numbers in the headings. In addition, the relevant U.S. Code citation is included with each section heading. Although the staff has made every effort to transcribe the statutory material accurately, this compendium is intended as a convenience for the public and not a substitute for the text in the U.S. Code.

## TABLE OF CONTENTS

§ 801   Short title
§ 802   Congressional findings and declaration of purpose
§ 803   Definitions
§ 804   Acquisition of location information
§ 805   Communication in connection with debt collection
§ 806   Harassment or abuse
§ 807   False or misleading representations
§ 808   Unfair practices
§ 809   Validation of debts
§ 810   Multiple debts
§ 811   Legal actions by debt collectors
§ 812   Furnishing certain deceptive forms
§ 813   Civil liability
§ 814   Administrative enforcement
§ 815   Reports to Congress by the Bureau; views of other Federal agencies
§ 816   Relation to State laws
§ 817   Exemption for State regulation
§ 818   Exception for certain bad check enforcement programs operated by private entities
§ 819   Effective date

**15 USC 1601 note**

## § 801. Short Title

This subchapter may be cited as the "Fair Debt Collection Practices Act."

**15 USC 1692**

## § 802. Congressional findings and declaration of purpose

(a) Abusive practices

There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy.

(b) Inadequacy of laws

Existing laws and procedures for redressing these injuries are inadequate to protect consumers.

(c) Available non-abusive collection methods

Means other than misrepresentation or other abusive debt collection practices are available for the effective collection of debts.

(d) Interstate commerce

Abusive debt collection practices are carried on to a substantial extent in interstate commerce and through means and instrumentalities of such commerce. Even where abusive debt collection practices are purely intrastate in character, they nevertheless directly affect interstate commerce.

(e) Purposes

It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

### § 803. Definitions

As used in this subchapter—

(1) The term "Bureau" means the Bureau of Consumer Financial Protection.

(2) The term "communication" means the conveying of information regarding a debt directly or indirectly to any person through any medium.

(3) The term "consumer" means any natural person obligated or allegedly obligated to pay any debt.

(4) The term "creditor" means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.

(5) The term "debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

(6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal pur-

pose of which is the enforcement of security interests. The term does not include—

(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

(B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts;

(C) any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties;

(D) any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt;

(E) any nonprofit organization which, at the request of consumers, performs bona fide consumer credit counseling and assists consumers in the liquidation of their debts by receiving payments from such consumers and distributing such amounts to creditors; and

(F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity

   (i)   is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement;

   (ii)  concerns a debt which was originated by such person;

   (iii) concerns a debt which was not in default at the time it was obtained by such person; or

   (iv)  concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

§ 803                                                                                    15 USC 1692a

   (7) The term "location information" means a consumer's place of abode and his telephone number at such place, or his place of employment.

   (8) The term "State" means any State, territory, or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any political subdivision of any of the foregoing.

### § 804. Acquisition of location information       15 USC 1692b

Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall—

   (1) identify himself, state that he is confirming or correcting location information concerning the consumer, and, only if expressly requested, identify his employer;

   (2) not state that such consumer owes any debt;

   (3) not communicate with any such person more than once unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information;

   (4) not communicate by post card;

   (5) not use any language or symbol on any envelope or in the contents of any communication effected by the mails or telegram that indicates that the debt collector is in the debt collection business or that the communication relates to the collection of a debt; and

   (6) after the debt collector knows the consumer is represented by an attorney with regard to the subject debt and has knowledge of, or can readily ascertain, such attorney's name and address, not communicate with any person other than that attorney, unless the attorney fails to respond within a reasonable period of time to communication from the debt collector.

## § 805. Communication in connection with debt collection

(a) Communication with the consumer generally

Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—

(1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer's location;

(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer; or

(3) at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.

(b) Communication with third parties

Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

(c) Ceasing communication

If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except—

(1) to advise the consumer that the debt collector's further efforts are being terminated;

(2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

If such notice from the consumer is made by mail, notification shall be complete upon receipt.

(d) "Consumer" defined

For the purpose of this section, the term "consumer" includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator.

### § 806. Harassment or abuse                              15 USC 1692d

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.

(2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

(3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of sec-

tion 1681a(f) or 1681b(3)[1] of this title.

(4) The advertisement for sale of any debt to coerce payment of the debt.

(5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

(6) Except as provided in section 1692b of this title, the placement of telephone calls without meaningful disclosure of the caller's identity.

**15 USC 1692e**

## § 807. False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.

(2) The false representation of—

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

---

1. Section 604(3) has been renumbered as Section 604(a)(3).

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

(6) The false representation or implication that a sale, referral, or other transfer of any interest in a debt shall cause the consumer to—

    (A) lose any claim or defense to payment of the debt; or

    (B) become subject to any practice prohibited by this subchapter.

(7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.

(8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

(9) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval.

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

(11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.

(12) The false representation or implication that accounts have been turned over to innocent purchasers for value.

Defendant's Exhibit A - p.136 of 180

    (13) The false representation or implication that documents are legal process.

    (14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

    (15) The false representation or implication that documents are not legal process forms or do not require action by the consumer.

    (16) The false representation or implication that a debt collector operates or is employed by a consumer reporting agency as defined by section 1681a(f) of this title.

**15 USC 1692f**     ## § 808. Unfair practices

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

    (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

    (2) The acceptance by a debt collector from any person of a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit.

    (3) The solicitation by a debt collector of any postdated check or other postdated payment instrument for the purpose of threatening or instituting criminal prosecution.

    (4) Depositing or threatening to deposit any postdated check or other postdated payment instrument prior to the date on such check or instrument.

    (5) Causing charges to be made to any person for communications by concealment of the true propose of the communication. Such charges include, but are not limited to, collect telephone calls and telegram fees.

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—

   (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

   (B) there is no present intention to take possession of the property; or

   (C) the property is exempt by law from such dispossession or disablement.

(7) Communicating with a consumer regarding a debt by post card.

(8) Using any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business.

## § 809. Validation of debts                                    15 USC 1692g

(a) Notice of debt; contents

   Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

   (1) the amount of the debt;

   (2) the name of the creditor to whom the debt is owed;

   (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

   (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such

verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

(b) Disputed debts

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

(c) Admission of liability

The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

(d) Legal pleadings

A communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a).

(e) Notice provisions

The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by title 26, title V of Gramm-Leach-Bliley Act [15 U.S.C. 6801 et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.

### § 810. Multiple debts

15 USC 1692h

If any consumer owes multiple debts and makes any single payment to any debt collector with respect to such debts, such debt collector may not apply such payment to any debt which is disputed by the consumer and, where applicable, shall apply such payment in accordance with the consumer's directions.

### § 811. Legal actions by debt collectors

15 USC 1692i

(a) Venue

Any debt collector who brings any legal action on a debt against any consumer shall—

(1) in the case of an action to enforce an interest in real property securing the consumer's obligation, bring such action only in a judicial district or similar legal entity in which such real property is located; or

(2) in the case of an action not described in paragraph (1), bring such action only in the judicial district or similar legal entity—

(A) in which such consumer signed the contract sued upon; or

(B) in which such consumer resides at the commencement of the action.

(b) Authorization of actions

Nothing in this subchapter shall be construed to authorize the bringing of legal actions by debt collectors.

15 USC 1692j

### § 812. Furnishing certain deceptive forms

(a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

(b) Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 1692k of this title for failure to comply with a provision of this subchapter.

15 USC 1692k

### § 813. Civil liability

(a) Amount of damages

Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of such failure;

(2) (A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or

(B) in the case of a class action,

(i) such amount for each named plaintiff as could be recovered under subparagraph (A), and

(ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this sec-

tion was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

(b) Factors considered by court

In determining the amount of liability in any action under subsection (a) of this section, the court shall consider, among other relevant factors—

(1) in any individual action under subsection (a)(2)(A) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional; or

(2) in any class action under subsection (a)(2)(B) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional.

(c) Intent

A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

(d) Jurisdiction

An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

(e) Advisory opinions of Bureau

No provision of this section imposing any liability shall apply to any act done or omitted in good faith in conformity with any advisory opinion of the Bureau, notwith-

standing that after such act or omission has occurred, such opinion is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

**15 USC 1692***l*

## § 814. Administrative enforcement

(a) Federal Trade Commission

The Federal Trade Commission shall be authorized to enforce compliance with this subchapter, except to the extent that enforcement of the requirements imposed under this subchapter is specifically committed to another Government agency under any of paragraphs (1) through (5) of subsection (b), subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.]. For purpose of the exercise by the Federal Trade Commission of its functions and powers under the Federal Trade Commission Act (15 U.S.C. 41 et seq.), a violation of this subchapter shall be deemed an unfair or deceptive act or practice in violation of that Act. All of the functions and powers of the Federal Trade Commission under the Federal Trade Commission Act are available to the Federal Trade Commission to enforce compliance by any person with this subchapter, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests under the Federal Trade Commission Act, including the power to enforce the provisions of this subchapter, in the same manner as if the violation had been a violation of a Federal Trade Commission trade regulation rule.

(b) Applicable provisions of law

Subject to subtitle B of the Consumer Financial Protection Act of 2010, compliance with any requirements imposed under this subchapter shall be enforced under—

(1) section 8 of the Federal Deposit Insurance Act [12 U.S.C. 1818], by the appropriate Federal banking agency, as defined in section 3(q) of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), with respect to—

(A) national banks, Federal savings associations, and Federal branches and Federal agencies of foreign banks;

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.]; and

(C) banks and State savings associations insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), and insured State branches of foreign banks;

(2) the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Administrator of the National Credit Union Administration with respect to any Federal credit union;

(3) subtitle IV of title 49, by the Secretary of Transportation, with respect to all carriers subject to the jurisdiction of the Surface Transportation Board;

(4) part A of subtitle VII of title 49, by the Secretary of Transportation with respect to any air carrier or any foreign air carrier subject to that part;

(5) the Packers and Stockyards Act, 1921 [7 U.S.C. 181 et seq.] (except as provided in section 406 of that Act [7 U.S.C. 226, 227]), by the Secretary of Agriculture with respect to any activities subject to that Act; and

(6) subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], by the Bureau, with respect to any person subject to this subchapter.

The terms used in paragraph (1) that are not defined in this subchapter or otherwise defined in section 3(s) of the Federal Deposit Insurance Act (12 U.S.C. 1813(s)) shall have the meaning given to them in section 1(b) of the International Banking Act of 1978 (12 U.S.C. 3101).

(c) Agency powers

For the purpose of the exercise by any agency referred to in subsection (b) of this section of its powers under any Act referred to in that subsection, a violation of any requirement imposed under this subchapter shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in subsection (b) of this section, each of the agencies referred to in that subsection may exercise, for the purpose of enforcing compliance with any requirement imposed under this subchapter any other authority conferred on it by law, except as provided in subsection (d) of this section.

(d) Rules and regulations

Except as provided in section 1029(a) of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5519(a)], the Bureau may prescribe rules with respect to the collection of debts by debt collectors, as defined in this subchapter.

<div style="margin-left:2em;"></div>

**15 USC 1692m** ## § 815. Reports to Congress by the Bureau; views of other Federal agencies

(a) Not later than one year after the effective date of this subchapter and at one-year intervals thereafter, the Bureau shall make reports to the Congress concerning the administration of its functions under this subchapter, including such recommendations as the Bureau deems necessary or appropriate. In addition, each report of the Bureau shall include its assessment of the extent to which compliance with this subchapter is being achieved and a summary of the enforcement actions taken by the Bureau under section 1692*l* of this title.

(b) In the exercise of its functions under this subchapter, the Bureau may obtain upon request the views of any other Federal agency which exercises enforcement functions under section 1692*l* of this title.

Defendant's Exhibit A - p.145 of 180

### § 816. Relation to State laws

15 USC 1692n

This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

### § 817. Exemption for State regulation

15 USC 1692o

The Bureau shall by regulation exempt from the requirements of this subchapter any class of debt collection practices within any State if the Bureau determines that under the law of that State that class of debt collection practices is subject to requirements substantially similar to those imposed by this subchapter, and that there is adequate provision for enforcement.

### § 818.  Exception for certain bad check enforcement programs operated by private entities

15 USC 1692p

(a) In general

    (1) Treatment of certain private entities

        Subject to paragraph (2), a private entity shall be excluded from the definition of a debt collector, pursuant to the exception provided in section 1692a(6) of this title, with respect to the operation by the entity of a program described in paragraph (2)(A) under a contract described in paragraph (2)(B).

    (2) Conditions of applicability

        Paragraph (1) shall apply if—

        (A) a State or district attorney establishes, within the jurisdiction of such State or district attorney and with respect to alleged bad check violations that do not involve a check described in subsection (b), a pretrial diversion program for alleged bad check

offenders who agree to participate voluntarily in such program to avoid criminal prosecution;

(B) a private entity, that is subject to an administrative support services contract with a State or district attorney and operates under the direction, supervision, and control of such State or district attorney, operates the pretrial diversion program described in subparagraph (A); and

(C) in the course of performing duties delegated to it by a State or district attorney under the contract, the private entity referred to in subparagraph (B)—

   (i)   complies with the penal laws of the State;

   (ii)  conforms with the terms of the contract and directives of the State or district attorney;

   (iii) does not exercise independent prosecutorial discretion;

   (iv) contacts any alleged offender referred to in subparagraph (A) for purposes of participating in a program referred to in such paragraph—

      (I)  only as a result of any determination by the State or district attorney that probable cause of a bad check violation under State penal law exists, and that contact with the alleged offender for purposes of participation in the program is appropriate; and

      (II) the alleged offender has failed to pay the bad check after demand for payment, pursuant to State law, is made for payment of the check amount;

   (v)  includes as part of an initial written communication with an alleged offender a clear and conspicuous statement that—

      (I)  the alleged offender may dispute the validity of any alleged bad check violation;

      (II) where the alleged offender knows, or has reasonable cause to believe, that the al-

§ 818

15 USC 1692p

leged bad check violation is the result of theft or forgery of the check, identity theft, or other fraud that is not the result of the conduct of the alleged offender, the alleged offender may file a crime report with the appropriate law enforcement agency; and

(III) if the alleged offender notifies the private entity or the district attorney in writing, not later than 30 days after being contacted for the first time pursuant to clause (iv), that there is a dispute pursuant to this subsection, before further restitution efforts are pursued, the district attorney or an employee of the district attorney authorized to make such a determination makes a determination that there is probable cause to believe that a crime has been committed; and

(vi) charges only fees in connection with services under the contract that have been authorized by the contract with the State or district attorney.

(b) Certain checks excluded

A check is described in this subsection if the check involves, or is subsequently found to involve—

(1) a postdated check presented in connection with a payday loan, or other similar transaction, where the payee of the check knew that the issuer had insufficient funds at the time the check was made, drawn, or delivered;

(2) a stop payment order where the issuer acted in good faith and with reasonable cause in stopping payment on the check;

(3) a check dishonored because of an adjustment to the issuer's account by the financial institution holding such account without providing notice to the person at the time the check was made, drawn, or delivered;

(4) a check for partial payment of a debt where the payee had previously accepted partial payment for such debt;

(5) a check issued by a person who was not competent, or was not of legal age, to enter into a legal contractual obligation at the time the check was made, drawn, or delivered; or

(6) a check issued to pay an obligation arising from a transaction that was illegal in the jurisdiction of the State or district attorney at the time the check was made, drawn, or delivered.

(c) Definitions

For purposes of this section, the following definitions shall apply:

(1) State or district attorney

The term "State or district attorney" means the chief elected or appointed prosecuting attorney in a district, county (as defined in section 2 of title 1), municipality, or comparable jurisdiction, including State attorneys general who act as chief elected or appointed prosecuting attorneys in a district, county (as so defined), municipality or comparable jurisdiction, who may be referred to by a variety of titles such as district attorneys, prosecuting attorneys, commonwealth's attorneys, solicitors, county attorneys, and state's attorneys, and who are responsible for the prosecution of State crimes and violations of jurisdiction-specific local ordinances.

(2) Check

The term "check" has the same meaning as in section 5002(6) of title 12.

(3) Bad check violation

The term "bad check violation" means a violation of the applicable State criminal law relating to the writing of dishonored checks.

15 USC 1692 note **§ 819. Effective date**

This title takes effect upon the expiration of six months after the date of its enactment, but section 809 shall apply only with respect to debts for which the initial attempt to collect occurs after such effective date.

## LEGISLATIVE HISTORY

House Report:  No. 95-131 (Comm. on Banking, Finance, and Urban Affairs)

Senate Report:  No. 95-382 (Comm. on Banking, Housing and Urban Affairs)

Congressional Record, Vol. 123 (1977)

April 4, House considered and passed H.R. 5294.

Aug. 5, Senate considered and passed amended version of H.R. 5294.

Sept. 8, House considered and passed Senate version.

Enactment:  Public Law 95-109 (September 20, 1977)

Amendments:  Public Law Nos.

99-361 (July 9, 1986)

101-73 (August 9, 1989)

102-242 (December 19, 1991)

102-550 (October 28, 1992)

104-88 (December 29, 1995)

104-208 (September 30, 1996)

109-351 (October 13, 2006)

111-203 (July 21, 2010)

**Printed May 2013**

Defendant's Exhibit A - p.151 of 180

Defendant's Exhibit A - p.152 of 180



# 2022 Credit Reporting Resource Guide ®

CREDIT REPORTING RESOURCE GUIDE

*Copyright 2022 © Consumer Data Industry Association*



EXP.VILLA.0259

# CONSUMER DATA INDUSTRY ASSOCIATION (CDIA)
# END USER LICENSE AGREEMENT
# TERMS AND CONDITIONS

1. **LICENSE GRANT.**   Conditioned on your continued compliance with the terms and conditions of this License Agreement, this License Agreement provides you, **as an individual**, with a **personal**, revocable, limited, non-exclusive, and nontransferable license to use the Credit Reporting Resource Guide® (CRRG®) for your informational and internal business purposes only.   The foregoing grant permits you to download a single electronic copy to a single computer or laptop and also print a single hard copy of the CRRG® from a single computer or laptop, provided that such copy contains all applicable proprietary notices.   Notwithstanding the foregoing, any rights granted hereby are licensed and not sold or otherwise transferred or assigned to you or any third party.

2. **LICENSE GRANT RESTRICTIONS.**   Except as provided above, you may not modify, alter, translate, create derivative work(s) of, distribute, display, broadcast, transmit, reproduce, publish, license, sub-license, sell, exploit, rent, lease, grant a security interest in, assign or transfer any right(s) in, or otherwise use in any manner not expressly permitted herein the CRRG® or any part thereof.   Specifically, you expressly agree that you are not using the CRRG® for competitive reasons (against Consumer Data Industry Association (CDIA)) or for the purpose of designing or developing similar materials.   In addition, you may not remove or alter any proprietary notice on the CRRG® **or use any portion of the CRRG® independently from the CRRG® as a whole**.   All rights not expressly granted to you herein are hereby reserved to CDIA.

3. **USER OBLIGATIONS.**   By installing, downloading, accessing, and/or using the CRRG®, you represent that you are of the legal age to create a binding agreement with CDIA and agree to abide by all applicable local, state, national, and international laws and regulations with respect to your use of the CRRG®.   You also agree to assume all responsibility concerning your use of the CRRG®, including meeting any requirements or obligations of your contracts with third parties.   CDIA assumes no responsibility or liability for any claims that may result directly or indirectly from the communications, agreements, or interactions you establish with third parties using the CRRG®.

4. **PROPRIETARY RIGHTS.**   CDIA or its licensors shall retain all ownership right, title, and interest, including, without limitation, all associated intellectual property or proprietary rights, in and to all text, graphics, methodologies, processes, procedures, content, products, information, and documentation associated with the CRRG® as well as its design, structure, "look and feel," and arrangement of any content contained on or available through the CRRG®.   The "Credit Reporting Resource Guide®" and its contents are © Consumer Data Industry Association and/or its licensors.   All rights reserved.   CREDIT REPORTING RESOURCE GUIDE®, CONSUMER DATA INDUSTRY ASSOCIATION, CDIA, and all other names, logos, and icons identifying CDIA and its products and services are proprietary trademarks of CDIA, and any use of such marks without the express written permission of CDIA is strictly prohibited.   Except as expressly provided herein, CDIA does not grant any express or implied right to you or any other person under any intellectual or proprietary rights.

EXP.VILLA.0260

5. **CONFIDENTIALITY.**  You acknowledge and agree that the certain parts of the CRRG® contain proprietary trade secrets and confidential information of CDIA (the "Confidential Information").  You agree to secure and protect the confidentiality of this Confidential Information of CDIA in a manner consistent with the maintenance of CDIA's rights therein, using at least as great a degree of care as you use to maintain the confidentiality of your own confidential information of a similar nature, but in no event using less than reasonable efforts.  You shall not, nor permit any third party to, sell, transfer, publish, disclose, or otherwise make available any portion of the Confidential Information to third parties, except as expressly authorized in this License Agreement.

6. **SUBMISSIONS.**  CDIA welcomes your feedback and suggestions about how to improve the CRRG®.  You agree that CDIA shall have the perpetual, royalty-free, and irrevocable right to use such feedback and suggestions in any manner it deems desirable without providing any consideration, attribution, or payment to you.

7. **DISCLAIMER.**  ALTHOUGH CDIA HAS USED COMMERCIALLY REASONABLE EFFORTS TO PROVIDE ACCURATE INFORMATION, NEITHER CDIA NOR THE CRRG® OFFERS ANY LEGAL OR OTHER PROFESSIONAL ADVICE.  CDIA ALSO MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT THE SUITABILITY, COMPLETENESS, TIMELINESS, RELIABILITY, LEGALITY, OR ACCURACY OF THE CRRG® FOR ANY PURPOSE.  THE CRRG® IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, INCLUDING, WITHOUT LIMITATION, ALL IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT AS WELL AS ANY WARRANTY RELATED TO THE USE, OR THE RESULTS OF THE USE, OF THE CRRG®.  THE ENTIRE RISK AS TO THE QUALITY OF AND RESULTS FROM THE USE OF THE CRRG® IS WITH YOU, AND YOU SHOULD NOT RELY ON ANY CONTENT IN THE CRRG® AS THE SOLE BASIS FOR ACTION OR ASSUME THAT ANY TACTICS DESCRIBED THEREIN WOULD, BY THEMSELVES, ACHIEVE A PARTICULAR RESULT.  IF ANY OF THE DISCLAIMERS OR EXCLUSIONS SET FORTH IN THIS SECTION ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION TO BE UNENFORCEABLE, THEN ALL SUCH EXPRESS AND IMPLIED WARRANTIES AND CONDITIONS PERMITTED BY LAW SHALL BE LIMITED IN DURATION FOR A PERIOD OF 30 DAYS AFTER THE EFFECTIVE DATE OF THIS AGREEMENT AND NO WARRANTIES OR CONDITIONS SHALL APPLY AFTER THAT PERIOD.

8. **LIMITATION OF LIABILITY.**  YOU AGREE THAT IN NO EVENT SHALL CDIA BE LIABLE FOR ANY INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OF THE CRRG® BY YOU OR ANYONE ELSE, WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, EVEN IF CDIA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. WITHOUT LIMITATION OF THE FOREGOING, THE TOTAL LIABILITY OF CDIA FOR ANY REASON WHATSOEVER RELATED TO USE OF THE CRRG®, INCLUDING FOR ANY INACCURACIES IN THE CRRG®, OR FOR ANY CLAIMS RELATING TO THIS LICENSE AGREEMENT SHALL NOT EXCEED $1,000 (USD).

9. **INDEMNITY.**  You agree to defend, indemnify, and hold harmless CDIA and its affiliates, employees, licensors, agents, directors, officers, partners, representatives, shareholders, attorneys, predecessors, successors, and assigns from and against any and all claims, proceedings, damages, injuries, liabilities, losses, costs, and expenses (including reasonable attorneys' fees and litigation expenses) relating to or arising from your use of the CRRG® and any breach by you of this License Agreement.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0261

10. **GOVERNING LAW.**  This License Agreement has been made in and will be construed and enforced solely in accordance with the laws of the District of Columbia as applied to agreements entered into and completely performed in the District of Columbia.  Any dispute, controversy, or claim between the parties arising out of or in connection with this License Agreement as to its conclusion, existence, validity, interpretation, performance, or non-performance, breach, termination, and the assessment of damages including claims in tort whether arising before or after the termination of the License Agreement shall be resolved in accordance with this License Agreement.  You also agree that any action to enforce this License Agreement will be brought solely in the federal or state courts in the District of Columbia, and all parties to this License Agreement expressly agree to be subject to the jurisdiction of such courts.

11. **TERM AND TERMINATION.**  This License Agreement and your right to use the CRRG® will take effect at the moment you click "I ACCEPT" or you install, download, access, or use the CRRG®, whichever occurs first, and is effective until terminated as set forth below.  This License Agreement will terminate automatically if you click "I REJECT" or if you fail to comply with any of the terms and conditions described herein, including by exceeding the scope of the license.  Termination or expiration of this License Agreement will be effective without notice. You may also terminate at any time by ceasing to use the CRRG®, but all applicable provisions of this License Agreement will survive termination, as outlined below.  Upon termination or expiration, any right to use the CRRG® will immediately cease and you must return, destroy, or delete from your system all copies of the CRRG® (and any associated materials) in your possession.  The miscellaneous provisions as well as the provisions concerning CDIA's proprietary rights, submissions, confidentiality, indemnity, disclaimers of warranty and liability, termination, and governing law, however, will survive the termination or expiration of this License Agreement for any reason.

12. **MISCELLANEOUS.**  The parties agree that this License Agreement is for the benefit of the parties hereto.  Failure to insist on strict performance of any of the terms and conditions of this License Agreement will not operate as a waiver of that or any subsequent default or failure of performance.  A printed version of this License Agreement and of any related notice given in electronic form shall be admissible in judicial or administrative proceedings based upon or relating to this License Agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form.  No joint venture, partnership, employment, alliance, or agency relationship exists between you and CDIA as result of this License Agreement or your utilization of the CRRG®.  Moreover, you may not bind CDIA in any way or otherwise make any representations or statements for or on behalf of CDIA without CDIA's separate, express, and written permission.  This License Agreement represents the entire agreement between you and CDIA with respect to use of the CRRG® and it supersedes all prior or contemporaneous communications and proposals, whether electronic, oral, or written between you and CDIA with respect to the CRRG®.  If any provision of this License Agreement is held by a court of competent jurisdiction to be contrary to law, such provision shall be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law and the remaining provisions of this License Agreement will remain in full force and effect.  This License Agreement and any rights granted by CDIA may not be assigned or transferred by you without the prior express written consent of CDIA.  If you have any questions regarding this License Agreement, the CRRG®, or other CDIA products or services, please contact CDIA at 1090 Vermont Avenue, NW, Suite 200, Washington, DC 20005, or www.cdiaonline.org.

EXP.VILLA.0262

# Table of Contents

| | |
|---|---|
| **RESPONSIBILITIES AND ROLES** | **1-1** |
| Responsibilities | 1-1 |
| Roles - CDIA, Consumer Reporting Agencies, Metro 2® Format Task Force, e-OSCAR® System Support Team, Data Furnisher, Consumer Financial Protection Bureau, Federal Trade Commission | 1-2 |
| | |
| **INDUSTRY STANDARDS** | |
| **AUTOMATED DATA REPORTING** | **2-1** |
| Features of the Metro 2® Format | 2-1 |
| Industry Reporting Standards | 2-2 |
| Industry Standard for Reporting Account Delinquency | 2-2 |
| Accuracy and Integrity Definitions | 2-3 |
| Maintaining Accuracy, Integrity and Consistency of Credit Information | 2-3 |
| | |
| **QUICK REFERENCE GUIDE TO INDUSTRY STANDARDS** | **2-5** |
| Banking/Savings & Loan/Credit Union Installment Loan & Line of Credit | 2-5 |
| Child Support Agencies | 2-6 |
| Credit Cards (non-Retail Cards) | 2-7 |
| Debt Buyers/Collection Agencies | 2-8 |
| Loan Finance Companies | 2-9 |
| Mortgage Lending | 2-10 |
| Point of Sale (POS) Accounts | 2-12 |
| Retail Accounts (store exclusive) | 2-14 |
| Sales Finance Companies | 2-15 |
| Student Loan Reporters – Federal Loans | 2-17 |
| Student Loan Reporters – Private Loans | 2-18 |
| Utility Companies | 2-19 |
| | |
| **METRO 2® FORMAT** | **3-1** |
| Business Requirements | 3-1 |
| Metro 2® Training | 3-2 |
| Programming Standards | 3-3 |
| Production Tips | 3-5 |

EXP.VILLA.0263

Defendant's Exhibit A - p.158 of 180

# Table of Contents

## RECORD LAYOUTS

**3-6**

| | |
|---|---|
| Header Record — Character Format | 3-7 |
| 426 Base Segment — Character Format | 3-8 |
| J1 Segment — Associated Consumer — Same Address | 3-10 |
| J2 Segment — Associated Consumer — Different Address | 3-11 |
| K1 Segment — Original Creditor Name | 3-12 |
| K2 Segment — Purchased From/Sold To | 3-12 |
| K3 Segment — Mortgage Information | 3-13 |
| K4 Segment — Specialized Payment Information | 3-13 |
| L1 Segment — Account Number/Identification Number Change | 3-14 |
| N1 Segment — Employment | 3-14 |
| Trailer Record — Character Format | 3-15 |
| Header Record — Packed Format | 3-17 |
| 366 Base Segment — Packed Format | 3-18 |
| Trailer Record — Packed Format | 3-20 |

## FIELD DEFINITIONS
## HEADER RECORD

**4-1**

| | |
|---|---|
| Block Descriptor Word (BDW) | 4-1 |
| Record Descriptor Word (RDW) | 4-1 |
| Record Identifier | 4-1 |
| Cycle Identifier | 4-2 |
| Innovis Program Identifier | 4-2 |
| Equifax Program Identifier | 4-2 |
| Experian Program Identifier | 4-2 |
| TransUnion Program Identifier | 4-2 |
| Activity Date | 4-2 |
| Date Created | 4-2 |
| Program Date | 4-2 |
| Program Revision Date | 4-3 |
| Reporter Name | 4-3 |
| Reporter Address | 4-3 |
| Reporter Telephone Number | 4-3 |
| Software Vendor Name | 4-3 |
| Software Version Number | 4-3 |
| MicroBilt/PRBC Program Identifier | 4-3 |
| Reserved | 4-3 |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0264

# Table of Contents

| **BASE SEGMENT** | **4-4** |
|---|---|
| Block Descriptor Word (BDW) | 4-4 |
| Record Descriptor Word (RDW) | 4-4 |
| Processing Indicator | 4-4 |
| Time Stamp | 4-5 |
| Reserved | 4-5 |
| Identification Number | 4-5 |
| Cycle Identifier | 4-5 |
| Consumer Account Number | 4-5 |
| Portfolio Type | 4-6 |
| Account Type | 4-6 |
| Date Opened | 4-6 |
| Credit Limit | 4-7 |
| Highest Credit or Original Loan Amount | 4-7 |
| Terms Duration | 4-8 |
| Terms Frequency | 4-8 |
| Scheduled Monthly Payment Amount | 4-9 |
| Actual Payment Amount | 4-9 |
| Account Status | 4-10 |
| Payment Rating | 4-10 |
| Payment History Profile | 4-11 |
| Special Comment | 4-12 |
| Compliance Condition Code | 4-13 |
| Current Balance | 4-14 |
| Amount Past Due | 4-14 |
| Original Charge-off Amount | 4-14 |
| Date of Account Information | 4-15 |
| FCRA Compliance/Date of First Delinquency | 4-16 |
| Date Closed | 4-17 |
| Date of Last Payment | 4-17 |
| Interest Type Indicator | 4-17 |
| Reserved | 4-17 |
| Surname | 4-18 |
| First Name | 4-18 |
| Middle Name | 4-19 |
| Generation Code | 4-19 |

EXP.VILLA.0265

Defendant's Exhibit A - p.160 of 180

# Table of Contents

## BASE SEGMENT (CONTINUED)

| | |
|---|---|
| Social Security Number | 4-19 |
| Date of Birth | 4-20 |
| Telephone Number | 4-20 |
| ECOA Code | 4-20 |
| Consumer Information Indicator | 4-21 |
| Country Code | 4-21 |
| First Line of Address | 4-22 |
| Second Line of Address | 4-22 |
| City | 4-22 |
| State | 4-23 |
| Postal/Zip Code | 4-23 |
| Address Indicator | 4-23 |
| Residence Code | 4-23 |

## J1 SEGMENT
## ASSOCIATED CONSUMER — SAME ADDRESS     4-24

| | |
|---|---|
| Segment Identifier | 4-24 |
| Reserved | 4-24 |
| Surname | 4-24 |
| First Name | 4-25 |
| Middle Name | 4-25 |
| Generation Code | 4-25 |
| Social Security Number | 4-26 |
| Date of Birth | 4-26 |
| Telephone Number | 4-27 |
| ECOA Code | 4-27 |
| Consumer Information Indicator | 4-28 |
| Reserved | 4-28 |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0266

Defendant's Exhibit A - p.161 of 180

# Table of Contents

**J2 SEGMENT**
**ASSOCIATED CONSUMER – DIFFERENT ADDRESS**                                    **4-29**

| | |
|---|---|
| Segment Identifier | 4-29 |
| Reserved | 4-29 |
| Surname | 4-29 |
| First Name | 4-30 |
| Middle Name | 4-30 |
| Generation Code | 4-30 |
| Social Security Number | 4-31 |
| Date of Birth | 4-32 |
| Telephone Number | 4-33 |
| ECOA Code | 4-33 |
| Consumer Information Indicator | 4-34 |
| Country Code | 4-34 |
| First Line of Address | 4-35 |
| Second Line of Address | 4-35 |
| City | 4-35 |
| State | 4-36 |
| Postal/Zip Code | 4-36 |
| Address Indicator | 4-36 |
| Residence Code | 4-36 |
| Reserved | 4-36 |

**K1 SEGMENT**
**ORIGINAL CREDITOR NAME**                                                     **4-37**

| | |
|---|---|
| Segment Identifier | 4-37 |
| Original Creditor Name | 4-38 |
| Creditor Classification | 4-39 |

**K2 SEGMENT**
**PURCHASED FROM/SOLD TO**                                                     **4-40**

| | |
|---|---|
| Segment Identifier | 4-40 |
| Purchased From/Sold To Indicator | 4-40 |
| Purchased From or Sold To Name | 4-40 |
| Reserved | 4-40 |

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0267

# Table of Contents

**K3 SEGMENT**

**MORTGAGE INFORMATION**                                             **4-41**

| | |
|---|---|
| Segment Identifier | 4-41 |
| Agency Identifier | 4-41 |
| Account Number | 4-41 |
| Mortgage Identification Number | 4-41 |

**K4 SEGMENT**

**SPECIALIZED PAYMENT INFORMATION**                                  **4-42**

| | |
|---|---|
| Segment Identifier | 4-42 |
| Specialized Payment Indicator | 4-42 |
| Deferred Payment Start Date | 4-42 |
| Balloon Payment Due Date | 4-42 |
| Balloon Payment Amount | 4-42 |
| Reserved | 4-42 |

**L1 SEGMENT**

**ACCOUNT NUMBER/IDENTIFICATION NUMBER CHANGE**                      **4-43**

| | |
|---|---|
| Segment Identifier | 4-43 |
| Change Indicator | 4-43 |
| New Consumer Account Number | 4-43 |
| New Identification Number | 4-44 |
| Reserved | 4-44 |

**N1 SEGMENT**

**EMPLOYMENT**                                                       **4-45**

| | |
|---|---|
| Segment Identifier | 4-45 |
| Employer Name | 4-45 |
| First Line of Employer Address | 4-45 |
| Second Line of Employer Address | 4-45 |
| Employer City | 4-45 |
| Employer State | 4-45 |
| Employer Postal/Zip Code | 4-45 |
| Occupation | 4-46 |
| Reserved | 4-46 |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0268

# Table of Contents

| | |
|---|---|
| **TRAILER RECORD** | **4-47** |
| Record Descriptor Word (RDW) | 4-47 |
| Record Identifier | 4-47 |
| Total Base Records | 4-47 |
| Reserved | 4-47 |
| Total of Status Code DF | 4-47 |
| Total Associated Consumer Segments (J1) | 4-47 |
| Total Associated Consumer Segments (J2) | 4-47 |
| Block Count | 4-47 |
| Total of Status Code DA | 4-47 |
| Total of Status Code 11 | 4-47 |
| Total of Status Code 13 | 4-48 |
| Total of Status Code 61 | 4-48 |
| Total of Status Code 62 | 4-48 |
| Total of Status Code 63 | 4-48 |
| Total of Status Code 64 | 4-48 |
| Total of Status Code 65 | 4-48 |
| Total of Status Code 71 | 4-48 |
| Total of Status Code 78 | 4-48 |
| Total of Status Code 80 | 4-48 |
| Total of Status Code 82 | 4-48 |
| Total of Status Code 83 | 4-48 |
| Total of Status Code 84 | 4-48 |
| Total of Status Code 88 | 4-48 |
| Total of Status Code 89 | 4-49 |
| Total of Status Code 93 | 4-49 |
| Total of Status Code 94 | 4-49 |
| Total of Status Code 95 | 4-49 |
| Total of Status Code 96 | 4-49 |
| Total of Status Code 97 | 4-49 |
| Total of ECOA Code Z (All Segments) | 4-49 |
| Total Employment Segments | 4-49 |
| Total Original Creditor Segments | 4-49 |
| Total Purchased From/Sold To Segments | 4-49 |

EXP.VILLA.0269

# Table of Contents

## TRAILER RECORD (CONTINUED)

| | |
|---|---|
| Total Mortgage Information Segments | 4-49 |
| Total Specialized Payment Information Segments | 4-49 |
| Total Change Segments | 4-49 |
| Total Social Security Numbers (All Segments) | 4-50 |
| Total Social Security Numbers (Base Segments) | 4-50 |
| Total Social Security Numbers (J1 Segments) | 4-50 |
| Total Social Security Numbers (J2 Segments) | 4-50 |
| Total Dates of Birth (All Segments) | 4-50 |
| Total Dates of Birth (Base Segments) | 4-50 |
| Total Dates of Birth (J1 Segments) | 4-50 |
| Total Dates of Birth (J2 Segments) | 4-50 |
| Total Telephone Numbers (All Segments) | 4-50 |
| Reserved | 4-50 |

CREDIT REPORTING RESOURCE GUIDE®
Copyright 2022 © Consumer Data Industry Association

EXP.VILLA.0270

Defendant's Exhibit A - p.165 of 180

# Table of Contents

| EXHIBITS | 5-1 |
|---|---|
| Exhibit 1 — Account Type Codes by Industry | 5-1 |
| Exhibit 2 — Account Type Codes within Portfolio Type | 5-7 |
| Exhibit 3 — Terms/Payment Amount Conversion to Monthly | 5-13 |
| Exhibit 4 — Account Status Codes | 5-14 |
| Exhibit 5 — Examples of Reporting Payment History Profile | 5-16 |
| Exhibit 6 — Special Comment Codes — by Category within Portfolio | 5-18 |
| Closed (Permanently or Temporarily) | 5-18 |
| Leasing | 5-20 |
| Legal Action | 5-21 |
| Other | 5-22 |
| Refinanced | 5-23 |
| Removal of Comment | 5-23 |
| Sold | 5-24 |
| Special Payment Arrangements | 5-24 |
| Transferred | 5-26 |
| Exhibit 7 — Special Comment Codes | 5-27 |
| Exhibit 8 — Compliance Condition Codes | 5-32 |
| Exhibit 9 — Explanation and Examples of FCRA Compliance/Date of First Delinquency | 5-36 |
| Exhibit 10 — ECOA Codes | 5-48 |
| Exhibit 11 — Consumer Information Indicators | 5-50 |
| Exhibit 12 — Country Codes | 5-53 |
| Exhibit 13 — General Rules for Addresses | 5-55 |
| Exhibit 14 — State Codes | 5-56 |
| Exhibit 15 — Data Conversion Checklist | 5-57 |
| Exhibit 16 — Examples of Record Layouts — Hexadecimal Representation | 5-60 |

EXP.VILLA.0271

# Table of Contents

| | |
|---|---|
| **FREQUENTLY ASKED QUESTIONS AND ANSWERS** | **6-1** |
| **Complete List of Questions** | 6-1 |
| Segments and Appendages | 6-6 |
| BDW / RDW | 6-8 |
| Delinquency Reporting | 6-8 |
| Cycle Reporting | 6-8 |
| Account Status, Payment Rating, Special Comment | 6-9 |
| ECOA Requirements | 6-10 |
| FCRA Requirements | 6-11 |
| Deleting Accounts/Borrowers | 6-12 |
| Consumer Information | 6-12 |
| Duplicate Tradelines | 6-14 |
| First Time Reporters | 6-15 |
| Accounts Included in Bankruptcy | 6-16 |
| Reporting Scenarios | 6-49 |
| | |
| **GLOSSARY OF TERMS** | **7-1** |
| | |
| **VALIDATION/IMPLEMENTATION CHECKLIST** | **8-1** |
| | |
| **INDUSTRY REPORTING GUIDELINES** | **9-1** |
| Child Support Reporting | 9-1 |
| Debt Buyer/Third Party Collection Agency Reporting | 10-1 |
| Mortgage Loan Modifications | 11-1 |
| Student Loan Reporting | 12-1 |
| Federal Student Loan Guidelines | 12-2 |
| Lender/Servicer/Secondary Market | 12-3 |
| Post-Default Loans | 12-17 |
| Federal Student Loan Glossary of Terms | 12-22 |
| Private Student Loan Guidelines | 12-25 |
| Private Student Loan Glossary of Terms | 12-42 |
| Utility Company Reporting | 13-1 |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0272

# Table of Contents

**e-OSCAR**®      **14-1**

| | |
|---|---|
| Consumer Dispute Process | 14-1 |
| Automated Consumer Dispute Verification (ACDV) | 14-2 |
| ACDV Workflow | 14-2 |
| Features of ACDV | 14-4 |
| The Update Process | 14-5 |
| Automated Universal Data Process via e-OSCAR® | 14-5 |
| Features of AUD | 14-6 |
| The Tradeline Block Rescission Request Process | 14-7 |
| Features of Block Rescission Request | 14-8 |

EXP.VILLA.0273

Defendant's Exhibit A - p.168 of 180

Exhibit 8

# Compliance Condition Codes

The Compliance Condition Code (CCC), which is reported in Field 20 of the Base Segment, allows the reporting of a condition that is required for legal compliance.

Compliance Condition Codes are used to reflect accounts closed at consumer's request, and consumer disputes under the Fair Credit Billing Act (FCBA), the Fair Debt Collection Practices Act (FDCPA), or the direct dispute provisions of the Fair Credit Reporting Act (FCRA) and its implementing rules.

The Compliance Condition Codes should <u>not</u> be reported in response to a consumer dispute investigation request from the consumer reporting agencies, except where a data furnisher uses a Compliance Condition Code to satisfy its FDCPA obligation to communicate that a debt is disputed.

Report the following codes:

| Code | Description |
|------|-------------|
| Blank | Retains previously reported code, or no new Compliance Condition Code applies for this reporting period |
| XA | Account closed at consumer's request<br><br>*Definition: Reported when a consumer requested an account be closed.*<br><br>**Important Note:  Report the Date Closed as the date the account was closed to further purchases.** |
| XB | Account information has been disputed by the consumer directly to the data furnisher under the Fair Credit Reporting Act (FCRA); the data furnisher is conducting its investigation.<br><br>*Definition: Reported when the completeness or accuracy of the account information is disputed directly to the data furnisher by the consumer under the FCRA and investigation of the dispute is in progress by the data furnisher.*<br><br>*Code XB should be reported for FDCPA disputes.*<br><br>**Important Note: Code XB should no longer be reported after the investigation is completed; the XB should be removed by reporting the removal code or changed to another code.** |
| XC | FCRA direct dispute investigation completed — consumer disagrees with the results of the data furnisher's investigation.<br><br>*Definition: Reported when the investigation of an FCRA dispute made by the consumer directly to the data furnisher has been completed by the data furnisher; however, the consumer disagrees with the outcome of the investigation.* |

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0399

# Exhibit 8

# Compliance Condition Codes

| Code | Description |
|------|-------------|
| XD | Account closed at consumer's request; and account information disputed by the consumer directly to the data furnisher under the FCRA; the data furnisher is conducting its investigation.

*Definition: Combination code reported when two conditions (XA and XB) apply to the account.  A consumer requested an account be closed and the completeness or accuracy of the account information is disputed directly to the data furnisher by the consumer under the FCRA and investigation of the dispute is in progress by the data furnisher.*

**Important Notes: Report the Date Closed as the date the account was closed to further purchases.**

**Code XD should no longer be reported after the investigation is completed; the XD should be changed to another code, such as XA or XE, if applicable.** |
| XE | Account closed at consumer's request; and data furnisher has completed its investigation; consumer disagrees with the results of the investigation. (To be used for direct disputes under the FCRA or FCBA disputes)

*Definition: Combination code reported when two conditions (XA and XC or XG) apply to the account.  A consumer requested an account be closed and the investigation of the dispute has been completed by the data furnisher; however, the consumer disagrees with the outcome of the investigation.*

**Important Note: Report the Date Closed as the date the account was closed to further purchases.** |
| XF | Account in dispute under Fair Credit Billing Act (FCBA); the data furnisher is conducting its investigation.

*Definition: Reported when information is disputed by the consumer under the FCBA and investigation of the dispute is in progress by the data furnisher.*

**Important Note: Code XF should no longer be reported after the investigation is completed; the XF should be removed by reporting the removal code or changed to another code.** |
| XG | FCBA dispute investigation completed — consumer disagrees with the results of the data furnisher's investigation.

*Definition: Reported when the investigation of an FCBA dispute has been completed by the data furnisher; however, the consumer disagrees with the outcome of the investigation.* |

(continued)

EXP.VILLA.0400

## Exhibit 8

# Compliance Condition Codes

| Code | Description |
|------|-------------|
| XH | Account previously in dispute; the data furnisher has completed its investigation. (To be used for direct disputes under the FCRA, FDCPA disputes or FCBA disputes)<br><br>*Definition: Reported when the investigation of a dispute by the data furnisher was completed.* |
| XJ | Account closed at consumer's request; and account information disputed by the consumer under FCBA; the data furnisher is conducting its investigation.<br><br>*Definition: Combination code reported when two conditions (XA and XF) apply to the account. A consumer requested an account be closed and information is disputed by the consumer under the FCBA and investigation of the dispute is in progress by the data furnisher.*<br><br>**Important Notes: Report the Date Closed as the date the account was closed to further purchases.**<br><br>**Code XJ should no longer be reported after the investigation is completed; the XJ should be changed to another code, such as XA or XE, if applicable.** |
| XR | Removes the most recently reported Compliance Condition Code<br><br>**Important Note: Do not use XR as a default code. If no Compliance Condition Code applies in the current reporting period, blank fill this field.** |

**Important Note:**

**When a dispute investigation is completed, it is important to delete the previously-reported Compliance Condition Code or to update the Compliance Condition Code to show that the investigation has been completed. Your internal policies and procedures should indicate which option your company prefers to use; and if you choose to report a code indicating that the investigation has been completed, how long to retain the code on the consumer's file.**

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0401

# Exhibit 8

# Compliance Condition Codes

The code should be reported each month as long as the condition applies.

| Date of Account Information | CCC | Action |
|---|---|---|
| 09/15/2021 | XA | XA is added to file. |
| 10/15/2021 | XA | XA is retained. |
| 11/15/2021 | XA | XA is retained. |
| 12/15/2021 | Blank | XA is retained. |
| 01/15/2022 | XD | XA is replaced with XD. |
| 02/15/2022 | XD | XD is retained. |
| 03/15/2022 | XA | XD is replaced with XA. |

As an option, the code should be reported one time and will be deleted only when another Compliance Condition Code or the **XR** (Removal code) is reported.  Example:

| Date of Account Information | CCC | Action |
|---|---|---|
| 09/15/2021 | XA | XA is added to file. |
| 10/15/2021 | Blank | XA is retained. |
| 11/15/2021 | Blank | XA is retained. |
| 12/15/2021 | Blank | XA is retained. |
| 01/15/2022 | XD | XA is replaced with XD. |
| 02/15/2022 | Blank | XD is retained. |
| 03/15/2022 | XA | XD is replaced with XA. |

**Note: Regardless of the method of reporting, the code will be deleted *only* when another Compliance Condition Code or the XR (Removal code) is reported.**

EXP.VILLA.0402

Defendant's Exhibit A - p.172 of 180

# Debt Buyer/Third Party Collection Agency Reporting

## GENERAL REPORTING GUIDELINES

A Debt Buyer is a company or individual who purchases accounts (generally non-performing debts) with the intent of collecting debts owed.  A Third Party Collection Agency is a company or individual who specializes in collecting outstanding debts for other businesses or individuals.

Do not report an account before communicating with the consumer(s) about the debt.

- Report data in the standard Metro 2® Format, including the Header Record.

- Report the complete name, address, social security number and date of birth for the legally liable consumer(s).

- Report all accounts on a monthly basis, including open collection accounts, collection accounts paid in full, and accounts requiring deletion or correction.

- Report paid in full collection accounts before purging the accounts from your internal collection system.  Do not re-report paid accounts for more than 3 months.

- Do not report Medical Debt collection accounts (as defined by Creditor Classification Code 02) until they are at least 180 days past the Date of First Delinquency that led to the account being sold or placed for collection.

  **Note: Effective July 1, 2022,** do not report Medical Debt collection accounts (as defined by Creditor Classification Code 02) until they are at least **365** days past the Date of First Delinquency that led to the account being sold or placed for collection.

(continued)

Copyright 2022 © Consumer Data Industry Association

EXP.VILLA.0546

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY
## REPORTING GUIDELINES

- **Do not delete paid in full collection accounts.**

| Accounts must be deleted for the following reasons: | | |
|---|---|---|
| | **Debt Buyers** | **Third Party Collection Agencies** |
| Accounts which have been forwarded or sold to another entity | X | |
| Accounts which have been canceled and returned to creditor | | X |
| Accounts reported in error | X | X |
| Accounts which have been confirmed as fraudulent | X | X |
| Accounts for consumers who are deceased | X | X |
| Accounts that are being paid by insurance or were paid in full through insurance (not by the consumer) | X | X |
| Accounts of consumers who have filed petitions for bankruptcy | | X |

- All parties reporting credit information must comply with the Fair Credit Reporting Act (FCRA), Fair Debt Collection Practices Act (FDCPA), any applicable state laws and regulatory authorities.

- The Date of First Delinquency is used to comply with FCRA sections 605 and 623 (obsolescence period). See page 10-4 of this document for detailed reporting requirements.

- The Creditor Classification must be reported in the K1 Segment to identify the original creditor's type of business.  Note that code 02 (Medical/Health Care) is used to identify an account as a medical collection debt in accordance with FCRA section 623.

- In the Identification Number field, report the internal code that identifies the debt buyer or third party collection agency where information is verified.

- All parties reporting credit information must respond to consumer inquiries.

**Note: The guidelines in this document are specific to your industry and should be used in conjunction with the specifications in the Metro 2® Format. Refer to the Metro 2® Format for detailed information on segments and field information.**

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0547

Defendant's Exhibit A - p.174 of 180

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY
## REPORTING GUIDELINES

1.  Consumer Account Number (Base Segment, Field 7)

    - Report the individual's complete and unique account number as extracted from your file.
    - If the account number changes, report the L1 Segment. See field definitions in the Metro 2® Format.
      **Note: Notify your consumer reporting agencies the first time L1 Segments are reported.**

2.  Portfolio Type (Base Segment, Field 8) — O (Open)

3.  Account Type Codes (Base Segment, Field 9)

    - 0C — Debt Buyer
    - 48 — Collection Agency/Attorney
    - 77 — Returned Check

4.  Date Opened (Base Segment, Field 10) — the date the account was purchased by the debt buyer or placed/assigned to the third party collection agency.  When reporting returned checks, provide the date the check was written.

5.  Highest Credit or Original Loan Amount (Base Segment, Field 12) — original assigned amount as of the date purchased, placed or assigned.  When reporting returned checks, report the original amount of the check, excluding fees and interest.

6.  Terms Duration (Base Segment, Field 13) — 001

7.  Account Status Codes (Base Segment, Field 17A) — report ***only*** the following:

    93 — Account assigned to internal or external collections
    62 — Paid in full, was a collection account
    DF — Delete entire account due to confirmed fraud
    DA — Delete entire account (for reasons other than fraud – see below)

    - Accounts reported in error
    - Consumer is deceased. (if no other associated consumer remains responsible for the account)
    - Accounts that are being paid by insurance or were paid in full through insurance (not by the consumer)
    - <u>Debt Buyers</u> must also delete accounts that have been forwarded or sold to another entity.
    - <u>Third Party Collection Agencies</u> must also delete accounts for the following reasons:
      — Accounts that have been canceled and returned to the creditor
      — Accounts of consumers who have filed petitions for Bankruptcy

    ***Do not delete paid in full collection accounts.***

EXP.VILLA.0548

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

8.    FCRA Compliance/Date of First Delinquency (Base Segment, Field 25) — the date of the first delinquency **with the original creditor** that led to the account being sold or placed for collection.

Example:
**Original Credit Grantor Reports:**

| Date of Account Information | Account Status Code | Definition | Date of First Delinquency |
|---|---|---|---|
| 05/31/2021 | 11 | Current (0-29 days past the due date) | Zero fill |
| 06/30/2021 | 71 | 30-59 days past the due date | 06/20/2021 |
| 07/31/2021 | 78 | 60-89 days past the due date | 06/20/2021 |
| 08/31/2021 | 80 | 90-119 days past the due date | 06/20/2021 |
| 09/30/2021 | 82 | 120-149 days past the due date | 06/20/2021 |
| 10/31/2021 | 83 | 150-189 days past the due date | 06/20/2021 |

Account is sold to debt buyer or assigned to collection agency.

**Debt Buyer/Collection Agency Reports:**

| Date of Account Information | Account Status Code | Definition | Date of First Delinquency |
|---|---|---|---|
| 12/31/2021 | 93 | Collection | 06/20/2021 |
| 01/31/2022 | 93 | Collection *Consumer agrees to a repayment plan. First payment is received by debt buyer, collection agency or credit grantor's internal collection department.* | 06/20/2021 |
| 02/28/2022 | 93 | Collection *Consumer continues to make payments.  Current Balance is reported as decreasing.* | 06/20/2021 |
| 03/31/2022 | 62 | Paid collection account *Current Balance is reported as zero.* | 06/20/2021 |

**Notes: The FCRA Compliance/Date of First Delinquency does not change due to subsequent repayment agreements.**

**When reporting returned checks, report the date the check was returned for insufficient funds. If not available, report the date of the check.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0549

# DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

FCRA Compliance/Date of First Delinquency (continued)

Effective March 31, 2004, the FCRA[1] states that "provided that the consumer does not dispute the information, a person that furnishes information on a delinquent account that is placed for collection, charged for profit and loss, or subjected to any similar action, complies with this paragraph, if —

(i) the person reports the same date of delinquency as that provided by the creditor to which the account was owed at the time at which the commencement of the delinquency occurred, if the creditor previously reported that date of delinquency to a consumer reporting agency;

(ii) the creditor did not previously report the date of delinquency to a consumer reporting agency, and the person establishes and follows reasonable procedures to obtain the date of delinquency from the creditor or another reliable source and reports that date to a consumer reporting agency as the date of delinquency; or

(iii) the creditor did not previously report the date of delinquency to a consumer reporting agency and the date of delinquency cannot be reasonably obtained as provided in clause (ii), the person establishes and follows reasonable procedures to ensure the date reported as the date of delinquency precedes the date on which the account is placed for collection, charged to profit or loss, or subjected to any similar action, and reports such date to the credit reporting agency."

9.  Report Special Comments (Base Segment, Field 19) in conjunction with Account Status Codes to further define the accounts.  As an example, Special Comment AU (Account paid in full for less than the full balance) could be reported with Account Status Code 62.

---

[1] Fair Credit Reporting Act Section 623(a)(5) [15 U.S.C. § 1681s-2]

EXP.VILLA.0550

# DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

10. Compliance Condition Codes (Base Segment, Field 20) – report the following codes, which are applicable to disputes under the Fair Debt Collection Practices Act (FDCPA) and to direct disputes under the Fair Credit Reporting Act (FCRA).

   XB – Account information has been disputed by the consumer directly to the data furnisher under the FCRA; the data furnisher is conducting its investigation. *Code XB should be reported for FDCPA disputes.*

   **Important Note: Code XB should no longer be reported after the investigation is completed; the XB should be removed by reporting the removal code or changed to another code.**

   XC – FCRA direct dispute investigation completed – consumer disagrees with the results of the data furnisher's investigation.

   XH – Account previously in dispute; the data furnisher has completed its investigation. (To be used for disputes under the FDCPA and for direct disputes under the FCRA)

   XR – Removes the most recently reported Compliance Condition Code

11. Current Balance (Base Segment, Field 21) and Amount Past Due (Base Segment, Field 22) — may include fees and interest, depending on state and federal laws. If payments are made, the Current Balance and Amount Past Due should decrease accordingly.

12. Date of Last Payment (Base Segment, Field 27) – the date of the most recent payment made to the debt buyer or third party collection agency.

13. Address (Base Segment, Fields 39 – 45; J2 Segment, Fields 12 – 18) – report the consumer's full address as provided by the original creditor or a newer known address. If the consumer's current address is unknown, report the consumer's last known address and Address Indicator 'N' (not confirmed address).

   **Note: An address found through skip tracing processes should be reported only when confirmed to be the address of the consumer you are reporting.**

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0551

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY
## REPORTING GUIDELINES

14. ECOA Code (Base Segment, Field 37; J1 and J2 Segment, Field 10) — used to designate an account as joint, individual, etc. in compliance with the Equal Credit Opportunity Act (ECOA).  Refer to Exhibit 10 in the Metro 2® Format for a list of available codes.

   **Notes: Authorized users (ECOA Code 3) should not be reported because they are not contractually liable.**

   **For accounts with more than one associated borrower, if one borrower becomes deceased, report ECOA Code Z (Delete Consumer) for that borrower.  In subsequent reporting periods, only the remaining consumer should be reported.**

15. Report the K1 Segment, which contains the name of the original creditor, including any partnering affinity name, and the creditor's classification.  The Affinity Name further identifies or provides linkage detail for the relationship of the original creditor to any connecting or supporting entities (e.g., ABC BANK THE HOME STORE).

   When reporting returned checks, report the name of the payee in the Original Creditor Name field.  Note that code 02 (Medical/Health Care) is used to identify an account as a medical collection debt in accordance with FCRA section 623.

   **Notes**: **Refer to the guidelines for the K1 Segment in the Metro 2® Format.**

   **Both the Original Creditor Name and Creditor Classification are required and must be reported.  The purpose of reporting the original creditor name is to help consumers identify the source of accounts that appear on their credit reports.   Without the original creditor names, consumers may not know what the accounts represent.**

   **Federal law stipulates that the name of the payee must be identified when reporting returned checks.  It also stipulates that medical debts must be identified.**

*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0552

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY
## REPORTING GUIDELINES

16.   The following Base Segment fields are not applicable:

- Cycle Identifier (Field 6) – blank fill
- Credit Limit (Field 11) – zero fill
- Terms Frequency (Field 14) – blank fill
- Scheduled Monthly Payment Amount (Field 15) – zero fill
- Payment Rating (Field 17B) – blank fill
- Payment History Profile (Field 18) – blank fill
- Original Charge-off Amount (Field 23) – zero fill

17.   **Debt Buyers *only* –** An optional segment that may be reported is the K2 Segment, which contains the name of the company from which the account was purchased.  If the original creditor name, which is reported in the K1 Segment, and the name of the company from which the account was purchased, are the same, the K2 Segment should not be reported.

Consumer Information Indicator (Base Segment, Field 38; J1 and J2 Segment, Field 11) — used to specify that a consumer has filed bankruptcy or a consumer cannot be located.  Refer to Exhibit 11 in the Metro 2® Format for a list of available indicators.

**Note: Debt Buyers should not report accounts that were included in discharged/completed bankruptcies prior to purchasing.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2022 © Consumer Data Industry Association*

EXP.VILLA.0553

Defendant's Exhibit A - p.180 of 180