FILED
2024 Oct-11  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER ROBINSON,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **Plaintiff,** | ) | **2:23-cv-01381-AMM** |
| | ) | |
| | ) | **ORAL ARGUMENT** |
| **v.** | ) | **REQUESTED** |
| | ) | |
| **SPRING OAKS CAPITAL, LLC;** | ) | |
| **Fictitious Defendants "A", "B"** | ) | |
| **and "C",** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANT SPRING OAKS CAPITAL, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### Introduction

Plaintiff Christopher Robinson ("Plaintiff") asserts that Defendant Spring Oaks Capital ("Defendant" or "Spring Oaks") violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") by falsely reporting to TransUnion that Plaintiff's dispute on an account was "now resolved." This Court should grant summary judgment in favor of Defendant because Plaintiff lacks standing and the undisputed facts establish that Defendant complied with the law and correctly reported the debt as disputed to TransUnion.

1

**Table of Contents**

Introduction ................................................................................................1

Table of Contents .........................................................................................2

Undisputed Material Facts ...........................................................................3

A.     The Communication ...........................................................................3

B.     Defendant Communicated Dispute Code XB to TransUnion.....................5

C.     Defendant Investigated Plaintiff's Dispute and Communicated the Results
of the Investigation to Plaintiff. ................................................................7

D.     Defendant Communicated Dispute Code XH to TransUnion ...................8

E.     Plaintiff's Lawsuit Against Defendant.............................................8

F.     Plaintiff's Factual Allegations against Defendant ...................................10

G.     Plaintiff's Credit Reports from annualcreditreport.com ...........................11

Argument & Discussion of Legal Authorities .......................................................14

I.     Standard of Law for Summary Judgment......................................................14

II.     Plaintiff Lacks Article III Standing..............................................................15

III.     Defendant Accurately Reported Plaintiff's Dispute ................................25

IV.     Plaintiff's Claim Should Be Dismissed Due to His Attorney's Tactics. ...32

V.     Conclusion....................................................................................................34

## Undisputed Material Facts

### A. The Communication

On October 3, 2022, Spring Oaks received a letter dated September 27, 2022 purporting to be from Plaintiff. (ECF 44-1, "Exhibit A", the Communication, at p. 55; ECF 44-1, "Exhibit A," Calko Dep. at 111:1-3[1]; ECF 1-1, at ¶ 15). The Communication states in relevant part:

> I understand that you are claiming that I owe you and/or your client money.
>
> I'm disputing this debt (and all other debts you claim that I have). You can find all the debts you claim to have on me – I dispute them all. Please note I do <u>NOT</u> want you to send me any information – I simply want you to know that I dispute any debts you claim to have on me. This is not a request for validation or verification. I am not interested in you sending me any documentation.
>
> If you want to communicate with me, there are only two convenient ways I want you to communicate with me – text and email. All other ways are inconvenient, and I do not want you to communicate with me in any way other than email or text.
>
> ***
>
> The only convenient times to communicate with me (only by text and email) are Monday to Friday from 1pm to 4pm. All other times are inconvenient for me so only communicate with me from 1pm to 4pm.
>
> (*See* ECF 44-1, "Exhibit A," at p. 55).

Plaintiff provided an email address and a phone number. *Id*. Plaintiff did not identify any further details about the account or accounts he was purporting to

---

[1] References to deposition testimony use the page and line numbers of the transcript, as opposed to the page number of the ECF document.

dispute, or the reasons for his dispute. *Id*. Plaintiff testified that the Communication was "a letter sent from my lawyers to Spring Oaks." (ECF 44-2, "Exhibit B," Robinson Dep., at p. 14:5-6). Plaintiff testified that his lawyers "printed out" the letter and Plaintiff "had to approve it" before it was sent to Defendant. (*Id*. at 14:12-13). Plaintiff testified that his lawyers' office pulls his "credit report" for him once per year. (*Id*. at 41:11, 16, 18). Plaintiff and his lawyers review the credit report and send out dispute letters. (*Id*. at 41:19-42:5). They have "sent out many of them." (*Id*. at 41:21). The dispute letters are all similar to the Communication sent to Defendant. (*Id.* at 42:5).

Plaintiff's counsel has sued Defendant, in this District and elsewhere, in over a dozen cases involving Defendant's responses to nearly identical dispute letters. (*See* ECF 26-1, at ¶¶ 4-5). The letters at issue in each case share the following characteristics: (1) the letter is sent by certified mail to Defendant; (2) the letter does not identify any creditor or account, but states that the consumer disputes "all" debts; (3) the letter states that the consumer does not want any "information" and that the letter is "not a request for validation or verification;" and (4) the letter states the consumer is only available to be reached between 1 p.m. and 4 p.m. Monday through Friday. *Id*. Such letters have been sent to Defendant in connection with at least three other lawsuits in this District. *Id*.

Spring Oaks employees review incoming correspondence to identify whether

the correspondence contains a dispute. (ECF 44-1, "Exhibit A," Calko Dep. at p. 35:2-5. When a dispute is identified, Defendant notes the account as disputed within Defendant's internal system of record. (*Id*. at 45:7-19). In this case, Defendant received the Communication from Plaintiff on October 3, 2022, and the Defendant agent identified the account as disputed that same day. (*Id*. at 116:21-117:6; *see also* ECF 44-1, "Exhibit A," Account Notes, at p. 73-74).

### B. Defendant Communicated Dispute Code XB to TransUnion

On a weekly basis, Defendant sends a report to TransUnion reflecting activity on Spring Oaks accounts. (ECF 44-1, "Exhibit A," Calko Dep., at 49:3-6, 49:10-14; 105:16-18; 108:9-10). The CDIA (Consumer Data Industry Association) is "a trade group comprised of hundreds of consumer-data companies." *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 900 (10th Cir. 2012). The CDIA is "*the* expert on accurate credit reporting" (*Kennedy v. Equifax Info. Servs., LLC*, No. 1:20-CV-01121-CL, 2020 WL 8093516, at *1 (D. Or. Dec. 4, 2020), *report and recommendation adopted,* No. 1:20 CV 01121-CL, 2021 WL 123370 (D. Or. Jan. 12, 2021)), and publishes the Credit Reporting Resource Guide on an annual basis which defines certain codes that data furnishers, like Defendant, use to reflect consumer disputes under the FDCPA. (*See* ECF 44-1, "Exhibit A," CRRG, at p. 154-180; *see also* ECF 44-1, "Exhibit A," Calko Dep. at 67:4-7; 68:12-21).

The guidelines outlined in the CRRG are widely adopted by the industry. *Kennedy*, *supra*, at *1 ("The accepted industry standards for credit reporting … are found in the Credit Reporting Resource Guide[.])" *See also, Foster v. AFNI, Inc.*, No. 2:18-CV-12340-TGB, 2020 WL 1531651, at *8 (E.D. Mich. Mar. 31, 2020) (accepting CRRG guidelines as industry standard); *Nissou-Rabban v. Cap. One Bank (USA), N.A.*, 285 F. Supp. 3d 1136, 1149 (S.D. Cal. 2018).

The CRRG "instruct Spring Oaks in what codes to report in certain instances to the credit reporting agencies." (ECF 44-1, Calko Dep. at 69:1-3). For Plaintiff's account at issue in this matter, Spring Oaks communicated dispute code "XB" to TransUnion on October 7, 2022. (*Id.*, at 116:24-117:7; *see also* ECF 44-1, "Exhibit A," Account Notes, at p. 73).

Dispute code XB is defined by the Consumer Data Industry Association as follows:

> *Definition: Reported when the completeness or accuracy of the account information is disputed directly to the data furnisher by the consumer under the FCRA and investigation of the dispute is in progress by the data furnisher. Code XB should be reported for FDCPA disputes.*

(ECF 44-1, "Exhibit A," CRRG, at p. 169).

On October 7, 2022, Spring Oaks reported the code XB to TransUnion regarding Plaintiff's account at issue in this matter, but Defendant is unaware of when TransUnion reported this code on Plaintiff's credit file. (ECF 44-1, "Exhibit A," Calko Dep. at 117:12-13, 117:18-21).

**C. Defendant Investigated Plaintiff's Dispute and Communicated the Results of the Investigation to Plaintiff.**

Spring Oaks investigated Plaintiff's dispute in the Communication and on October 31, 2022, Defendant emailed Plaintiff a letter responding to Plaintiff's dispute and attaching two recent credit card statements addressed to Plaintiff at his address in Falkville, Alabama evidencing that Plaintiff owes this debt. (ECF 44-1, "Exhibit A," Calko Dep., at 134:1-20; *see Id*., Account Notes, p. 72-73; *see also Id*., Validation Packet, at p. 56-67). The Validation Packet stated, in relevant part:

> Our office is in receipt of your dispute and/or request for validation of the debt. Please be advised that we have reviewed your account and have confirmed the name and amount owed on the account. Based on our investigation of your dispute, we have determined that you are the correct consumer listed for this account.

> Enclosed you will find documents associated with your account provided in response to your dispute and/or request for validation. Should you have any questions regarding this account, please feel free to contact us.

(ECF 44-1, "Exhibit A," Validation Packet, at p. 56)*. Defendant did not receive any indication that the October 31, 2022, email sent to Plaintiff with the Validation Packet "bounced back." (ECF 44-1, "Exhibit A," Calko Dep. at 168:2-8). Further, there is no evidence in the record that Plaintiff responded to the Validation Packet before initiating this litigation. On October 31, 2024, Defendant updated its internal system of record to reflect dispute code "XH." (ECF 44-1, "Exhibit A," Account Notes, at p. 73).

**D. Defendant Communicated Dispute Code XH to TransUnion**

On November 4, 2022, Defendant updated its reporting to TransUnion on Plaintiff's account by communicating the dispute code "XH." (*See* ECF 44-1, "Exhibit A," Calko Dep., at 93:25-94:10; *see also* "Exhibit A," Account Notes, at p. 72). The dispute code XH is defined by the CDIA as follows:

> *Definition: Reported when the investigation of a dispute by the data furnisher was completed.*

(ECF 44-1, "Exhibit A," CRRG, at p. 171 and "Exhibit A," Calko Dep., at p. 171:18-20)*.* The CRRG also contain a description of the XH code: "Account previously in dispute; the data furnisher has completed its investigation. (To be used for direct disputes under the FCRA, FDCPA disputes or FCBA disputes)." (ECF 44-1, "Exhibit A," CRRG, at p. 171)

"The code is to signify that an investigation has been completed. That's how the code is defined." (ECF 44-1, "Exhibit A," Calko Dep., at p. 172:8-10)*.* "The XH code is a dispute code that indicates that the data furnisher, Spring Oaks, has completed its investigation." (*Id.* at 91:6-8). In this case, Spring Oaks employees reported the dispute code XH to TransUnion on Plaintiff's account because they had completed the investigation. (*Id*. at 158:8-13; 159:8-9; 171:18-20; 172:8-10).

**E. Plaintiff's Lawsuit Against Defendant**

On September 14, 2023, Plaintiff executed a fee agreement with the Watts Herring law firm related to his claims against Defendant. (ECF 44-3, "Exhibit C,"

Fee Agreement, at p. 1-3). The Court previously granted Defendant's Motion to Compel and ordered Plaintiff to produce this agreement in response to Defendant's written discovery requests. (ECF 30). The fee agreement states:

> This suit is brought for Statutory damages under the Fair Debt Collection Practices Act which entitles Client to up to $1,000 for the case… Client assigns to Firm any right to attorney fees, expenses and costs which will be all other funds in this case from Defendant. **It is very likely that Firm will receive more money than Client and Client agrees to this as this is not a case where actual damages are being sought but instead only Statutory Damages which are a maximum of $1,000.**

> (ECF 44-3, "Exhibit C," at p. 1).

In keeping with the fee agreement, the Complaint filed in the Circuit Court of Jefferson County, Alabama (also on September 14, 2023) and removed to this Court makes no factual allegation of actual damages. (ECF 1-1). Rather, the Complaint alleges that Defendant made actions that were "in violation of the FDCPA" and that such conduct "proximately caused Plaintiff damages" (*Id*. at ¶¶ 19-20) and that "[a]s a result of Defendant's violations of the FDCPA, Plaintiff is entitled to damages and reasonable attorney's fees and costs from Defendant." *Id*. at ¶ 22.

Throughout discovery, Plaintiff identified his damages as "stress," "other things like going to court and having to deal with this," and "depression and anxiety issues." (ECF 44-2, "Exhibit B," Robinson Dep. at p. 39:14-21). Plaintiff claims that he "suffered mental anguish and emotional distress" due to Defendant's actions. (ECF 44-2, "Exhibit B," at p. 146). Plaintiff claims that Defendant asserted that

Plaintiff's account was "previously in dispute and now resolved when I never quit disputing it and it never has been resolved. Being ignored like this is very upsetting. It makes me feel anxious and like I'm being harassed." *Id*. In response to questioning from his attorney, Plaintiff testified that he lost sleep:

> Q. It made you feel anxious, okay. And have you lost any sleep over it?
>
> A. Yes. I take sleeping medication that don't work half the time.
>
> Q. Okay. And even so, you know, even if you did take sleeping medications, at the time you discovered it or when you discovered that this was not disputed on your credit report, did that make you lose sleep?
>
> A. Yes.
>
> (ECF 44-2, "Exhibit B," Robinson Dep., at p. 74:3-12).

Plaintiff did not seek or receive any medical attention for the damages alleged in this lawsuit. (ECF 44-2, "Exhibit B," Admission No. 19, at p. 162).

### F.  Plaintiff's Factual Allegations against Defendant

Plaintiff claims that Defendant violated the Fair Debt Collection Practices Act. (ECF 1-1, at ¶ 18). Specifically, Plaintiff claims that Defendant "updated Plaintiff's credit reports with an account from Defendant without marking the account as disputed" and that on "July 21, 2023, Defendant updated its account on the July 28, 2023 Trans Union report of Plaintiff without showing the account as disputed." (*Id*. at ¶¶ 17-18; *see* ECF 44-2, "Exhibit B," Robinson Dep., at p. 33:8-14) (Plaintiff characterized Defendant's conduct as reporting "something about it

done been resolved and I was disputing it but y'all saying it's resolved and it's not resolved"); (*Id.* at 35:19-20) ("Y'all said it was resolved but it's not resolved"). In response to a Defendant's interrogatory, asking Plaintiff to "explain the factual basis" for his allegation that "Defendant updated Plaintiff's credit reports with an account from Defendant without marking the account as disputed," Plaintiff stated that "Defendant's credit report was marked with the language 'Account previously in dispute—now resolved' rather than 'Account information disputed by consumer' as outlined by the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 e(8)." (ECF 44-2, "Exhibit B," Ans. to Int. No. 10, at p. 147).

### G. Plaintiff's Credit Reports from annualcreditreport.com

In discovery, Plaintiff identified one document that allegedly supports his allegation: his "TransUnion credit report." (*Id.* at Ans. to Int. No. 11). Plaintiff produced three credit report documents. (ECF 44-1, "Exhibit A," at pp. 99-107) (excerpts from the reports introduced by Plaintiff's counsel at the Calko deposition). The reports produced by Plaintiff include the following internet URL in the footer of each page: "http://annualcreditreport.transunion.com/dss/disclosure.page." *Id.*

Annualcreditreport.com is "the official site to get your free annual credit reports" and is "maintained by Central Source, LLC," which is "sponsored by Equifax, Experian and TransUnion[.]"[2] Annualcreditreport.com is the result of

---

[2] See https://annualcreditreport.com/aboutThisSite.action

11

federal regulations which require the nationwide consumer reporting agencies to "jointly design, fund, implement, maintain, and operate a centralized source," including a "single, dedicated Web site," for consumers to obtain "annual file disclosures." 12 C.F.R. § 1022.136(b)(1)(i); *see also* 15 U.S.C. § 1681j(a)(1)(B). There is no evidence in the record, or allegation from Plaintiff, that Defendant creates the content displayed by, or controls, annualcreditreport.transunion.com or TransUnion.

The November 25, 2022 annualcreditreport.com report includes the following "remarks:" "Account previously in dispute-now resolved. reported by credit grant; >PLACED FOR COLLECTION<" [*sic*]. (ECF 44-1, "Exhibit A," at p. at 99). The words in the "remarks" section of the annualcreditreport.com report were not provided by Defendant. (ECF 44-1, "Exhibit A," Calko Dep., at p. 169:6). Defendant reported "an XH code." (*Id.* at 169:14-15). Defendant "just reports the code, the XH. It does not report any language or tell TransUnion or annualcreditreport.com what language to use." (*Id.* at 169:25-170:3, 173:3). Defendant did not dictate the verbiage used by annualcreditreport.com in the "remarks" section of Plaintiff's credit report. (*Id.* at 170:9-10; 172:16-17). "Spring Oaks does not know exactly what the report reporting agency may use in the remarks and does not dictate that." (*Id*. at 174:4-7). Defendant "reports the code" and "understand[s] the definition of the code[.]" *Id*.

Plaintiff also produced in discovery a July 28, 2023 report, also from annualcreditreport.com, that includes the same "remarks" as the November 25, 2022 report. (ECF 44-1, "Exhibit A," at p. 101-104). As with the November 25, 2022 report, Defendant "did not dictate that language" but simply "used an XH code to indicate that the investigation was complete." (ECF 44-1, "Exhibit A," Calko Dep. at p. 175:6-10).

Plaintiff additionally produced in discovery a November 29, 2023 report from annualcreditreport.com which reflects that Plaintiff had 11 accounts with adverse information, including the Spring Oaks account at issue (identified as 11164****). (ECF 44-2, "Exhibit B," TransUnion Credit Report, at p. 85-116). This report includes the same "remarks" as the November 25, 2022 and July 28, 2023 reports. (*Id*. at p. 115). Plaintiff testified that his annualcreditreport.com reports contain inaccurate data from creditors other than Defendant. (ECF 44-2, "Exhibit B," Robinson Dep., at p. 77 *et seq*.). Plaintiff testified that his November 29, 2023, annualcreditreport.com report contained "inaccuracies" regarding accounts with Ally Financial, Covington Credit, Discover Bank, and First Premier Bank. (*Id*. at 77). Plaintiff testified that all of these inaccuracies caused him stress and anxiety. (*Id*. at 77:24-78:4). According to Plaintiff, the November 29,2023, report also contained inaccuracies related to trade lines with MRV Banks, Security Finance,

Wells Fargo Card Services, LVNV Funding, and Resurgent Receivables. (*Id*. at 78:5-79:4).

## Argument & Discussion of Legal Authorities

Plaintiff's only factual allegation against Defendant is that it falsely communicated to TransUnion that Plaintiff's debt was no longer disputed and was "now resolved." (ECF 1-1, at ¶ 17-18; ECF 44-2, "Exhibit B," Robinson Dep. at p. 33:8-14 and Ans. to Int. No. 10, at p. 147). Defendant is entitled to summary judgment for the following reasons (1) Plaintiff lacks Article III standing; (2) there is no evidence that Defendant communicated the challenged language to TransUnion; and (3) even if Defendant did communicate to TransUnion that the debt was "now resolved," such communication would not violate the FDCPA.   In addition, Defendant asks this Honorable Court to consider the circumstances surrounding Plaintiff's dispute in light of the fact the letters are produced by counsel and seem closer in purpose to inviting a lawsuit than honestly disputing a debt.

## I.  Standard of Law for Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the court determines that there exists no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368 (11th Cir.1982).

Once the moving party satisfies its burden, the burden of persuasion shifts to the non-moving party to establish the existence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is material if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co*., 357 F.3d 1256, 1259–60 (11th Cir.2004). The non-moving party must set forth specific facts showing a genuine issue of material fact, via particular materials in the record. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 323–24, 106 S. Ct. 2548. Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986). The court will not weigh the evidence or make findings of fact; the court's role is to determine if there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Anderson*, 477 U.S. at 249.

## II. Plaintiff Lacks Article III Standing

Article III grants federal courts the "judicial Power" to resolve only "Cases" or "Controversies." U.S. Const. art. III §§ 1–2. As a result, federal courts may exercise their power only for "the determination of real, earnest, and vital controversy between individuals." *Chi. & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court

jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quotation marks omitted). This case-or-controversy requirement, embodied in the doctrine of standing, "confines the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).

"Under settled precedent, the irreducible constitutional minimum of standing consists of three elements: the plaintiff must have suffered an injury in fact, the defendant must have caused that injury, and a favorable decision must be likely to redress it." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (quotation marks and citation omitted).

A "concrete" injury must be "*de facto*"—that is, it must be "real, and not abstract." *Spokeo*, 136 S. Ct. at 1548 (quotation marks omitted). A "particularized" injury "must affect the plaintiff in a personal and individual way." *Id.* (quotation marks omitted). Each subsidiary element of injury—a legally protected interest, concreteness, particularization, and imminence—must be satisfied. *See id.* at 1545; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "These cases turn most centrally on the requirement of concreteness." *Trichell*, 964 F.3d at 997.

"As a general matter, tangible injuries qualify as concrete." *Id., citing Spokeo*, 136 S. Ct. at 1549. "Intangible injuries sometimes qualify as concrete, but not always. In particular, a plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to

16

authorize that person to sue to vindicate that right." *Trichell*, 964 F.3d at 997 (cleaned up). *See also Spokeo*, 136 S. Ct. at 1549. Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S. Ct. at 1549. "[A]lleging a bare procedural violation, divorced from any concrete harm is not enough to support standing." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (quotation marks and citation omitted).

Here, Plaintiff alleges a bare procedural violation. He cannot establish the existence of any concrete and particularized injury. In the pleadings, Plaintiff asserts only intangible injury, in the form of alleged violation of 15 U.S.C. § 1692e(8). Any shadow of an allegation of actual harm, such as allegations of loss of sleep or emotional distress raised in discovery (but not in the pleadings) are insufficient to establish standing, because they are unsubstantiated, and because Plaintiff cannot show causation.

### a. Plaintiff Alleges Only Statutory Damages.

The Complaint alleges only statutory damages.[3] (ECF 1-1). Plaintiff makes no factual allegations in the pleadings about actual damages, such as financial

---

[3] Defendant removed this action to United States District Court, noting that the Complaint alleges violations of the Fair Debt Collection Practices Act and therefore presents a federal question. ECF 1. At time of the removal, Defendant believed that Plaintiff was asserting he had suffered some actual damage and thus had standing. *Id*. Through discovery, Defendant has learned that Plaintiff agreed in writing that he had only statutory damages. While at the pleading stage, general allegations of injury may suffice to establish standing, but at the summary judgment stage, a plaintiff cannot rest on mere allegations and must present specific facts. *Lujan v. Defs. of Wildlife*,

Case 2:23-cv-01381-AMM   Document 45   Filed 10/11/24   Page 18 of 35

damages, reputational harm, lost credit opportunities, health impacts, or anything else. *Id*. He denies having been denied credit in his Answers to Defendant's Interrogatories, and, in fact, states that he has been granted three additional credit accounts. (ECF 44-2, "Exhibit B," at p. 150-151 (Ans. to Int. 19, 20)).

Moreover, Plaintiff's fee agreement with his attorneys makes it explicitly clear that he is seeking <u>only</u> statutory damages. (ECF 44-3). Further, the fee agreement operates to assign any damages obtained beyond the statutory damages to Plaintiff's attorneys. *Id*.

> This suit is brought for Statutory damages under the Fair Debt Collection Practices Act which entitles Client to up to $1,000 for the case… Client assigns to Firm any right to attorney fees, expenses and costs which will be all other funds in this case from Defendant. **It is very likely that Firm will receive more money than Client and Client agrees to this as this is not a case where actual damages are being sought but instead only Statutory Damages which are a maximum of $1,000.**

> *Id*.

Plaintiff has assigned "any right" to "all other funds" awarded beyond statutory damages to his attorneys. *Id.* Therefore, even if Plaintiff is deemed to have alleged actual damages, he lacks standing to assert those damages against Defendant. A favorable decision from the Court would not provide Plaintiff with any redress,

---

504 U.S. 555, 561 (1992) (quotation marks and citations omitted). "Jurisdictional objections also can be raised at any time in the litigation." *Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023).

since Plaintiff has abandoned any right to obtain redress for these damages by assigning them to his attorneys. Redress is one of three elements of the "irreducible constitutional minimum of standing." *Trichell*, 964 F.3d at 996.

### b. Plaintiff's Alleged Statutory Damages Are Not Analogous to Damages Recognized at Common Law.

Precedent in the Supreme Court and Eleventh Circuit make clear that a plaintiff must show that an alleged statutory violation caused or qualified as a concrete harm. *Spokeo*, 578 U.S. at 341; *Muransky*, 979 F.3d at 929; *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1243 (11th Cir. 2022). One way this can be done is by "demonstrating a close relationship to a harm traditionally recognized in tort law." *Id*. (quotation marks and citation omitted). When an element "essential to liability" at common law is missing from an alleged harm, the common-law comparator is not closely related to that harm. *Id*. at 1244.

Here, Plaintiff cannot demonstrate a sufficiently close relationship to any common law tort, and therefore, in the absence of any actual damages, his claim fails for lack of standing. The *Hunstein* court considered allegations that a debt collector transmitted information about a debt to a third-party vendor, allegedly violating 15 U.S.C. § 1692c(b)'s prohibition on communicating about a debt with someone other than the debtor. *Id*. at 1245. Finding that the communication at issue in *Hunstein* lacked elements of the common law tort of public disclosure (particularly, publicity), the court of appeals, sitting en banc, ruled that the plaintiff had no standing. *Id*.

As here, the *Hunstein* plaintiff "points to nothing tangible like financial loss or physical injury." *Id.* at 1245.

*Hunstein* and *TransUnion* make clear that to find an analogue with common law torts like public disclosure and defamation, the allegedly improperly disclosed or false information must be publicized. "Publication is essential to liability in a suit for defamation… And there is no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 434 (2021) (comparing defamation to statutory violation) (quotation marks and citations omitted). "Publicity causes a qualitatively different harm, one that is essential to creating the comparator tort in the first place[.]" *Hunstein*, 48 F.4th at 1249 (discussing tort of public disclosure).

Though it is true that annualcreditreport.com ultimately published certain information about Plaintiff's account with Defendant, there is no evidence in the record that Defendant controlled or had any responsibility for the allegedly inaccurate information appearing in Plaintiff's report. The record is utterly lacking in probative evidence as to how the complained-of language found its way into the "remarks" section of the annualcreditreport.com report. In fact, there is no allegation or evidence that Defendant communicated anything at all to Central Source, LLC, the operator of annualcreditreport.com. Plaintiff is missing a vital evidentiary link:

the evidence does not support the conclusion that language appearing on annualcreditreport.com originated with Defendant. There is no evidence as to what TransUnion communicated to annualcreditreport.com after receiving the dispute code XH from Defendant.

The eventual publication of information by annualcreditreport.com is not at issue in this litigation, nor is the implied publication by TransUnion to Central Source, LLC or annualcreditreport.com. The statute prohibits the "communicating" of false credit information by Defendant, including the failure to communicate a dispute. 15 U.S.C. § 1692e(8). The undisputed evidence in the record establishes definitively that Defendant did not communicate the complained-of "now resolved" language to annualcreditreport.com or to TransUnion. Defendant communicated that the debt was disputed by transmitting the code XB. Defendant again communicated that the debt had been disputed and its investigation was complete by transmitting the code XH. These communications are the only actions at issue in this litigation. These communications are not analogous to common law torts, and any harm caused by these communications is solely statutory. Accordingly, Plaintiff lacks Article III standing.

### c. Any Allegations of Actual Damages Are Not Sufficiently Concrete and Plaintiff Cannot Establish Causation.

In discovery, Plaintiff makes vague allegations of emotional distress-type damages (loss of sleep, with no additional detail). These allegations do not save his claims from lack of standing, because they lack concreteness and causation.

The Eleventh Circuit has "not yet decided in a published opinion whether emotional distress alone is a sufficiently concrete injury for standing purposes[.]" *Toste v. Beach Club at Fontainebleau Park Condo. Ass'n, Inc.*, No. 21-14348, 2022 WL 4091738, at *4 (11th Cir. Sept. 7, 2022). However, district court rulings from within the circuit indicate that mere emotional distress, without physical manifestations or corroborating, objective evidence, is not enough to establish standing.

In *Rivas v. Midland Funding, LLC*, 842 F. App'x 483 (11th Cir. 2021), the plaintiff had entered a settlement agreement with debt collector and started making payments, but the debt collector's website subsequently displayed incorrect account balances and continued to show debt owing contrary to the settlement agreement. This caused plaintiff "loss of sleep and extreme stress" which was a "sufficiently tangible injury," which, *in combination* with "reliance on the information" on the website was sufficient to confer Article III standing. *Rivas,* 842 F. App'x at 486. *Rivas* is distinguishable from Plaintiff's case, because Plaintiff is not alleged to have "relied" on any purportedly incorrect communication from Defendant.

22

In *Luce v. LVNV Funding LLC*, No. 21-CV-82143, 2023 WL 1472582 (S.D. Fla. Jan. 18, 2023), *report and recommendation adopted,* No. 21-CV-82143-RAR, 2023 WL 1466815 (S.D. Fla. Feb. 2, 2023), the court adopted the magistrate judge's recommendation that plaintiff's claim of emotional distress was insufficient to establish Article III standing, and, where plaintiff may have had "multiple issues with [his] credit," plaintiff would not have been able to establish causation between the defendant's conduct and any emotional distress. *Id*. at *4-6. Causation is a key factor here, where Plaintiff testified that all eleven derogatory accounts displayed on his annualcreditreport.com report were inaccurate. (ECF 44-2, "Exhibit B," Robinson Dep., at p. 62:19-20).  Plaintiff explicitly attributes his alleged credit denial to this totality of derogatory information and his emotional damage claim would be subject to the same multitude of causal contributors.

In *Sanchez v. LVNV Funding, LLC*, No. 1:21-CV-4815-MLB, 2023 WL 7169085 (N.D. Ga. Sept. 26, 2023), the district court held that "emotional distress alone can establish standing *if* it is caused by the defendant's error." *Id*. at *3 (emphasis in the original). Where the alleged emotional distress is due to other factors, or hypothetical future harms, the allegation of emotional distress is "too tenuous" to confer standing. *Id*. Such is the case here, where the Spring Oaks account was one of many derogatory accounts reflected on Plaintiff's annualcreditreport.com report. Plaintiff has not demonstrated that any emotional distress is attributable to

the Spring Oaks account *at all*, let alone attributable Defendant's communication of XH to TransUnion.

In *Burgos v. Helvey & Associates, Inc.,* No. 6:23-CV-1793-JSS-LHP, 2024 WL 3495004 (M.D. Fla. July 22, 2024), plaintiff "testified that she received virtual counseling from a psychiatrist … that her sleep was disturbed … and that she experienced some headaches," and the court found that these "physical and emotional ailments tied to the 'emotional distress' caused by the" allegedly inaccurate debt reporting were sufficient to establish standing. *Id*. at *3. Here, Plaintiff lacks the physical manifestations of emotional distress and the objective corroboration of treatment by a medical professional.

In *Nelson v. Caine & Weiner Co., Inc.*, No. 122CV02587MLBRDC, 2023 WL 4401622 (N.D. Ga. May 17, 2023), *report and recommendation adopted,* No. 1:22-CV-2587-MLB, 2023 WL 10325439 (N.D. Ga. Aug. 18, 2023), the court found that plaintiff's claim of emotional distress, in the absence of "any corroborating objective evidence" and where plaintiff denied "any related medication or professional treatment" and did not "describe any wasted time or loss of sleep," was insufficient to establish standing. *Id*. at *4. The court also found that, where plaintiff's credit report contained multiple derogatory accounts in addition to the one at issue, plaintiff could not establish concrete harm caused by the disputed account. *Id*.

For all these reasons, Plaintiff's actual damages, to the extent he is deemed to have alleged them in the first place, are insufficient to establish standing. Plaintiff's claim should be dismissed for lack of standing.

### III.        Defendant Accurately Reported Plaintiff's Dispute

Plaintiff's claim arises solely from 15 U.S.C. § 1692e(8), which prohibits "[c]ommunicating … to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." *Id*. Particularly, Plaintiff alleges that Defendant failed to communicate to TransUnion that Plaintiff's debt was disputed.

### a. Defendant's Reporting to TransUnion Is Distinct From Content of Report on AnnualCreditReport.com.

Determining whether a violation of § 1692e(8) occurred in this instance depends entirely on the substance of the communication from Defendant to TransUnion. The statute prohibits Defendant from "communicating" false information or failing to communicate that a debt is disputed. The statute does not assign any liability to Defendant for what information TransUnion reports to annualcreditreport.com or what annualcreditreport.com publishes or makes available to the consumer. The evidence in the record establishes that Defendant communicated two pieces of information to TransUnion: the dispute code "XB," and the dispute code "XH."

There is a material distinction between Defendant's communication to TransUnion and the information ultimately published by either TransUnion or annualcreditreport.com. Credit reporting agencies commonly misreport consumer information as a result of "mixed files," which occur when credit information relating to one consumer is mistakenly placed in the file of another. *See TransUnion LLC v. Ramirez,* 594 U.S. 413, 417, 141 S. Ct. 2190, 2200, 210 L. Ed. 2d 568 (2021). Thus, Plaintiff's purported credit report from annualcreditreport.com is insufficient evidence of what Defendant communicated to TransUnion.

Here, the unrefuted evidence shows only that Defendant communicated the dispute codes XB and XH to TransUnion. Any alleged error in the content that ultimately appears on the annualcreditreport.com report was introduced either by TransUnion or by annualcreditreport.com.

Plaintiff's failure to present any evidence on this question is grounds for summary judgment for Defendant. Plaintiff failed to gather or present any evidence about what was communicated between TransUnion and annualcreditreport.com, or about who was responsible for adding the language in the "remarks" section of his report. At his deposition, Plaintiff claimed that TransUnion published the allegedly inaccurate information but admitted that he did not take any legal action against TransUnion. (ECF 44-2, "Exhibit B," at p. 79:18-20; 80:21-23).

### b. Defendant Accurately Reported Code XB to TransUnion.

The undisputed evidence in this case, consisting of testimony from Defendant's corporate representative and business records, conclusively establishes that Defendant received the Communication purporting to be from Plaintiff on October 3, 2022 and updated its internal reporting system that same day to reflect a dispute. (ECF 1-1, ¶15); (ECF 44-1, "Exhibit A," Calko Dep., p. 111:1-3; 116:21-117:6; Account Notes, p. 73-74). Just four days later, on October 7, 2022, Defendant communicated dispute code "XB" to TransUnion. (*Id*. at Calko Dep., pp. 116:24-117:7) (*Id*. at "Exhibit A," p. 73-74). Following the guidelines established by the Consumer Data Industry Association, Defendant reports dispute code XB "when the completeness or accuracy of the account information is disputed…and investigation of the dispute is in progress[.]" (ECF 44-1, "Exhibit A," at p. 169).

By reporting dispute code XB to TransUnion, Defendant accurately reflected the status of the account and communicated to TransUnion that the account was disputed. Other courts considering similar allegations and factual circumstances have found that reporting dispute code XB "plainly mark[s]" the account as disputed and therefore complies with § 1692e(8). *See Davis v. Nationwide Collection Agencies, Inc., No. 17-13618, 2018 WL 3020440, at *2 (E.D. Mich. June 18, 2018); Burns v. Keybridge Med. Revenue Care, No. 2:20-CV-12732, 2021 WL 3089247, at *2 (E.D. Mich. July 22, 2021); Foster v. AFNI,*

27

*Inc.*, No. 2:18-CV-12340-TGB, 2020 WL 1531651, *6 (E.D. Mich. Mar. 31, 2020);

*Fulton v. Equifax Info. Servs., LLC*, No. 15-14110, 2016 WL 5661588, at *3 (E.D.

Mich. Sept. 30, 2016).

### c.  Defendant Accurately Reported Code XH to TransUnion.

Defendant investigated Plaintiff's dispute and informed Plaintiff that it had

reviewed the dispute, confirmed that Plaintiff was the "correct consumer listed for

this account," and that the amount owed on the account was correct. (ECF 44-1,

"Exhibit A," p. 56). Defendant then updated its reporting to TransUnion by reporting

code XH, defined by the CRRG to be reported "when the investigation of a dispute

by the data furnisher was completed." (*Id*. at "Exhibit A," CRRG at p. 171 and Calko

Dep., p. 171:18-20. "The XH code is a dispute code that indicates that the data

furnisher, Spring Oaks, has completed its investigation." (*Id.* at 91:6-8).

The July 28, 2023 annualcreditreport.com report produced by Plaintiff shows

that the Defendant account was updated on July 21, 2023. (ECF 44-1, "Exhibit A,"

at p. 103). The July 28, 2023 report includes the language that Plaintiff contests in

this litigation, found in the "remarks" section of the report: "Account previously in

dispute-now resolved. reported by credit grant; >PLACED FOR COLLECTION<"

[*sic*]. *Id.*

The undisputed evidence in this case establishes that at no time did Spring

Oaks communicate that the dispute was "now resolved." Defendant "did not dictate

that language" but simply "used an XH code to indicate that the investigation was complete." (ECF 44-1, Calko Dep., p. 175:6-10).  Defendant "just reports the code, the XH. It does not report any language or tell TransUnion or annualcreditreport.com what language to use." (*Id.* at 169:25-170:3; *see also* 173:3). Defendant does not dictate the verbiage used by TransUnion or annualcreditreport.com in the "remarks" section of a consumer's credit report. (*Id.* at 170:9-10; 172:16-17). Plaintiff has presented no evidence supporting his allegation that Defendant communicated to TransUnion that Plaintiff's dispute was resolved. Defendant's reporting of the dispute code XH to TransUnion on Plaintiff's account, like its reporting of the dispute code XB on the account, complies with the requirements of 15 U.S.C. 1692e(8). *See Harris v. The Bureaus*, No. 1:20-cv-297-MHC-LTW, 2021 WL 7708311 at *2 (N.D. Ga. January 14, 2021).

Section 1692e(8) focuses on the communication made by the debt collector, not on any action taken by a third party, such as a credit reporting agency or the centralized source for consumer reports. Defendant accurately communicated to TransUnion that Plaintiff's account was disputed and that Defendant had completed its investigation. Defendant is not responsible for what Plaintiff believes to be inaccurate representation of the debt by TransUnion or annualcreditreport.com.

In examining a similar situation, the United States District Court in the Eastern District of Michigan has found that it is appropriate to remove the XB code and

report the XH code after completing the investigation of a consumer dispute. In *Foster*, 2020 WL 1531651, the court observed that the CDIA guidelines "expressly state that XB should no longer be reported after the investigation is complete" and rejected the plaintiff's argument that removing the XB code was a violation of § 1692e(8). *Id*. at *7. The *Foster* court found that use of the XH code after the debt collector completed its investigation was accurate and appropriate based on the guidance from the CDIA. *Id*. The court observed that the "description for code 'XH' includes nothing about whether the debtor agrees with the outcome or acquiesces to the debt." *Id*.

> ### d. Alternatively, Even if Defendant Had Reported that the Dispute was "Previously" Disputed and Now "Resolved," Such Reporting Would Not Violate § 1692e(8).

The evidence demonstrates that Defendant reported the CDIA codes XB and XH to TransUnion and that the language in the annualcreditreport.com report about which Plaintiff complains was not dictated by, or transmitted to TransUnion by, Defendant. However, even if Defendant had communicated the language that the dispute was "previously disputed" and "now resolved," such a communication would not violate § 1692e(8).

Defendant investigated and responded to Plaintiff's dispute by providing him with documentation supporting the debt and informing him that they had validated the debt. (ECF 44-1, "Exhibit A," at p. 56). Plaintiff did not respond to Defendant's

validation letter. In light of Plaintiff's failure to respond, Defendant did not, and could not, have knowledge that Plaintiff continued to dispute the debt after Defendant provided validation. Plaintiff has presented no authority that would suggest that a dispute, once it is investigated and validated, continues to operate indefinitely in the absence of any response from the consumer.

The *Foster* court reached the same conclusion, noting no authority for the plaintiff's proposition that a singular dispute letter which "notably, does not specifically dispute the debt … should operate in perpetuity, despite action and response" by the defendant debt collector. *Foster*, No. 2:18-CV-12340-TGB, 2020 WL 1531651 at *7. As the court notes in *Foster*, this position is "untenable, and contrary to the purpose of § 1692e(8) of the FDCPA[.]" The court held that "on this record, Defendant could not have had knowledge that Plaintiff disputed the outcome of its investigation." *Id*.

Other courts agree. In *Wood v. Sec. Credit Servs., LLC*, No. 20 C 2369, 2023 WL 3614919 (N.D. Ill. May 23, 2023) (appeal pending in 7th Cir., Case No. 23-2071) ("*Wood v. SCS"*), the district court stated that it was not aware of any cases "that hold that once a debtor disputes a debt, the debt collector's obligation to report a debt as disputed lasts indefinitely." *Id.* at *4. Following *Foster*, the *Wood v. SCS* court held that "when a debt collector investigates a dispute and communicates the results to the consumer, the dispute is resolved unless the consumer indicates that it

disagrees with the results." *Id*. Cases where the consumer attempts to perpetuate a dispute through silence are distinguishable from *Wood v. Credit One Bank*, 277 F. Supp. 3d 821 (E.D. Va. 2017) ("*Wood v. Credit One*"), where the consumer continued to submit disputes (six separate disputes, alleging fraud, within the span of 74 days). In *Wood v. Credit One*, the district court held that the use of the XH code was misleading, because the consumer continued to dispute the debt and dispute the results of Credit One's investigation. *Id*. at 854. Such is not the case here.

## IV.  Plaintiff's Generic Dispute Letter Fails the True Purpose of the FDCPA

This case began with "a letter sent from [Plaintiff's] lawyers to Spring Oaks," (ECF 44-2, "Exhibit B," Robinson Dep., at 14:5-6). Plaintiff's lawyers "printed out" the letter and Plaintiff testified that he approved it before it was sent to Defendant. (*Id*. at 14:12-13). Plaintiff and his attorneys have "sent out many" dispute letters (*Id*. at 41:21), all similar to the Communication sent to Defendant. (*Id.*, at 42:5). Plaintiff's counsel has sued Defendant in over a dozen cases involving nearly identical dispute letters. (ECF 26-1, ¶¶4-5). Such letters have been sent to Defendant in connection with at least three other lawsuits filed in this District. *Id*.

Defendant asks this Honorable Court to consider if these mass-produced letters, for multiple clients, is closer in purpose to advancing the legitimate rights of debtors, or to fishing for technical violations by the collector in responding to the letter itself.  The purpose of the FDCPA is to protect debtors from abusive collectors

but not to prevent the collection of legitimate debt.  If the debtor disputes the account, the purpose of the FDCPA – and public interest in general – is advanced by a clear and honest dispute.  Surely the debtor would not dispute a debt for no reason, or for a false reason.  Nothing is served by an oblique or tricky dispute correspondence.

Here, it is important to note Plaintiff's dispute is non-specific as to any particular account and equally devoid of any explanation for the dispute.  Such specifics would make a mass-produced generic letter more expensive to manufacture.  In addition, rather than seek information about the debt, as a genuinely curious debtor who has questions about the debt might do, Plaintiff wants no information about it all.  Finally, Plaintiff picks completely random times during which he can receive communications, the obvious intent of such artificial restrictions being the hope an email may come outside the window and thus justify an FDCPA claim in reply.  Defendant is confident in representing to this Honorable Court that Plaintiff's purported "inconvenient" times are artificial because the similar dispute letters received by Defendant for clients of Plaintiff's counsel all have the same "inconvenient" times.

Plaintiff's position, that his lawyers' carefully crafted dispute "should operate in perpetuity" and prevent Defendant from any further action is "untenable, and contrary to the purpose of § 1692e(8)[.]" *Foster*, 2020 WL 1531651 at *7. Defendant asks this Honorable Court to consider cases where other courts have described the

"cottage industry" of plaintiffs' lawyers who "seize on the most technical alleged defects" in collections practices – here, pouncing on the reporting of code XH as opposed to XB – and bring cases for the "non-salutary purpose of squeezing a nuisance settlement and a pittance of attorneys' fees out of a collection company." *Huebner v. Midland Credit Mgmt., Inc.*, 85 F. Supp. 3d 672, 673 (E.D.N.Y. 2015).

## V. Conclusion

For all the reasons stated above, Defendant is entitled to summary judgment. As a preliminary matter, Plaintiff lacks Article III standing and this case should be dismissed for lack of jurisdiction. On its merits, Plaintiff's claim fails because there is no evidence that Defendant communicated any false credit information.

Respectfully submitted,

/s/ Neal D. Moore, III
Neal D. Moore, III
*Attorney for Defendant,*
*Spring Oaks Capital, LLC*

**OF COUNSEL:**
CHRISTIAN & SMALL, LLP
505 20th Street, Suite 1800
Birmingham, Alabama 35203
ndmoore@csattorneys.com

/s/ John K. Rossman
John K. Rossman
*Attorney for Defendant (Admitted Pro Hac Vice)*
*Spring Oaks Capital, LLC*

**OF COUNSEL:**
ROSSMAN ATTORNEY GROUP, PLLC
4628 Bruce Avenue
Edina, Minnesota 55424
John.rossman@rossmanattorneygroup.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2024, a copy of the foregoing document

has been served via electronic filing to the following:

John G. Watts
M. Stan Herring
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
john@wattsherring.com
stan@wattsherring.com

Patricia S. Lockhart
McCarthy Law, PLC
5723 Annandale Lane
Irondale, Alabama 35210
patricialockhartlaw@gmail.com


/s/ Neal D. Moore, III
OF COUNSEL

4352144.1